In The

# United States Court of Appeals
### For The Fourth Circuit

## ROSE LORENZO,

*Plaintiff – Appellee,*

**v.**

## PRIME COMMUNICATIONS, L.P.,
## a Texas General Partnership,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
AT RALEIGH**

_____

**JOINT APPENDIX
VOLUME I OF II
(Pages 1 – 505)**

_____

| | | |
|---|---|---|
| William W. Pollock | Zev H. Antell | Stephen A. Dunn |
| John B. Walker | Harris D. Butler | EMANUEL & DUNN, PLLC |
| RAGSDALE LIGGETT, PLLC | BUTLER ROYALS, PLC | 130 South Salisbury Street |
| CrossPointe Plaza | 140 Virginia Street, Suite 302 | Post Office Box 426 |
| 2840 Plaza Place, Suite 400 | Richmond, Virginia 23219 | Raleigh, North Carolina 27601 |
| Raleigh, North Carolina 27612 | (804) 648-4848 | (919) 832-0329 |
| (919)787-5200 | | |
| *Counsel for Appellant* | *Counsel for Appellee* | *Counsel for Appellee* |

# Appendix Table of Contents

| Docket No. | Document | Page |
|---|---|---|
| | Docket Entries | 1 |
| 1 | Complaint, With Civil Cover Sheet and Summons, filed February 17, 2012 | 22 |
| 13 | Defendant's Answer to Plaintiff's Complaint and Demand for Arbitration filed April 13, 2012 | 39 |
| 15 15-1 | First Amended Collective and Class Action Complaint, With Consent to Become Party to Collective Action, filed May 4, 2012 | 49 |
| 21 | Defendant's Answer to Plaintiff's First Amended Collective and Class Action Complaint and Defendant's Demand for Arbitration filed June 7, 2012 | 71 |
| 22 | Joint Rule 26(f) Discovery Plan filed September 6, 2102 | 89 |
| 23 | Order of The Honorable Malcolm J. Howard Re: Approving Discovery Plan filed October 4, 2012 | 96 |
| 24 | Joint Motion to Amend Scheduling Order filed December 19, 2012 | 100 |

| 25 | Amended Scheduling Order of The Honorable Malcolm J. Howard filed January 2, 2013 | 103 |
|----|-----------------------------------------------------------------------------------|-----|
| 28 | Plaintiffs' Motion for Facilitated Notice filed January 18, 2013 | 104 |
| 31-1 | Exhibit 1 to Defendant's Brief in Opposition to Plaintiffs' Motion for Facilitated Notice filed February 8, 2013: Excerpts from Transcript of Deposition of Rose Emily Lorenzo | 109 |
| 31-2 | Exhibit 2 to Defendant's Brief in Opposition to Plaintiffs' Motion for Facilitated Notice filed February 8, 2013: Excerpts from Transcript of Deposition of Angela Dunlap | 132 |
| 31-4 | Exhibit 4 to Defendant's Brief in Opposition to Plaintiffs' Motion for Facilitated Notice filed February 8, 2013: Excerpts from Transcript of Deposition of Guy Rodriguez | 143 |
| 33 | Second Joint Motion to Amend Scheduling Order filed February 28, 2013 | 151 |
| 34 | Second Amended Scheduling Order of The Honorable Malcolm J. Howard filed March 8, 2013 | 155 |

| 35 | Order of<br>The Honorable Malcolm J. Howard<br>Re: Denying Plaintiff's Motion<br>    filed April 3, 2013 | 156 |
|----|----|----|
| 41<br>41-1 | Plaintiff's Renewed Motion for<br>Facilitated Notice,<br>With Attachment,<br>    filed June 14, 2013 | 164 |
| 42-1 | Exhibit 1 to Plaintiff's Memorandum in Support<br>of their Renewed Motion for Facilitated Notice<br>    filed June 14, 2013:<br><br>    Defendant's Responses to Plaintiff's Second<br>    Supplemental Interrogatories and Request for<br>    Production of Documents | 175 |
| 42-2 | Exhibit 2 to Plaintiff's Memorandum in Support<br>of their Renewed Motion for Facilitated Notice<br>    filed June 14, 2013:<br><br>    US Dept. of Labor Opinion Letter<br>    (FLSA2006-35) | 180 |
| 42-3 | Exhibit 3 to Plaintiff's Memorandum in Support<br>of their Renewed Motion for Facilitated Notice<br>    filed June 14, 2013:<br><br>    Excerpts from Transcript of Deposition of<br>    Steve Martin<br>        taken June 10, 2013 | 184 |

| | | |
|---|---|---|
| 42-4 | Exhibit 4 to Plaintiff's Memorandum in Support of their Renewed Motion for Facilitated Notice filed June 14, 2013:<br><br>Excerpts from Transcript of Deposition of Angela Dunlap taken December 6, 2012 | 190 |
| 42-5 | Exhibit 5 to Plaintiff's Memorandum in Support of their Renewed Motion for Facilitated Notice filed June 14, 2013:<br><br>Defendant's Responses to Plaintiff's Supplemental Requests for Production of Documents dated April 30, 2013 | 203 |
| 42-6 | Exhibit 6 to Plaintiff's Memorandum in Support of their Renewed Motion for Facilitated Notice filed June 14, 2013:<br><br>Declaration of Rose Lorenzo sworn January 17, 2013 | 214 |
| 42-7 | Exhibit 7 to Plaintiff's Memorandum in Support of their Renewed Motion for Facilitated Notice filed June 14, 2013:<br><br>Declaration of Guy A. Rodriguez sworn February 19, 2013 | 219 |
| 43 | Plaintiff's Motion for Class Certification under Rule 23 F.R.Civ. P. filed June 14, 2013 | 225 |

| 44-1 | Exhibit 1 to Plaintiff's Memorandum in Support of Motion to Certify Class Pursuant to Rule 23 F.R.Civ.P.<br>　　filed June 14, 2013:<br><br>Excerpts from Transcript of Deposition of Rose Emily Lorenzo<br>　　taken December 14, 2012 | 229 |
|---|---|---|
| 44-2 | Exhibit 2 to Plaintiff's Memorandum in Support of Motion to Certify Class Pursuant to Rule 23 F.R.Civ.P.<br>　　filed June 14, 2013:<br><br>Affidavit of Rose Lorenzo and Exhibits<br>　　sworn June 14, 2013 | 260 |
| 44-9 | Exhibit 3 to Plaintiff's Memorandum in Support of Motion to Certify Class Pursuant to Rule 23 F.R.Civ.P.<br>　　filed June 14, 2013:<br><br>Excerpts from Transcript of Deposition of Angela Dunlap and Exhibits<br>　　taken December 6, 2012 | 298 |
| 44-10 | Exhibit 4 to Plaintiff's Memorandum in Support of Motion to Certify Class Pursuant to Rule 23 F.R.Civ.P.<br>　　filed June 14, 2013:<br><br>Employee Commissions/<br>Bonus Payout Procedures | 305 |

| | | |
|---|---|---|
| 44-11 | Exhibit 5 to Plaintiff's Memorandum in Support of Motion to Certify Class Pursuant to Rule 23 F.R.Civ.P.<br>    filed June 14, 2013:<br><br>Excerpts of the Transcript of Deposition of Laren Whiddon<br>    taken June 10, 2013 | 306 |
| 44-12 | Exhibit 6 to Plaintiff's Memorandum in Support of Motion to Certify Class Pursuant to Rule 23 F.R.Civ.P.<br>    filed June 14, 2013:<br><br>Chargeback Policy Acknowledgment and Wage Deduction Authorization Agreement signed by Ashley Barnette and<br>Excerpts of the Transcript of Deposition of Ashley Barnett<br>    dated February 27, 2013 | 317 |
| 44-13 | Exhibit 7 to Plaintiff's Memorandum in Support of Motion to Certify Class Pursuant to Rule 23 F.R.Civ.P.<br>    filed June 14, 2013:<br><br>Defendant's Responses to Plaintiff's First Interrogatories and  Request for Production of Documents<br>    dated February 11, 2013 | 324 |

| 44-14 44-15 | Exhibit 8 to Plaintiff's Memorandum in Support of Motion to Certify Class Pursuant to Rule 23 F.R.Civ.P.<br>    filed June 14, 2013:<br><br>    Defendant's Supplemental Responses to Plaintiff's First Interrogatories and Request for Production of Documents<br>        dated March 4, 2013 | 333 |
|---|---|---|
| 44-16 | Exhibit 9 to Plaintiff's Memorandum in Support of Motion to Certify Class Pursuant to Rule 23 F.R.Civ.P.<br>    filed June 14, 2013:<br><br>    Excerpts from Transcript of Deposition of Michael Palmieri<br>        dated June 6, 2013 | 351 |
| 44-17 | Exhibit 10 to Plaintiff's Memorandum in Support of Motion to Certify Class Pursuant to Rule 23 F.R.Civ.P.<br>    filed June 14, 2013:<br><br>    Excerpts from Transcript of Deposition of Guy Rodriguez<br>        taken January 16, 2013 | 358 |
| 44-18 | Exhibit 11 to Plaintiff's Memorandum in Support of Motion to Certify Class Pursuant to Rule 23 F.R.Civ.P.<br>    filed June 14, 2013:<br><br>    Firm Overview of Butler Royals, PLC and Emanuel & Dunn | 361 |
| 45 | Defendant's Motion and Demand for Arbitration<br>    filed June 19, 2013 | 365 |

| | | |
|---|---|---|
| 47-2 | Exhibit B to Defendant's Brief in Support of Their Motion and Demand for Arbitration: | |
| | Employee Handbook Acknowledgements signed by Charlotte Woodring and Guy Rodriguez<br>various dates | 368 |
| 47-3 | Exhibit C to Defendant's Brief in Support of Their Motion and Demand for Arbitration: | |
| | Various Employee Documents signed by Rose Lorenzo<br>various dates | 370 |
| 47-4 | Exhibit D to Defendant's Brief in Support of Their Motion and Demand for Arbitration: | |
| | Excerpts from Transcript of Deposition of Rose Emily Lorenzo<br>taken December 14, 2012 | 372 |
| 52-1 | Exhibit 1 to Defendant's Brief in Opposition to Plaintiffs' Renewed Motion for Facilitated Notice<br>filed July 19, 2013: | |
| | Excerpts from Transcript of Deposition of Rose Emily Lorenzo<br>taken December 14, 2012 | 381 |
| 52-2 | Exhibit 2 to Defendant's Brief in Opposition to Plaintiffs' Renewed Motion for Facilitated Notice<br>filed July 19, 2013: | |
| | Excerpts from Transcript of Deposition of Angela Dunlap<br>taken December 6, 2012 | 393 |

| | | |
|---|---|---|
| 52-3 | Exhibit 3 to Defendant's Brief in Opposition to Plaintiffs' Renewed Motion for Facilitated Notice<br>    filed July 19, 2013:<br><br>Excerpts from Transcript of Deposition of Ashley Barnette<br>    taken February 27, 2013 | 399 |
| 52-4 | Exhibit 4 to Defendant's Brief in Opposition to Plaintiffs' Renewed Motion for Facilitated Notice<br>    filed July 19, 2013:<br><br>Printout from USDOL website | 404 |
| 52-5 | Exhibit 5 to Defendant's Brief in Opposition to Plaintiffs' Renewed Motion for Facilitated Notice<br>    filed July 19, 2013:<br><br>Affidavit of Aslam Hussain, and Exhibits<br>    sworn February 7, 2013 | 405 |
| 52-6 | Exhibit 6 to Defendant's Brief in Opposition to Plaintiffs' Renewed Motion for Facilitated Notice<br>    filed July 19, 2013:<br><br>Excerpts from Transcript of Deposition of Guy Rodriguez<br>    taken January 16, 2013 | 409 |
| 53-2 | Exhibit 2 to Defendant's Brief in Opposition to Plaintiff's Motion to Certify Class Pursuant to Rule 23 F.R.Civ.P.<br>    filed July 19, 2013:<br><br>Wage Deduction Authorization Agreements (one signed by Rose Lorenzo)<br>    dated October 20, 2009 | 412 |

| | | |
|---|---|---|
| 53-3 | Exhibit 3 to Defendant's Brief in Opposition to Plaintiff's Motion to Certify Class Pursuant to Rule 23 F.R.Civ.P.<br>    filed July 19, 2013:<br><br>Prime Communications Employee Handbook<br>    dated April 1, 2011 | 415 |
| 53-4 | Exhibit 4 to Defendant's Brief in Opposition to Plaintiff's Motion to Certify Class Pursuant to Rule 23 F.R.Civ.P.<br>    filed July 19, 2013:<br><br>Sales Compensation/Bonus Plan<br>    various dates | 446 |
| 53-5 | Exhibit 5 to Defendant's Brief in Opposition to Plaintiff's Motion to Certify Class Pursuant to Rule 23 F.R.Civ.P.<br>    filed July 19, 2013:<br><br>Affidavit of Laren Whiddon<br>    sworn July 19, 2013 | 450 |
| 53-6 | Exhibit 6 to Defendant's Brief in Opposition to Plaintiff's Motion to Certify Class Pursuant to Rule 23 F.R.Civ.P.<br>    filed July 19, 2013:<br><br>Excerpts from Transcript of Deposition of Laren Whiddon<br>    taken June 10, 2013 | 452 |

| | | |
|---|---|---|
| 53-7 | Exhibit 7 to Defendant's Brief in Opposition to Plaintiff's Motion to Certify Class Pursuant to Rule 23 F.R.Civ.P.<br>    filed July 19, 2013:<br><br>Excerpts from Transcript of Deposition of Rose Emily Lorenzo<br>    taken December 14, 2012 | 459 |
| 53-8 | Exhibit 8 to Defendant's Brief in Opposition to Plaintiff's Motion to Certify Class Pursuant to Rule 23 F.R.Civ.P.<br>    filed July 19, 2013:<br><br>Affidavit of Shehzad Momin<br>    sworn July 19, 2013 | 471 |
| 54-1 | Exhibit 1 to Plaintiffs' Opposition to Defendant's Demand and Motion for Arbitration<br>    filed July 24, 2013:<br><br>Dispute/Conflicts Resolution Program<br>    effective August 1, 2006 | 474 |
| 54-2 | Exhibit 1 to Plaintiffs' Opposition to Defendant's Demand and Motion for Arbitration<br>    filed July 24, 2013:<br><br>Declaration of Rose Lorenzo and Declaration of Guy Rodriguez<br>    sworn July 22, 2013 | 481 |
| 55-1 | Exhibit 1A to Plaintiff's Reply to Defendant's Opposition to Renewed Motion for Facilitated Notice<br>    filed August 5, 2013:<br><br>Excerpt from 6/30/12-7/13/12 Hours Worked Spreadsheet | 484 |

| 55-2 | Exhibit 1B to Plaintiff's Reply to Defendant's Opposition to Renewed Motion for Facilitated Notice<br>    filed August 5, 2013:<br><br>    Excerpt from 7/14/12-7/27/12<br>    Hours Worked Spreadsheet | 485 |
| 55-3 | Exhibit 2 to Plaintiff's Reply to Defendant's Opposition to Renewed Motion for Facilitated Notice<br>    filed August 5, 2013:<br><br>    Excerpts from Transcript of Deposition of<br>    Stephen Martin | 486 |
| 56-1 | Exhibit 1 to Plaintiff's Reply Memorandum in Support of Motion to Certify Class Pursuant to Rule 23 F.R.Civ. P<br>    filed August 5, 2013:<br><br>    Excerpts from "November 2010<br>    AT&T Data (Reference)" | 494 |
| 56-2 | Exhibit 2 to Plaintiff's Reply Memorandum in Support of Motion to Certify Class Pursuant to Rule 23 F.R.Civ.P.<br>    filed August 5, 2013:<br><br>    Excerpts from "June 2010"<br>    AT&T Data (Reference) | 506 |
| 56-3 | Exhibit 3 to Plaintiff's Reply Memorandum in Support of Motion to Certify Class Pursuant to Rule 23 F.R.Civ.P.<br>    filed August 5, 2013:<br><br>    Excerpts from "June 2010 Features GP" | 533 |

| 60 | Memorandum and Recommendation of<br>The Honorable Kimberly A. Swank<br>Re:  Denying Defendant's Motion<br>    filed October 29, 2013 | 543 |
|------|------|------|
| 69 | Order of<br>The Honorable Malcolm H. Howard<br>Re:  Denying Defendant's Motion<br>    filed November 20, 2013 | 549 |
| 74 | Order and Memorandum & Recommendation  of<br>The Honorable Kimberly A. Swank<br>    filed January 15, 2014 | 552 |
| 75 | Transcript of Hearing on Plaintiff's Motion to<br>Compel Discovery and Plaintiff's Motions to<br>Certify Class, and Status Conference before<br>The Honorable Kimberly A. Swank<br>    on November 21, 2013 | 566 |
| 77 | Defendant's Motion for Reconsideration<br>    filed January 30, 2014 | 662 |
| 77-1 | Exhibit A to Defendant's Motion for<br>Reconsideration<br>    filed January 30, 2014:<br><br>    Declaration of Rose Lorenzo<br>        sworn July 22, 2013 | <br><br><br><br>668 |
| 77-2 | Exhibit B to Defendant's Motion for<br>Reconsideration<br>    filed January 30, 2014:<br><br>    Employee Handbook Acknowledgement<br>    page signed by Rose Lorenzo | <br><br><br><br>672 |

| | | |
|---|---|---|
| 77-3 | Exhibit C to Defendant's Motion for Reconsideration<br>　　filed January 30, 2014:<br><br>　　Chargeback Policy Acknowledgement<br>　　page signed by Rose Lorenzo | 674 |
| 77-4 | Exhibit D to Defendant's Motion for Reconsideration<br>　　filed January 30, 2014:<br><br>　　Affidavit of Christopher Larkins<br>　　　sworn January 30, 2014 | 676 |
| 79 | Defendant's Motion to Dismiss Certain Opt-in Plaintiffs<br>　　filed January 30, 2014 | 681 |
| 80-2 | Exhibit B to Memorandum of Law in Support of Defendant's Motion to Dismiss Certain Opt-in Plaintiffs Employee Handbook<br>　　filed January 30, 2014:<br><br>　　Employee Handbook Acknowledgement<br>　　pages signed by Rajan Patel,<br>　　Charlotte Woodring and<br>　　Guy Rodriguez<br>　　　various dates | 684 |
| 80-3 | Exhibit C to Memorandum of Law in Support of Defendant's Motion to Dismiss Certain Opt-in Plaintiffs Employee Handbook<br>　　filed January 30, 2014:<br><br>　　Blank Employee Handbook<br>　　Acknowledgement page | 687 |

| 82-1 | Exhibit A to Defendant's Appeal of Order Certifying Collective Action    filed January 31, 2014:<br><br>Defendant's First Supplemental Responses to Plaintiff's Supplemental Requests for Production of Documents    dated June 8, 2013 | 688 |
|---|---|---|
| 94 | Order of<br>The Honorable Malcolm H. Howard<br>Re:  Denying Defendant's Appeal    filed March 24, 2014 | 707 |
| 97 | Memorandum and Recommendation of<br>The Honorable Kimberly A. Swank    filed March 31, 2014 | 712 |
| COA 2-1 | Petitioner Prime Communications, L.P.'s Appeal of Class Certification Pursuant to Fed. R. Civ. P. 23(f) | 719 |
| 151 | Order of<br>The Honorable Malcolm J. Howard<br>Re:  Denying Motion to Compel    July 9, 2014 | 784 |
| 154 | Defendant's Notice of Appeal    filed July 18, 2014 | 787 |

APPEAL,MEDIATION,USMJ Swank

# U.S. District Court
## EASTERN DISTRICT OF NORTH CAROLINA (Western Division)
## CIVIL DOCKET FOR CASE #: 5:12-cv-00069-H

Lorenzo v. Prime Communications, L.P.
Assigned to: Senior Judge Malcolm J. Howard
Demand: $1,000,000
Case in other court: 4th Circuit Court of Appeals, 14-01727
Cause: 29:201 Fair Labor Standards Act

Date Filed: 02/17/2012
Jury Demand: Both
Nature of Suit: 710 Labor: Fair Standards
Jurisdiction: Federal Question

### Plaintiff

**Rose Lorenzo**                    represented by    **Harris D. Butler**
Butler Royals, PLC
100 Shockoe Slip, 4th Floor
Richmond, VA 23219
804-648-4848
Fax: 804-648-6814
Email: harris.butler@butlerroyals.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles Jeffreys Cushman**
Dunn Pittman Skinner & Cushman, PLLC
3230 Country Club Rd.
P. O. Box 1389
New Bern, NC 28563
252-633-3800
Fax: 252-633-6669
Email: ccushman@DunnPittman.com
*TERMINATED: 04/28/2014*
*ATTORNEY TO BE NOTICED*

**Raymond Earl Dunn , Jr.**
Dunn Pittman Skinner & Cushman, PLLC
3230 Country Club Rd.
P. O. Box 1389
New Bern, NC 28563
252-633-3800
Fax: 252-633-6669
Email: rdunn@DunnPittman.com
*TERMINATED: 04/28/2014*
*ATTORNEY TO BE NOTICED*

**Zev H. Antell**
Butler Royals, PLC
100 Shockoe Slip, 4th Floor
Richmond, VA 23219

804-648-4848
Fax: 804-648-6814
Email: zev.antell@butlerroyals.com
*ATTORNEY TO BE NOTICED*

**Stephen A. Dunn**
Emanuel & Dunn
130 South Salisbury St.
P. O. Box 426
Raleigh, NC 27601
919-832-0329
Fax: 832-6731
Email: sdunn@emanuelanddunn.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Prime Communications, L.P.**                represented by   **John Bowen Walker**
*a Texas General Parnership*                                   Ragsdale Liggett PLLC
                                                              P.O. Box 31507
                                                              2840 Plaza Place, Suite 400
                                                              Raleigh, NC 27612
                                                              919-787-5200
                                                              Fax: 919-783-8991
                                                              Email: bwalker@rl-law.com
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **William W. Pollock**
                                                              Ragsdale Liggett PLLC
                                                              P.O. Box 31507
                                                              2840 Plaza Place, Suite 400
                                                              Raleigh, NC 27612
                                                              919-881-2224
                                                              Fax: 919-783-8991
                                                              Email: bpollock@rl-law.com
                                                              *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 02/17/2012 | 1 | COMPLAINT against Prime Communications, L.P. ( Filing fee $ 350 receipt number 0417-1951618.), filed by Rose Lorenzo. (Attachments: # 1 Civil Cover Sheet, # 2 Supplement Civil Summons) (Dunn, Stephen) (Entered: 02/17/2012) |
| 02/17/2012 | 2 | FINANCIAL DISCLOSURE STATEMENT by Rose Lorenzo (Dunn, Stephen) (Entered: 02/17/2012) |
| 02/17/2012 | 3 | NOTICE of Appearance by Stephen A. Dunn on behalf of Rose Lorenzo (Dunn, Stephen) (Entered: 02/17/2012) |

| 02/17/2012 | 4 | NOTICE of Appearance by Stephen A. Dunn on behalf of Rose Lorenzo (Dunn, Stephen) (Entered: 02/17/2012) |
|---|---|---|
| 02/17/2012 | 5 | NOTICE of Appearance by Stephen A. Dunn on behalf of Rose Lorenzo (Dunn, Stephen) (Entered: 02/17/2012) |
| 02/21/2012 | | NOTICE TO COUNSEL - Each attorney must file their own Notice of Appearance. Attorney Raymond E. Dunn, Jr. and attorney Charles J. Cushman must file a Notice of Appearance using their cm/ecf login and password in order to associate themselves with the plaintiff. (Heath, D.) (Entered: 02/21/2012) |
| 02/21/2012 | 6 | Summons Issued as to Prime Communications, L.P. Counsel should print summons to effect service. (Rudd, D.) (Entered: 02/21/2012) |
| 02/22/2012 | 7 | NOTICE of Appearance by Charles Jeffreys Cushman on behalf of Rose Lorenzo (Cushman, Charles) (Entered: 02/22/2012) |
| 02/22/2012 | 8 | NOTICE of Appearance by Raymond Earl Dunn, Jr on behalf of All Plaintiffs (Dunn, Raymond) (Entered: 02/22/2012) |
| 02/22/2012 | | Case Selected for Mediation - A printable list of certified mediators for the Eastern District of North Carolina is available on the court's Website, http://www.nced.uscourts.gov/attorney/mediators.aspx. Please serve this list on all parties. (Horton, B.) (Entered: 02/22/2012) |
| 03/01/2012 | 9 | AFFIDAVIT of Service for Complaint and Summons served on Defendant's Registered Agent on February 27, 2012, filed by Rose Lorenzo. (Attachments: # 1 Exhibit Cover Letter, # 2 Exhibit Return Receipt) (Cushman, Charles) (Entered: 03/01/2012) |
| 03/16/2012 | 10 | NOTICE of Appearance by John Bowen Walker on behalf of Prime Communications, L.P. (Walker, John) (Entered: 03/16/2012) |
| 03/16/2012 | 11 | MOTION for Extension of Time to File Answer re 1 Complaint by Prime Communications, L.P.. (Attachments: # 1 Text of Proposed Order) (Walker, John) (Entered: 03/16/2012) |
| 03/20/2012 | | MOTION REFERRED to Julie A. Richards, Clerk of Court: 11 MOTION for Extension of Time to File Answer re 1 Complaint. (Rudd, D.) (Entered: 03/20/2012) |
| 03/20/2012 | | TEXT ORDER granting 11 Defendant's Motion for Extension of Time. Prime Communications, L.P.'s answer or response to plaintiff's complaint is due on or before April 18, 2012. Signed by Julie A. Richards, Clerk of Court, on 3/20/2012. (Richards, J.) (Entered: 03/20/2012) |
| 04/04/2012 | 12 | FINANCIAL DISCLOSURE STATEMENT by Prime Communications, L.P. (Walker, John) (Entered: 04/04/2012) |
| 04/13/2012 | 13 | ANSWER to 1 Complaint by Prime Communications, L.P. (Walker, John) (Entered: 04/13/2012) |
| 04/16/2012 | 14 | ORDER FOR DISCOVERY PLAN sent to all parties. Discovery Plan due by 5/30/2012. Signed by Julie A. Richards, Clerk of Court on 4/16/2012. (Rudd, D.) (Entered: 04/16/2012) |
| 05/04/2012 | 15 | AMENDED COMPLAINT against Prime Communications, L.P., filed by Rose Lorenzo. (Attachments: # 1 Lorenzo Consent to Become Party to Collective Action) |

|            |     |                                                                                                                                                                                                                                                                                                                                                                  |
| ---------- | --- | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------ |
|            |     | (Cushman, Charles) (Entered: 05/04/2012)                                                                                                                                                                                                                                                                                                                          |
| 05/04/2012 | 16  | CERTIFICATE OF SERVICE by Rose Lorenzo regarding 15 Amended Complaint. (Cushman, Charles) (Entered: 05/04/2012)                                                                                                                                                                                                                                                   |
| 05/09/2012 |     | NOTICE TO COUNSEL regarding 15 Amended Complaint. Counsel should reflect "Western Division" in the heading on all future filings. (Heath, D.) (Entered: 05/09/2012)                                                                                                                                                                                                |
| 05/10/2012 | 17  | MOTION for Extension of Time to File Answer *to Plaintiff's Amended Complaint* by Prime Communications, L.P. (Attachments: # 1 Proposed Order) (Walker, John) (Entered: 05/10/2012)                                                                                                                                                                                |
| 05/10/2012 |     | MOTION REFERRED to Julie A. Richards, Clerk of Court: 17 MOTION for Extension of Time to File Answer *to Plaintiff's Amended Complaint. (Rudd, D.) (Entered: 05/10/2012)*                                                                                                                                                                                           |
| 05/10/2012 |     | TEXT ORDER granting 17 Motion for Extension of Time. Defendant's deadline to answer or otherwise respond to plaintiff's amended complaint is extended until June 18, 2012. Signed by Jolie Skinner for Julie A. Richards, Clerk of Court on 05/10/2012. (Skinner, J.) (Entered: 05/10/2012)                                                                         |
| 05/18/2012 | 18  | NOTICE of Appearance for non-district by Harris D. Butler on behalf of Rose Lorenzo (Butler, Harris) (Entered: 05/18/2012)                                                                                                                                                                                                                                        |
| 05/18/2012 | 19  | NOTICE of Appearance for non-district by Zev H. Antell on behalf of Rose Lorenzo (Antell, Zev) (Entered: 05/18/2012)                                                                                                                                                                                                                                              |
| 05/23/2012 | 20  | NOTICE by Rose Lorenzo *Filing of Consents to Become a Party* (Attachments: # 1 Exhibit Ashley Barnette, # 2 Exhibit Guy Rodriguez, # 3 Exhibit Charlotte Woodring) (Cushman, Charles) (Entered: 05/23/2012)                                                                                                                                                       |
| 06/07/2012 | 21  | *Defendant Prime Communication's* ANSWER to 15 Amended Complaint by Prime Communications, L.P. (Walker, John) (Entered: 06/07/2012)                                                                                                                                                                                                                               |
| 07/09/2012 |     | NOTICE TO COUNSEL regarding: 14 Order for Discovery Plan - The Parties Discovery Plan was due by 5/30/2012. (Rudd, D.) (Entered: 07/09/2012)                                                                                                                                                                                                                       |
| 09/06/2012 | 22  | Rule 26(f) Report (joint) by Rose Lorenzo. (Cushman, Charles) (Entered: 09/06/2012)                                                                                                                                                                                                                                                                               |
| 10/04/2012 | 23  | ORDER Approving 22 Joint Rule 26(f) Report - Counsel shall read the order in its entirety for pertinent details and deadlines. Signed by Senior Judge Malcolm J. Howard on 10/4/2012. (Lee, L.) (Entered: 10/04/2012)                                                                                                                                              |
| 12/19/2012 | 24  | Joint MOTION to Amend/Correct 23 Order *(Scheduling Order)* by Rose Lorenzo. (Attachments: # 1 Text of Proposed Order) (Cushman, Charles) (Entered: 12/19/2012)                                                                                                                                                                                                    |
| 12/20/2012 |     | Motion Submitted to Senior District Judge Malcolm J. Howard: 24 Joint MOTION to Amend 23 Order *(Scheduling Order). (Rudd, D.) (Entered: 12/20/2012)*                                                                                                                                                                                                              |
| 01/02/2013 | 25  | AMENDED SCHEDULING ORDER: Discovery due by 2/28/2013. Motion for Rule 23 class certification or conditional certification as a 29 USC § 216(b) collective action due by 3/31/2013. Except as hereby amended, the Scheduling Order entered October 4, 2012 shall remain in effect. Signed by Senior Judge Malcolm J. Howard on 1/2/2013. (Lee, L.) (Entered: 01/02/2013) |

**4**

| 01/17/2013 | 26 | MOTION to Certify Class *utilizing Facilitated Notice* by Rose Lorenzo. (Attachments: # 1 Text of Proposed Order Proposed Notice) (Cushman, Charles) (Entered: 01/17/2013) |
|---|---|---|
| 01/17/2013 | 27 | Memorandum in Support regarding 26 MOTION to Certify Class *utilizing Facilitated Notice* filed by Rose Lorenzo. (Attachments: # 1 Exhibit 1 - Selected Pages from Dunlap Deposition, # 2 Exhibit 2 - Declaration of Rose Lorenzo) (Cushman, Charles) (Entered: 01/17/2013) |
| 01/18/2013 | | NOTICE OF DEFICIENCY regarding: 27 Memorandum in Support and 26 Motion to Certify Class. The electronic signature on the document and the electronic filer do not match. Counsel is directed to refile the documents reflecting that the filer and the signer are the same individual. (Heath, D.) (Entered: 01/18/2013) |
| 01/18/2013 | 28 | MOTION to Certify Class *utilizing Facilitated Notice* by Rose Lorenzo. (Attachments: # 1 Text of Proposed Order (Proposed Notice)) (Cushman, Charles) (Entered: 01/18/2013) |
| 01/18/2013 | 29 | Memorandum in Support regarding 28 MOTION to Certify Class *utilizing Facilitated Notice* filed by Rose Lorenzo. (Attachments: # 1 Exhibit 1 - Selected Pages from Dunlap Deposition, # 2 Exhibit 2 - Declaration of Rose Lorenzo) (Cushman, Charles) (Entered: 01/18/2013) |
| 02/07/2013 | 30 | RESPONSE in Opposition regarding 28 MOTION to Certify Class *utilizing Facilitated Notice* filed by Prime Communications, L.P.. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit) (Walker, John) (Entered: 02/07/2013) |
| 02/08/2013 | | NOTICE OF DEFICIENCY regarding: 30 Response in Opposition to Motion. Failure to identify exhibits. Pursuant to Section L(2)(b) of the Courts' Electronic Policy and Procedure Manual, all exhibits must be identified with a clear and complete description of the document. Counsel is directed to refile the entire document, properly describing the exhibits. (Heath, D.) (Entered: 02/08/2013) |
| 02/08/2013 | 31 | RESPONSE in Opposition regarding 28 MOTION to Certify Class *utilizing Facilitated Notice Refile* filed by Prime Communications, L.P. (Attachments: # 1 Exhibit Deposition of R. Lorenzo, # 2 Exhibit Deposition of A. Dunlap, # 3 Exhibit Job Description, # 4 Exhibit Deposition of G. Rodriquez, # 5 Exhibit Affidavit of Aslam Hussain, # 6 Exhibit Case Law - Green v. Harbor Freight) (Walker, John) (Entered: 02/08/2013) |
| 02/20/2013 | 32 | REPLY to Response to Motion regarding 28 MOTION to Certify Class *utilizing Facilitated Notice* filed by Rose Lorenzo. (Attachments: # 1 Exhibit 1- Declaration of Guy Rodriguez) (Cushman, Charles) (Entered: 02/20/2013) |
| 02/21/2013 | | Motion Submitted to Senior District Judge Malcolm J. Howard: 28 MOTION to Certify Class *utilizing Facilitated Notice. (Rudd, D.) (Entered: 02/21/2013)* |
| 02/28/2013 | 33 | Joint MOTION to Amend 25 Scheduling Order, 23 Order by Rose Lorenzo. (Attachments: # 1 Text of Proposed Order Second Amended Scheduling Order) (Cushman, Charles) (Entered: 02/28/2013) |
| 02/28/2013 | | Motion Submitted to Senior District Judge Malcolm J. Howard: 33 Joint MOTION to Amend/Correct 25 Scheduling Order, 23 Order. (Rudd, D.) (Entered: 02/28/2013) |

| 03/08/2013 | 34 | ORDER granting 33 Motion to Amend the Scheduling Order. 1) That initial discovery will be concluded by April 30, 2013. 2) That Plaintiff shall file any motion for Rule 23 class certification no later than May 31, 2013; and 3) Except as hereby amended, the Scheduling Order entered October 4, 2012 andamended January 2, 2013 shall remain in effect. Signed by Senior Judge Malcolm J. Howard on 3/7/2013. (Rudd, D.) (Entered: 03/08/2013) |
|---|---|---|
| 04/03/2013 | 35 | ORDER denying 28 Motion to Certify Class. The court hereby amends its prior scheduling orders to grant plaintiff an additional forty-five (45) days to conduct additional discovery related to 29 U.S.C. § 216(b) conditional certification. Signed by Senior Judge Malcolm J. Howard on 4/3/2013. (Rudd, D.) (Entered: 04/03/2013) |
| 05/30/2013 | 36 | MOTION to Compel *Discovery* by Rose Lorenzo. (Attachments: # 1 Exhibit A - Def Response and Objections to Pl First ROGs and RFPs, # 2 Exhibit B - Def Supplemental Responses and Objections to Pl First ROGs and RFPs, # 3 Exhibit C - Def Responses and Objections to Pl Second ROGs and RFPs, # 4 Exhibit D - Pl Febraury 22, 2013 correspondence to Def requesting compliance in discovery) (Dunn, Stephen) (Entered: 05/30/2013) |
| 05/30/2013 | 37 | Memorandum in Support regarding 36 MOTION to Compel *Discovery* filed by Rose Lorenzo. (Dunn, Stephen) (Entered: 05/30/2013) |
| 05/30/2013 | 38 | MOTION for Extension of Time *to file motion for Rule 23 Class Certification* by Rose Lorenzo. (Attachments: # 1 Text of Proposed Order extending time to file motion for Rule 23 Class Certification) (Dunn, Stephen) (Entered: 05/30/2013) |
| 06/03/2013 | | MOTION SUBMITTED to Senior Judge Malcolm J. Howard: 38 Motion for Extension of Time *to file motion for Rule 23 Class Certification*. (Sawyer, D.) (Entered: 06/03/2013) |
| 06/04/2013 | 39 | ORDER granting 38 Motion for Extension of Time. Plaintiff shall have up to and including 6/14/2013 to file her motion for Rule 23 class certification. Signed by Senior Judge Malcolm J. Howard on 6/4/2013. (Sawyer, D.) (Entered: 06/04/2013) |
| 06/13/2013 | 40 | RESPONSE in Opposition regarding 36 MOTION to Compel *Discovery* filed by Prime Communications, L.P.. (Attachments: # 1 Exhibit Supplemental Responses, # 2 Exhibit Sample of CD, # 3 Exhibit 30(b)(6) Notice of Deposition, # 4 Exhibit Vendor Agreements, # 5 Exhibit Second Supplemental Responses) (Walker, John) (Entered: 06/13/2013) |
| 06/14/2013 | | Motion Submitted to Senior District Judge Malcolm J. Howard: 36 MOTION to Compel *Discovery. (Rudd, D.) (Entered: 06/14/2013)* |
| 06/14/2013 | 41 | Second MOTION to Certify Class *under 29 USC Sec. 216(b)* by Rose Lorenzo. (Attachments: # 1 Exhibit 1 - Proposed Notice) (Dunn, Stephen) (Entered: 06/14/2013) |
| 06/14/2013 | 42 | Memorandum in Support regarding 41 Second MOTION to Certify Class *under 29 USC Sec. 216(b)* filed by Rose Lorenzo. (Attachments: # 1 Exhibit 1 - Prime's Objections and Responses to Plaintiff's 2nd Supp Interrogatories and Request for Documents, # 2 Exhibit 2 - US Dept of Labor Opinion Letter (FLSA2006-35), # 3 Exhibit 3 -Deposition Excerpts (Steve Martin), # 4 Exhibit 4 - Deposition Excerpts (Angela Dunlap), # 5 Exhibit 5 - Prime's Response to Plaintiff's Supp Request for Documents, # 6 Exhibit 6 - Declaration of Rose Lorenzo, # 7 Exhibit 7 - Declaration |

| | | |
|---|---|---|
| | | of Guy Rodriguez) (Dunn, Stephen) (Entered: 06/14/2013) |
| 06/14/2013 | 43 | MOTION to Certify Class *under Rule 23* by Rose Lorenzo. (Attachments: # 1 Text of Proposed Order granting Rule 23 Class Certification) (Dunn, Stephen) (Entered: 06/14/2013) |
| 06/14/2013 | 44 | Memorandum in Support regarding 43 MOTION to Certify Class *under Rule 23* filed by Rose Lorenzo. (Attachments: # 1 Exhibit 1 - Excerpts from Deposition of Rose Lorenzo, # 2 Exhibit 2 - Affidavit of Rose Lorenzo, # 3 Exhibit A to Lorenzo Aff - Sales Compensation Plan, # 4 Exhibit B to Lorenzo Aff - Sales Compensation/Bonus Plan, # 5 Exhibit C to Lorenzo Aff - Deactivations, # 6 Exhibit C to Lorenzo Aff - Omitted Sales, # 7 Exhibit E to Lorenzo Aff - Omitted Sales, # 8 Exhibit F to Lorenzo Aff - Omitted Sales, # 9 Exhibit 3 - Excerpts from Deposition of Angela Dunlap, # 10 Exhibit 4 - Employee Commissions/Bonus Payout Procedures, # 11 Exhibit 5 - Excerpts from Deposition of Laren Whiddon, # 12 Exhibit 6 - Excerpts from Deposition of Ashley Barnette, # 13 Exhibit 7 - Defendant's Resp to Plaintiff's First Interrogatories, # 14 Exhibit 8a - Defendants Supplemental Response to Plaintiff's First Interrogatories (Part 1), # 15 Exhibit 8b - Defendant's Supplemental Response to Plaintiff's First Interrogatories (Part 2), # 16 Exhibit 9 - Excerpts from Deposition of Michael Palmieri, # 17 Exhibit 10 - Excerpts from Deposition of Guy Rodriguez, # 18 Exhibit 11- Firm Overviews) (Dunn, Stephen) (Entered: 06/14/2013) |
| 06/19/2013 | 45 | MOTION to Stay *and Demand for Arbitration* by Prime Communications, L.P. (Walker, John) (Entered: 06/19/2013) |
| 06/19/2013 | 46 | Memorandum in Support regarding 45 MOTION to Stay *and Demand for Arbitration* filed by Prime Communications, L.P. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Walker, John) (Entered: 06/19/2013) |
| 06/19/2013 | | NOTICE OF DEFICIENCY regarding: 46 Memorandum in Support - Pursuant to Section L of the CM/ECF Policy and Procedure Manual, attachments and exhibits must be identified with a clear and complete description of the document. Counsel is directed to refile the entire document, properly describing the exhibits. (Rudd, D.) (Entered: 06/19/2013) |
| 06/20/2013 | 47 | Memorandum in Support regarding 45 MOTION to Stay *and Demand for Arbitration*, 46 Memorandum in Support, Notice of Deficiency, filed by Prime Communications, L.P.. (Attachments: # 1 Exhibit A: Employee Handbook, # 2 Exhibit B: Acknowledgment Pages, # 3 Exhibit C: Lorenzo Documents, # 4 Exhibit D: Lorenzo Deposition Transcript) (Walker, John) (Entered: 06/20/2013) |
| 06/27/2013 | 48 | MOTION for Extension of Time to File Response as to 41 Second MOTION to Certify Class *under 29 USC Sec. 216(b)*, 43 MOTION to Certify Class *under Rule 23* by Prime Communications, L.P.. (Attachments: # 1 Text of Proposed Order Proposed Order) (Walker, John) (Entered: 06/27/2013) |
| 06/27/2013 | 49 | RESPONSE to Motion regarding 48 MOTION for Extension of Time to File Response as to 41 Second MOTION to Certify Class *under 29 USC Sec. 216(b)*, 43 MOTION to Certify Class *under Rule 23* filed by Rose Lorenzo. (Dunn, Stephen) (Entered: 06/27/2013) |
| 06/28/2013 | | Motion Submitted to Senior District Judge Malcolm J. Howard: 48 MOTION for Extension of Time to File Response as to 41 Second MOTION to Certify Class *under 29 USC Sec. 216(b)*, 43 MOTION to Certify Class *under Rule 23*. (Rudd, D.) |

| | | |
|---|---|---|
| | | *(Entered: 06/28/2013)* |
| 07/03/2013 | 50 | ORDER granting 48 Motion for Extension of Time to File Response regarding 41 Second MOTION to Certify Class *under 29 USC Sec. 216(b). Responses due by 7/19/2013. The court defers ruling on plaintiff's request to toll the claims of putative FLSA claimants during the period of extension. Signed by Senior Judge Malcolm J. Howard on 7/3/2013. (Rudd, D.) (Entered: 07/03/2013)* |
| 07/09/2013 | 51 | MOTION for Extension of Time to File Response/Reply as to 45 MOTION to Stay *and Demand for Arbitration* by Rose Lorenzo. (Attachments: # 1 Text of Proposed Order allowing extension of time to file response) (Dunn, Stephen) (Entered: 07/09/2013) |
| 07/19/2013 | 52 | RESPONSE in Opposition regarding 41 Second MOTION to Certify Class *under 29 USC Sec. 216(b)* filed by Prime Communications, L.P.. (Attachments: # 1 Exhibit Depo of Lorenzo, # 2 Exhibit Depo of Dunlap, # 3 Exhibit Depo of Barnette, # 4 Exhibit DOL Website page, # 5 Affidavit Aslam Affidavit, # 6 Exhibit Depo of Rodriquez) (Walker, John) (Entered: 07/19/2013) |
| 07/19/2013 | 53 | RESPONSE in Opposition regarding 43 MOTION to Certify Class *under Rule 23* filed by Prime Communications, L.P.. (Attachments: # 1 Exhibit Discovery Responses, # 2 Exhibit Authorization Agreement, # 3 Exhibit Employee Handbook, # 4 Exhibit Bonus Plan, # 5 Affidavit Whiddon, # 6 Exhibit Depo of Whiddon, # 7 Exhibit Depo of Lorenzo, # 8 Affidavit Momin) (Walker, John) (Entered: 07/19/2013) |
| 07/22/2013 | | ORAL ORDER granting 51 MOTION for Extension of Time to File Response as to 45 MOTION to Stay *and Demand for Arbitration filed by Rose Lorenzo. Response is due by 7/24/2013. Entered by Senior Judge Malcolm J. Howard on 7/22/2013. (Rudd, D.) (Entered: 07/22/2013)* |
| 07/24/2013 | 54 | RESPONSE in Opposition regarding 45 MOTION to Stay *and Demand for Arbitration* filed by Rose Lorenzo. (Attachments: # 1 Exhibit 1 - Arbitration Program, # 2 Exhibit 2 - Affidavits of R. Lorenzo and G. Rodriguez) (Dunn, Stephen) (Entered: 07/24/2013) |
| 08/05/2013 | 55 | REPLY to Response to Motion regarding 41 Second MOTION to Certify Class *under 29 USC Sec. 216(b)* filed by Rose Lorenzo. (Attachments: # 1 Exhibit 1a - Prime Payroll Cycle Summary 6/30 - 7/13, # 2 Exhibit 1b - Prime Payroll Cycle Summary 7/14 - 7/27, # 3 Exhibit 2 - Excerpts from Stephen Martin Deposition) (Dunn, Stephen) (Entered: 08/05/2013) |
| 08/05/2013 | 56 | REPLY to Response to Motion regarding 43 MOTION to Certify Class *under Rule 23* filed by Rose Lorenzo. (Attachments: # 1 Exhibit 1 - AT&T Data(Reference) November 2010, # 2 Exhibit 2 - AT&T Data(Reference) June 2010, # 3 Exhibit 3 - Prime Features GP June 2010) (Dunn, Stephen) (Entered: 08/05/2013) |
| 08/07/2013 | 57 | REPLY to Response to Motion regarding 45 MOTION to Stay *and Demand for Arbitration* filed by Prime Communications, L.P.. (Walker, John) (Entered: 08/07/2013) |
| 08/12/2013 | 58 | MOTION for Hearing regarding 36 MOTION to Compel *Discovery*, 41 Second MOTION to Certify Class *under 29 USC Sec. 216(b)*, 45 MOTION to Stay *and Demand for Arbitration*, 43 MOTION to Certify Class *under Rule 23* by Rose Lorenzo. (Dunn, Stephen) (Entered: 08/12/2013) |
| 08/21/2013 | | Motion Submitted to Senior District Judge Malcolm J. Howard: 41 Second MOTION to Certify Class *under 29 USC Sec. 216(b)*, 45 MOTION to Stay *and Demand for* |

| | | |
|---|---|---|
| | | *Arbitration*, 43 MOTION to Certify Class *under Rule 23. (Rudd, D.) (Entered: 08/21/2013)* |
| 08/29/2013 | 59 | RESPONSE regarding 58 MOTION for Hearing regarding 36 MOTION to Compel *Discovery*, 41 Second MOTION to Certify Class *under 29 USC Sec. 216(b)*, 45 MOTION to Stay *and Demand for Arbitration*, 43 MOTION to Certify Class *under Rule 2 filed by Prime Communications, L.P. (Walker, John) (Entered: 08/29/2013)* |
| 08/30/2013 | | Motion Submitted to Senior District Judge Malcolm J. Howard: 58 MOTION for Hearing regarding 36 MOTION to Compel *Discovery*, 41 Second MOTION to Certify Class *under 29 USC Sec. 216(b)*, 45 MOTION to Stay *and Demand for Arbitration*, 43 MOTION to Certify Class *under Rule 2. (Rudd, D.) (Entered: 08/30/2013)* |
| 10/17/2013 | | MOTIONS REFERRED Magistrate Judge Kimberly A. Swank: 36 MOTION to Compel *Discovery*, 41 Second MOTION to Certify Class *under 29 USC Sec. 216(b)*, 45 MOTION to Stay *and Demand for Arbitration*, 58 MOTION for Hearing regarding 36 MOTION to Compel *Discovery*, 41 Second MOTION to Certify Class *under 29 USC Sec. 216(b)*, 45 MOTION to Stay *and Demand for Arbitration*, 43 MOTION to Certify Class *under Rule 2, 43 MOTION to Certify Class under Rule 23. (Rudd, D.) (Entered: 10/17/2013)* |
| 10/29/2013 | 60 | MEMORANDUM AND RECOMMENDATIONS regarding 45 MOTION to Stay *and Demand for Arbitration* filed by Prime Communications, L.P. The court RECOMMENDS that the defendant's motion to compel arbitration be DENIED. Signed by Magistrate Judge Kimberly A. Swank on 10/28/2013. (Attachments: # 1 Memorandum and Recommendation Notice) (Rudd, D.) (Entered: 10/29/2013) |
| 10/29/2013 | 61 | ORDER granting in part and denying in part 36 Motion to Compel; granting in part and denying in part 58 Motion for Hearing. This case shall be set for hearing on 11/21/2013 at 1:30 p.m. before Magistrate Judge Kimberly A. Swank at the United States Courthouse Annex in Greenville. Counsel should read this order in its entirety for information and any deadlines. Signed by Magistrate Judge Kimberly A. Swank on 10/28/2013. (Rudd, D.) (Entered: 10/29/2013) |
| 10/29/2013 | | Set Hearing as to 41 Second MOTION to Certify Class *under 29 USC Sec. 216(b), 43 MOTION to Certify Class under Rule 23 and any discovery disputes. Status Conference and Motion Hearing set for 11/21/2013 at 1:30 PM in Greenville Annex Courtroom before Magistrate Judge Kimberly A. Swank. (Rudd, D.) (Entered: 10/29/2013)* |
| 10/31/2013 | 62 | MOTION Tolling Statute of Limitations under Putative Rule 216(b) by Rose Lorenzo. (Dunn, Stephen) (Entered: 10/31/2013) |
| 10/31/2013 | 63 | Memorandum in Support regarding 62 MOTION Tolling Statute of Limitations under Putative Rule 216(b) filed by Rose Lorenzo. (Dunn, Stephen) (Entered: 10/31/2013) |
| 10/31/2013 | | NOTICE OF DEFICIENCY regarding: 62 Motion for Miscellaneous Relief; Pursuant to Local Civil Rule 6.1, or the judges practice preferences on the courts website, counsel must submit a proposed order. The order must be filed electronically using the event PROPOSED ORDER located in the RESPONSES AND REPLIES category. Additionally, the judge's practice preferences MAY require counsel to email the proposed order in a word processing format. (Rudd, D.) (Entered: 10/31/2013) |

| | | |
|---|---|---|
| 10/31/2013 | 64 | Proposed Order regarding 62 MOTION Tolling Statute of Limitations under Putative Rule 216(b) filed by Rose Lorenzo. (Dunn, Stephen) (Entered: 10/31/2013) |
| 11/13/2013 | 65 | MOTION for Extension of Time to File *an Objection* by Prime Communications, L.P.. (Attachments: # 1 Text of Proposed Order Proposed Order) (Walker, John) (Entered: 11/13/2013) |
| 11/13/2013 | 66 | OBJECTION to 60 Memorandum and Recommendations by Prime Communications, L.P.. (Walker, John) (Entered: 11/13/2013) |
| 11/14/2013 | | MOTION REFERRED to Magistrate Judge Kimberly A. Swank: 65 MOTION for Extension of Time to File *an Objection. (Rudd, D.) (Entered: 11/14/2013)* |
| 11/14/2013 | 67 | ORDER dismissing as moot 65 Motion for Extension of Time to File. Signed by Magistrate Judge Kimberly A. Swank on 11/14/2013. (Rudd, D.) (Entered: 11/14/2013) |
| 11/15/2013 | 68 | RESPONSE regarding 66 Objection to Memorandum and Recommendations filed by Rose Lorenzo. (Dunn, Stephen) (Entered: 11/15/2013) |
| 11/20/2013 | 69 | ORDER denying 45 Motion to Stay and compel arbitration; adopting Report and Recommendations regarding 60 Memorandum and Recommendations. Signed by Senior Judge Malcolm J. Howard on 11/19/2013. (Rudd, D.) (Entered: 11/20/2013) |
| 11/21/2013 | 72 | Minute Entry for proceedings held before Magistrate Judge Kimberly A. Swank in Greenville Annex, NC: The court heard matters on plaintiff's motion to compel at DE #36 - By order dated 10/29/13, the court granted the motion in part but scheduled the remainder of the discovery motion for hearing - The Court entered an Oral Order (1) requiring the defendant to provide within fifteen (15) days additional clarification or certification regarding its response to Interrogatory #1; and (2) as to Interrogatory #11, #12 and #13, requiring the defendant to provide to its attorney copies of all carrier/vendor agreements to which the interrogatories apply so that counsel may review and provide a supplemental response to plaintiff regarding those interrogatories within thirty (30) days - Arguments were heard from counsel regarding the remaining discovery disputes - The Court took all remaining discovery issues under advisement - As to the motions to certify class [DE ## 41 and 43] - The Court heard arguments from the parties - The Court took the matters under Advisement - As to scheduling - the parties made inquiry about a new scheduling order - The Court advised counsel that pursuant to the scheduling order previously entered in the case - the court would enter a new scheduling order addressing any merits discovery, mediation, trial dates, etc. following the Plaintiffs class certification motions. (Court Reporter FTR Gold) (Rudd, D.) (Entered: 12/02/2013) |
| 11/21/2013 | | ORAL ORDER - Defendant is to provide within fifteen (15) days additional clarification or certification regarding its response to Interrogatory #1. Entered in open court by Magistrate Judge Kimberly A. Swank on 11/21/2013. (Rudd, D.) (Entered: 12/02/2013) |
| 11/21/2013 | | ORAL ORDER - As to Interrogatories 11, 12 and 13, defendant is to provide its attorney copies of all carrier/vendor agreements to which the interrogatories apply so that counsel may review and provide a supplemental response to plaintiff regarding those interrogatories within thirty (30) days. Entered in open court by Magistrate Judge Kimberly A. Swank on 11/21/2013. (Rudd, D.) (Entered: 12/02/2013) |

| 11/22/2013 | 70 | RESPONSE in Opposition regarding 62 MOTION Tolling Statute of Limitations under Putative Rule 216(b) filed by Prime Communications, L.P.. (Walker, John) (Entered: 11/22/2013) |
|---|---|---|
| 11/26/2013 | 71 | REPLY to Response to Motion regarding 62 MOTION Tolling Statute of Limitations under Putative Rule 216(b) filed by Rose Lorenzo. (Dunn, Stephen) (Entered: 11/26/2013) |
| 12/02/2013 | | Motion Submitted to Senior District Judge Malcolm J. Howard: 62 MOTION Tolling Statute of Limitations under Putative Rule 216(b). (Rudd, D.) (Entered: 12/02/2013) |
| 12/06/2013 | | MOTION REFERRED to Magistrate Judge Kimberly A. Swank: 62 MOTION Tolling Statute of Limitations under Putative Rule 216(b). (Rudd, D.) (Entered: 12/06/2013) |
| 01/09/2014 | 73 | NOTICE by Rose Lorenzo *Filing of Consents to Become a Party* (Attachments: # 1 Exhibit Consent of A Kumar, # 2 Exhibit Consent of R Patel) (Dunn, Stephen) (Entered: 01/09/2014) |
| 01/15/2014 | 74 | ORDER granting in part and denying in part regarding 41 Second MOTION to Certify Class *under 29 USC Sec. 216(b)* filed by Rose Lorenzo. MEMORANDUM AND RECOMMENDATIONS regarding 43 MOTION to Certify Class *under Rule 23* filed by Rose Lorenzo. Signed by Magistrate Judge Kimberly A. Swank on 1/14/2014. (Attachments: # 1 Memorandum and Recommendation Notice) (Rudd, D.) (Entered: 01/15/2014) |
| 01/29/2014 | 75 | OFFICIAL TRANSCRIPT OF MOTION HEARING PROCEEDINGS held on November 21, 2013, before Magistrate Judge Kimberly A. Swank. Transcriber Janice Russell Transcripts. Transcript may be viewed at the court public terminal or purchased through the Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 2/22/2014. Redacted Transcript Deadline set for 3/4/2014. Release of Transcript Restriction set for 5/2/2014. (Thuemmel Proctor, S.) (Entered: 01/30/2014) |
| 01/29/2014 | | NOTICE of Filing of Official Transcript 75 Transcript. The parties have seven calendar days from the filing of the transcript to file a Notice of Intent to Request Redaction. The parties must also serve a copy on the court reporter or transcriber. After filing the Notice of Intent to Request Redaction, a party must submit to the court reporter or transcriber, within 21 calendar days of the filing of the transcript, a written statement indicating where the personal data identifiers to be redacted appear in the transcript. (Thuemmel Proctor, S.) (Entered: 01/30/2014) |
| 01/30/2014 | 76 | NOTICE of Appearance by William W. Pollock on behalf of All Defendants (Pollock, William) (Entered: 01/30/2014) |
| 01/30/2014 | 77 | MOTION for Reconsideration regarding 46 Memorandum in Support *of Motion and Demand for Arbitration 45* by Prime Communications, L.P.. (Attachments: # 1 Affidavit Lorenzo Affidavit, # 2 Exhibit Lorenzo Handbook Acknowledgement, # 3 Exhibit Lorenzo Chargeback Acknowledgement, # 4 Affidavit Larkins Affidavit) (Walker, John) (Entered: 01/30/2014) |
| 01/30/2014 | 78 | Memorandum in Support regarding 77 MOTION for Reconsideration regarding 46 Memorandum in Support *of Motion and Demand for Arbitration 45* filed by Prime |

| | | |
|---|---|---|
| | | Communications, L.P.. (Walker, John) (Entered: 01/30/2014) |
| 01/30/2014 | 79 | MOTION to Dismiss *Certain Opt-in Plaintiffs* by Prime Communications, L.P.. (Walker, John) (Entered: 01/30/2014) |
| 01/30/2014 | 80 | Memorandum in Support regarding 79 MOTION to Dismiss *Certain Opt-in Plaintiffs* filed by Prime Communications, L.P.. (Attachments: # 1 Exhibit Applicable Portions of Employee Handbook, # 2 Exhibit Handbook Acknowledgement Pages, # 3 Exhibit Blank Acknowledgement Page) (Walker, John) (Entered: 01/30/2014) |
| 01/31/2014 | 81 | **DISREGARD - This is an Objection to a Memorandum and Recommendation and has been refiled at DE #83** - APPEAL OF US MAGISTRATE JUDGE DECISION to District Court by Prime Communications, L.P. regarding 74 MEMORANDUM AND RECOMMENDATIONS regarding 43 MOTION to Certify Class *under Rule 23* filed by Rose Lorenzo (Walker, John) Modified on 1/31/2014 (Lee, L.). (Entered: 01/31/2014) |
| 01/31/2014 | 82 | APPEAL OF US MAGISTRATE JUDGE DECISION to District Court by Prime Communications, L.P. regarding 74 ORDER regarding 41 Second MOTION to Certify Class *under Rule 29* filed by Rose Lorenzo (Attachments: # 1 Exhibit Discovery) (Walker, John) Modified on 1/31/2014 (Moore,P ). Modified on 1/31/2014 to reflect this is appealing an Order (not a Memorandum and Recommendation). (Lee, L.). (Entered: 01/31/2014) |
| 01/31/2014 | 83 | OBJECTION to 74 Memorandum and Recommendations *Certifying 43 Rule 23 Class Action* by Prime Communications, L.P.. (Walker, John) (Entered: 01/31/2014) |
| 02/10/2014 | 84 | NOTICE by Prime Communications, L.P. regarding 79 MOTION to Dismiss *Certain Opt-in Plaintiffs*, 77 MOTION for Reconsideration regarding 46 Memorandum in Support *of Motion and Demand for Arbitration 45* , 82 Appeal of Magistrate Judge Decision to District Court, 83 Objection to Memorandum and Recommendations (Attachments: # 1 Exhibit Court of Appeals Opinion) (Walker, John) (Entered: 02/10/2014) |
| 02/10/2014 | 85 | Memorandum in Opposition regarding 79 MOTION to Dismiss *Certain Opt-in Plaintiffs*, 77 MOTION for Reconsideration regarding 46 Memorandum in Support *of Motion and Demand for Arbitration 45* filed by Rose Lorenzo. (Attachments: # 1 Exhibit 1 - Declaration of Rose Lorenzo, # 2 Exhibit 2 - Prime's Dispute/Conflict Resolution Program) (Dunn, Stephen) (Entered: 02/10/2014) |
| 02/14/2014 | 86 | NOTICE by Rose Lorenzo *of Filing Consent to Become Party to Collective Action Under 29 USC 216* (Attachments: # 1 Exhibit Consent to Become Party by Cori Anne Martinez) (Dunn, Stephen) (Entered: 02/14/2014) |
| 02/15/2014 | 87 | RESPONSE by Plaintiff Rose Lorenzo regarding 82 Appeal of Magistrate Judge Decision to District Court, 83 Objection to Memorandum and Recommendations . (Attachments: # 1 Appendix Unpublished opinion Ceras-Campo v. WF Partnership, 2011 WL 588417 (E.D.N.C. Feb. 9, 2011), # 2 Appendix Unpublished opinion Chiari v. NY Racing Ass'n, 2013 WL 5234242 (E.D.N.Y. Sept. 16, 2013), # 3 Appendix Unpublished opinion Crosby v. City of Gastonia, 2008 WL 1944399 (W.D.N.C. May 1, 2008)) (Dunn, Stephen) (Entered: 02/15/2014) |
| 02/17/2014 | 88 | RESPONSE to Order regarding 74 MEMORANDUM AND RECOMMENDATIONS regarding 43 MOTION to Certify Class *under Rule 23* filed by Rose Lorenzo *and 74* |

|  |  | *ORDER regarding 41 MOTION for Facilitated Notice under 29 USC 216(b), Conditionally Certifying Collective Class, Submitting the Parties Joint Proposed Notice and Opt-in Form and Procedures for Distribution required by 74 ORDER* filed by Rose Lorenzo. (Attachments: # 1 Exhibit A - Proposed Notice and Opt-in Form) (Dunn, Stephen) (Entered: 02/17/2014) |
|---|---|---|
| 02/27/2014 | 89 | REPLY to Response to Motion regarding 79 MOTION to Dismiss *Certain Opt-in Plaintiffs*, 77 MOTION for Reconsideration regarding 46 Memorandum in Support *of Motion and Demand for Arbitration 45* filed by Prime Communications, L.P.. (Walker, John) (Entered: 02/27/2014) |
| 02/28/2014 |  | Motions Submitted to Senior District Judge Malcolm J. Howard: 79 MOTION to Dismiss *Certain Opt-in Plaintiffs*, 77 MOTION for Reconsideration regarding 46 Memorandum in Support *of Motion and Demand for Arbitration 45* , 74 MEMORANDUM AND RECOMMENDATIONS regarding 43 MOTION to Certify Class *under Rule 23* filed by Rose Lorenzo and 82 Appeal of a US Magistrate Decision. (Rudd, D.) (Entered: 02/28/2014) |
| 03/06/2014 | 90 | MOTION to Compel *Defendant to produce list of putative plaintiffs and contact information* by Rose Lorenzo. (Dunn, Stephen) (Entered: 03/06/2014) |
| 03/06/2014 | 91 | Memorandum in Support regarding 90 MOTION to Compel *Defendant to produce list of putative plaintiffs and contact information* filed by Rose Lorenzo. (Dunn, Stephen) (Entered: 03/06/2014) |
| 03/20/2014 |  | MOTIONS REFERRED to Magistrate Judge Kimberly A. Swank: 79 MOTION to Dismiss *Certain Opt-in Plaintiffs and 77 MOTION for Reconsideration regarding 46 Memorandum in Support of Motion and Demand for Arbitration 45 . (Rudd, D.) (Entered: 03/20/2014)* |
| 03/20/2014 | 92 | ORDER regarding 36 MOTION to Compel *Discovery* filed by Rose Lorenzo. Plaintiffs motion to compel [DE #36] is GRANTED in part, DENIED in part and DISMISSED AS MOOT in part. The parties are directed to comply with the terms hereinabove set forth. Signed by Magistrate Judge Kimberly A. Swank on 3/20/2014. (Rudd, D.) (Entered: 03/20/2014) |
| 03/20/2014 | 93 | ORDER - This matter was referred to the undersigned by Senior United States District Judge Malcolm J. Howard for consideration of the parties joint proposed Notice and Consent Form for the FLSA claim conditionally certified as a collective action pursuant to 29 U.S.C. § 216(b). On or before April 15, 2014, the parties shall file a revised proposed Notice reflecting the above revisions. Signed by Magistrate Judge Kimberly A. Swank on 3/20/2014. (Rudd, D.) (Entered: 03/20/2014) |
| 03/24/2014 | 94 | ORDER granting 43 Motion to Certify Class as set out in order; adopting Report and Recommendations regarding 74 Memorandum and Recommendations. Additionally, defendant's appeal of the order granting conditional certification 82 is DENIED. The clerk is directed to refer this matter to Judge Swank for entry of a scheduling order. Counsel should read this order in its entirety for critical information. Signed by Senior Judge Malcolm J. Howard on 3/24/2014. (Rudd, D.) (Entered: 03/24/2014) |
| 03/24/2014 | 95 | RESPONSE in Opposition regarding 90 MOTION to Compel *Defendant to produce list of putative plaintiffs and contact information* filed by Prime Communications, L.P.. (Walker, John) (Entered: 03/24/2014) |

| | | |
|---|---|---|
| 03/25/2014 | | Motion Submitted to Senior District Judge Malcolm J. Howard: 90 MOTION to Compel *Defendant to produce list of putative plaintiffs and contact information.* (Rudd, D.) (Entered: 03/25/2014) |
| 03/27/2014 | | MOTION REFERRED to Magistrate Judge Kimberly A. Swank: 90 MOTION to Compel *Defendant to produce list of putative plaintiffs and contact information.* (Rudd, D.) (Entered: 03/27/2014) |
| 03/31/2014 | 96 | ORDER Setting Hearing on Motion - 90 MOTION to Compel *Defendant to produce list of putative plaintiffs and contact information* and Scheduling Conference set for 4/7/2014 at 11:00 AM in Telephonic before Magistrate Judge Kimberly A. Swank. The clerk will initiate the telephone call. Prior to the hearing, the parties shall confer and submit to the court a Rule 26(f) plan for Phase II discovery and the trial of this matter. Signed by Magistrate Judge Kimberly A. Swank on 3/31/2014. (Rudd, D.) (Entered: 03/31/2014) |
| 03/31/2014 | 97 | MEMORANDUM AND RECOMMENDATIONS regarding 79 MOTION to Dismiss *Certain Opt-in Plaintiffs* filed by Prime Communications, L.P., 77 MOTION for Reconsideration regarding 46 Memorandum in Support *of Motion and Demand for Arbitration 45* filed by Prime Communications, L.P. The undersigned RECOMMENDS that Defendant's motion to dismiss opt-in plaintiffs and Defendants motion for reconsideration of its prior motion to compel arbitration be DENIED. Signed by Magistrate Judge Kimberly A. Swank on 3/31/2014. (Attachments: # 1 Memorandum and Recommendation Notice) (Rudd, D.) (Entered: 03/31/2014) |
| 04/05/2014 | 98 | Rule 26(f) Report (joint) by Rose Lorenzo. (Attachments: # 1 Exhibit A - Consent Protective Order) (Dunn, Stephen) (Entered: 04/05/2014) |
| 04/07/2014 | 99 | SCHEDULING ORDER: Discovery due by 4/30/2015. All potentially dispositive motions should be filed within thirty (30) days following the close of merits discovery. This action has been selected for mandatory mediation pursuant to the court's Alternative Dispute Resolution Rules, Local Civil Rules 101-101.3, E.D.N.C. This matter is hereby set for a scheduling conference, to be held telephonically, on Monday, September 8, 2014, at 2:00 p.m., at which time the court will set a date for the final pretrial conference and address any outstanding scheduling issues. The remaining portions of the parties' Phase II Discovery Plan are ADOPTED as the court's order, except as otherwise provided herein. *Counsel should read this order in its entirety for all pertinent information and deadlines. Signed by Magistrate Judge Kimberly A. Swank on 4/7/2014. (Lee, L.) (Entered: 04/07/2014) |
| 04/07/2014 | 100 | Minute Entry for proceedings held before Magistrate Judge Kimberly A. Swank in Greenville: Motion Hearing regarding 90 MOTION to Compel and Scheduling Conference held on 4/7/2014. *Hearing conducted telephonically with counsel for plaintiff and defendant.* Court orders the documents in the motion 90 be produced by 4/15/14. Written order to follow addressing scheduling. (Court Reporter -FTR Gold) (Foell, S.) (Entered: 04/08/2014) |
| 04/15/2014 | 103 | RESPONSE to Order regarding 93 Order, 94 Order on Motion to Certify Class, Order on Memorandum and Recommendations,, filed by Rose Lorenzo. (Attachments: # 1 Exhibit A - Notice of Collective under FLSA, # 2 Exhibit B - Plaintiffs Proposed Notice of Rule 23 North Carolina Class Claims) (Dunn, Stephen) (Entered: 04/15/2014) |

| 04/17/2014 | 104 | OBJECTION to 97 Memorandum and Recommendations by Prime Communications, L.P.. (Attachments: # 1 Exhibit Applicable Portions of Employee Handbook) (Walker, John) (Entered: 04/17/2014) |
| 04/22/2014 | 105 | MOTION to Withdraw as Attorney by Rose Lorenzo. (Attachments: # 1 Text of Proposed Order Allowing Withdrawal) (Cushman, Charles) (Entered: 04/22/2014) |
| 04/22/2014 | | Motion Submitted to Senior District Judge Malcolm J. Howard: 105 MOTION to Withdraw as Attorney. (Rudd, D.) (Entered: 04/22/2014) |
| 04/28/2014 | 106 | ORDER granting 105 Motion to Withdraw as Attorney. Attorney Charles Jeffreys Cushman and Raymond Earl Dunn, Jr. terminated. Signed by Senior Judge Malcolm J. Howard on 4/28/2014. (Rudd, D.) (Entered: 04/28/2014) |
| 04/28/2014 | 107 | MOTION for Extension of Time *to Designate Mediator* by Rose Lorenzo. (Attachments: # 1 Text of Proposed Order allowing extension) (Dunn, Stephen) (Entered: 04/28/2014) |
| 04/29/2014 | | MOTION REFERRED to Magistrate Judge Kimberly A. Swank: 107 MOTION for Extension of Time *to Designate Mediator. (Rudd, D.) (Entered: 04/29/2014)* |
| 04/30/2014 | 108 | ORDER granting 107 Motion for Extension of Time. IT IS ORDERED, ADJUDGED AND DECREED that the time within the parties may file a statement identifying the selected mediator and meeting other applicable requirements of Local Civil Rule 101.1c(a) be and is hereby extended up to and including May 9, 2014. Signed by Magistrate Judge Kimberly A. Swank on 4/30/2014. (Rudd, D.) (Entered: 04/30/2014) |
| 05/01/2014 | 109 | RESPONSE regarding 104 Objection to Memorandum and Recommendations *denying Dismissal and Reconsideration* 97 filed by Rose Lorenzo. (Dunn, Stephen) (Entered: 05/01/2014) |
| 05/02/2014 | | Motion Submitted to Senior District Judge Malcolm J. Howard: 97 MEMORANDUM AND RECOMMENDATIONS regarding 79 MOTION to Dismiss *Certain Opt-in Plaintiffs* filed by Prime Communications, L.P., 77 MOTION for Reconsideration regarding 46 Memorandum in Support *of Motion and Demand for Arbitration. (Rudd, D.) (Entered: 05/02/2014)* |
| 05/05/2014 | 110 | ORDER - This matter is before the court for consideration of the parties' proposed class notices and consent form. Signed by Magistrate Judge Kimberly A. Swank on 5/5/2014. (Attachments: # 1 Exhibit A - Notice) (Rudd, D.) (Entered: 05/05/2014) |
| 05/06/2014 | 111 | NOTICE by Rose Lorenzo *of Joint Submisssion of Consent Protective Order* (Attachments: # 1 Exhibit A - Consent Protective Order) (Dunn, Stephen) (Entered: 05/06/2014) |
| 05/07/2014 | | NOTICE TO COUNSEL regarding: 111 Notice. Counsel must file a motion seeking leave of court to file their protective order pursuant to Local Rule 7.1 and Federal Civil Rule of Procedures Rule 26(c). (Rudd, D.) (Entered: 05/07/2014) |
| 05/07/2014 | 112 | Joint MOTION for Protective Order by Rose Lorenzo. (Attachments: # 1 Exhibit A - Proposed Consent Protective Order) (Dunn, Stephen) (Entered: 05/07/2014) |
| 05/07/2014 | 113 | Memorandum in Support regarding 112 Joint MOTION for Protective Order filed by Rose Lorenzo. (Dunn, Stephen) (Entered: 05/07/2014) |

| | | |
|---|---|---|
| 05/08/2014 | | MOTION REFERRED to Magistrate Judge Kimberly A. Swank: 112 Joint MOTION for Protective Order. (Rudd, D.) (Entered: 05/08/2014) |
| 05/08/2014 | 114 | CONSENT PROTECTIVE ORDER - granting 112 Joint Motion for Protective Order. Signed by Magistrate Judge Kimberly A. Swank on 5/8/2014. (Rudd, D.) (Entered: 05/08/2014) |
| 05/08/2014 | 115 | MEMORANDUM AND RECOMMENDATIONS regarding 62 MOTION Tolling Statute of Limitations under Putative Rule 216(b) filed by Rose Lorenzo. The undersigned RECOMMENDS that Plaintiffs motion to toll the statute of limitations [DE #62] be GRANTED and that the court equitably toll the FLSA limitations period from August 13, 2013, until April 15, 2014. Signed by Magistrate Judge Kimberly A. Swank on 5/8/2014. (Attachments: # 1 Memorandum and Recommendation Notice) (Rudd, D.) (Entered: 05/08/2014) |
| 05/09/2014 | 116 | NOTICE by Rose Lorenzo regarding 103 Response, 110 Order *approving class notice, confirming mailing of notices on May 7, 2014* (Dunn, Stephen) (Entered: 05/09/2014) |
| 05/09/2014 | 117 | SELECTION OF Jonathan R Harkavy as mediator (Dunn, Stephen) (Entered: 05/09/2014) |
| 05/12/2014 | 118 | NOTICE by Rose Lorenzo *of Filing of Consents to Become a Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Justin Chalfant, # 2 Exhibit Consent of Eric Dixon, # 3 Exhibit Consent of Robert Corey Cooper) (Dunn, Stephen) (Entered: 05/12/2014) |
| 05/13/2014 | 119 | NOTICE by Rose Lorenzo *of Filing Consents to Become a Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Ashely L. Rubin, # 2 Exhibit Consent of Amber Jesberger (formerly Amber Van Alstine), # 3 Exhibit Consent of James Meador) (Dunn, Stephen) (Entered: 05/13/2014) |
| 05/15/2014 | 120 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Imran Ahmad, # 2 Exhibit Consent of Carol Baker, # 3 Exhibit Consent of Paul G Monaghan) (Dunn, Stephen) (Entered: 05/15/2014) |
| 05/16/2014 | 121 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Amy Evans, # 2 Exhibit Consent of Michael Fairchild, # 3 Exhibit Consent of Michelle Garner, # 4 Exhibit Consent of William Halstead, # 5 Exhibit Consent of Brandon Hathaway, # 6 Exhibit Consent of Cassidi Manary, # 7 Exhibit Consent of Elan Schlossberg, # 8 Exhibit Consent of Jacob Short, # 9 Exhibit Consent of Glenn Sudhop, # 10 Exhibit Consent of Richard Sullivan) (Dunn, Stephen) (Entered: 05/16/2014) |
| 05/19/2014 | 122 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of John Christopher Eastman, # 2 Exhibit Consent of Michael J. Ciaravella, # 3 Exhibit Consent of Anthony Rowell, # 4 Exhibit Consent of Christopher Bishop, # 5 Exhibit Consent of James Kyle Goins, # 6 Exhibit Consent of Timothy J. Hephner, Jr., # 7 Exhibit Consent of Courtney Smith, # 8 Exhibit Consent of Jay Michael Turner) (Dunn, Stephen) (Entered: 05/19/2014) |
| 05/20/2014 | 123 | NOTICE by Rose Lorenzo *of filing Consent to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Joseph J. Yanda) |

| | | |
|---|---|---|
| | | (Dunn, Stephen) (Entered: 05/20/2014) |
| 05/22/2014 | 124 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Glen Britton, # 2 Exhibit Consent of Ramiro Anthony Cerda, # 3 Exhibit Consent of Mary Rohen, # 4 Exhibit Consent of Barbara J. Vuocolo, # 5 Exhibit Consent of Jessica Bjugan) (Dunn, Stephen) (Entered: 05/22/2014) |
| 05/23/2014 | 125 | NOTICE by Rose Lorenzo *of filing Consent to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Jimmie Dillon) (Dunn, Stephen) (Entered: 05/23/2014) |
| 05/27/2014 | 126 | ORDER Appointing Mediator Jonathan R. Harkavy. Signed by Julie A. Richards, Clerk of Court on 5/27/14. (Horton, B.) (Entered: 05/27/2014) |
| 05/30/2014 | 127 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of David Davis, # 2 Exhibit Consent of Aleita Drake, # 3 Exhibit Consent of Tracie S. Ward Jones) (Dunn, Stephen) (Entered: 05/30/2014) |
| 05/30/2014 | 128 | Joint MOTION *for Supplemental Notice Period for 216(b) Putative Plaintiffs employed at Defendant's California Locations* by Rose Lorenzo. (Attachments: # 1 Text of Proposed Order allowing Supplemental Notice Period for 216(b) Putative Plaintiffs at Defendant's California locations) (Dunn, Stephen) (Entered: 05/30/2014) |
| 06/01/2014 | 129 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Savannah Crawford Canty, # 2 Exhibit Consent of James S. Heubel, # 3 Exhibit Consent of Sarah Kerchinski, # 4 Exhibit Consent of Alejandra Vasquez) (Dunn, Stephen) (Entered: 06/01/2014) |
| 06/03/2014 | 130 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Yaser Warrich, # 2 Exhibit Consent of Jared Carlson) (Dunn, Stephen) (Entered: 06/03/2014) |
| 06/04/2014 | 131 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Nayibe Sequera, # 2 Exhibit Consent of Stanley Jones, # 3 Exhibit Consent of Brenton E. Tate) (Dunn, Stephen) (Entered: 06/04/2014) |
| 06/06/2014 | 132 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Briana Cameron, # 2 Exhibit Consent of Alan Corrado, # 3 Exhibit Consent of Carmie David Harrall) (Dunn, Stephen) (Entered: 06/06/2014) |
| 06/09/2014 | | Motions Submitted to Senior District Judge Malcolm J. Howard: 115 MEMORANDUM AND RECOMMENDATIONS regarding 62 MOTION Tolling Statute of Limitations under Putative Rule 216(b) filed by Rose Lorenzo, 128 Joint MOTION *for Supplemental Notice Period for 216(b) Putative Plaintiffs employed at Defendant's California Locations. (Rudd, D.) (Entered: 06/09/2014)* |
| 06/09/2014 | 133 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Matthew J Farkas, # 2 Exhibit Consent of Michael Arwine Jr, # 3 Exhibit Consent of Taylor Johnson) (Dunn, Stephen) (Entered: 06/09/2014) |

| | | |
|---|---|---|
| 06/10/2014 | 134 | NOTICE by Rose Lorenzo *of Mailing Facilitated Notice to Putative Plaintiffs employed in Defendant's California locations* (Dunn, Stephen) (Entered: 06/10/2014) |
| 06/10/2014 | 135 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Jacob Robinson, # 2 Exhibit Consent of Alisha Lile) (Dunn, Stephen) (Entered: 06/10/2014) |
| 06/11/2014 | 136 | MOTION for Extension of Time to respond to plaintiff's post certifications interrogatories and request for production of documents by Prime Communications, L.P.. (Attachments: # 1 Text of Proposed Order) (Walker, John) Modified on 6/12/2014 to clarify docket text. (Rudd, D.) (Entered: 06/11/2014) |
| 06/11/2014 | 137 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Lissette Morales, # 2 Exhibit Consent of Mahmoud Gaballa, # 3 Exhibit Consent of Tanya Lynette Harvey) (Dunn, Stephen) (Entered: 06/11/2014) |
| 06/12/2014 | | MOTION REFERRED to US Magistrate Judge Kimberly A. Swank: 136 MOTION for Extension of Time. (Rudd, D.) (Entered: 06/12/2014) |
| 06/12/2014 | 138 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Jessica A Good, # 2 Exhibit Consent of Saivazali Jiwa, # 3 Exhibit Consent of Patricia White, # 4 Exhibit Consent of Cynthia B Young) (Dunn, Stephen) (Entered: 06/12/2014) |
| 06/14/2014 | 139 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Jared Costner, # 2 Exhibit Consent of Dennis May, # 3 Exhibit Consent of London Stewart, # 4 Exhibit Consent of Olivia Y Wu) (Dunn, Stephen) (Entered: 06/14/2014) |
| 06/16/2014 | 140 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Victor Smith, # 2 Exhibit Consent of Allyn Weimer, # 3 Exhibit Consent of Andres Franky, # 4 Exhibit Consent of Cynthia B Garcia, # 5 Exhibit Consent of Mohammad F Baree) (Dunn, Stephen) (Entered: 06/16/2014) |
| 06/17/2014 | 141 | NOTICE by Rose Lorenzo *of filing Consent to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Brett Thompson) (Dunn, Stephen) (Entered: 06/17/2014) |
| 06/19/2014 | 142 | NOTICE by Rose Lorenzo *of filing Consent to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Amy L. Hickok) (Dunn, Stephen) (Entered: 06/19/2014) |
| 06/23/2014 | | MOTION REFERRED to Magistrate Judge Kimberly A. Swank: 128 Joint MOTION *for Supplemental Notice Period for 216(b) Putative Plaintiffs employed at Defendant's California Locations.* (Lee, L.) (Entered: 06/23/2014) |
| 06/23/2014 | 143 | ORDER granting Defendant's 136 Motion for Extension of Time to respond to plaintiff's Post Certification Interrogatories and Request for Production of Documents to and including July 24, 2014. Signed by Magistrate Judge Kimberly A. Swank on 6/23/2014. (Lee, L.) (Entered: 06/23/2014) |
| 06/23/2014 | 144 | ORDER granting 128 Joint Motion for Supplemental Notice Period for 216(b) Putative Plaintiffs employed at Defendant's California Locations. Signed by Magistrate Judge |

| | | |
|---|---|---|
| | | Kimberly A. Swank on 6/23/2014. (Lee, L.) (Entered: 06/23/2014) |
| 06/24/2014 | 145 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Fritz Bautista, # 2 Exhibit Consent of Matt Chamberlain, # 3 Exhibit Consent of Chrisner Patao, # 4 Exhibit Consent of Juan I Buezo) (Dunn, Stephen) (Entered: 06/24/2014) |
| 06/24/2014 | 148 | FOURTH CIRCUIT ORDER - CASE NUMBER 14-1622 regarding 94 Order on Motion to Certify Class, Order on Memorandum and Recommendations,, 74 MEMORANDUM AND RECOMMENDATIONS regarding 43 MOTION to Certify Class *under Rule 23* filed by Rose Lorenzo. Signed by Patricia S. Connor, Clerk for the Fourth Circuit on 6/24/2014. (Attachments: # 1 Appellate Case Number, # 2 Petitioner Prime Communication Appeal of Class Certifcation Fed.R.Civ.P. 23(f)) (Rudd, D.) Modified on 7/2/2014 to correct case number. (Rudd, D.) (Entered: 07/02/2014) |
| 06/27/2014 | 146 | NOTICE by Rose Lorenzo *of filing Consent to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Bryant James Devlin) (Dunn, Stephen) (Entered: 06/27/2014) |
| 06/27/2014 | 147 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Albert Alvarez, # 2 Exhibit Consent of Karalena Cook-Missig, # 3 Exhibit Consent of Krystle L Schweizer, # 4 Exhibit Consent of Tyler Missig) (Dunn, Stephen) (Entered: 06/27/2014) |
| 06/30/2014 | | Appeal Filing fee: $505.00, receipt number RAL0038678 (14-1622). (Rudd, D.) (Entered: 07/02/2014) |
| 07/02/2014 | | Notification to Appeals Court of Filing regarding Filing Fee Received. (Fogle, L.) (Entered: 07/02/2014) |
| 07/08/2014 | 149 | NOTICE by Rose Lorenzo *of filing Consent to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Rebecca Willoughby) (Dunn, Stephen) (Entered: 07/08/2014) |
| 07/09/2014 | 150 | ORDER granting 62 Motion to toll the statute of limitations; adopting Report and Recommendations regarding 115 Memorandum and Recommendations. The plaintiff's motion to toll the statute of limitations [DE #62] is GRANTED, and the FLSA limitations period is hereby equitably tolled from August 13, 2013, until April 15, 2014. Signed by Senior Judge Malcolm J. Howard on 7/8/2014. (Rudd, D.) (Entered: 07/09/2014) |
| 07/09/2014 | 151 | ORDER denying 77 Motion for Reconsideration; denying 79 Motion to Dismiss; adopting Report and Recommendations regarding 97 Memorandum and Recommendations. Signed by Senior Judge Malcolm J. Howard on 7/8/2014. (Rudd, D.) (Entered: 07/09/2014) |
| 07/17/2014 | 152 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Robert Floyd, # 2 Exhibit Consent of Natasia E. Horton, # 3 Exhibit Consent of Adam Richards, # 4 Exhibit Consent of Amanda Webb, # 5 Exhibit Consent of David R. Horton, Jr., # 6 Exhibit Consent of Albert Ramos, # 7 Exhibit Consent of Jesse Serrato, # 8 Exhibit Consent of Miguel Rodriguez) (Dunn, Stephen) (Entered: 07/17/2014) |

| | | |
|---|---|---|
| 07/17/2014 | 153 | NOTICE by Rose Lorenzo *of filing Consent to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Benjamin Gonzalez) (Dunn, Stephen) (Entered: 07/17/2014) |
| 07/18/2014 | 154 | NOTICE OF APPEAL as to 151 Order on Motion for Reconsideration, Order on Motion to Dismiss, Order on Memorandum and Recommendations by Prime Communications, L.P.. Filing fee $ 505, receipt number RAL039011. (Pollock, William) (Entered: 07/18/2014) |
| 07/21/2014 | 155 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Roxanne Montgomery, # 2 Exhibit Consent of Edward Massin) (Dunn, Stephen) (Entered: 07/21/2014) |
| 07/21/2014 | 156 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding 154 Notice of Appeal by Prime Communications, L.P. (Fogle, L.) (Entered: 07/21/2014) |
| 07/21/2014 | 157 | US Court of Appeals Case Number 14-1727, RJ Warren, Case Manager for 154 Notice of Appeal filed by Prime Communications, L.P. (Fogle, L.) (Entered: 07/21/2014) |
| 07/24/2014 | 158 | NOTICE by Rose Lorenzo *of filing Consent to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Lijo Kurion) (Dunn, Stephen) (Entered: 07/24/2014) |
| 07/25/2014 | 159 | NOTICE by Rose Lorenzo *of filing Consent to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Brett Bashore) (Dunn, Stephen) (Entered: 07/25/2014) |
| 07/25/2014 | 161 | ORDER of US Court of Appeals as to 154 Notice of Appeal filed by Prime Communications, L.P. Upon consideration of submissions relative to the motion to consolidate, the court grants the motion and consolidates Case No. 14-1622(L) and Case No. 14-1727. (Fogle, L.) Modified on 7/28/2014 to correct file date. (Fogle, L.). (Entered: 07/28/2014) |
| 07/27/2014 | 160 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Nisarg Dave, # 2 Exhibit Consent of Steve A. Myers, # 3 Exhibit Consent of Brad Weiner) (Dunn, Stephen) (Entered: 07/27/2014) |
| 07/28/2014 | 162 | NOTICE by Rose Lorenzo *of filing Consent to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Matthew Johnson) (Dunn, Stephen) (Entered: 07/28/2014) |
| 08/01/2014 | 163 | NOTICE by Rose Lorenzo *of filing Consent to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Thomas Gregg) (Dunn, Stephen) (Entered: 08/01/2014) |
| 08/04/2014 | 164 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Jeremy Manalo, # 2 Exhibit Consent of Jonathan Keathley, # 3 Exhibit Consent of Keith Archie) (Dunn, Stephen) (Entered: 08/04/2014) |
| 08/05/2014 | 165 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Michael Allmun, # 2 Exhibit |

| | | |
|---|---|---|
| | | Consent of Coby Coe) (Dunn, Stephen) (Entered: 08/05/2014) |
| 08/11/2014 | 166 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Deborah M Phelps, # 2 Exhibit Consent of Becca Woolley, # 3 Exhibit Consent of Andrew Beau Campbell) (Dunn, Stephen) (Entered: 08/11/2014) |
| 08/11/2014 | 167 | NOTICE by Rose Lorenzo *of filing Consent to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Jeffrey L Truss) (Dunn, Stephen) (Entered: 08/11/2014) |
| 08/21/2014 | 168 | NOTICE by Rose Lorenzo *of filing Consent to Beome Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Haroon Warrich) (Dunn, Stephen) (Entered: 08/21/2014) |
| 09/02/2014 | 169 | NOTICE by Rose Lorenzo *of filing Consent to Become Party to Collective Action Under 29 USC Section 216* (Attachments: # 1 Exhibit Consent of Gregory Casale) (Dunn, Stephen) (Entered: 09/02/2014) |
| 09/22/2014 | 170 | NOTICE by Rose Lorenzo *of filing Consents to Become Party to Collective Action Under 29 USC 216* (Attachments: # 1 Exhibit Consent of Maria Mejia, # 2 Exhibit Consent of Valentin Jimenez) (Dunn, Stephen) (Entered: 09/22/2014) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/01/2014 13:24:52 | | |
| **PACER Login:** | lg0335:2587280:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 5:12-cv-00069-H |
| **Billable Pages:** | 17 | **Cost:** | 1.70 |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA


ROSE LORENZO,                    )
                                 )
                    Plaintiff    )
                                 )          Case No.
        v.                       )
                                 )
PRIME COMMUNICATIONS, L.P., a    )          JURY TRIAL DEMANDED
Texas General Partnership,       )
                                 )
                    Defendant.   )


## INTRODUCTION

Plaintiff Rose Lorenzo ("Lorenzo" or "Plaintiff") brings this action to recover unpaid wages,

overtime, commissions, compensatory damages, liquidated damages and attorneys fees from her

former employer Prime Communications, L.P. ("Prime" or "Company" or Defendant"), for

violations of the Fair Labor Standards Act (hereinafter "FLSA"), 29 U.S.C. § 201 et seq., and the

North Carolina Wage and Hour Act (hereinafter "NCWHA"), N.C.G.S. § 95-25.1 et seq. Prime is

one of the nation's largest specialty-based retailers of wireless communication products, services and

accessories, operating over 230 stores and kiosks in regional malls and shopping centers throughout

North Carolina, South Carolina, Georgia, Texas, Indiana, New York, Ohio, Pennsylvania and

California, employing more than 900 people in 12 states. At all times alleged in this Complaint,

Plaintiff was the victim of a uniform policy and practice to deprive her of lawful wages in willful

violation of the FLSA and NCWHA.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1337 (commerce), 28 U.S.C. § 1331 (federal question), and 29 U.S.C. § 216(b) (FLSA) and 28 U.S.C. § 1367 (supplemental jurisdiction)

2.     Venue is proper in this Court under 28 U.S.C. § 1391. The causes of action asserted herein occurred and/or accrued in Wake County, North Carolina. Venue is also appropriate in this Court because Defendant owns and/or operates one or more retail stores in Wake County, North Carolina. In addition, Defendant's unlawful conduct occurred in, among other places, North Carolina.

## PARTIES

3.     Plaintiff is a natural person residing in Wake County, North Carolina and, at all relevant times asserted in this Complaint, was an employee of Defendant in its retail store located at and known as Middle Creek Commons, in Raleigh, North Carolina.

4.     Defendant is an enterprise, as defined in 29 U.S.C. § 203(r)(1) and N.C.G.S. § 95-25.2(18), engaged in business in the State of North Carolina, operating retail stores and kiosks for the sale of wireless communication products, services and accessories throughout North Carolina.

## FACTUAL ALLEGATIONS – OVERTIME WAGES

5.     Prior to February 2010, Defendant employed Lorenzo as a solutions specialist in its Fuquay-Varina, North Carolina retail store. As a solutions specialist, Lorenzo was paid an hourly wage. Defendant recorded Lorenzo's hours at work, regular and overtime, using a Punch Clock. Lorenzo was paid, regular and overtime pay, on a bi-weekly basis.

2

6. In January 2010, Defendant asked Lorenzo to relocate to its Middle Creek Commons store in Raleigh as a store manager. In order to incentivize Lorenzo to move immediately to the Middle Creek Commons store, Defendant offered Lorenzo bonus wages of One Thousand Five Hundred Dollars ($1,500.00). Lorenzo accepted the Defendant's offer and moved immediately to the Middle Creek Commons store and began work as the store manager on January 30, 2010.

7. Lorenzo's first pay date as an alleged store manager was February 19, 2010. When she received her first earnings statement (sometime after February 19, 2010), she noticed that the Defendant failed to pay her the promised bonus wages and failed to pay her overtime for the hours that she worked over Forty (40) hours during the first pay period as store manager.

8. As an alleged store manager, Lorenzo received a salary, but the Defendant continued to record Lorenzo's hours at work, regular and overtime, using a Punch Clock. Lorenzo continued to be paid on a bi-weekly basis, but received no compensation for overtime hours worked through and including her last day of work on June 17, 2011.

9. Defendant required Lorenzo, as store manager, to keep the Middle Creek Commons store open 9 hours per day, seven days a week, and to participate in telephone conferences at least twice a week outside of store hours. Lorenzo did not perform managerial or administrative duties. Lorenzo did not have authority to hire employees. Most of the time at the Middle Creek Commons store, Lorenzo was the only employee of the Defendant. On occasions, Defendant authorized one other employee of their selection at Middle Creek Commons. Ninety-five (95%) percent of Lorenzo's time at Middle Creek Commons involved the same customer sales activities she performed as a solutions specialist.

3

10. As a store manager, Lorenzo regularly worked hours in excess of forty hours per week.

11. Defendant classified Lorenzo as a "Salary, exempt" employee which Defendant defined in its 2010 Employee Handbook as those employees ". . . who work on salary and who are not paid based on hours worked." According to Defendant, only employees who are paid hourly are entitled to be paid "time and one-half for hours worked in excess of 40 hours in one (1) week."

12. Lorenzo was not exempt from overtime pay under FLSA because she was not employed in a bona fide executive, administrative or professional capacity. Instead, Lorenzo was employed as an "inside" sales person who earned less than $40,000 per year and who did not earn more than one-half of her total compensation from commissions.

13. Defendant's classifications and its policy and practice with respect to the payment of overtime wages to Lorenzo violated the FLSA and NCWHA, and deprived Lorenzo of the lawful wages to which she was entitled.

## FACTUAL ALLEGATIONS – COMMISSION WAGES

14. Defendant promised to pay Lorenzo, as a solutions specialist, commissions upon sales of wireless products, services and accessories calculated on "gross profit with factored discounts and features, net of costs, chargeback's [sic], and deductions."

15. Defendant promised to pay Lorenzo, as a store manager, commissions upon store sales of wireless products, services and accessories calculated upon "gross profit" which is "net of costs and chargeback's [sic] with factored discounts and features."

16. Contrary to its promises, Defendant did not pay Lorenzo commissions based upon gross profit, but only upon a portion of Defendant's gross profit allocable to the customer payment at

4

the point of sale, which is only a fraction of the gross profit the company actually received for its store sales.

17.     Defendant omitted certain sales from its calculation of gross profit, without providing documentation or an explanation to Lorenzo.

18.     Defendant refunded certain of Lorenzo's sales further reducing gross profit, without providing documentation or an explanation to Lorenzo.

19.     Defendant charged back against Lorenzo's sales sums attributable to:

i)      cancellations and returns of wireless products, services and accessories that were unrelated to Lorenzo's sales;

ii)     cancellations and returns of wireless products, services and accessories from store sales under former store managers;

iii)    cancellations or returns of wireless products, services or accessories that had not, in fact, been cancelled or returned;

iv)     inventory shortages, without disclosure of any loss or verification of any actual loss;

v)      returns, which were in fact exchanges, without credit for its replacement; and

vi)     sales of prepaid services such as Gophones.

20.     Defendant's chargebacks on some of Lorenzo's sales exceeded the gross profit attributable to the sale, resulting in a reduction of gross profit on other sales.

21.     Defendant's only written Chargeback Policy is a one page document, neither presented to nor signed by Lorenzo, requiring compliance with undisclosed policies of Prime's carriers and vendors, and containing an incomplete list of acts or omissions that result in charge backs against employee commissions. Defendant's Chargeback Policy is summarized by Defendant

5

in the following excerpt from its Chargeback Policy, "Because chargeback's [sic] are caused when an employee does an activity incorrectly, Prime Communications will charge back against earned commission."

22.    As a result of Prime's policies and practices with respect to the calculation of gross profit, sales omissions, and arbitrary refunds and chargebacks, earned commissions were wrongfully withheld and diverted from Lorenzo.

23.    Prime's policies and practices with respect to the payment of commissions were misleading and fraudulent, were a breach of its promises to employees, violated the wage provisions of the FLSA and NCWHA, and deprived Lorenzo of the lawful wages to which she was entitled.

## FACTUAL ALLEGATIONS – WILLFUL CONDUCT

24.    Defendant's 2010 Employee Handbook sought to establish a "Dispute/Conflict Resolution Program" which purportedly required Prime employees to waive "all rights to bring a lawsuit against Prime Communications and to a jury trial regarding any dispute, including, but not limited to, claims for pay or benefits under the Fair Labor Standards Act, Texas Pay Day Law Act or other similar state statute, the Employee Retirement Income Security Act "(ERISA," except of any vested benefits) [sic] . . . and claims of discrimination based upon race, color, religion, sex, national origin, age, retaliation of any nature or disability under federal, state or local civil rights statue [sic]; or any other claims, whether specifically employment-related or otherwise, arising from contract, tort or statue [sic] which Employee might have arising from my employment with and separation from the Company."

25.     Defendant's dispute resolution provisions are unlawful and unenforceable and demonstrate Defendant's awareness of and willful disregard for its obligations under the FLSA and NCWHA.

## FIRST CLAIM FOR RELIEF
### (Violation of the Fair Labor Standards Act)

26.     Plaintiff re-alleges and incorporates the preceding and subsequent paragraphs as if fully set forth herein.

27.     Defendant violated Lorenzo's rights under the FLSA by failing to pay Lorenzo overtime compensation for hours worked in excess of forty (40) hours for each workweek that Lorenzo worked between February 2010 and June 17, 2011.

28.     Lorenzo was entitled to all the rights and protections of the FLSA and Defendant's failure to pay Lorenzo overtime was in violation of the FLSA.

29.     Defendant acted willfully and with reckless disregard for Lorenzo's rights under the FLSA.

30.     Plaintiff is entitled to back pay for all overtime hours worked during her employment with Defendant in an amount equal to one and one-half times her regular rate of pay.

31.     As a result of Defendant's willful and reckless actions, Lorenzo is entitled to recover liquidated damages pursuant to 29 U.S.C. § 216(b).

32.     Plaintiff is entitled to recover her attorney's fees pursuant to 29 U.S.C. § 216(b).

## SECOND CLAIM FOR RELIEF
### (Violation of the North Carolina Wage and Hour Act – Overtime)

33.     The allegations of paragraphs 1 through 32 above are re-alleged.

7

34. Defendant violated Lorenzo's rights under the NCWHA by failing to pay Lorenzo overtime compensation for hours worked in excess of forty (40) hours for each workweek that Lorenzo worked between February 2010 and June 17, 2011.

35. Lorenzo was entitled to all the rights and protections of the NCWHA and Defendant's failure to pay Lorenzo overtime was in violation of the NCWHA.

36. Defendant acted willfully and with reckless disregard for Lorenzo's rights under the NCWHA.

37. Lorenzo is entitled to back pay for all overtime hours worked during her employment with Defendant in an amount equal to one and one-half times her regular rate of pay.

38. As a result of Defendant's willful and reckless actions, Lorenzo is entitled to recover liquidated damages pursuant to N.C. Gen. Stat. § 95-25.22.

39. Lorenzo is entitled to recover her attorney's fees pursuant to N.C. Gen. Stat. § 95-25.22(d).

## THIRD CLAIM FOR RELIEF
(Violation of the North Carolina Wage and Hour Act – Unpaid Commissions)

40. The allegations contained in paragraph 1 through 39 are re-alleged and incorporated herein by reference.

41. Defendant violated Lorenzo's rights under the NCWHA by failing to pay and diverting from Lorenzo earned commissions on store sales that she procured before her employment ended on June 17, 2011.

8

42.     Lorenzo was entitled to all rights and protections of the NCWHA and Defendant violated the NCWHA by failing to pay and diverting from Lorenzo earned commissions on store sales that she procured before her employment ended on June 17, 2011.

43.     Lorenzo is entitled to recovery of earned but unpaid commissions for all store sales that she procured before her employment ended on June 17, 2011.

44.     Defendant acted willfully and with reckless disregard for Lorenzo's rights under the NCWHA.

45.     As a result of Defendant's willful action, Lorenzo is entitled to recover liquidated damages pursuant to N.C. Gen. Stat. § 95-25.22

46.     Lorenzo is entitled to recover her attorney's fees pursuant to N.C. Gen. Stat. § 95-25.22(d).

## FOURTH CLAIM FOR RELIEF
(Violation of the North Carolina Wage and Hour Act – Bonus)

47.     The allegations contained in paragraphs 1 through 46 above are re-alleged.

48.     In order to induce Lorenzo to accept the position as store manager of the Middle Creek Commons in Raleigh, Defendant promised to pay Lorenzo a bonus of One Thousand Five Hundred Dollars ($1,500.00).

49.     After accepting the position and commencing work at the Middle Creek Commons store in Raleigh, Defendant failed and refused to pay Lorenzo the guaranteed bonus.

50.     Under the NCWHA, bonuses promised by an employer are deemed to be wages as defined by N.C. Gen. Stat. § 95-25.2(16).

9

51.    Defendant violated Lorenzo's rights under the NCWHA by failing to pay and diverting from Lorenzo the bonus promised by Defendant on or before her next regular payday after her employment ended on June 17, 2011.

52.    Lorenzo was entitled to all rights and protections of the NCWHA and Defendant violated the NCWHA by failing to pay and diverting from Lorenzo the bonus promised by Defendant on or before her next regular payday after her employment ended on June 17, 2011.

53.    Lorenzo is entitled to recovery of all bonuses promised by the Defendant.

54.    Defendant acted willfully and with reckless disregard for Lorenzo's rights under the NCWHA.

55.    As a result of Defendant's willful action, Lorenzo is entitled to recover liquidated damages pursuant to N.C. Gen. Stat. § 95-25.22.

56.    Lorenzo is entitled to recover her attorney's fees pursuant to N.C. Gen. Stat. § 95-25.22(d).

## FIFTH CLAIM FOR RELIEF
(Breach of Contract)

57.    The allegations contained in paragraphs 1 through 56 above are re-alleged.

58.    Defendant and Plaintiff entered into an employment agreement in which the parties mutually agreed that the Plaintiff would be paid a bonus of One Thousand Five Hundred Dollars ($1,500.00) and that the Plaintiff would receive commissions upon store sales at Middle Creek Commons of wireless products, services and accessories calculated upon "gross profit."

59.    Defendant failed to pay Lorenzo commissions and bonuses as promised and has breached its agreement with Lorenzo by failing to do so.

10

60.     As a direct and proximate result of Defendant's breach of contract, Lorenzo has been damaged and is entitled to recover from the Defendant a sum in excess of $10,000.00.

## SIXTH CLAIM FOR RELIEF
### (Unjust Enrichment)

61.     The allegations contained in paragraphs 1 through 60 above are re-alleged.

62.     The wages, commissions, and bonuses which were withheld and diverted by the Defendant were of significant value to Lorenzo.

63.     Lorenzo reasonably expected Defendant to pay her the wages, commissions, and bonus promised.

64.     Defendant knew or should have known that Lorenzo expected to be paid the wages, commissions, and bonuses promised by the Defendant prior to the end of her employment on June 17, 2011.

65.     Defendant withheld and diverted from Lorenzo wages, commissions, and bonuses promised.

66.     Defendant has been unjustly enriched at the expense of Lorenzo in a sum in excess of Ten Thousand Dollars ($10,000.00).

## JURY DEMAND

Plaintiff hereby demands a trail by jury on all issues so triable.

WHEREFORE, Lorenzo prays the Court:

1.     For an award of compensatory damages against the Defendant, in an amount to be determined, for unpaid overtime for all hours worked in excess of forty (40) hours in a workweek during Lorenzo's employment with the Defendant;

11

2. For an award of compensatory damages against the Defendant, in an amount to be determined, for unpaid commissions on store sales at Middle Creek Commons of wireless products, services and accessories calculated upon "gross profit;"

3. For an award of compensatory damages against the Defendant, in an amount to be determined, for unpaid bonuses;

4. For an award of Liquidated damages against the Defendant;

5. For an award of compensatory damages in a sum in excess of Ten Thousand Dollars ($10,000) for breach of contract;

6. For an award of compensatory damages in a sum in excess of Ten Thousand Dollars ($10,000.00) because the Defendant has been unjustly enriched at the expense of Lorenzo;

7. For pre-judgment and post-judgment interest;

8. For reasonable attorney fees pursuant to N.C. Gen. Stat. § 95-25.22(d) and 29 U.S.C. § 216(b);

9. For the costs of this action;

10. For trial by Jury;

11. For all other just and proper relief.

12

**Dated**: February 17, 2012.

Respectfully submitted,

**ROSE LORENZO,**

By Her Undersigned Attorneys

/s/ Stephen A. Dunn
Stephen A. Dunn
State Bar No. 12389
sdunn@emanuelanddunn.com
EMANUEL & DUNN, PLLC
Post Office Box 426
Raleigh, North Carolina 27602
(919) 832-0329 (PHONE)
(919) 832-0731 (FAX)

/s/ Raymond E. Dunn, Jr.
Raymond E. Dunn, Jr.
State Bar No. 8739
rdunn@emanuelanddunn.com
EMANUEL & DUNN, PLLC
Post Office Drawer 1389
New Bern, North Carolina 28563
(252) 633-3800 (PHONE)
(919) 833-6669 (FAX)

/s/ Charles J. Cushman
Charles J. Cushman
State Bar No. 36170
ccushman@emanuelanddunn.com
EMANUEL & DUNN, PLLC
Post Office Drawer 1389
New Bern, North Carolina 28563
(252) 633-3800 (PHONE)
(919) 833-6669 (FAX)

13

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
ROSE LORENZO

## DEFENDANTS
PRIME COMMUNICATIONS, L.P.

**(b)** County of Residence of First Listed Plaintiff   Wake
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Stephen A. Dunn, Emanuel & Dunn PLLC, POB 426, Raleigh NC 27602, (919) 832-0329; Raymond E. Dunn, Jr., Charles J. Cushman, Emanuel & Dunn PLLC, POB 1389, New Bern NC 28563, (252) 633-3800

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government Plaintiff

☒ 3   Federal Question
    *(U.S. Government Not a Party)*

☐ 2   U.S. Government Defendant

☐ 4   Diversity
    *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)*     and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | Liability | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | ☒ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 380 Other Personal Property Damage | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Empl. Ret. Inc. | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | Security Act | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district *(specify)*    ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U.S.C. § 216(b) (FLSA) and 28 U.S.C. § 1367(supplemental jurisdiction), N.C.G.S. § 95-25.1 et seq

Brief description of cause:
Violation of wage and hour provisions of federal and state law

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE          DOCKET NUMBER

DATE
02/17/2012

SIGNATURE OF ATTORNEY OF RECORD
/s/ Stephen A. Dunn

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE

Case 5:12-cv-00069-H   Document 1-1   Filed 02/17/12   Page 1 of 2

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.    (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.    Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.    Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.    Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.    Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**    Example:    U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.    Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# UNITED STATES DISTRICT COURT

for the

Eastern District of North Carolina

| | |
|---|---|
| ROSE LORENZO | ) |
| _Plaintiff_ | ) ) |
| v. | ) Civil Action No. |
| PRIME COMMUNICATIONS, L.P. | ) ) |
| _Defendant_ | ) ) |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_  Prime Communications, L.P.
c/o Capitol Corporate Services, Inc., its registered agent
120 Penmarc Drive, Suite 118
Raleigh, NC 27603

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Stephen A. Dunn
EMANUEL & DUNN, PLLC
PO Box 426
Raleigh NC 27602

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_CLERK OF COURT_

Date: _____            _____
_Signature of Clerk or Deputy Clerk_

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)*

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

| | | |
|---|---|---|
| ROSE LORENZO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Action No. 5:12-cv-69-H** |
| | ) | |
| PRIME COMMUNICATIONS, L.P., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT PRIME COMMUNICATIONS, L.P.'S
## ANSWER TO PLAINTIFF'S COMPLAINT AND
## DEMAND FOR ARBITRATION

NOW COMES Defendant Prime Communications, L.P. ("Defendant Prime"), by and through counsel, and responds to the allegations set forth in Plaintiff's Complaint as follows:

### FIRST DEFENSE AND DEMAND FOR ARBITRATION

Defendant Prime states as an affirmative defense that in the 2010 Employee Handbook, under the section entitled, "Conflict/Dispute Resolution," (page 23) the parties to this action have agreed to the procedure in which disputes are to be handled concerning employment related issues, including wage disputes. Under this section, among other things, the parties are to resolve employment related issues through binding arbitration in accordance with the Dispute/Conflict Resolution Program. THEREFORE, Defendant Prime moves this court to stay these proceedings, so that the parties may conduct arbitration in accordance with the Dispute/Conflict Resolution Program.

## SECOND DEFENSE

The responses and allegations in Plaintiff's "Introduction" require no response from Defendant Prime. If a response is deemed required, then the responses and allegations contained in the "Introduction" are denied to the extent they contradict any allegations admitted herein.

## THIRD DEFENSE

Defendant Prime answering the enumerated paragraphs of Plaintiff's Complaint responds as follows:

1.     The allegations contained in Paragraph 1 of Plaintiff's Complaint are conclusions of law, where no response is required from Defendant Prime. If a response is deemed required, the allegations contained in Paragraph 1 of Plaintiff's Complaint are denied.

2.     It is admitted that the causes of action asserted in Plaintiff's Complaint occurred and/or accrued in Wake County, North Carolina. It is also admitted that Defendant Prime owns and/or operates one or more retail stores in Wake County, North Carolina. All of the other allegations contained in Paragraph 2 of Plaintiff's Complaint are denied.

3.     The allegations contained in Paragraph 3 of Plaintiff's Complaint are admitted upon information and belief.

4.     The allegations contained in Paragraph 4 of Plaintiff's Complaint are admitted.

5.     The allegations contained in Paragraph 5 of Plaintiff's Complaint are admitted.

6.     It is admitted that in January of 2010, Defendant Prime promoted Plaintiff to store manager and relocated her to its Middle Creek Commons Store in Raleigh. It is also admitted that Plaintiff began working as a store manager on or around January 30, 2010. All other allegations contained in Paragraph 6 of Plaintiff's Complaint are denied.

2

7. It is admitted that Plaintiff's first pay date as a store manager was February 19, 2010. All other allegations contained in Paragraph 7 of Plaintiff's Complaint are denied.

8. It is admitted that as a store manager Plaintiff received a salary but was not eligible for receiving compensation for overtime hours worked, through and including her last day of work on June 17, 2011. It is also admitted the Defendant Prime keeps track of all its employees' and managers' hours of work by using a punch clock. It is also admitted that Plaintiff was paid on a bi-weekly basis. All other allegations contained in Paragraph 8 of Plaintiff's Complaint are denied.

9. It is admitted that as a part of her duties as a store manager, Plaintiff was required to keep the Middle Creek Commons Store open nine hours per day, seven days a week and to participate in telephone conferences as needed. It is also admitted that Plaintiff had the authority to hire up to two employees to work under her supervision at the Middle Creek Commons Store during these hours. All other allegations contained in Paragraph 9 of Plaintiff's Complaint are denied.

10. The allegations contained in Paragraph 10 of Plaintiff's Complaint are admitted.

11. The language and wording of the 2010 Employee Handbook speaks for itself and is the best evidence of its contents. Therefore, any misleading or misstated quotations from that handbook contained in Paragraph 11 of Plaintiff's Complaint are denied. It is admitted that Plaintiff was defined as a "Salary, exempt" employee upon her promotion to store manager in January of 2010. It is also admitted that hourly associates are eligible for overtime pay in accordance with the 2010 Employee Handbook. All other allegations contained in Paragraph 11 of Plaintiff's Complaint are denied.

3

12.     The allegations contained in Paragraph 12 of Plaintiff's Complaint state conclusions of law, where no response is required of Defendant Prime. However, if a response is deemed required, the allegations contained in Paragraph 12 of Plaintiff's Complaint are denied.

13.     The allegations contained in Paragraph 13 of Plaintiff's Complaint are denied.

14.     The allegations contained in Paragraph 14 of Plaintiff's Complaint are admitted as read and understood by Defendant Prime.

15.     The allegations contained in Paragraph 15 of Plaintiff's Complaint are admitted as read and understood by Defendant Prime.

16.     The allegations contained in Paragraph 16 of Plaintiff's Complaint are denied as worded.

17.     The allegations contained in Paragraph 17 of Plaintiff's Complaint are denied.

18.     The allegations contained in Paragraph 18 of Plaintiff's Complaint are denied.

19.     In responding to the allegations contained in Paragraph 19 of Plaintiff's Complaint it is admitted the Defendant Prime would deduct deactivation chargebacks from the gross profit in determining what bonus, if any, its store managers were to receive. All other allegations contained in Paragraph 19, including subparts, contained in Plaintiff's Complaint are denied.

20.     The allegations contained in Paragraph 20 of Plaintiff's Complaint are denied.

21.     The allegations contained in Paragraph 21 of Plaintiff's Complaint are denied.

22.     The allegations contained in Paragraph 22 of Plaintiff's Complaint are denied.

23.     The allegations contained in Paragraph 23 of Plaintiff's Complaint are denied.

24.     The language and wording of the 2010 Employee Handbook speaks for itself and is the best evidence of its contents. Therefore, any misleading or misstated quotations from that handbook contained in Paragraph 24 of Plaintiff's Complaint are denied. All other allegations

4

contained in Paragraph 24 of Plaintiff's Complaint are denied to the extent they contradict the wording of the 2010 Employee Handbook.

25.    The allegations contained in Paragraph 25 of Plaintiff's Complaint are denied.

26.    The responses to the allegations of Paragraph 1-25 above are restated and incorporated herein by reference.

27.    The allegations contained in Paragraph 27 of Plaintiff's Complaint are denied.

28.    The allegations contained in Paragraph 28 of Plaintiff's Complaint are denied as worded.

29.    The allegations contained in Paragraph 29 of Plaintiff's Complaint are denied.

30.    The allegations contained in Paragraph 30 of Plaintiff's Complaint are denied.

31.    The allegations contained in Paragraph 31 of Plaintiff's Complaint are denied.

32.    The allegations contained in Paragraph 32 of Plaintiff's Complaint are denied.

33.    The responses to the allegations of Paragraph 1-32 above are restated and incorporated herein by reference.

34.    The allegations contained in Paragraph 34 of Plaintiff's Complaint are denied.

35.    The allegations contained in Paragraph 35 of Plaintiff's Complaint are denied as worded.

36.    The allegations contained in Paragraph 36 of Plaintiff's Complaint are denied.

37.    The allegations contained in Paragraph 37 of Plaintiff's Complaint are denied.

38.    The allegations contained in Paragraph 38 of Plaintiff's Complaint are denied.

39.    The allegations contained in Paragraph 39 of Plaintiff's Complaint are denied.

40.    The responses to the allegations of Paragraph 1-39 above are restated and incorporated herein by reference.

5

41.     The allegations contained in Paragraph 41 of Plaintiff's Complaint are denied.

42.     The allegations contained in Paragraph 42 of Plaintiff's Complaint are denied as worded.

43.     The allegations contained in Paragraph 43 of Plaintiff's Complaint are denied as worded.

44.     The allegations contained in Paragraph 44 of Plaintiff's Complaint are denied.

45.     The allegations contained in Paragraph 45 of Plaintiff's Complaint are denied.

46.     The allegations contained in Paragraph 46 of Plaintiff's Complaint are denied.

47.     The responses to the allegations of Paragraph 1-46 above are restated and incorporated herein by reference.

48.     The allegations contained in Paragraph 48 of Plaintiff's Complaint are denied.

49.     The allegations contained in Paragraph 49 of Plaintiff's Complaint are denied as worded.

50.     The allegations contained in Paragraph 50 of Plaintiff's Complaint are conclusions of law, wherein no response is required of Defendant Prime.  However, if a response is deemed required, any allegations or inferences of negligence or misconduct on behalf of Defendant Prime contained in Paragraph 50 of Plaintiff's Complaint are denied.

51.     The allegations contained in Paragraph 51 of Plaintiff's Complaint are denied.

52.     The allegations contained in Paragraph 52 of Plaintiff's Complaint are denied as worded.

53.     The allegations contained in Paragraph 53 of Plaintiff's Complaint are denied as worded.

54.     The allegations contained in Paragraph 54 of Plaintiff's Complaint are denied.

6

55. The allegations contained in Paragraph 55 of Plaintiff's Complaint are denied.

56. The allegations contained in Paragraph 56 of Plaintiff's Complaint are denied.

57. The responses to the allegations of Paragraph 1-56 above are restated and incorporated herein by reference.

58. It is admitted that the Plaintiff would receive a bonus based upon store sales at Middle Creek Commons in accordance with the 2010 Employee Handbook, as well as the applicable Sales Compensation/Bonus Plan. All other allegations contained in Paragraph 58 of Plaintiff's Complaint are denied.

59. The allegations contained in Paragraph 59 of Plaintiff's Complaint are denied.

60. The allegations contained in Paragraph 60 of Plaintiff's Complaint are denied.

61. The responses to the allegations of Paragraph 1-60 above are restated and incorporated herein by reference.

62. The allegations contained in Paragraph 62 of Plaintiff's Complaint are denied as worded.

63. The allegations contained in Paragraph 63 of Plaintiff's Complaint pertain to the thoughts, ideas, and mental impressions of the Plaintiff, which Defendant Prime has no knowledge or information; therefore, the allegations contained in Paragraph 63 of Plaintiff's Complaint are denied.

64. It is admitted that Defendant Prime knew that their employees and managers would expect to be paid their wages. However, it is denied that Defendant Prime knew or should have known the Plaintiff expected to be paid commissions and/or bonuses, as they are discretionary pursuant to the 2010 Employee Handbook and the applicable Sales Compensation/Bonus Plan. Additionally, as a store manager, Plaintiff was eligible for a bonus if

her store met appropriate goals for the given month, as set out in the applicable Sale Compensation/Bonus Plan. All other allegations contained in Paragraph 64 of Plaintiff's Complaint are denied.

65.    The allegations contained in Paragraph 65 of Plaintiff's Complaint are denied.

66.    The allegations contained in Paragraph 66 of Plaintiff's Complaint are denied.

67.    All other allegations contained in Plaintiff's Complaint, not specifically admitted herein, are denied including Plaintiff's claim for relief.

## FOURTH DEFENSE

As an Affirmative Defense, Defendant Prime states that Plaintiff, as the store manager of the Middle Creek Commons Store in Raleigh, North Carolina was authorized to hire two employees to work at the store under her managerial control.

## FIFTH DEFENSE

As an Affirmative Defense, Defendant Prime states that Plaintiff was paid all wages, compensation, bonuses and commissions that she earned during her time as an employee and manager with Defendant Prime.

## SIXTH DEFENSE

Defendant Prime reserves the right to amend this Answer to assert any further defenses found through the course of discovery.

294261

**WHEREFORE**, Defendant Prime prays the Court that:

1. This action be stayed and that the parties are ordered to arbitration in accordance with the 2010 Employee Handbook;

2. This action be dismissed as to Prime Communications, L.P.;

3. Plaintiff have and recover nothing from Prime Communications, L.P.;

4. The costs of this action be taxed against parties other than Prime Communications, L.P.;

5. Prime Communications, L.P. have such other and further relief as the Court shall deem just and proper; and

6. In the alternative, if arbitration is denied, Prime Communications, L.P. reserves their right to trial by jury on all issues so triable.

Respectfully submitted this the 13th day of April, 2012.

**RAGSDALE LIGGETT, PLLC**

BY:  */s/ John B. Walker*
John B. Walker
N.C. State Bar No.: 35631
Post Office Box 31507
Raleigh, NC 27622-1507
Email: bwalker@rl-law.com
Telephone:  (919) 787-5200
Facsimile:  (919) 783-8991
*Attorneys for Defendant Prime*
*Communications, L.P.*

9

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of April, 2012, I electronically filed the foregoing **DEFENDANT PRIME COMMUNICATION, L.P.'S ANSWER TO PLAINTIFF'S COMPLAINT AND DEMAND FOR ARBITRATION** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

Attorneys for Plaintiff

Stephen A. Dunn
EMANUEL & DUNN, PLLC
Post Office Box 426
Raleigh, NC 27602
sdunn@emanuelanddunn.com

Raymond E. Dunn, Jr.
Charles J. Cushman
EMANUEL & DUNN, PLLC
Post Office Box 1389
New Bern, NC 28563
rdunn@emanuelanddunn.com
ccushman@emanuelanddunn.com

**RAGSDALE LIGGETT, PLLC**

BY:  /s/ John B. Walker
John B. Walker
Post Office Box 31507
Raleigh, NC 27622-1507
Email: bwalker@rl-law.com
Telephone:    (919) 787-5200
Facsimile:    (919) 783-8991
*Attorneys for Defendant Prime*
*Communications, L.P.*

10

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ROSE LORENZO, and all others similarly situated, | ) ) ) | |
| Plaintiff | ) ) | Case No. 5:12-CV-00069-H |
| v. | ) ) | |
| PRIME COMMUNICATIONS, L.P., a Texas General Partnership, | ) ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |

## FIRST AMENDED COLLECTIVE AND CLASS ACTION COMPLAINT

Plaintiff Rose Lorenzo ("Lorenzo" or "Plaintiff"), pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, within 21 days after service of a responsive pleading, amends her complaint to bring this action on her own behalf and on behalf of all others similarly situated, to recover unpaid wages, overtime, commissions, compensatory damages, liquidated damages and attorneys fees from her former employer Prime Communications, L.P. ("Prime" or "Company" or "Defendant"), for violations of the Fair Labor Standards Act (hereinafter "FLSA"), 29 U.S.C. § 201 et seq., and the North Carolina Wage and Hour Act (hereinafter "NCWHA"), N.C.G.S. § 95-25.1 et seq. Prime is one of the nation's largest specialty-based retailers of wireless communication products, services and accessories, operating over 230 stores and kiosks in regional malls and shopping centers throughout North Carolina, South Carolina, Georgia, Texas, Indiana, New York, Ohio, Pennsylvania and California, employing more than 900 people in 12 states. At all times alleged in this Complaint, Plaintiff was the victim of a uniform policy and practice to deprive her of lawful wages in willful violation of the FLSA and NCWHA.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1337 (commerce), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1367 (supplemental jurisdiction) and 29 U.S.C. § 216(b) (FLSA).

2. Venue is proper in this Court under 28 U.S.C. § 1391. The causes of action asserted herein occurred and/or accrued in Wake County, North Carolina. Venue is also appropriate in this Court because Defendant owns and/or operates one or more retail stores in Wake County, North Carolina. In addition, Defendant's unlawful conduct occurred in, among other places, North Carolina.

## PARTIES

3. Plaintiff is a natural person residing in Wake County, North Carolina and, at all relevant times asserted in this Complaint, was an employee of Defendant in its retail store located at and known as Middle Creek Commons, in Raleigh, North Carolina.

4. Defendant is an enterprise, as defined in 29 U.S.C. § 203(r)(1) and N.C.G.S. § 95-25.2(18), engaged in business in the State of North Carolina, operating retail stores and kiosks for the sale of wireless communication products, services and accessories throughout North Carolina.

## FACTUAL ALLEGATIONS – OVERTIME WAGES

5. Prior to February 2010, Defendant employed Lorenzo as a solutions specialist in its Fuquay-Varina, North Carolina retail store. As a solutions specialist, Lorenzo was paid an hourly wage. Defendant recorded Lorenzo's hours at work, regular and overtime, using a Punch Clock. Lorenzo was paid, regular and overtime pay, on a bi-weekly basis.

2

6.     In January 2010, Defendant asked Lorenzo to relocate to its Middle Creek Commons store in Raleigh as a store manager. In order to incentivize Lorenzo to move immediately to the Middle Creek Commons store, Defendant offered Lorenzo bonus wages of One Thousand Five Hundred Dollars ($1,500.00). Lorenzo accepted the Defendant's offer and moved immediately to the Middle Creek Commons store and began work as the store manager on January 30, 2010.

7.     Lorenzo's first pay date as an alleged store manager was February 19, 2010. When she received her first earnings statement (sometime after February 19, 2010), she noticed that the Defendant failed to pay her the promised bonus wages and failed to pay her overtime for the hours that she worked over Forty (40) hours during the first pay period as store manager.

8.     As an alleged store manager, Lorenzo and all others similarly situated received a salary, but the Defendant continued to record Lorenzo's hours at work, regular and overtime, using a Punch Clock. Lorenzo continued to be paid on a bi-weekly basis, but received no compensation for overtime hours worked through and including her last day of work on June 17, 2011.

9.     Defendant required Lorenzo, as store manager, to keep the Middle Creek Commons store open 9 hours per day, seven days a week, and to participate in telephone conferences at least twice a week outside of store hours. Lorenzo did not perform managerial or administrative duties. Lorenzo did not have authority to hire employees. Most of the time at the Middle Creek Commons store, Lorenzo was the only employee of the Defendant. On occasions, Defendant authorized one other employee of their selection at Middle Creek Commons. Ninety-five (95%) percent of Lorenzo's time at Middle Creek Commons involved the same customer sales activities she performed as a "solutions specialist."

3

10.     On information and belief, Defendant employed other "store managers" who were similarly situated to Plaintiff in that they primarily performed non-managerial and non-administrative duties.

11.     As a store manager, Lorenzo and all others similarly situated regularly worked hours in excess of forty hours per week.

12.     Defendant classified Lorenzo and all others similarly situated as "Salary, exempt" employees which Defendant defined in its 2010 Employee Handbook as those employees ". . . who work on salary and who are not paid based on hours worked." According to Defendant, only employees who are paid on an hourly basis are entitled to be paid "time and one-half for hours worked in excess of 40 hours in one (1) week."

13.     Thus, Defendant pays its "store manager" employees based on their title ("store manager") and method of compensation ("salary, exempt") rather than based on their substantive job functions.

14.     Lorenzo and all others similarly situated were not exempt from overtime pay under FLSA because they were not employed in a bona fide executive, administrative or professional capacity. Instead, Lorenzo was employed as an "inside" sales person who earned less than $40,000 per year and who did not earn more than one-half of her total compensation from commissions.

15.     Defendant's classifications and its policy and practice with respect to the payment of overtime wages to Lorenzo and all others similarly situated violated the FLSA and NCWHA, and deprived Lorenzo and all others similarly situated of the lawful wages to which they were entitled.

4

## FACTUAL ALLEGATIONS – COMMISSION WAGES

16.    Defendant promised to pay Lorenzo and others similarly situated, as a solutions specialists, commissions upon sales of wireless products, services and accessories calculated on "gross profit with factored discounts and features, net of costs, chargeback's [sic], and deductions."

17.    Defendant promised to pay Lorenzo and others similarly situated, as a store managers, commissions upon store sales of wireless products, services and accessories calculated upon "gross profit" which is "net of costs and chargeback's [sic] with factored discounts and features."

18.    Contrary to its promises, Defendant did not pay Lorenzo or others similarly situated commissions based upon gross profit, but only upon a portion of Defendant's gross profit allocable to the customer payment at the point of sale, which is only a fraction of the gross profit the company actually received for its store sales.

19.    Defendant omitted certain sales from its calculation of gross profit, without providing documentation or an explanation to Lorenzo or others similarly situated.

20.    Defendant refunded certain of Lorenzo's sales, and the sales of others similarly situated, further reducing gross profit, without providing documentation or an explanation to Lorenzo or others similarly situated.

21.    Defendant charged back against Lorenzo's sales, and against sales of others similarly situated, sums attributable to:

i)    cancellations and returns of wireless products, services and accessories that were unrelated to their sales;

5

ii)     cancellations and returns of wireless products, services and accessories from store sales under former store managers;

iii)    cancellations or returns of wireless products, services or accessories that had not, in fact, been cancelled or returned;

iv)    inventory shortages, without disclosure of any loss or verification of any actual loss;

v)    returns, which were in fact exchanges, without credit for its replacement; and

vi)    sales of prepaid services such as Gophones.

22.    Defendant's chargebacks on some of Lorenzo's sales, and on sales of others similarly situated, exceeded the gross profit attributable to the sale, resulting in a reduction of gross profit on other sales.

23.    Defendant's written Chargeback Policy is a one page document the purports to require compliance with undisclosed policies of Prime's carriers and vendors, and contains an incomplete list of acts or omissions that result in charge backs against employee commissions. Defendant's Chargeback Policy is summarized by Defendant in the following excerpt from its Chargeback Policy, "Because chargeback's [sic] are caused when an employee does an activity incorrectly, Prime Communications will charge back against earned commission."

24.    As a result of Prime's policies and practices with respect to the calculation of gross profit, sales omissions, and arbitrary refunds and chargebacks, earned commissions were wrongfully withheld and diverted from Lorenzo and others similarly situated.

25.    Prime's policies and practices with respect to the payment of commissions were misleading and fraudulent, were a breach of its promises to employees, violated the wage provisions

6

of the FLSA and NCWHA, and deprived Lorenzo and others similarly situated of the lawful wages to which they were entitled.

## FACTUAL ALLEGATIONS – WILLFUL CONDUCT

26.     Defendant has failed to classify Plaintiff and similarly situated employees for the purposes of their entitlement to overtime compensation under the FLSA based on their actual job functions. Rather, Defendant has arbitrarily assigned titles and has paid these employees salaried compensation for the purpose of avoiding its obligations to properly classify, and pay, its employees overtime compensation.

27.     Moreover, in an additional attempt to avoid its legal obligations with regard to the proper payment of compensation and overtime compensation, Defendant's 2010 Employee Handbook sought to establish a "Dispute/Conflict Resolution Program" which purportedly required Prime employees to waive "all rights to bring a lawsuit against Prime Communications and to a jury trial regarding any dispute, including, but not limited to, claims for pay or benefits under the Fair Labor Standards Act, Texas Pay Day Law Act or other similar state statute, the Employee Retirement Income Security Act "(ERISA," except of any vested benefits) [sic] . . . and claims of discrimination based upon race, color, religion, sex, national origin, age, retaliation of any nature or disability under federal, state or local civil rights statue [sic]; or any other claims, whether specifically employment-related or otherwise, arising from contract, tort or statue [sic] which Employee might have arising from my employment with and separation from the Company."

28.     As applied to overtime and compensation policies and practices applicable to groups of employees in similar payroll status, Defendant's dispute resolution provisions are unlawful and

7

unenforceable and demonstrate Defendant's awareness of and willful disregard for its obligations under the FLSA and NCWHA.

## COLLECTIVE CLAIMS UNDER FLSA

29.     Plaintiff brings this on her own behalf and as collective action on behalf of others similarly situated to recover unpaid compensation, in the form of overtime compensation, pursuant to FLSA. For at least three years prior to filing this complaint, Defendant has had a uniform policy and practice of requiring its store managers to work in excess of 40 hours per week for a salary without overtime compensation. Plaintiff and others similarly situated are or were employed with the Defendant in positions denominated "store manager" but their managerial duties were minimal as compared to other job duties regularly performed. Store managers, including Plaintiff, perform managerial duties less than five (5%) percent of their work week and the remainder of their time is devoted to non-managerial functions, namely on-site sales.

30.     On information and belief Defendant manages the classification of employees for FLSA purposes, including store managers, in a centralized and uniform fashion, from its Sugarland, Texas home office for all states in which Defendant operates.

31.     On further information and belief, Defendant's payroll function is operated in a centralized and uniform manner from its Sugarland, Texas home office and Plaintiff's paychecks were regularly issued from this centralized payroll operation. On information and belief, paychecks for all similarly situated employees were issued from the same, centralized payroll department in Defendant's Sugarland, Texas home office for all states in which Defendant operates.

32.     Plaintiff and others similarly situated were paid a specified salary and were not paid any overtime compensation notwithstanding they worked in excess of 40 hours per week and the

8

vast majority of those hours were spent performing non-managerial duties. Plaintiff and others similarly situated who elect to participate in this action seek unpaid overtime wage compensation, an equal amount of liquidated damages, attorneys' fees, and costs pursuant to 29 U.S.C. § 216(b).

33.     Defendant is an enterprise engaged in commerce or in the production of goods for commerce as defined by § 203(s)(1) of the FLSA.

34.     Defendant is an employer as defined by § 203(d) of the FLSA.

35.     At all times material to this action, the Plaintiff and others similarly situated are and/or were employees of Defendant as defined by § 203(e)(1) of the FLSA, and worked for Defendant within three years preceding the filing of this action.

36.     The provisions set forth in §§ 206 and 207, respectively, of the FLSA apply to Defendant, and all members of the Plaintiff class herein were covered by §§ 206 and 207 of the FLSA while they were employed by Defendant.

37.     At all times relevant to this action, Defendant employed Plaintiff and others similarly situated in the capacity of store managers.

38.     The Plaintiff and others similarly situated were required to perform non-exempt work without overtime compensation.

39.     Defendant has knowingly and intentionally failed and/or refused to pay the Plaintiff and others similarly situated overtime compensation as required by the provisions of the FLSA.

40.     For at least three years, the Defendant has been aware of the requirements of the FLSA and its corresponding regulations, notwithstanding it willfully refused and failed to pay its store managers overtime wages as required by FLSA.

9

41.     Defendant has failed, and on information and belief, continues to fail, to maintain accurate time records for Plaintiffs and other similarly situated employees as required by the FLSA.

42.     Defendant willfully violated the FLSA by failing to keep accurate time records of all hours worked by Plaintiff and other similarly situated employees.

43.     The foregoing conduct constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a), as Defendant knew or showed reckless disregard for the fact that its compensation practices were in violation of these laws.

44.     Plaintiff, and other similarly situated present and former employees, are entitled to statutory damages equal to the mandated overtime premium pay within the three (3) (or more) years preceding the filing of this Complaint.

45.     Defendant has shown a reckless disregard for the FLSA's overtime requirements. Although Defendant had an obligation to make proper inquiry into their FLSA compliance obligations, it failed to do so or, having inquired, they ignored or willfully attempted to avoid their legal obligations.

46.     Moreover, Defendant instructed its store managers that they had complied with the FLSA and paid all overtime required under federal law.  As such, Plaintiffs and similarly situated employees were misled into believing that Defendant was in full compliance with the FLSA laws concerning payment of overtime compensation to deputies.

47.     Defendant has not acted in good faith with respect to the failure to pay overtime compensation. Defendant had no legitimate reason to believe their actions and omissions were *not* a violation of the FLSA, thus entitling Plaintiff, and those similarly situated, to recover an award of

10

liquidated damages in an amount equal to the amount of unpaid overtime compensation described above.

48.     There are numerous employees and former employees of Defendant who are similarly situated to Plaintiff who have been denied overtime compensation in violation of the FLSA, who would benefit from the issuance of Court-Supervised Notice and opportunity to join the present lawsuit. Those similarly situated employees and former employees are best known to Defendant, they are readily identifiable from Defendant's records, and their overtime hours have been recorded and maintained. Accordingly, all store managers and former store managers who are or have been employed with Defendant for the last three years, who have worked overtime hours and who have not been compensated overtime wages, should be given Court-Supervised Notice of this lawsuit and opportunity to join herein.

49.     Plaintiff consents to become a party plaintiff in this representative FLSA action pursuant to 29 U.S.C. § 216(b), as evidenced by Plaintiff's "Consent to Become Party to Collective Action Under 29 U.S.C. § 216," filed herewith.

### RULE 23(b)(3) CLAIMS UNDER NCWHA

50.     Plaintiff further brings this action on her own behalf and as a Class Action pursuant to Rules 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following proposed class:

> All employees of Prime Communications LP employed in North Carolina who were promised or paid commission compensation based upon sales of wireless products, services and accessories from any store owned or operated by Prime Communications LP (the "Class").

Upon completion of discovery with respect to the scope of the Class, Plaintiff reserves the right to amend the Class definition. Excluded from the Class are Defendant, its parents, subsidiaries and affiliates, their directors and officers, and members of their immediate families.

11

51.    Numerosity:  The members of the Class are so numerous and geographically diverse that joinder of all of them is impracticable.  While the exact number and identities of members of the Class are unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes and therefore avers that there are hundreds of Class members throughout the United States.

52.    Commonality:  There are questions of fact and law common to members of the Class that predominate over any questions affecting any individual members including, *inter alia*, the following:

a.    Whether Prime has a uniform policy and practice of misleading its employees with respect to the payment of sales commissions;

b.    Whether Prime has a uniform policy and practice of misrepresenting its gross profit for purposes of calculating commissions;

c.    Whether Prime has a uniform policy and practice of manipulating its gross profit to withhold and divert sales commissions earned by its employees;

d.    Whether Prime has a uniform policy and practice of using chargebacks to withhold or divert commissions earned by its employees;

e.    Whether Prime has a uniform policy and practice of using chargebacks to reduce commissions earned by its employees without disclosure of the grounds therefore;

f.    Whether Prime has a uniform policy and practice of depriving its employees of earned commissions;

g.    Whether Prime fails to pay wages accruing its employees in accordance with the NCWHA;

h.    Whether Prime's polices and practices are willful;

i.    Whether Plaintiff and the Class are entitled to a declaratory judgment that Prime's conduct violated and/or continues to violate North Carolina law;

12

j.    Whether Plaintiff and the Class are entitled to unpaid wages, interest, liquidated damages, attorneys fees and costs and if so, in what amounts; and

k.    Whether Plaintiff and the Class are entitled to equitable relief, including injunctive relief to prohibit future policies and practices depriving Plaintiff and others similarly situated.

53.    <u>Typicality</u>: Plaintiff's claims are typical of the claims of the other members of the Class in that Plaintiff alleges a uniform policy and practice by Defendant towards members of the Class. Plaintiff, like other members of the Class, has been deprived wages under the NCWHA. Plaintiff and the other members of the Class seek identical remedies under identical legal theories, and there is no antagonism or material factual variation between Plaintiff's claims and those of the Class.

54.    <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's claims are coextensive with, and not antagonistic to, the claims of the other members of the Class. Plaintiff is willing and able to vigorously prosecute this action on behalf of the Class, and Plaintiff has retained competent counsel experienced in litigation of this nature.

55.    Plaintiff brings this action under Rule 23(b)(3) because common questions of law and fact predominate over questions of law and fact affecting individual members of the Class. The predominant issues in this action are whether Defendant is violating and has violated the NCWHA by its failure to pay wages. In addition, the expense of litigating each Class member's claim individually would be so cost prohibitive as to deny Class members a viable remedy. Certification under Rule 23(b)(3) is appropriate because a class action is superior to the other available methods for the fair and efficient adjudication of this action, and Plaintiff envisions no unusual difficulty in the management of this action as a class action.

13

## FIRST CLAIM FOR RELIEF
### Violation of the Fair Labor Standards Act
(Collective Action)

56. Plaintiff re-alleges and incorporates the preceding and subsequent paragraphs as if fully set forth herein.

57. Defendant violated Lorenzo's rights under the FLSA by failing to pay Lorenzo overtime compensation for hours worked in excess of forty (40) hours for each workweek that Lorenzo worked between February 2010 and June 17, 2011.

58. Lorenzo and all others similarly situated were entitled to all the rights and protections of the FLSA and Defendant's failure to pay Lorenzo overtime was in violation of the FLSA.

59. Defendant acted willfully and with reckless disregard for Lorenzo's rights under the FLSA.

60. Lorenzo and all others similarly situated are entitled to back pay for all overtime hours worked during their employment with Defendant in an amount equal to one and one-half times her regular rate of pay.

61. As a result of Defendant's willful and reckless actions, Lorenzo and all others similarly situated are entitled to recover liquidated damages pursuant to 29 U.S.C. § 216(b).

62. Lorenzo and all others similarly situated are entitled to recover attorney's fees pursuant to 29 U.S.C. § 216(b).

## SECOND CLAIM FOR RELIEF
### Violation of the North Carolina Wage and Hour Act – Overtime
(Rule 23(b)(3) Class Action)

63. Plaintiff re-alleges and incorporates the preceding and subsequent paragraphs as if fully set forth herein.

14

64. Defendant violated Lorenzo's rights under the NCWHA by failing to pay Lorenzo overtime compensation for hours worked in excess of forty (40) hours for each workweek that Lorenzo worked between February 2010 and June 17, 2011.

65. Lorenzo and all others similarly situated were entitled to all the rights and protections of the NCWHA and Defendant's failure to pay Lorenzo overtime was in violation of the NCWHA.

66. Defendant acted willfully and with reckless disregard for Lorenzo's rights under the NCWHA.

67. Lorenzo and all others similarly situated are entitled to back pay for all overtime hours worked during their employment with Defendant in an amount equal to one and one-half times her regular rate of pay.

68. As a result of Defendant's willful and reckless actions, Lorenzo and all others similarly situated are entitled to recover liquidated damages pursuant to N.C. Gen. Stat. § 95-25.22.

69. Lorenzo and all others similarly situated are entitled to recover attorney's fees pursuant to N.C. Gen. Stat. § 95-25.22(d).

### THIRD CLAIM FOR RELIEF
**Violation of the North Carolina Wage and Hour Act – Unpaid Commissions**
(Rule 23(b)(3) Class Action)

70. Plaintiff re-alleges and incorporates the preceding and subsequent paragraphs as if fully set forth herein.

71. Defendant violated Lorenzo's rights under the NCWHA by failing to pay and diverting from Lorenzo earned commissions on store sales that she procured before her employment ended on June 17, 2011.

15

72.     Lorenzo and all others similarly situated were entitled to all rights and protections of the NCWHA and Defendant violated the NCWHA by failing to pay and diverting from Lorenzo and all others similarly situated earned commissions on store sales that were procured during employment.

73.     Lorenzo and all others similarly situated are entitled to recovery of earned but unpaid commissions for all store sales that were procured during employment.

74.     Defendant acted willfully and with reckless disregard for Lorenzo's rights under the NCWHA.

75.     As a result of Defendant's willful action, Lorenzo and all others similarly situated are entitled to recover liquidated damages pursuant to N.C. Gen. Stat. § 95-25.22

76.     Lorenzo and all others similarly situated are entitled to recover attorney's fees pursuant to N.C. Gen. Stat. § 95-25.22(d).

### FOURTH CLAIM FOR RELIEF
**Violation of the North Carolina Wage and Hour Act – Bonus**
(Plaintiff Lorenzo Individually)

76.     Plaintiff re-alleges and incorporates the preceding and subsequent paragraphs as if fully set forth herein.

77.     In order to induce Lorenzo to accept the position as store manager of the Middle Creek Commons in Raleigh, Defendant promised to pay Lorenzo a bonus of One Thousand Five Hundred Dollars ($1,500.00).

78.     After accepting the position and commencing work at the Middle Creek Commons store in Raleigh, Defendant failed and refused to pay Lorenzo the guaranteed bonus.

16

79.     Under the NCWHA, bonuses promised by an employer are deemed to be wages as defined by N.C. Gen. Stat. § 95-25.2(16).

80.     Defendant violated Lorenzo's rights under the NCWHA by failing to pay and diverting from Lorenzo the bonus promised by Defendant on or before her next regular payday after her employment ended on June 17, 2011.

81.     Lorenzo was entitled to all rights and protections of the NCWHA and Defendant violated the NCWHA by failing to pay and diverting from Lorenzo the bonus promised by Defendant on or before her next regular payday after her employment ended on June 17, 2011.

82.     Lorenzo is entitled to recovery of all bonuses promised by the Defendant.

83.     Defendant acted willfully and with reckless disregard for Lorenzo's rights under the NCWHA.

84.     As a result of Defendant's willful action, Lorenzo is entitled to recover liquidated damages pursuant to N.C. Gen. Stat. § 95-25.22.

85.     Lorenzo is entitled to recover her attorney's fees pursuant to N.C. Gen. Stat. § 95-25.22(d).

**FIFTH CLAIM FOR RELIEF**
**Breach of Contract**
(Plaintiff Lorenzo Individually)

86.     Plaintiff re-alleges and incorporates the preceding and subsequent paragraphs as if fully set forth herein.

87.     Defendant and Plaintiff entered into an employment agreement in which the parties mutually agreed that the Plaintiff would be paid a bonus of One Thousand Five Hundred Dollars

17

($1,500.00) and that the Plaintiff would receive commissions upon store sales at Middle Creek Commons of wireless products, services and accessories calculated upon "gross profit."

88.     Defendant failed to pay Lorenzo commissions and bonuses as promised and has breached its agreement with Lorenzo by failing to do so.

89.     As a direct and proximate result of Defendant's breach of contract, Lorenzo has been damaged and is entitled to recover from the Defendant a sum in excess of $10,000.00.

**SIXTH CLAIM FOR RELIEF**
**Unjust Enrichment**
(Plaintiff Lorenzo Individually)

90.     Plaintiff re-alleges and incorporates the preceding and subsequent paragraphs as if fully set forth herein.

91.     The wages, commissions, and bonuses which were withheld and diverted by the Defendant were of significant value to Lorenzo.

92.     Lorenzo reasonably expected Defendant to pay her the wages, commissions, and bonus promised.

93.     Defendant knew or should have known that Lorenzo expected to be paid the wages, commissions, and bonuses promised by the Defendant prior to the end of her employment on June 17, 2011.

94.     Defendant withheld and diverted from Lorenzo wages, commissions, and bonuses promised.

95.     Defendant has been unjustly enriched at the expense of Lorenzo in a sum in excess of Ten Thousand Dollars ($10,000.00).

18

## JURY DEMAND

Plaintiff hereby demands a trail by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, individually and on behalf of all other similarly situated employees and former employees of Defendant, prays for the following relief:

A.      At the earliest possible time, she be allowed to give notice, or that the Court issue such Notice, to all Defendant's employees and former employees during the three years immediately preceding the filing of this suit, to all other potential Plaintiffs who may be similarly situated informing them that this action has been filed, the nature of the action, and of their right to opt-into this lawsuit if they worked overtime but were not paid overtime wages therefore, pursuant to 29 U.S.C. § 216(b);

B.      Designate this action as a collective action on behalf of the FLSA collective class pursuant to 29 U.S.C. § 216(b);

C.      Enter judgment declaring that the acts and practices complained of herein are violations of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*;

D.      Enter judgment that the Plaintiff, and all others similarly situated, be awarded damages in the amount of their respective unpaid overtime wage compensation, plus an equal amount of liquidated damages pursuant to 29 U.S.C. § 216(b), and prejudgment interest;

E.      Enter judgment that Defendant's violations of the FLSA were willful;

F.      For an order certifying the Class under the appropriate provisions of Rule 23, naming Plaintiff as the representative of the Class and its attorneys as Class counsel;

G.      Declaring that Defendant's conduct violates NCWHA;

H.      Enter judgment that the Plaintiff, and all others similarly situated, be awarded damages in the amount of their respective unpaid commission wage compensation, plus an equal amount of liquidated damages pursuant to N.C.G.S. § 95-25.22, and prejudgment interest;

I.      Enter judgment awarding Plaintiff Lorenzo compensatory damages against the Defendant, in an amount to be determined, for unpaid bonuses, breach of contract, and unjust enrichment;

19

J.   Enter judgment awarding Plaintiff, and those similarly situated, reasonable attorney's fees and costs of this suit, pursuant to N.C. Gen. Stat. § 95-25.22(d) and 29 U.S.C. § 216(b);

K.   Enter judgment for post-judgment interest at the applicable legal rate;

L.   Grant leave to amend to add additional plaintiffs by motion, the filing of written consent forms, or any other method approved by the Court; to add claims under applicable state and federal laws, including claims for minimum wages pursuant to 29 U.S.C. § 206; and/or to add other Defendants who meet the definition of Plaintiffs' employer, pursuant to 29 U.S.C. § 203(d);

M.   Enjoin Defendant from future violations of the FLSA through the mandated payment of overtime compensation to similarly situated employees for hours worked in excess of forty (40) per week;

N.   Such other legal and equitable relief including, but not limited to, any injunctive and/or declaratory relief, to which they may be entitled; and

O.   Such further relief as this Court deems just and appropriate.

**Dated**: May 4, 2012.                     Respectfully submitted,

**ROSE LORENZO,**
By Her Undersigned Attorneys

/s/ Stephen A. Dunn
Stephen A. Dunn (NC State Bar No.12389)
sdunn@emanuelanddunn.com

/s/ Raymond E. Dunn, Jr.
Raymond E. Dunn, Jr. (NC State Bar No. 8739)
rdunn@emanuelanddunn.com

/s/ Charles J. Cushman
Charles J. Cushman (NC State Bar No. 36170)
ccushman@emanuelanddunn.com
EMANUEL & DUNN, PLLC
Post Office Box 426
Raleigh, North Carolina 27602
(919) 832-0329 (PHONE)
(919) 832-0731 (FAX)

20

/s/ Harris D. Butler, III
Harris D. Butler, III (VSB No. 26483)
harris.butler@butlerroyals.com

/s/ Zev H. Antell
Zev H. Antell (VSB No. 74634)
zev.antell@butlerroyals.com
BUTLER ROYALS, PLC
100 Shockoe Slip, 4th Floor
Richmond, Virginia 23219
T: (804) 648-4848
F: (804) 648-6814

*PRO HAC VICE TO BE FILED*

21

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
CASE NO.: 5:12-CV-69-H

ROSE LORENZO, individually and on )
behalf of others similarly situated, )
                                          )
                       Plaintiffs, )
                                          )         CONSENT TO BECOME PARTY
          v.                          )           TO COLLECTIVE ACTION
                                          )           UNDER 29 U.S.C. § 216
PRIME COMMUNICATIONS, L.P., a )
Texas General Partnership, )
                                          )
                     Defendant. )

       The undersigned, a current or former employee of Prime Communications, Inc., hereby

consents to become a party plaintiff in this representative FSLA action pursuant to 29 U.S.C. §

216(b), effective this 12th day of April, 2012.

                                  _____
                                  Signature

                                  _____
                                  Print Name

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

ROSE LORENZO,                          )
                                       )
                Plaintiff,             )
                                       )
v.                                     )        **Civil Action No. 5:12-cv-69-H**
                                       )
PRIME COMMUNICATIONS, L.P.,            )
                                       )
                Defendant.             )
_____)

### DEFENDANT PRIME COMMUNICATIONS, L.P.'S ANSWER TO PLAINTIFF'S FIRST AMENDED COLLECTIVE AND CLASS ACTION COMPLAINT AND DEFENDANT PRIME COMMUNICATIONS, L.P.'S DEMAND FOR ARBITRATION

NOW COMES Defendant Prime Communications, L.P. ("Defendant Prime"), by and through counsel, and responds to the allegations set forth in Plaintiff's Amended Complaint as follows:

### FIRST DEFENSE AND DEMAND FOR ARBITRATION

Defendant Prime states as an affirmative defense that in the 2010 Employee Handbook, under the section entitled, "Conflict/Dispute Resolution," (page 23) the parties to this action have agreed to the procedure in which disputes are to be handled concerning employment related issues, including wage disputes. Under this section, among other things, the parties are to resolve employment related issues through binding arbitration in accordance with the Dispute/Conflict Resolution Program. THEREFORE, Defendant Prime moves this court to stay these proceedings, so that the parties may conduct arbitration in accordance with the Dispute/Conflict Resolution Program.

1

## SECOND DEFENSE

Defendant Prime states that this court should refuse supplemental jurisdiction pursuant to 28 U.S.C. §1367(c) as to Plaintiff's North Carolina Wage and Hour Act ("NCWHA") claims and other state claims as alleged in Plaintiff's Amended Complaint because those claims substantially predominate over the claims over which this court has original jurisdiction.

## THIRD DEFENSE

In Plaintiff's "Introduction," it is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure. The remaining responses and allegations in Plaintiff's "Introduction" require no response from Defendant Prime. If a response is deemed required, then the responses and allegations contained in the "Introduction" are denied to the extent they contradict any allegations admitted herein.

## FOURTH DEFENSE

Defendant Prime answering the enumerated paragraphs of Plaintiff's First Amended Collective and Class Action Complaint ("Amended Complaint") responds as follows:

1.     The allegations contained in Paragraph 1 of Plaintiff's Amended Complaint are conclusions of law, where no response is required from Defendant Prime. If a response is deemed required, the allegations contained in Paragraph 1 of Plaintiff's Amended Complaint are denied.

2.     It is admitted that the causes of action asserted in Plaintiff's Amended Complaint occurred and/or accrued in Wake County, North Carolina. It is also admitted that Defendant Prime owns and/or operates one or more retail stores in Wake County, North Carolina. All of the other allegations contained in Paragraph 2 of Plaintiff's Amended Complaint are denied.

2

3.     The allegations contained in Paragraph 3 of Plaintiff's Amended Complaint are admitted upon information and belief.

4.     The allegations contained in Paragraph 4 of Plaintiff's Amended Complaint are admitted.

5.     The allegations contained in Paragraph 5 of Plaintiff's Amended Complaint are admitted.

6.     It is admitted that in January of 2010, Defendant Prime promoted Plaintiff to store manager and relocated her to its Middle Creek Commons Store in Raleigh.  It is also admitted that Plaintiff began working as a store manager on or around January 30, 2010.  All other allegations contained in Paragraph 6 of Plaintiff's Amended Complaint are denied.

7.     It is admitted that Plaintiff's first pay date as a store manager was February 19, 2010.  All other allegations contained in Paragraph 7 of Plaintiff's Amended Complaint are denied.

8.     It is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.  It is admitted that as a store manager Plaintiff received a salary but was not eligible for receiving compensation for overtime hours worked.  It is also admitted the Defendant Prime keeps track of all its employees' and managers' hours of work by using a punch clock.  It is also admitted that Plaintiff was paid on a bi-weekly basis.  All other allegations contained in Paragraph 8 of Plaintiff's Amended Complaint are denied.

9.     It is admitted that as a part of her duties as a store manager, Plaintiff was required to keep the Middle Creek Commons Store open nine hours per day, seven days a week and to

3

participate in telephone conferences as needed. All other allegations contained in Paragraph 9 of Plaintiff's Amended Complaint are denied.

10.     The allegations contained in Paragraph 10 of Plaintiff's Amended Complaint are denied.

11.     The allegations contained in Paragraph 11 of Plaintiff's Amended Complaint are admitted as to Plaintiff. However, the allegations are denied as to "all others similarly situated," since their identity is unknown and number of hours worked in a given week is specific to each manager at each specific store. Additionally, it is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.

12.     The language and wording of the 2010 Employee Handbook speaks for itself and is the best evidence of its contents. Therefore, any misleading or misstated quotations from that handbook contained in Paragraph 12 of Plaintiff's Amended Complaint are denied. It is admitted that Plaintiff was defined as a "Salary, exempt" employee upon her promotion to store manager in January of 2010. It is also admitted that hourly associates are eligible for overtime pay in accordance with the 2010 Employee Handbook. It is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure. All other allegations contained in Paragraph 12 of Plaintiff's Amended Complaint are denied.

13.     The allegations contained in Paragraph 13 of Plaintiff's Amended Complaint are denied as worded. Also, it is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.

4

14. The allegations contained in Paragraph 14 of Plaintiff's Amended Complaint state conclusions of law, where no response is required of Defendant Prime. However, if a response is deemed required, the allegations contained in Paragraph 14 of Plaintiff's Amended Complaint are denied.

15. The allegations contained in Paragraph 15 of Plaintiff's Amended Complaint are denied.

16. The allegations as they pertain to Plaintiff contained in Paragraph 16 of Plaintiff's Amended Complaint are admitted as read and understood by Defendant Prime. However, it is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.

17. The allegations as they pertain to Plaintiff contained in Paragraph 17 of Plaintiff's Amended Complaint are admitted as read and understood by Defendant Prime. However, it is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.

18. The allegations contained in Paragraph 18 of Plaintiff's Amended Complaint are denied as worded. Also, it is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.

19. The allegations contained in Paragraph 19 of Plaintiff's Amended Complaint are denied.

20. The allegations contained in Paragraph 20 of Plaintiff's Amended Complaint are denied.

21. In responding to the allegations contained in Paragraph 21 of Plaintiff's Amended Complaint it is admitted the Defendant Prime would deduct deactivation charge backs from the

5

gross profit in determining what bonus, if any, its store managers were to receive. All other allegations contained in Paragraph 21, including subparts, contained in Plaintiff's Amended Complaint are denied. Also, it is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.

22.   The allegations contained in Paragraph 22 of Plaintiff's Amended Complaint are denied.

23.   The allegations contained in Paragraph 23 of Plaintiff's Amended Complaint are denied as worded. Also, the language and wording of the Chargeback Policy speaks for itself and is the best evidence of its contents. Therefore, any misleading or misstated quotations from that document contained in Paragraph 23 of Plaintiff's Amended Complaint are denied.

24.   The allegations contained in Paragraph 24 of Plaintiff's Amended Complaint are denied.

25.   The allegations contained in Paragraph 25 of Plaintiff's Amended Complaint are denied.

26.   The allegations contained in Paragraph 26 of Plaintiff's Amended Complaint are denied.

27.   The language and wording of the 2010 Employee Handbook speaks for itself and is the best evidence of its contents. Therefore, any misleading or misstated quotations from that handbook contained in Paragraph 27 of Plaintiff's Amended Complaint are denied. All other allegations contained in Paragraph 27 of Plaintiff's Amended Complaint are denied to the extent they contradict the wording of the 2010 Employee Handbook.

28.     The allegations contained in Paragraph 28 of Plaintiff's Amended Complaint are denied. Also, it is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.

29.     The allegations contained in Paragraph 29 of Plaintiff's Amended Complaint are denied. Also, it is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.

30.     The allegations contained in Paragraph 30 of Plaintiff's Amended Complaint are denied as worded.

31.     It is admitted that Defendant Prime's payroll function is operated in a centralized and uniform manner from its Sugarland, Texas home office. It is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure. All other allegations contained in Paragraph 31 of Plaintiff's Amended Complaint are denied.

32.     It is admitted that Plaintiff, as a store manager, was paid a specified salary and was not eligible for overtime compensation. It is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure. All other allegations contained in Paragraph 32 of Plaintiff's Amended Complaint are denied.

33.     The allegations contained in Paragraph 33 of Plaintiff's Amended Complaint are conclusions of law, where no response is required from Defendant Prime. If a response is deemed required, the allegations contained in Paragraph 33 of Plaintiff's Amended Complaint are admitted.

296632

34.     The allegations contained in Paragraph 34 of Plaintiff's Amended Complaint are conclusions of law, where no response is required from Defendant Prime.  If a response is deemed required, the allegations contained in Paragraph 34 of Plaintiff's Amended Complaint are admitted.

35.     The allegations contained in Paragraph 35 of Plaintiff's Amended Complaint are conclusions of law, where no response is required from Defendant Prime.  However, it is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.  Therefore, the allegations contained in Paragraph 35 of Plaintiff's Amended Complaint are denied.

36.     The allegations contained in Paragraph 36 of Plaintiff's Amended Complaint are conclusions of law, where no response is required from Defendant Prime.  However, it is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.  Therefore, the allegations contained in Paragraph 36 of Plaintiff's Amended Complaint are denied.

37.     The allegations in Paragraph 37 of Plaintiff's Amended Complaint as they pertain to Plaintiff are admitted,.  However, it is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.

38.     It is admitted that Plaintiff, as a store manager, was paid a specified salary and was not eligible for overtime compensation.  It is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.  All other allegations contained in Paragraph 38 of Plaintiff's Amended Complaint are denied.

39. The allegations contained in Paragraph 39 of Plaintiff's Amended Complaint are denied.

40. The allegations contained in Paragraph 40 of Plaintiff's Amended Complaint are denied.

41. The allegations contained in Paragraph 41 of Plaintiff's Amended Complaint are denied.

42. The allegations contained in Paragraph 42 of Plaintiff's Amended Complaint are denied.

43. The allegations contained in Paragraph 43 of Plaintiff's Amended Complaint are denied.

44. The allegations contained in Paragraph 44 of Plaintiff's Amended Complaint are denied. Additionally, it is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.

45. The allegations contained in Paragraph 45 of Plaintiff's Amended Complaint are denied.

46. The allegations contained in Paragraph 46 of Plaintiff's Amended Complaint are denied.

47. The allegations contained in Paragraph 47 of Plaintiff's Amended Complaint are denied.

48. The allegations contained in Paragraph 48 of Plaintiff's Amended Complaint are denied. Specifically, it is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.

49.     The allegations contained in Paragraph 49 of Plaintiff's Amended Complaint are conclusions of law, where no response is required from Defendant Prime.  If a response is deemed required, the allegations contained in Paragraph 49 of Plaintiff's Amended Complaint are denied.

50.     It is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.  Therefore, the allegations contained in Paragraph 50 of Plaintiff's Amended Complaint are denied.

51.     It is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.  Therefore, the allegations contained in Paragraph 51 of Plaintiff's Amended Complaint are denied.

52.     It is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.  Therefore, the allegations contained in Paragraph 52 of Plaintiff's Amended Complaint, including all subparts, are denied.

53.     It is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.  Therefore, the allegations contained in Paragraph 53 of Plaintiff's Amended Complaint are denied.

54.     It is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.  Therefore, the allegations contained in Paragraph 54 of Plaintiff's Amended Complaint are denied.

55.     It is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.  Therefore, the allegations contained in Paragraph 55 of Plaintiff's Amended Complaint are denied.

56.     The responses to the allegations of Paragraph 1-55 above are restated and incorporated herein by reference.

57.     The allegations contained in Paragraph 57 of Plaintiff's Amended Complaint are denied.

58.     The allegations contained in Paragraph 58 of Plaintiff's Amended Complaint are denied as worded.  Also, it is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.

59.     The allegations contained in Paragraph 59 of Plaintiff's Amended Complaint are denied.

60.     The allegations contained in Paragraph 60 of Plaintiff's Amended Complaint are denied.

61.     The allegations contained in Paragraph 61 of Plaintiff's Amended Complaint are denied.

62.     The allegations contained in Paragraph 62 of Plaintiff's Amended Complaint are denied.

63.     The responses to the allegations of Paragraph 1-62 above are restated and incorporated herein by reference.

64.     The allegations contained in Paragraph 64 of Plaintiff's Amended Complaint are denied.

65.     The allegations contained in Paragraph 65 of Plaintiff's Amended Complaint are denied as worded.  Also, it is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.

66.     The allegations contained in Paragraph 66 of Plaintiff's Amended Complaint are denied.

67.     The allegations contained in Paragraph 67 of Plaintiff's Amended Complaint are denied.

68.     The allegations contained in Paragraph 68 of Plaintiff's Amended Complaint are denied.

69.     The allegations contained in Paragraph 69 of Plaintiff's Amended Complaint are denied.

70.     The responses to the allegations of Paragraph 1-69 above are restated and incorporated herein by reference.

71.     The allegations contained in Paragraph 71 of Plaintiff's Amended Complaint are denied.

72.     The allegations contained in Paragraph 72 of Plaintiff's Amended Complaint are denied as worded. Also, it is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.

73.     The allegations contained in Paragraph 73 of Plaintiff's Amended Complaint are denied as worded. Also, it is denied that there is a recognizable class under either Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure.

74.     The allegations contained in Paragraph 74 of Plaintiff's Amended Complaint are denied.

75.     The allegations contained in Paragraph 75 of Plaintiff's Amended Complaint are denied.

12

76.     The allegations contained in Paragraph 76 of Plaintiff's Amended Complaint are denied.

76.[1]     The responses to the allegations of Paragraph 1-76 above are restated and incorporated herein by reference.

77.     The allegations contained in Paragraph 77 of Plaintiff's Amended Complaint are denied.

78.     The allegations contained in Paragraph 78 of Plaintiff's Amended Complaint are denied as worded.

79.     The allegations contained in Paragraph 79 of Plaintiff's Complaint are conclusions of law, wherein no response is required of Defendant Prime. However, if a response is deemed required, any allegations or inferences of negligence or misconduct on behalf of Defendant Prime contained in Paragraph 79 of Plaintiff's Complaint are denied.

80.     The allegations contained in Paragraph 80 of Plaintiff's Amended Complaint are denied.

81.     The allegations contained in Paragraph 81 of Plaintiff's Amended Complaint are denied as worded.

82.     The allegations contained in Paragraph 82 of Plaintiff's Amended Complaint are denied as worded.

83.     The allegations contained in Paragraph 83 of Plaintiff's Amended Complaint are denied.

84.     The allegations contained in Paragraph 84 of Plaintiff's Amended Complaint are denied.

---

[1] There are two Paragraph 76s in Plaintiff's Amended Complaint. Defendant Prime has answered them in the order that they appear.

296632

85.     The allegations contained in Paragraph 85 of Plaintiff's Amended Complaint are denied.

86.     The responses to the allegations of Paragraph 1-85 above are restated and incorporated herein by reference.

87.     It is admitted that the Plaintiff would receive a bonus based upon store sales at Middle Creek Commons in accordance with the 2010 Employee Handbook, as well as the applicable Sales Compensation/Bonus Plan. All other allegations contained in Paragraph 87 of Plaintiff's Amended Complaint are denied.

88.     The allegations contained in Paragraph 88 of Plaintiff's Amended Complaint are denied.

89.     The allegations contained in Paragraph 89 of Plaintiff's Amended Complaint are denied.

90.     The responses to the allegations of Paragraph 1-89 above are restated and incorporated herein by reference.

91.     The allegations contained in Paragraph 91 of Plaintiff's Amended Complaint are denied as worded.

92.     The allegations contained in Paragraph 92 of Plaintiff's Amended Complaint pertain to the thoughts, ideas, and mental impressions of the Plaintiff, which Defendant Prime has no knowledge or information; therefore, the allegations contained in Paragraph 92 of Plaintiff's Amended Complaint are denied.

93.     It is admitted that Defendant Prime knew that their employees and managers would expect to be paid their wages. However, it is denied that Defendant Prime knew or should have known the Plaintiff expected to be paid commissions and/or bonuses, as they are

discretionary pursuant to the 2010 Employee Handbook and theapplicable Sales Compensation/Bonus Plan. Additionally, as a store manager, Plaintiff was eligible for a bonus if her store met appropriate goals for the given month, as set out in the applicable Sale Compensation/Bonus Plan. All other allegations contained in Paragraph 93 of Plaintiff's Amended Complaint are denied.

94. The allegations contained in Paragraph 94 of Plaintiff's Amended Complaint are denied.

95. The allegations contained in Paragraph 95 of Plaintiff's Amended Complaint are denied.

96. All other allegations contained in Plaintiff's Amended Complaint, not specifically admitted herein, are denied including Plaintiff's claim for relief.

## FIFTH DEFENSE

As an Affirmative Defense, Defendant Prime alleges that there is not a recognizable class under Rule 23 of the Federal Rules of Civil Procedure or Rule 23 of the North Carolina Rules of Civil Procedure and joinder of individual purported class members is impractical and should not be permitted. Moreover, Plaintiff's claims are inappropriate for handling as a collective or class action for failure to satisfy the applicable Rules of Civil Procedure.

## SIXTH DEFENSE

As an Affirmative Defense, Defendant Prime alleges that Plaintiff's claims are inappropriate for handling as a class action since the common questions of law and fact do not predominate over the individual claims of the class members as required under the applicable Rules of Civil Procedure governing collective or class actions.

15

## SEVENTH DEFENSE

As an Affirmative Defense, Defendant Prime alleges that Plaintiff's claims are inappropriate for handling as a class action since the claims of the named Plaintiff is not typical of the claims of the purported class as required by the applicable Rules of Civil Procedure governing collective or class actions.

## EIGHTH DEFENSE

As an Affirmative Defense, Defendant Prime states that Plaintiff, as the store manager of the Middle Creek Commons Store in Raleigh, North Carolina was authorized to hire two employees to work at the store under her managerial control.

## NINTH DEFENSE

As an Affirmative Defense, Defendant Prime states that Plaintiff was paid all wages, compensation, bonuses and commissions that she earned during her time as an employee and manager with Defendant Prime.

## TENTH DEFENSE

Defendant Prime reserves the right to amend this Answer to assert any further defenses found through the course of discovery.

**WHEREFORE**, Defendant Prime prays the Court that:

1.  This action be stayed and that the parties are ordered to arbitration in accordance with the 2010 Employee Handbook;

2.  That the class certification be denied;

3.  This action be dismissed as to Prime Communications, L.P.;

4.  Plaintiff have and recover nothing from Prime Communications, L.P.;

5.     The costs of this action be taxed against parties other than Prime

       Communications, L.P.;

6.     Prime Communications, L.P. have such other and further relief as the Court shall

       deem just and proper; and

7.     In the alternative, if arbitration is denied, Prime Communications, L.P. reserves

       their right to trial by jury on all issues so triable.

Respectfully submitted this the 7th day of June, 2012.


                            **RAGSDALE LIGGETT, PLLC**


                    BY:     /s/ John B. Walker
                            John B. Walker
                            N.C. State Bar No.: 35631
                            Post Office Box 31507
                            Raleigh, NC27622-1507
                            Email: bwalker@rl-law.com
                            Telephone:     (919) 787-5200
                            Facsimile:     (919) 783-8991
                            *Attorneys for Defendant Prime*
                            *Communications, L.P.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 7th day of June, 2012, I electronically filed the foregoing **DEFENDANT PRIME COMMUNICATIONS, L.P.'S ANSWER TO PLAINTIFF'S FIRST AMENDED COLLECTIVE AND CLASS ACTION COMPLAINT AND DEFENDANT PRIME COMMUNICATIONS, L.P.'S DEMAND FOR ARBITRATION** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

Stephen A. Dunn, Esq.
EMANUEL & DUNN, PLLC
Post Office Box 426
Raleigh, NC 27602
*Counsel for Plaintiff*
sdunn@emanuelanddunn.com

Raymond E. Dunn, Jr., Esq.
Charles J. Cushman, Esq.
EMANUEL & DUNN, PLLC
Post Office Box 1389
New Bern, NC 28563
*Counsel for Plaintiff*
rdunn@emanuelanddunn.com
ccushman@emanuelanddunn.com

Harris D. Butler III, Esq.
Zev H. Antell, Esq.
BUTLER ROYALS, PLC
100 Shockoe Slip, 4th Floor
Richmond, VA 23219
Harris.butler@butlerroyals.com
Zev.antell@butlerroyals.com
*Counsel for Plaintiff*


**RAGSDALE LIGGETT, PLLC**

BY:     /s/ John B. Walker
        John B. Walker
        Post Office Box 31507
        Raleigh, NC27622-1507
        Email: bwalker@rl-law.com
        Telephone:    (919) 787-5200
        Facsimile:    (919) 783-8991
        *Attorneys for Defendant Prime*
        *Communications, L.P.*

18

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

ROSE LORENZO, on behalf of herself and
all others similarly situated,

    Plaintiff,

  v.

PRIME COMMUNICATIONS, L.P., a
Texas General Partnership,

    Defendant.

Case No:  5:12-cv-00069-H

## <u>JOINT RULE 26(f) DISCOVERY PLAN</u>

1. In accordance with Fed. R. Civ. P. Rule 26(f), the following parties participated in discussions by telephone conference and email correspondence: Stephen A. Dunn, Raymond E. Dunn, Jr., and Charles J. Cushman, from the law firm of Emanuel & Dunn, PLLC, Raleigh and New Bern, NC, and Harris D. Butler, III, and Zev H. Antell from the law firm of Butler Royals, PLC, Richmond, VA, as counsel for Plaintiff Rose Lorenzo, on behalf of herself and all others similarly situated; and John B. Walker from the law firm of Ragsdale Liggett, PLLC, Raleigh, NC, as counsel for Defendant.

2. Initial Disclosures. The parties will complete by September 30, 2012 the initial disclosures required by Rule 26(a)(1).

3. Discovery Plan. The parties propose this discovery plan:

 (a) Discovery will be needed on these subjects: Plaintiffs will seek initial discovery of Defendant's relevant timekeeping and compensation policies and practices and records/data retention, including Defendant's treatment of work hours and pay for Plaintiff and similarly

situated employees and such FLSA exemptions as have been raised by Defendant in order to determine whether proper cause exists to move for conditional certification pursuant to the standard(s) provided by 29 U.S.C. § 216(b) and *Hoffman-Laroche v. Sperling*, 493 U.S. 165, 169 (1989), and its progeny. Plaintiffs will further seek initial discovery relating to the standards for certification of the Rule 23 Class alleged. This discovery is not intended to include production of any individual employment or payroll records for persons not specifically named as plaintiffs in this lawsuit absent the Court permitting the same upon Motion by either party.

(b)     Following a ruling on conditional certification under 29 U.S.C. § 216(b), Plaintiffs will seek merits discovery related to the Defendant's payroll practices related to hours worked, Defendant's FLSA exemption determinations, and such electronic and paper company records as are germane to the Plaintiff's claims and the Defendant's affirmative defenses.

(c)     Concurrent with (and, as applicable, subsequent to) discovery on the conditional 29 U.S.C. §216(b) certification, the parties will seek discovery on the elements necessary for the Court's consideration of certification of the Rule 23 class alleged. This discovery is not intended to include production of any individual employment or payroll records for persons not specifically named as plaintiffs in this lawsuit absent the Court permitting the same upon Motion by either party.

(d)     Disclosure or discovery of electronically stored information should be handled as follows: The parties expect that discovery of some electronically stored information (ESI) may be required by either or both parties, and have agreed to maintain both the relevant devices and files. The parties will endeavor to insure that the identification of applicable

databases containing ESI will occur promptly and that their document production includes all relevant and discoverable electronically-stored information.

(e)    The parties have agreed to an order regarding claims of privilege or of protection as trial-preparation material, as follows: Any party or witness claiming that documents, written discovery responses, or tangible evidence constitutes or includes confidential information shall mark those materials "Confidential." The party claiming confidentiality shall have the burden of proof as to its confidentiality. Except as otherwise ordered by the Court, confidential information shall be used only for purposes of this litigation and disclosed only to: attorneys of record for the parties, and their associates, paralegal, clerical, or service support staff; experts or consultants who are retained by a party to this litigation (including their employees, associates and/or support staff); and the Court, its personnel, and court reporters.

(f)    Discovery shall be conducted in two phases. Initial discovery related to 29 U.S.C. § 216(b) Conditional Certification and/or Rule 23 Class Certification shall commence upon entry of a scheduling order and must be commenced in time to be completed by December 31, 2012. During initial discovery:

a.    With respect to Conditional Certification pursuant to 29 U.S.C. § 216(b), Each party may serve a maximum of 10 interrogatories, including subparts, to any other party. Responses will be due as required by Fed. R. Civ. P. 33.

b.    With respect Rule 23 Class Certification, Each party may serve a maximum of 30 interrogatories, including subparts, to any other party. Responses will be due as required by Fed. R. Civ. P. 33.

c.      With respect Conditional Certification pursuant to 29 U.S.C. § 216(b), each party may serve a maximum of 10 requests for admissions to any other party. Responses will be due as required by Fed. R. Civ. P. 36.

d.      With respect to Rule 23 Class Certification, each party may serve a maximum of 30 requests for admissions to any other party. Responses will be due as required by Fed. R. Civ. P. 36.

e.      With respect to Conditional Certification pursuant to 29 U.S.C. § 216(b), each party may take up to a maximum of 3 depositions. However, the Defendant may take the deposition of any and all named plaintiff(s) that have joined or will subsequently join this lawsuit, and these depositions will not count against Defendant's maximum of 3 depositions set forth herein.  Plaintiffs have not waived any right to object to collective-wide discovery. Each deposition shall be limited to one day and shall be conducted for no longer than 7½ hours.

f.      With respect to Rule 23 Class Certification, each party may take up to a maximum of 6 depositions. However, the Defendant may take the deposition of any and all named plaintiff(s) that have joined or will subsequently join this lawsuit, and these depositions will not count against Defendant's maximum of 6 depositions set forth herein.  Plaintiffs have not waived any right to object to class-wide discovery. Each deposition shall be limited to one day and shall be conducted for no longer than 7½ hours.

g.      Plaintiff shall designate expert witnesses on or before October 1, 2012. Defendant shall designate expert witnesses on or before November 30, 2012.

h.      Supplementation of responses shall be made in accordance with the Rules of

Civil Procedure.

(g)      Discovery related to the merits shall commence upon entry of any order(s)

conditionally certifying (or denying) the 29 U.S.C. § 216(b) collective or certifying (or

denying) the Rule 23 class. Once a ruling on class certification has been made the parties

will supplement this Order to provide a timeline for the remaining discovery in this matter.

At this time, it is expected that during merits discovery:

a.      Each party may serve a maximum of 30 interrogatories, including subparts, to

any other party. Responses will be due as required by Fed. R. Civ. P. 33.

b.      Each party may serve a maximum of 30 requests for admissions to any other

party. Responses will be due as required by Fed. R. Civ. P. 36.

c.      Each party may take up to a maximum of 6 depositions. However, the

Defendant may take the deposition of any and all named plaintiff(s) that have joined

or will subsequently join this lawsuit, and these depositions will not count against

Defendant's maximum of 6 depositions set forth herein. Plaintiffs have not waived

any right to object to class or collective-wide discovery. Each deposition shall be

limited to one day and shall be conducted for no longer than 7½ hours.

d.      Plaintiff shall designate expert witnesses on or before 75 days following entry

of an order certifying (or denying) the class. Defendants shall designate expert

witnesses on or before 105 days following entry of an order certifying (or denying)

the class.

e.      Supplementation of responses shall be made in accordance with the Rules of

Civil Procedure.

(h)     The parties have not waived, and specifically reserve and retain, the right to object to any discovery requested or served by the other party.

4.     Other Items:

(a)     The parties will not request a conference with the Court before the entry of the Scheduling Order.

(b)     With the specific exception of putative Plaintiffs who file opt-in consent forms to join the 29 U.S.C. § 216(b) collective prior to the end of any Court approved notice period, the parties shall have until September 30, 2012 to amend their pleadings or to join additional parties or seek a standing order allowing for the automatic addition of parties upon the filing of consents to opt-into the action pursuant to 29 U.S.C. § 216(b).

(c)     All potentially dispositive motions should be filed within 30 days following the close of merits discovery.

(d)     Counsel discussed the possibility of settlement, timing of meaningful settlement discussions and the options of using private mediators and/or the Court's Settlement Conference process for settlement discussions. Counsel believe that following initial discovery and a ruling on the matter of Conditional Certification (and the conclusion of any associated notice period) that the procedural posture may better enable counsel to conduct meaningful settlement discussions, if at all, and to address the timing of settlement discussions with their clients.

(e)     The parties expect the trial to take 5-7 days to the extent that the Court permits representative testimony on issues of liabiity.

(f)     The parties do not consent to a determination by a magistrate judge.

(g)     The case does not need early judicial intervention due to complexity or other

factors.

This 6th day of September, 2012.

**Counsel for Plaintiff**

/s/ Stephen A. Dunn
Stephen A. Dunn NC State Bar No. 12389
Raymond E. Dunn, Jr. NC State Bar No. 8739
Charles J. Cushman NC State Bar No. 36170
sdunn@emanuelanddunn.com
rdunn@emanuelanddunn.com
ccushman@emanuelanddunn.com
EMANUEL & DUNN, PLLC
Post Office Box 426
Raleigh, North Carolina 27602
(919) 832-0329 (PHONE)
(919) 832-0731 (FAX)


/s/ Harris D. Butler, III
Harris D. Butler, III VA State Bar No. 26483
Zev H. Antell Virginia State Bar No. 74634
harris.butler@butlerroyals.com
zev.antell@butlerroyals.com
BUTLER ROYALS, PLC
100 Shockoe Slip, 4th Floor
Richmond, Virginia  23219
(804) 648-4848 (PHONE)
(804) 648-6814 (FAX)

**Counsel for Defendant**

/s/ John B. Walker
John B. Walker NC State Bar No. 35631
bwalker@rl-law.com
RAGSDALE LIGGETT, PLLC
Post Office Box 31507
Raleigh, North Carolina 27622
(919) 787-5200 (PHONE)
(919) 783-8991 (FAX)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:12-CV-69-H

ROSE LORENZO, on behalf of        )
herself and all others           )
similarly situated,              )
                                 )
        Plaintiff,               )
                                 )
    v.                           )        **ORDER**
                                 )
PRIME COMMUNICATIONS, L.P., a    )
Texas General Partnership,       )
                                 )
        Defendant.               )

This case comes before the court for the issuance of a Scheduling Order. The court has reviewed the parties' Joint Rule 26(f) Discovery Plan [DE #22], filed September 6, 2012 ("Discovery Plan"). The court finds the Discovery Plan to be reasonable. Accordingly, the Discovery Plan is APPROVED, subject to any modifications noted herein.

1. **Discovery**. Discovery shall be conducted in two phases. Initial discovery related to 29 U.S.C. § 216(b) Conditional Certification and/or Rule 23 Class Certification shall commence upon entry of a scheduling order and must be commenced in time to be completed by December 31, 2012.

Discovery related to the merits shall commence upon entry of any order(s) conditionally certifying (or denying) the 29 U.S.C. § 216(b) or Rule 23 classes. Within twenty (20) days of

a ruling on class certification or the expiration of the deadline for filing a motion for Rule 23 or conditional certification if no such motion is filed, the parties shall confer and submit to the court a joint report and plan for discovery on the merits of this action.

Supplementation must be made promptly after receipt of the supplementary information by a party or its counsel in accordance with Fed. R. Civ. P. 26(e)(1 )(A). Other critical deadlines are as follows:

2.   **Motions to Amend or Add Additional Parties**.  With the specific exception of putative Plaintiffs who file opt-in consent forms to join the 29 U.S.C. § 216(b) collective prior to the end of any Court approved notice period, the parties shall have until September 30, 2012 to amend their pleadings or to join additional parties or seek a standing order allowing for the automatic addition of parties upon the filing of consents to opt-into the action pursuant to 29 U.S.C. § 216(b).  Nothing in this order shall relieve any party of any requirement to obtain court approval prior to joining a party or amending its pleadings.

3.   **Class Certification**.  Plaintiff shall file any motion for Rule 23 class certification or conditional certification as a 29 U.S.C. § 216(b) collective action no later than January 31, 2013.

4. **Expert Witnesses**. Plaintiff shall designate expert witnesses on or before October 1, 2012. Defendant shall designate expert witnesses on or before November 30, 2012.

5. **Dispositive Motions**. All potentially dispositive motions should be filed within 30 days following the close of merits discovery.

4. **Mediation**. This action has been selected for mandatory mediation pursuant to the court's Alternative Dispute Resolution Rules, Local Civil Rules 101-101.3, E.D.N.C. If the parties are able to agree on a mediator, they shall file a statement identifying the selected mediator and meeting the other applicable requirements within 20 days after entry of a ruling on class certification or the expiration of the deadline for filing a motion for class or conditional certification if no such motion is filed. If a statement is not timely filed, the Clerk will appoint a mediator from the list of court-certified mediators, in accordance with Local Civil Rule 101.1c(b). The deadline for completion of mediation will be set by scheduling order upon completion of the parties' initial discovery.

The remaining portions of the Discovery Plan are ADOPTED as the court's order, except as otherwise provided herein.

Any party making an appearance after this order has been entered shall be required to confer with opposing counsel and make disclosures pursuant to Fed. R. Civ. P. 26(a)(1) within 20

days after the party's appearance. Such party shall be bound by the terms of this order unless the party moves for and obtains amendment of this order by the court.

This _____ day of October 2012.

MALCOLM J. HOWARD
Senior United States District Judge

At Greenville, NC
#31

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:12-cv-00069-H

ROSE LORENZO, individually and on        )
behalf of others similarly situated,     )
                          Plaintiffs,    )
                                         )        **JOINT MOTION TO AMEND**
        v.                               )        **SCHEDULING ORDER**
                                         )
PRIME COMMUNICATIONS, L.P., a            )
Texas General Partnership,               )
                          Defendant.     )

All parties by and through undersigned counsel of record hereby move the Court to amend the Scheduling Order entered October 4, 2012 [Document 23], and in support hereof respectfully show:

1)  This action was commenced by Plaintiff on February 17, 2012 by filing a Complaint alleging violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. and the North Carolina Wage and Hour Act, N.C.G.S. §§ 95-25.1 et seq. and was amended May 4, 2012, to seek relief on behalf of class(es) of persons similarly situated.

2)  By Order entered October 4, 2012, initial discovery related to 29 U.S.C. § 216(b) Conditional Certification and/or Rule 23 Class Certification was to commence upon entry of the order and be completed by December 31, 2012, and any motion for class certification was to be filed no later than January 31, 2013. Merits discovery was to commence following a ruling upon class certification based upon further joint report to be filed within twenty (20) days after such ruling.

3)  The parties have actively participated in discovery and having consulted on the need for additional discovery, agree that additional time, up to and including February 28, 2013, is needed to

complete initial discovery, and further agree that the deadline for filing any motion for class certification should be extended accordingly.

WHEREFORE, the parties jointly move the Court for an Order amending the October 4, 2012 Scheduling Order to provide:

1) That initial discovery will be concluded by February 28, 2013.

2) That Plaintiff shall file any motion for Rule 23 class certification or conditional certification as a 29 U.S.C. § 216(b) collective action no later than March 31, 2013.

This 19th day of December, 2012.

**Counsel for Plaintiff**

/s/ Stephen A. Dunn
Stephen A. Dunn NC State Bar No. 12389
Raymond E. Dunn, Jr. NC State Bar No. 8739
Charles J. Cushman NC State Bar No. 36170
sdunn@emanuelanddunn.com
rdunn@emanuelanddunn.com
ccushman@emanuelanddunn.com
EMANUEL & DUNN, PLLC
Post Office Box 426
Raleigh, North Carolina 27602
(919) 832-0329 (PHONE)
(919) 832-0731 (FAX)


/s/ Harris D. Butler, III
Harris D. Butler, III VA State Bar No. 26483
Zev H. Antell Virginia State Bar No. 74634
harris.butler@butlerroyals.com
zev.antell@butlerroyals.com
BUTLER ROYALS, PLC
100 Shockoe Slip, 4th Floor
Richmond, Virginia  23219
(804) 648-4848 (PHONE)
(804) 648-6814 (FAX)

**Counsel for Defendant**

/s/ John B. Walker
John B. Walker NC State Bar No. 35631
bwalker@rl-law.com
RAGSDALE LIGGETT, PLLC
Post Office Box 31507
Raleigh, North Carolina 27622
(919) 787-5200 (PHONE)
(919) 783-8991 (FAX)

2

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 19, 2012, I electronically filed the foregoing JOINT

MOTION TO AMEND SCHEDULING ORDER with the Clerk of Court using the CM/ECF

system which will send notification of such filing to the following:

> John Bowen Walker
> *Attorney for Defendant*
> bwalker@rl-law.com
>
> RAGSDALE LIGGETT, PLLC
> Post Office Box 31507
> Raleigh, North Carolina 27622-1507

This 19th day of December, 2012.

> EMANUEL & DUNN, PLLC
> *Attorneys for Plaintiffs*
>
> /s/ Charles J. Cushman
> Charles J. Cushman, N.C. Bar # 36170

3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:12-cv-00069-H

ROSE LORENZO, individually and on )
behalf of others similarly situated, )
                Plaintiffs, )
                        )
v.                     )       **AMENDED SCHEDULING ORDER**
                        )
PRIME COMMUNICATIONS, L.P., a )
Texas General Partnership, )
                Defendant. )

This matter is before the Court upon joint motion by all parties to amend the Scheduling

Order entered October 4, 2012 [Document 23], and for good cause shown, IT IS HEREBY

ORDERED:

      1)     That initial discovery will be concluded by February 28, 2013.

      2)     That Plaintiff shall file any motion for Rule 23 class certification or conditional

certification as a 29 U.S.C. § 216(b) collective action no later than March 31, 2013; and

      3)     Except as hereby amended, the Scheduling Order entered October 4, 2012 shall

remain in effect.

      This 2nd day of January 2013.

                                 _____
                                   Malcolm J. Howard
                                   Senior United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

ROSE LORENZO, on behalf of herself and
all others similarly situated,

        Plaintiff,

v.

PRIME COMMUNICATIONS, L.P., a
Texas General Partnership,

        Defendant.

Case No: 5:12-cv-00069-H

## PLAINTIFFS' MOTION FOR FACILITATED NOTICE

Come now, Plaintiffs Rose Lorenzo, on behalf of herself and all others similarly situated (collectively, the "Plaintiffs"), by counsel, and respectfully move the Court for an Order authorizing their claims against Prime Communications, L.P., a Texas General Partnership ("Prime") to proceed as a collective action, and facilitating the collective action through discovery of, and notice to potential parties to the action. Plaintiffs state as follows in support of the motion:

1.      On or about May 4, 2012 Lorenzo, who is a store "manager" with Prime, filed an Amended Complaint against Prime pursuant to the Fair Labor Standards Act ("FLSA"), *29 U.S.C. § 701, et seq.*, on behalf of herself and other current and former similarly situated employees of Prime, seeking payment of unpaid overtime compensation and unpaid minimum wages.

2.      Pursuant to 29 U.S.C. § 216(b), the FLSA's "collective action" provision,

one or more employees may bring an action for overtime compensation "for and in behalf of himself or themselves and other employees who are similarly situated." Under this provision, those employees who wish to participate in a collective action under the FLSA must affirmatively "opt in" by giving written consent to join in the action as a party.

3.     The Plaintiffs are "similarly situated" in their job duties and manner of compensation to all Prime "managers" who were employed by Prime from May 4, 2009 to the present.

4.     Lorenzo worked as a "manager" for Prime for the time period beginning approximately January 2010 and ending June 2011. Her job key duties consisted of selling AT&T mobile devices and service plans to current and prospective customers.

5.     Prior to July of 2012, when it began paying managers overtime, Prime paid all of its "managers" on a salary basis and did not provide for any overtime premium for hours worked in excess of forty (40) in a single week.

6.     Plaintiffs have alleged that, during times pertinent to this action, Prime failed to maintain hours worked by "managers" in each workweek, which records are required by the FLSA and for the timely and proper calculation and payment of minimum wage and overtime compensation due employees. Prime misclassified its managers as overtime "exempt." Prime has required all or most of its managers to perform overtime work; however, Prime has not paid overtime compensation to its "managers" during the times at issue in this action. Plaintiffs allege that Prime has required its "managers" to perform work which is unrecorded, "off the clock." Plaintiffs allege that Prime has also required its managers to perform work during times for which it has not compensated employees.

2

7.    The Plaintiffs regularly worked more than forty (40) hours in a workweek without receiving overtime compensation, and were paid less than minimum wage during certain workweeks during their employment at Prime.

8.    For these reasons, and for the reasons set forth in the accompanying memorandum, Plaintiffs move this Court for authorization to proceed as a collective action for overtime compensation and minimum wages under 29 U.S.C. § 216(b) on behalf of Prime managers who have worked more than forty (40) hours in a workweek for Prime without compensation for their overtime hours worked, and/or who were not paid the minimum wage for the time period beginning on May 4, 2009 through the present.

For the foregoing reasons, and for the reasons contained in the accompanying Memorandum in support, the Court should grant this motion to: (1) authorize this matter to proceed as a collective action, (2) require Defendant to provide counsel for Plaintiffs, in electronic format if available from Defendant or from vendors over whom Defendant has control, the names, addresses, e-mail addresses, telephone numbers and last known contact information (and all alternate addresses/contact information) for all persons employed by Defendant, or its predecessors, as managers from May 4, 2009 to the present; and, (3) authorize mailing and emailing of the proposed Notice, attached as Exhibit 1, to all persons employed by Defendant, or its predecessors, as managers employed from May 4, 2009 to the present.

3

Respectfully submitted,

ROSE LORENZO, on behalf of herself and
all other current and former similarly situated
employees of Prime Communications, L.P.

By:  /s/ Charles J. Cushman
     Stephen A. Dunn NC State Bar No. 12389
     Raymond E. Dunn, Jr. NC State Bar No. 8739
     Charles J. Cushman NC State Bar No. 36170
     sdunn@emanuelanddunn.com
     rdunn@emanuelanddunn.com
     ccushman@emanuelanddunn.com
     EMANUEL & DUNN, PLLC
     Post Office Box 426
     Raleigh, North Carolina 27602
     (919) 832-0329 (PHONE)
     (919) 832-0731 (FAX)

     /s/ Harris D. Butler, III
     Harris D. Butler, III VA State Bar No. 26483
     Zev H. Antell Virginia State Bar No. 74634
     harris.butler@butlerroyals.com
     zev.antell@butlerroyals.com
     BUTLER ROYALS, PLC
     100 Shockoe Slip, 4th Floor
     Richmond, Virginia 23219
     (804) 648-4848 (PHONE)
     (804) 648-6814 (FAX)

4

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2013, I electronically filed the foregoing

MOTION FOR FACILITATED NOTICE with the Clerk of Court using the CM/ECF

system which will send notification of such filing to the following:

John Bowen Walker
*Attorney for Defendant*
bwalker@rl-law.com

RAGSDALE LIGGETT, PLLC
Post Office Box 31507
Raleigh, North Carolina 27622-1507

This 18th day of January, 2013.

EMANUEL & DUNN, PLLC
*Attorneys for Plaintiffs*

/s/ Charles J. Cushman
Charles J. Cushman, N.C. Bar # 36170

5

**Examination of Rose Emily Lorenzo**
Rose Lorenzo v. Prime Communications, LP

| | | |
|---|---|---|
| 1 | A | Uh-huh. |
| 2 | Q | Is that a yes? |
| 3 | A | Yes. |
| 4 | Q | I'm sorry, it's for the record. Do you know how |
| 5 | | many employees was at that Fuquay store when you |
| 6 | | first started? |
| 7 | A | It was Crystal and Ashley Barnett, and they were |
| 8 | | the only two working in that store when I started. |
| 9 | Q | Okay. And what job did you take initially with |
| 10 | | Prime Communications? |
| 11 | A | Solution specialist. |
| 12 | Q | And what were your job duties as a Solution |
| 13 | | Specialist? |
| 14 | A | Sales. |
| 15 | Q | Any other job requirements? |
| 16 | A | No. |
| 17 | Q | Didn't have to make any deposits or do any deposits |
| 18 | | or -- |
| 19 | A | No, sir. |
| 20 | Q | Okay. Who did the scheduling? |
| 21 | A | The scheduling was done through -- the district |
| 22 | | manager would -- my understanding was, the |
| 23 | | scheduling came from the district manager, he said |
| 24 | | this is how many hours for your employees and you |

Examination of Rose Emily Lorenzo
Rose Lorenzo v. Prime Communications, LP

110

| | | |
|---|---|---|
| 1 | | half an hour, depending.  You know, there could be |
| 2 | | one sale that day and it would take you three |
| 3 | | minutes to check it.  You know, you could have one |
| 4 | | that was like a day where you had ten sales.  You |
| 5 | | know, might take you a little bit longer. |
| 6 | Q | And the Middle Creek store that we have been |
| 7 | | talking about, is that a kiosk or a standalone |
| 8 | | store or just a shopping mall store? |
| 9 | A | In a strip mall. |
| 10 | Q | A strip mall.  And the Fuquay store, what kind of |
| 11 | | store was that? |
| 12 | A | It's also in a strip mall. |
| 13 | Q | Now, other than Billy -- when you took over the |
| 14 | | store in February of 2011, I understand Amy left. |
| 15 | | Were there any other employees at that store? |
| 16 | A | In 2011, other than -- |
| 17 | Q | Yes, ma'am.  When you first got there. |
| 18 | A | No. |
| 19 | Q | Okay.  So starting in February of 2011, how long |
| 20 | | was Billy there? |
| 21 | A | I think he left in the end of May, beginning of |
| 22 | | June. |
| 23 | Q | And he was a solution specialist; is that correct? |
| 24 | A | That's correct. |

Examination of Rose Emily Lorenzo
Rose Lorenzo v. Prime Communications, LP

111

1    Q    So were you his boss?

2    A    I wouldn't say I was his boss because I didn't have

3         the authority to fire him.

4    Q    Okay.

5    A    I didn't have the authority to discipline him.

6         That instruction would come from either the

7         regional or the district manager, if there needed

8         to be a talk about sales, right?

9    Q    So if you wanted to fire Billy, how would you go

10        about doing that?

11   A    I would have to go to the district manager and say,

12        this is the issue that we're having.  You know, and

13        if he thought it was warranted to let Billy go,

14        then he would be the one to do it.

15   Q    Okay.

16   A    Because he would write it all up and then let him

17        go.

18   Q    What if you wanted to hire another employee, how

19        would you do that?

20   A    Same process.  I would go to the district manager

21        and say, "I need another person."

22             "Okay, well do you have anybody in mind?"

23             "No."

24             "Okay, I'll find you somebody."  He would

Examination of Rose Emily Lorenzo
Rose Lorenzo v. Prime Communications, LP

112

1          either pull somebody from another store that might

2          want to come to Middle Creek or if there was an

3          applicant that went to another store that he

4          thought was really good, he might entice them to

5          say, well we don't have a position here but we have

6          one at Middle Creek, would you be willing to go

7          there instead?

8     Q    The district manager at the time was Jessie; is

9          that correct?

10    A    That's correct.

11    Q    How long was Jessie the district manager while you

12         were a store manager?

13    A    Jessie had been with the company as a district

14         manager, I want to say, five years and left

15         somewhere around July.

16    Q    Okay.  Of 2011 or 2012?

17    A    It would have been 2011 because I left in June of

18         2012, so it was 2011.

19    Q    And who was the district manager after Jessie?

20    A    Jeremy Haynes.

21    Q    Okay.  And while you were store manager, was there

22         ever another district manager after Jeremy?

23    A    No.

24    Q    Okay.  I'm going to break it down between each of

Examination of Rose Emily Lorenzo
Rose Lorenzo v. Prime Communications, LP

113

| | | |
|---|---|---|
| 1 | | them. While Jessie was the district manager, did |
| 2 | | you ever make any requests for more employees? |
| 3 | A | Yes. |
| 4 | Q | Okay. How many times? |
| 5 | A | Every month. |
| 6 | Q | Okay. And what was his response? |
| 7 | A | The store doesn't make enough revenue to constitute |
| 8 | | another employee. |
| 9 | Q | And at that time, was Billy still working at the |
| 10 | | store? |
| 11 | A | Yes. |
| 12 | Q | Now, once Billy left, did you make a request for |
| 13 | | another employee? |
| 14 | A | Yes. |
| 15 | Q | Okay. And what -- was that request made to Jessie |
| 16 | | or Jeremy? |
| 17 | A | To both. |
| 18 | Q | To both. Who was the regional manager at the time? |
| 19 | | Or the district manager at the time? |
| 20 | A | It was Jessie. Then he left and then Jeremy came |
| 21 | | in. |
| 22 | Q | Okay. Well, just talking about Jessie for now, |
| 23 | | when you made the request to Jessie for a new |
| 24 | | employee after Billy left, what was his response? |

**Examination of Rose Emily Lorenzo**
Rose Lorenzo v. Prime Communications, LP

114

| | | |
|---|---|---|
| 1 | A | He would have to get approval. |
| 2 | Q | Okay. And who was he going to get approval from? |
| 3 | A | Binay. |
| 4 | Q | And was approval given? |
| 5 | A | No. |
| 6 | Q | And what was their reasoning? |
| 7 | A | The store doesn't generate enough revenue to |
| 8 | | constitute another person. |
| 9 | Q | Even if it was to fill a position that had been |
| 10 | | left -- that had been vacated? |
| 11 | A | Yes, they felt that the store could run with one |
| 12 | | person. |
| 13 | Q | I'm sorry, what is Billy's last name again? |
| 14 | A | Moan, M-O-A-N. |
| 15 | Q | Moan, that's right. Did you ever get approval to |
| 16 | | hire an employee after Billy left? |
| 17 | A | Yes. |
| 18 | Q | Okay. Who was hired. |
| 19 | A | Suleika, S-U-L-E-K-A [sic], I think. |
| 20 | Q | Okay. |
| 21 | A | Last name was Coffey, C-O-F-F-E-Y. |
| 22 | Q | And when did she start? |
| 23 | A | She started in September. |
| 24 | Q | Of? |

**Examination of Rose Emily Lorenzo**
Rose Lorenzo v. Prime Communications, LP

| | | |
|---|---|---|
| 1 | A | 2011. |
| 2 | Q | And how long was she at the store? |
| 3 | A | Until June of 2012. |
| 4 | Q | Was she still there when you left? |
| 5 | A | Yes. |
| 6 | Q | So looks like if Billy left in June of 2011 and |
| 7 | | Suleika started in September of 2011, we're looking |
| 8 | | at July -- well, I guess, the remaining of June |
| 9 | | when he left, July, August, and then September when |
| 10 | | she started, maximum of four months, I guess, two |
| 11 | | to four months that you were the only person |
| 12 | | working in the store? |
| 13 | A | That's correct. |
| 14 | Q | Is that correct?  Where there ever any other |
| 15 | | employees besides Billy and Suleika in that store? |
| 16 | A | No. |
| 17 | Q | Did you find Suleika? |
| 18 | A | Suleika came into the store because she was looking |
| 19 | | for a job, and she had previously worked for |
| 20 | | Sprint.  And I said, "Well, I'm the only one here. |
| 21 | | I'll pass your resume on to my district manager and |
| 22 | | we will see."  At this point, I hadn't been given |
| 23 | | approval to hire another person. |
| 24 | Q | What changed in the store from June of 2011 to |

**Examination of Rose Emily Lorenzo**
Rose Lorenzo v. Prime Communications, LP

1      September of 2011, that necessitated a need to hire

2      someone?

3   A   I was complaining every day, because I was working

4      seven days a week from open to close.  And I had

5      made a request that I was no longer going to work

6      seven days a week.  You know, we would have to

7      close on Sundays because it was just too much to be

8      there by yourself every single day.  You know, with

9      the amount of traffic that came through Middle

10     Creek was minimal, so you could spend five hours a

11     day sitting there before you saw a client, you

12     know, and so I complained enough that they said,

13     "Okay, we will give a person."

14  Q   When you made these complaints every day, who would

15     you make them to?

16  A   Jessie, Binay.

17  Q   And I guess Jeremy when he was there?

18  A   And then Jeremy.

19  Q   And would you call them to make these complaints,

20     send e-mails?  How would you do it?

21  A   Both.

22  Q   Which one would you do more often?

23  A   Call.

24  Q   Would you e-mail every day?

**Examination of Rose Emily Lorenzo**
Rose Lorenzo v. Prime Communications, LP

117

1    A        No.

2    Q        How often would you say you would email?

3    A        I probably emailed at least once a week.

4    Q        And what account did you usually email from?

5    A        Their Prime email.

6    Q        Do you remember what that email address was?

7    A        No.  I think it was roselorenzo@att. -- no, I don't

8             remember.

9    Q        During this time period from June to September of

10            2011, did you ever present a resume of an employee

11            to either Jessie or Binay or Jeremy?

12   A        Yes.

13   Q        Who did you present?

14   A        I presented one for Suleika.  I presented one for a

15            young guy named -- I think his name was Jeremy.  I

16            presented three or four.  And the guys that I had

17            presented, they would have been awesome in my

18            store.  They were hired by Jeremy and Jessie, but

19            they were sent to other stores.  They were sent to

20            Crabtree Mall, Cary Towne Square, and Falls Point.

21   Q        Do you know why they were sent to other stores?

22   A        They were larger stores.  There was more revenue

23            and they needed a person there, and this person

24            would have been a great fit for them.

* * *

**Examination of Rose Emily Lorenzo**
Rose Lorenzo v. Prime Communications, LP

123

1        active, why my own personal account was being --

2        had been charged back. Why I got charged back from

3        Amy. There was never any resolution to that and

4        they never paid me any of that money back. You

5        know, so it was like, yeah I told you, you know,

6        this was what was going on, but they didn't say,

7        this is how we are going to fix it.

8  Q    Now, you mentioned this managers' meeting where

9        they came down to Raleigh to discuss different

10       issues. Was that a managers meeting for all the

11       store managers in North Carolina?

12  A   That was the managers' meeting for the managers in

13       North Carolina, that's correct.

14  Q   How often did you have those managers meeting?

15  A   Once a month.

16  Q   Any other meetings that you had to take a part of?

17  A   Yes. We had daily meetings, weekly meetings. The

18       district manager would hold an hour to an hour and

19       a half, sometime two-hour, meetings before the

20       store opened. Typically, around 8:00 in the

21       morning, sometimes 7:30 to 9:30, because my store

22       opened at 10:00, to go over the numbers, the goal

23       of the district, problems that we were having,

24       whatever.

**Examination of Rose Emily Lorenzo**
Rose Lorenzo v. Prime Communications, LP

124

1          You know, whenever he was getting slammed

2     with corporate, we had a meeting every day.  And

3     that was for his ten stores that he had.  Then once

4     a week, there was a three-hour meeting that was for

5     all the stores in Eastern North Carolina, which

6     included the whole eastern district, which included

7     South Carolina and Atlanta, where all of the

8     managers would get on this meeting and Binay, who

9     was the Regional, would host this meeting.

10          And sometimes somebody from corporate

11    would join the meeting and they would talk about

12    whatever the new thing that was happening or some

13    policy change on AT&T's side that we needed to be

14    aware of.  Any promotions or, you know, contests

15    that they were going to have, would be discussed in

16    this meeting.  They would talk about, you know,

17    what market was doing better, what we were going to

18    differently, what they expected, you know, the

19    market.

20          And that was once a week for anywhere

21    from two hours to -- you know, sometimes it could

22    go over the two hours, but usually typically about

23    two hours once a week.  And then there was the

24    once-a-month managers' meeting, which was out of

**Examination of Rose Emily Lorenzo**
Rose Lorenzo v. Prime Communications, LP

125

```
1        the store.  The other meetings were on the phone,

2        and those meetings were out of the store.  We went

3        to Situs Court, which is where is AT&T's corporate

4        office is.  And they had a conference room there

5        and that would be pretty much four, six, a whole-

6        day meeting you would have there.  Sometimes it

7        would be four hours, most times it was about six

8        hours.

9    Q   And when were those meetings usually held?

10   A   Once a month.  I'm not -- they were random days

11       so --

12   Q   They weren't like the last Friday of every month or

13       something like that?

14   A   No, it was random.  I think it was based on when

15       they could get a conference room at Situs Court or

16       based on whenever the corporate office said, you

17       need to have your meeting this week.  You know, but

18       there was no system of we're going to have it the

19       second week of every month or we're going to have

20       it the first week of every month.  It was pretty

21       random.

22   Q   Speaking of store, the Middle Creek store, what

23       were the hours of operation?

24   A   It was 10:00 to 7:00, Monday through Saturday, and
```

**Examination of Rose Emily Lorenzo**
**Rose Lorenzo v. Prime Communications, LP**

126

1          11:00 to 6:00 on Sunday.

2    Q     Now, you -- as a sales associate or as a solution

3          specialist, you didn't have to attend any of these

4          meetings.  Is that correct?

5    A     No.

6    Q     Okay.

7    A     I did have to attend trainings at Situs Court,

8          though.

9    Q     Okay.

10   A     Which was equivalent to the managers' meeting,

11         usually about -- it would be like an all-day or

12         half-day meeting that they would have.

13   Q     And were those monthly training sessions?

14   A     They were.

15   Q     And what did they teach you about in these monthly

16         training sessions as a solution specialist?

17   A     Whatever the product that they wanted to push that

18         month, AT&T wanted to push, because the training

19         was conducted by AT&T employees, not by Prime.  So

20         say their push was wireline, they wanted to push U-

21         verse, you know, and home phones, so then the

22         training would be about the benefits of you know,

23         the wireline or this is what we're doing and this

24         is how we're promoting U-verse this month.  And you

**Examination of Rose Emily Lorenzo**
**Rose Lorenzo v. Prime Communications, LP**

128

1    Q    The mall hours.

2    A    So during the holiday season, they were open later,

3         they opened earlier.  And then during the regular

4         times, they were open when the mall opened and when

5         the mall closed.

6    Q    My understanding is, when you were a solution

7         specialist, you were paid an hourly wage plus

8         commissions.  Is that correct?

9    A    Plus commissions, plus overtime.

10   Q    Okay.  And then as a manager, you were paid a

11        salary; is that correct?

12   A    That's correct.

13   Q    Plus commissions.  Did you also receive, I don't

14        know if they called it a commission or a bonus,

15        based on the store's productivity?

16   A    I didn't get paid commissions and the store's

17        commissions.  I got paid the store's commission.

18   Q    Okay.

19   A    Okay.  So, I didn't get paid for my own personal

20        sales.  I got paid for the store, whatever the

21        store did.

22   Q    And if you sold it in the store, then you would get

23        paid because the store made the sale; is that

24        correct?

**Examination of Rose Emily Lorenzo**
Rose Lorenzo v. Prime Communications, LP

129

```
 1                    MR. DUNN:  Objection.

 2    Q    Well, let me clarify my question.  You said you

 3         didn't get paid your commissions on your sales, but

 4         you got commissions on what the store made on their

 5         sales, correct?

 6    A    That's correct.

 7    Q    Okay.  But your sales were a part of the store's

 8         sales, correct?

 9    A    That's correct.

10    Q    Okay.

11    A    So to clarify, because you said, was I -- I got

12         paid a salary plus commission plus a bonus.

13    Q    Okay.

14    A    I was not getting paid the commission.  I was

15         getting paid the store commission.

16    Q    Okay.

17    A    Not a personal commission in addition to.

18    Q    Got you.  Because what that meant was that you also

19         paid bonuses based on the sales of either Billy or

20         Suleika while they were working in your store at

21         Middle Creek.

22    A    That's correct, but I also received their

23         chargeback too.

24    Q    Yeah.
```

**Examination of Rose Emily Lorenzo**
Rose Lorenzo v. Prime Communications, LP

181

1    Q      You would be in charge of reporting it?

2    A      Yeah, I would tell -- well, if I saw it, yeah.  It

3          would be my responsibility to not ignore it.  And

4          in the same respect, if I did something that they

5          weren't supposed to do, they could also report me.

6    Q      Do you agree that the manger is ultimately

7          responsible for the activities of the location and

8          will be held accountable for any discrepancy in the

9          store's paperwork, sales, deposits, and inventory?

10   A      I believe that that's what they say.

11   Q      Do you disagree with that being a job

12         responsibility of a store manager?

13   A      Well, because I'm not responsible for all of the

14         activities of the sales for every associate or

15         salesperson in that store.

16   Q      Why not?

17   A      Because I don't -- I'm not really managing them.

18         Number one, I was -- I would be responsible for

19         myself because I worked by myself 90 percent of the

20         time.  So, you know, if I was -- I wasn't with

21         Suleika because I had to have two days off.  She

22         had to have two days off.  So we maybe worked

23         together one day, maybe two, on different shifts.

24         So it would be impossible for me to see everything

**Examination of Rose Emily Lorenzo**
Rose Lorenzo v. Prime Communications, LP

182

1      that she's doing, and for her to see everything

2      that I'm doing.  So I can't say that in my position

3      at Middle Creek, that I was responsible for all the

4      activities that Suleika was doing because I wasn't

5      even in the store.  I wasn't even working.

6    Q   Well, how often did you work in the store?

7    A   Well, I worked -- my shifts, I worked every day.

8      When Suleika wasn't there and Billy wasn't there, I

9      worked seven days a week.  When I got Suleika, then

10     I worked every day but Suleika was off two days and

11     I was off one day, and then we closed on Sunday,

12     right?  So, we only worked together maybe two days,

13     maybe one day, and we worked opposite shifts.

14         Like she would work in the morning and

15     then I would come in and I would close, or I would

16     work in the morning and then she would go home like

17     around 2:00 or 3:00, depending on how many hours

18     they allotted her.  You know, because Suleika was

19     more of a part-timer/full-timer.  She worked maybe

20     30 hours, you know, unless I was on vacation.  You

21     know, then she would have to work 40 hours that

22     week because I was on vacation.

23   Q   So Suleika didn't work a full-time job?

24   A   She didn't work 40 hours a week.  That store wasn't

Examination of Rose Emily Lorenzo
Rose Lorenzo v. Prime Communications, LP

185

1    during the week.  Managers were required to work

2    every Monday and every Friday.  So I had to try to

3    take a day off in-between, and it was never

4    consistent.  Her day off was Sunday because she

5    went to church and she had all these activities, so

6    she -- I said, you just take Sunday off because I

7    don't go to church, you know, I don't have anything

8    going on.  I live by myself.  You know, so you take

9    Sunday off and I will work on Sunday.  It's not a

10   big deal.  And it was always very slow.

11            Occasionally, it got busy, but that was

12   the day that I worked by myself, and we both worked

13   together on Saturday, because Saturday was usually

14   a busy day, and Friday, and then in between.  It

15   was mandatory Mondays, you had to work on a Monday,

16   and you had to work on a Friday.

17   Q   As a store manager, did you also create the

18       employees' schedules once you got the number of

19       hours that were allotted from the district manager?

20   A   Not in my store.  That happened -- Jeremy or Jessie

21       would create the schedule based on the number of

22       hours they wanted me to work and the number of

23       hours that they wanted Suleika to work.

24   Q   Now, why is that different than when Crystal was

Examination of Rose Emily Lorenzo
Rose Lorenzo v. Prime Communications, LP

186

1          the store manager at Fuquay?

2    A     I think that they wanted to make sure that the

3          store had me in there as much as possible, and

4          Suleika not so much, to try to build the sales.

5          You know, I was being paid a salary and Suleika was

6          being paid hourly.  So if she wasn't producing, you

7          know, she was getting paid her hourly.  You know,

8          and so -- and plus whatever commission she was

9          producing.

10              I don't really understand the logic

11         behind it.  I know that in my store and in talking

12         to Charlotte, who was the manager at Wake Forest

13         and then Holly Springs, and Cassidy was the manager

14         at Holly Springs and then she left, Ashley who

15         became the manager at Maynard for a short while,

16         the same thing happened to them as to me.  Their

17         schedule was pre-loaded for them, you know.  And if

18         you tried to go in and load the schedule to what

19         you wanted to allocate for your store, Jeremy would

20         go in and change it.  "No, no, no, this is what I

21         want," you know.

22   Q     Uh-huh.

23   A     And so then you would print it out and post it on

24         the back and this is your schedule for the week.

* * *

**Examination of Rose Emily Lorenzo**
Rose Lorenzo v. Prime Communications, LP

194

```
1          your previous testimony, that would be about

2          another -- I think you said it was like a 2- to 3-

3          hour meeting once a week and then an hour meeting

4          every morning.

5    A     Yeah.

6    Q     So that would be another 7 to 10 hours a week?

7    A     7 to 10 hours, maybe more, on average.

8    Q     When you took the job as a manager, or store

9          manager, were you explained that you were not going

10         to be receiving overtime?

11   A     No.  Well, I was explained that if I worked -- as a

12         store manager, I was going to get this salary but I

13         was required to work 45 hours.  But I was not told

14         that if I worked 50 hours or 60 hours, that I was

15         not going to be compensated for that, you know. And

16         so that is something that I addressed all the way

17         up to Michael Castelli.  That you want me to work

18         all these hours by myself with no support.  If you

19         take my salary, I may be making ten bucks an hour.

20              Now I'm working 70 hours a week; you're

21         paying me five bucks an hour.  You know, that has

22         to change.  Well, no, because store managers don't

23         make overtime.  Well, I'm not really managing

24         anybody but myself.  You know, so how am I -- you
```

**Examination of Rose Emily Lorenzo**
Rose Lorenzo v. Prime Communications, LP

1       to-close, different shifts.  And then, I wouldn't

2       say that I actually managed him because I wasn't in

3       the store, he ran the store.  When I was in the

4       store, I ran the store, and then just made sure the

5       store was open and the people that came in were

6       buying something.

7   Q   And if y'all were both in the store, would you be

8       managing him?

9   A   No, we would both be selling.  So there really

10      wasn't like anything to manage.  We were -- the

11      focus of that store was sales.  That's what my job

12      was, get those numbers up, get the sales.  They

13      wanted us to build displays of which they wouldn't

14      provide any money to buy whatever display stuff for

15      the holidays and Valentine's Day and whatever.

16      They would want these displays in front of the

17      store.

18          They wanted us to go with a sign to the

19      corner to draw people into the store.  I'm like,

20      how am I going to do that if I'm the only person in

21      the store?  I'm going to go out to the corner; no

22      one is in the store.  I have to close the store to

23      go out there?  I mean, there were just ridiculous

24      demands that they would want.

Examination of Rose Emily Lorenzo
Rose Lorenzo v. Prime Communications, LP

197

1        And they wanted pictures.  We want you

2    build a display, send me a picture of the display,

3    you know.  And I did it for a couple of times and

4    then I'm like, you want a display, you send me a

5    check here or cash or go buy whatever it is you

6    want to me build and I'll be happy to do it for

7    you.  But I am no longer spending $20.00 or $30.00

8    to buy stuff to make the store look all presentable

9    the way you want it to be, not the way AT&T

10   Corporate wants, to build these displays to put

11   outside to entice people to come in.

12       Because they were not reimbursing you

13   that money.  In fact, I had to buy some supplies

14   for the store because they never shipped them and

15   they never reimbursed me.  I gave them the receipt.

16   I'm like, "I spent $60.00 on this."

17       "Oh, yeah, yeah, we'll get you

18   reimbursed."

19       They never did.  You know, so I'm like

20   I'm not spending my money.  I don't make enough

21   money to be spending my money on Prime stuff.

22  Q   And was that a responsibility of a manager to buy

23   that stuff, or was that just something extra that

24   you did?

Examination of Rose Emily Lorenzo
Rose Lorenzo v. Prime Communications, LP

198

1    A     That was something that they -- well, they wanted

2          everybody in -- like all the stores did it.

3          Crystal, who manages Fuquay, would say, oh, we need

4          to buy all of these things, but she ended up having

5          like a surplus because she had been there for a

6          while.  All the stores were having to buy these

7          whatever.  So it wasn't necessarily something --

8          because I was the only one there, it was something

9          that I did, but the employees of Southpoint were

10         the ones who bought the stuff, not the manager

11         there.

12                 The employees of Falls Point were the

13         ones who bought the stuff there.  You know, so not

14         necessarily DeWall, who was the manager of the

15         Falls Point store, went out and bought the stuff

16         because they would have the meeting and say, this

17         is what we want you to do.  And whether the manager

18         of the store would say, "Yeah, I'm going to do

19         that" or the employees say, "Okay, I'll go and buy

20         the stuff at Party City or at the Dollar Store and

21         buy it," they chose to spend their own money to do

22         that.  I chose not to after a few times.

23                 MR. WALKER:  Ms. Lorenzo, I believe I am

24         done with all my questions.  I appreciate your

* * *

1   be a regional director if the market was large enough

2   to so need.  Below that would be district managers.  To

3   kind of give you a feel for that, you would have a

4   vice-president of the Southeast Region.  Underneath

5   that they had like Georgia and North and South

6   Carolina.  North and South Carolina might have a

7   regional director and Georgia have a regional

8   director.  Then underneath that you have district

9   managers reporting to that regional.

10          Most district managers had 10 to 12

11  stores unless they were in a geographical area that was

12  very spread out.  Then they might have as few as five

13  because of the driving distance and having to get to

14  all those locations.  Underneath district manager would

15  then be -- each store would have a store manager.

16  Underneath the store manager there would be at least

17  two sales reps, two or more sales reps.

18      Q    And who -- so each region had a

19  vice-president, and your example was Southeast Region?

20      A    Uh-huh.

21      Q    And that's yes, right?

22      A    Yes.

23      Q    So is there a vice-president of sales and

24  operations in Sugar Land at corporate that oversees the

25  regional VPs?

ROSS REPORTING SERVICES, INC.          281-484-0770

Electronically signed by Judy Hodges (101-114-331-9776)   Case 5:12-cv-00069-H   Document 31-2   Filed 02/08/13   Page 2 of 12   d6a5d886-0eb1-443a-9898-110fa43fccc4

132

1    A    No.  They report to the COO.

2    Q    Okay.  So that -- so each regional

3    vice-president reports up to the COO?

4    A    Yes.

5    Q    And that's Mr. Mohamed?

6    A    Correct.

7    Q    Akbar Mohamed?

8    A    Akbar Mohamed.

9    Q    Do you know what type of -- or at what level

10   scheduling occurs within the operations for the -- your

11   managers?  And I believe solution specialists are the

12   other -- that would be below a manager?

13   A    That would be below a manager.  They're now

14   called retail sales associates.

15   Q    Previously they were called solution

16   specialists?

17   A    Yes.

18   Q    So the solution specialist or retail sales

19   associate, that would be the entry level position?

20   A    Correct.

21   Q    In the sales organization?

22   A    Correct.  The schedules were made by the store

23   manager.

24   Q    Do you know if a district manager was involved

25   in scheduling for stores?

ROSS REPORTING SERVICES, INC.          281-484-0770
Electronically signed by Judy Hodges (101-114-381-9770)   Case 5:12-cv-00069-H   Document 31-2   Filed 02/08/13   Page 3 of 12   d6a3d83f-0ab1-443a-9898-110fa43fccc4

133

1      A     The schedules were turned into the district

2   manager.  The district manager then would approve or

3   say -- you know, critique the schedule if he felt or

4   she felt there was an issue with it.

5      Q     Do you know if any solution specialists

6   reported directly to any district managers?

7      A     That would only occur if a store did not have

8   a manager.

9      Q     And in what circumstances would a store not

10  have a manager?

11     A     The manager was fired, the manager quit, the

12  manager was demoted, while we're looking for a

13  replacement.

14     Q     So mainly interim?

15     A     Correct.

16     Q     Were there any stores that were -- let's take

17  an example, the mall kiosk -- where a solution

18  specialist would report directly to a district manager

19  without an assigned store manager?

20     A     No.

21     Q     So even a kiosk would have assigned store

22  managers?

23     A     Correct.

24     Q     Okay.  And who would be responsible for the

25  staffing at the store level?

ROSS REPORTING SERVICES, INC.              281-484-0770
Electronically signed by Judy Hodges (101-714-351-9776)    Case 5:12-cv-00069-H   Document 31-2   Filed 02/08/13   Page 4 of 12    86a3d886-bab1-443a-9898-110fa43fccc4

134

1      A      The store manager is responsible for

2      recruiting for their location. As long as -- and they

3      had a certain protocol to follow as far as who was

4      qualified to work for Prime. If a store was really

5      short staffed a district manager might assist in

6      finding candidates. But it was up to the store manager

7      to keep their store staffed.

8      Q      And from a budget dollars standpoint did the

9      store manager have the ability without approval to

10     hire? In other words, upstream approval. So could a

11     store manager hire an employee without the district

12     manager's approval?

13     A      All stores were allotted two -- three head

14     count which is two sales reps and a manager. If a

15     store wanted to add a fourth person, then yeah. If

16     they went outside the box, they would have to get

17     approval for additional head count than what was

18     allotted to each store.

19     Q      And do you know how many stores, for instance,

20     were fully staffed during the times that you were --

21     the full three head count during the times that we're

22     talking about?

23     A      I would say at least 20 percent of the stores

24     were always -- we always had at least 20 percent of the

25     stores where we were actively recruiting to fill

ROSS REPORTING SERVICES, INC.           281-484-0770

Electronically signed by Judy Hodges (401-414-587-8778)   Case 5:12-cv-00069-H   Document 31-2   Filed 02/08/13   Page 5 of 12   863d5d886-bab1-443a-9898-110fa43fccc4

135

1    vacancies.  Being retail there's just high turnover.

2        Q    So, under the standard format as designed,

3    there would be a store manager and an allotment for two

4    nonmanagerial solution specialists or retail sales

5    associates, correct?

6        A    Correct.

7        Q    And you're saying that your estimate would be

8    around 20 percent of the stores would be at least one

9    sales -- solution specialist or retail sales associate

10   short and were recruiting for one?

11       A    I wouldn't say just that scenario.  I might

12   have a store that has six employees and they're short

13   one.  At all times we were actively recruiting for at

14   least 20 percent of the stores.  I couldn't say how

15   many of those were short one of two.

16       Q    So I think, for instance, you said your

17   default would be a three head count?

18       A    Correct.

19       Q    But some stores, obviously, had more than

20   three?

21       A    Correct.

22       Q    And do you know the percentage of stores that

23   were staffed with over three persons?

24       A    At least 30 percent or more.  For example, my

25   California stores had six to eight employees per

ROSS REPORTING SERVICES, INC.                281-484-0770
Electronically signed by Judy Hodges (101-114-351-9776)   Case 5:12-cv-00069-H   Document 31-2   Filed 02/08/13   Page 6 of 12   86a3d889-bab1-443a-8898-110fa43fccc4

136

1    location.

2         Q    And that pretty much tracked the populations

3    that you're servicing?

4         A    Uh-huh.

5         Q    Is that a yes?

6         A    Yes.

7         Q    So, for instance, looking back at Exhibit 2,

8    the Orange Company -- I guess they don't have one

9    broken down for Orange County.  Yeah, they do.  Orange

10   County would probably have more employees at a store

11   than Bastrop, Louisiana?

12        A    Yes.

13        Q    Okay.  Or Tallulah, Louisiana.

14        A    Yes.

15        Q    And particular to the kiosk locations, are

16   the -- describe for me -- I've seen them in the malls,

17   but kind of describe for me kind of how that kiosk

18   retail establishment is -- I mean, you have a location

19   in a mall.  So it's walk-up customers, correct?

20        A    It's a freestanding booth, for lack of a

21   better word; but it's a kiosk.  It's four sides and

22   customers walk up and the employees are within the

23   booth.  I mean, they'll get out of the kiosk and greet

24   customers and show merchandise.  But it's just

25   freestanding, typically around food courts, that type

ROSS REPORTING SERVICES, INC.          281-484-0770
Electronically signed by Judy Rodgers (101-114-561-9770)   Document 31-2   Filed 02/08/13   Page 7 of 12   86a3d889-bab1-443a-9898-110fa43fccc4

137

35

1    thing.

2        Q    And is it your understanding that the kiosks

3    were typically staffed with a manager and two employees

4    who were all physically present at the same time?

5        A    No.  A kiosk, they're kind of different

6    because of the extended mall hours.  They were allotted

7    the one plus two; but, you know, sometimes they'd have

8    two part-timers or four part-timers.  It depended on,

9    you know, how they were able to work around their

10   hours.  They might have two full-timers and a

11   part-timer to bridge the gap on handling the mall

12   hours.

13       Q    But the employee -- the store manager or the

14   district manager scheduling would, of course,

15   reflect -- those records would reflect the numbers of

16   employees who were assigned to each location at a

17   particular time, correct?

18       A    Correct.

19       Q    And do you know what the software was that

20   they used?

21       A    Yes, RQ4.

22       Q    RQ4?

23       A    RQ4, which is the point of sale system.  It

24   was our time clock and scheduling tool.

25       Q    Is that a shelf --

Electronically signed by Judy Hodges (001-114-989-9770) Case 5:12-cv-00069-H   Document 31-2   Filed 02/08/13   Page 8 of 12   8da5d066-0ab1-443a-9898-110fa43fccc4

* * *

ANGELA DUNLAP

1    A    They were.  I think that's changed.

2    Q    And when did that change?

3    A    Summer of two -- July of 2012.

4    Q    And how are the store managers now classified?

5    A    They are nonexempt.

6    Q    Did that relate in any way to the Department

7    of Labor investigation?

8    A    No.

9    Q    Why did you change the store managers from

10   exempt to nonexempt?

11   A    Part of it had to do with a scheduling

12   analysis.  We had managers that were working 30, 35

13   hours a week and had sales reps working overtime; and

14   in order to get the managers to be there more we had to

15   convert them to an overtime rate.  In other words,

16   force them to be there.

17   Q    So were they still paid salary, the managers?

18   A    Up until July and then they were converted to

19   hourly and they're at $10 an hour or more.

20   Q    How long did this analysis take place?  When

21   did it begin, the analysis of -- consideration of

22   changing from -- the store managers from a nonexempt

23   status to -- or rather an exempt status to a nonexempt

24   status for overtime purposes?

25   A    That was fall 2012 -- fall 2012.  Winter,

* * *

1     A     Yes.

2     Q     All right.  In the summer of 2012 you didn't

3   completely rewrite the job function for a store manager

4   and say, "Now you're going to work different hours.

5   Now you're going to do different things"?

6     A     No.

7     Q     All right.  As I understand your position,

8   Prime Communications made a voluntary decision to do

9   this change of store managers, but it wasn't

10  necessarily related to a legal requirement, that it was

11  voluntary.  Is that correct?

12     A     That's correct.

13     Q     All right.  I understand that.  I may be

14  done.  Let me check.

15               MR. WALKER:  Good, because I'm hungry.

16               MR. BUTLER:  I know.  It's time to eat.

17     Q     (BY MR. BUTLER)  Are there any third-party

18  vendors that we've not discussed for any of these

19  systems that we've talked about?  Most of them are web

20  based, but the payroll systems or the timekeeping

21  systems.  I mean, it's pretty much the provider if

22  they're web based.

23     A     There's no other third-party vendors.

24     Q     In the kiosk where are the FLSA or state

25  overtime posters maintained?

ROSS REPORTING SERVICES, INC.          281-484-0770
Electronically signed by Judy Hodges (101-114-359-9776)   Case 5:12-cv-00069-H   Document 31-2   Filed 02/08/13   Page 10 of 12   d0e3d886-9ab1-443a-8898-110fa43fccc4
* * *

140

```
  * * *
```

1    A    Yes, that was in the file we created with the

2    conversion rates and what the impact was going to be

3    based on managers that were going to average 45, 50

4    hours a week.

5    Q    And what was the dollar effect on either a

6    payroll period basis or --

7    A    It wasn't too significant.

8    Q    When you say not too significant --

9    A    I mean, it was a slight bump, but it was not

10   major.

11   Q    So a slight upward?

12   A    Upward bump, yes.

13        Part of what -- while I'm thinking about

14   it, part of what went into that not only was we had --

15   was the fact that we had managers that were not working

16   as many hours or work 40-hour weeks, but some of our

17   markets due to the decline in revenues, we were

18   spending a lot more on payroll and to cut back on head

19   count we had to convert.  That was part of the purpose

20   of converting managers, was so we could cut back on the

21   number of sales reps in the stores as well.

22   Q    The manager's -- part of the manager's duties

23   are to perform sales functions, correct, while they're

24   in the store?

25   A    If there's a guest that needs to be waited on,

Electronically signed by Jody Scholz (201-036-030-9775) Document 31-2   Filed 02/08/13   Page 11 of 12   8b04452-9898-110fa43fccc4

122

1    yes; but that's not their primary job.

2        Q    But depending on staffing -- if, for instance,

3    they're short one or two retail sales associates, then

4    the manager --

5        A    They would have to.

6        Q    -- would have to do it?

7        A    I mean, they would have to step in.

8        Q    Okay.  So that is actually a part of their

9    duties as well, to do the sales function as required?

10        A    Yeah, as needed.

11        Q    Do you know the gross and net income of the

12    company from February 2009 forward?

13        A    No.

14        Q    They're private, not public, correct?

15        A    Correct.

16        Q    Do you know where the gross and net income

17    will be published, if anywhere, publicly?

18        A    I don't believe it is published publicly.

19        Q    But you don't know -- who would know that, the

20    CFO or one of the operations --

21        A    Yes.

22        Q    Are there any parents or subsidiaries that --

23    or other corporate entities that have any ownership

24    interest in the retail operations of Prime

25    Communications?

Electronically signed by Rachel Daste (301-000-089-8776)   Document 31-2    Filed 02/08/13   Page 510f4132-9898-110fa43fccc4

142

1      It's not inside a mall but, you know, inside a strip.

2              Q      Okay.

3              A      You could have a pizza place next to you and

4      you could have another store next to you.

5              Q      And where was this strip mall located?

6              A      In the Wal-Mart shopping center.

7              Q      Is there only one Wal-Mart in Holly Springs?

8              A      That's correct.

9              Q      Okay.  And what were the hours that that

10     store was open?

11             A      Ten to seven Monday through Saturday, and

12     then I think twelve to five on Sunday.

13             Q      And what days did you generally work?

14             A      I worked all the time.  It wouldn't matter,

15     just whenever.  It doesn't matter.  I'd work Sundays.  I

16     worked Monday through Sunday whenever I had to work

17     because whenever -- whenever the 38 hours was up.  It just

18     didn't matter.  Almost every day, at least six days a week

19     I used to work.

20             Q      And who made the schedule for when --

21             A      I made the schedule.

22             Q      For both when Nikki and Kelly were working

23     there?

24             A      Yes, that's correct.

25             Q      And what were Kelly's hours, if you recall?

1          A     Different all the time, just no set hours.

2          Q     But she would work the 40-hour week?

3          A     The 38 hours, yes.

4          Q     Okay.  And did she ever work overtime hours?

5          A     No.  And if she did it was because she had

6     to stay -- like if she closed she stayed late and then

7     they would call me and tell me like make her come in

8     later.  Do you know what I mean?  She might -- Sometimes

9     if we might have customers then you might stay until -- if

10    we closed at seven we might stay until nine o'clock

11    helping customers.

12         Q     Because you'd have customers?

13         A     Yeah, and it takes like an hour and a half

14    to activate a phone, so by the time you do that whole

15    process, if you've got someone that walks in at 6:50

16    you're not going to leave until at least eight o'clock, so

17    sometimes you would be there later.

18         Q     And then Nikki, is she full time as well?

19         A     She was.

20         Q     Was she working 38 hours a week?

21         A     That's correct.

22         Q     Did she work any overtime?

23         A     No.

24         Q     Okay.  And while you were the store manager

25    did you ever work at the same time that Kelly was in the

```
 1        A     Yes.

 2        Q     All right.  Tell me about those.

 3        A     When you went to meetings, if you worked at

 4  another store you couldn't log in and out of their system

 5  because you're only capable of doing it at your own store.

 6  And you had to fingerprint, so it only knows the

 7  fingerprint.  That's how you would log in and log out.

 8        Q     Tell me about the meetings.  What type of

 9  meetings did you have?

10        A     They would have meetings at the AT&T office.

11        Q     And where is that?

12        A     That would be, I guess, in Cary, considered

13  Cary.

14        Q     And what type of meeting was that?

15        A     It would be like a sales meeting.  You'd sit

16  like at a big desk like this (indicating to conference

17  table).

18        Q     And how often did those sales meetings

19  occur?

20        A     Every month.  And then you had every morning

21  before you went to work you would have a half hour to an

22  hour phone call meeting almost every day that wasn't

23  clocked.

24        Q     And what time would that occur?

25        A     That would occur before the store opened.
```

Page 69

1    So say if your store opened at ten o'clock, so if you're

2    supposed to be at work at ten, it would be a nine o'clock

3    meeting every day on the phone.  And sometimes it could be

4    15 minutes or it could be as long as an hour until you get

5    to the store.

6         Q    And where were you usually during these

7    phone meetings?

8              A    Home.

9              Q    Were you at the store, at home?

10             A    Yeah, home, in my car.

11             Q    But you would just do them on your cell

12   phone?

13             A    That's correct.

14             Q    Any other meetings that you attended?

15             A    That would be it.

16             Q    The sales meeting, who would be at those

17   meetings?

18             A.   It would be Jeremy, AT&T, maybe a guest from

19   Texas, one of the guys from Texas.  It could be HR from

20   Texas just going over new things.

21             Q    And were those for just store managers or

22   store managers and sales associates?

23             A    Only just managers.  They were the managers

24   only.

25             Q    And what about the morning meetings, were

1     were starting to talk about your duties as a store

2     manager, and we talked about a couple of them.  I believe

3     you said that sales was a part of your position as a store

4     manager; is that correct?

5               A    Yes.

6               Q    As part of your responsibilities to oversee

7     the sales associate whether it was Nikki or Kelly at a

8     given time; is that correct?

9               A    Yes.

10              Q    You also made the schedule for yourself and

11    the sales associate at the time; is that correct?

12              A    Yes.

13              Q    What other duties did you have as a store

14    manager that we haven't talked about?

15              A    You know, like doing bank deposits, you

16    know, filing all the paperwork, making sure the deposits

17    went with the paperwork.  And then every six months you

18    would send back, you would send back the paperwork.  I did

19    vacuuming, cleaning, you know, keeping the store clean,

20    ordering phones, ordering -- I wouldn't, you know, I'm

21    going to take away the ordering of the phone thing.  I'm

22    going to say I requested -- I would -- I would put like a

23    request in for like supplies, but that didn't mean that I

24    was getting it.

25                        So like even like accessories, they would

1    tell you, "Fill out this order form," but they was really

2    ultimately they would say, "Ah, we're going to send you

3    what we want to send you," but they would ask for like our

4    recommendation type of thing, and we would do that on a

5    weekly basis.  Inventory once a month, so that, like

6    inventory, remember you were asking me about like when --

7    oh, no, that wasn't it.  You were asking me about clocking

8    in and out.

9           Q    Right.

10          A    We would clock in for that, so that didn't

11   matter.

12          Q    Okay.

13          A    But it would be, you know, it would have to

14   be when the store was closed when we did inventory.

15          Q    You would do it after hours?

16          A    After hours or before, like on a Sunday

17   would be like the prime time because we didn't open until

18   12:00, so you would go in at like nine o'clock.

19          Q    Gotcha.  Now, these jobs that you just

20   talked about, the bank deposits and the filing and the

21   paperwork, were those all duties that you had to do, or

22   were just in charge that they got done?  For instance, the

23   vacuuming, did you have to vacuum or did you just have to

24   ensure that the store was always clean?

25          A    I had to vacuum if I was the only one there

Case 5:12-cv-00069-H   Document 31-4   Filed 02/08/13   Page 7 of 9

1    so, yeah, so but if, you know, like I said, we were fair

2    about it.  Like everyone contributed so, yes, so like

3    everyone did.  But like the bank deposits I would do

4    because it had to be scanned, emailed to certain people.

5         Q    And maybe that's a better way to ask the

6    question.  Is there any of these job duties that we just

7    talked about that you could not give to a sales associate

8    to handle?

9         A    Like sending the paperwork back, making sure

10    those items -- anything that had to do with closing the

11    store or anything with the numbers that they wanted.

12         Q    So those are the things you wouldn't put off

13    to a sales associate, you would do those yourself every

14    time; is that right?

15         A    That's correct.

16         Q    During your time at Prime Communications who

17    was your direct supervisor?

18         A    Jeremy Haynes.

19         Q    Was he the district manager the entire time

20    you were there?

21         A    The entire time.  He started the same time I

22    did actually.

23         Q    You talked briefly about charge backs a

24    minute ago.  What is your understanding of what a charge

25    back is?

GARRETT REPORTING SERVICES, INC.       (919) 676-1502
Case 5:12-cv-00069-H   Document 31-4   Filed 02/08/13   Page 8 of 9
* * *
149

1          Q      Do you have an estimate of how much that

2     would change the percentage if you added in those

3     meetings?

4          A      I would say an hour or anywhere between a

5     half hour to an hour a day because that's how long those

6     meetings were.  And if it was the monthly meeting, then

7     that would be a half a day.

8          Q      Okay.  Were you responsible for any

9     marketing of your individual store at Holly Springs as the

10    store manager?

11         A      They would want you to -- They would want

12    you to go buy your own paper and make coupons and then go

13    put them on people's cars, you know, but they would expect

14    you to put the money out for that and not reimburse you,

15    so I would never do it.  But they would ask that, yes.

16         Q      And how do you know they wouldn't reimburse

17    you; did they tell you that?

18         A      Oh, because I would ask.  I would always ask

19    for mileage back if like they would have me -- they would

20    have us bring phones to other stores and stuff, and they

21    would never like -- I'll ask for the mileage or gas money,

22    and they would never reimburse you.  If I said, "Oh, well,

23    are you going to give us the flyers?"  They'd be like,

24    "Oh, go buy the paper and just do it.  You're benefitting

25    yourself."  Jeremy would be like, "You're just benefitting

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:12-cv-00069-H

ROSE LORENZO, individually and on          )
behalf of others similarly situated,       )
                             Plaintiffs,      )
                                          )          **SECOND JOINT MOTION TO**
          v.                         )          **AMEND SCHEDULING ORDER**
                                          )
PRIME COMMUNICATIONS, L.P., a            )
Texas General Partnership,                )
                             Defendant.      )

All parties by and through undersigned counsel of record hereby move the Court to amend the Scheduling Order entered October 4, 2012 [Document 23] and modified by Amended Scheduling Order entered January 2, 2013 [Document 25], to enlarge the time for completion of initial discovery from February 28, 2013 up to and including April 30, 2013, and to enlarge the time for filing a motion to certify a Rule 23 class from March 31, 2013 up to and including May 31, 2013, and in support hereof respectfully shows::

1)  This action was commenced by Plaintiff on February 17, 2012 by filing a Complaint alleging violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. and the North Carolina Wage and Hour Act, N.C.G.S. §§ 95-25.1 et seq. and was amended May 4, 2012, to seek relief on behalf of class(es) of persons similarly situated.

2)  By Scheduling Order entered October 4, 2012 [Document 23] and Amended January 2, 2013 [Document 25], initial discovery related to 29 U.S.C. § 216(b) Conditional Certification and/or Rule 23 Class Certification was to be completed by February 28, 2013, and any motion for class certification was to be filed no later than March 31, 2013. Merits discovery commences following a

ruling upon class certification based upon further joint report to be filed within twenty (20) days after ruling.

3) The parties have actively pursued discovery and Plaintiff has moved Conditional Certification related to the 29 U.S.C. § 216(b) claims [Document 28], but additional time is needed to complete initial discovery related to the Rule 23 class claims.

4) The parties do not seek to delay ruling upon Conditional Certification related to the 29 U.S.C. § 216(b) claims, which motion is fully briefed and before the Court for consideration.

5) The parties have conferred with respect to this motion and consent to the entry of an order enlarging the time for completion of initial discovery up to and including April 30, 2013, and enlarging the time for filing a motion to certify Rule 23 class claims up to and including May 31, 2013.

WHEREFORE, the parties jointly move the Court for an Order amending the January 2, 2013 Amended Scheduling Order to provide:

1)       That initial discovery will be concluded by April 30, 2013.

2)       That Plaintiff shall file any motion for Rule 23 class certification no later than May 31, 2013.


This 28th day of February, 2013.

2

**Counsel for Plaintiff**

/s/ Charles J. Cushman
Stephen A. Dunn NC State Bar No. 12389
Raymond E. Dunn, Jr. NC State Bar No. 8739
Charles J. Cushman NC State Bar No. 36170
sdunn@emanuelanddunn.com
rdunn@emanuelanddunn.com
ccushman@emanuelanddunn.com
EMANUEL & DUNN, PLLC
Post Office Box 426
Raleigh, North Carolina 27602
(919) 832-0329 (PHONE)
(919) 832-0731 (FAX)


/s/ Harris D. Butler, III
Harris D. Butler, III VA State Bar No. 26483
Zev H. Antell Virginia State Bar No. 74634
harris.butler@butlerroyals.com
zev.antell@butlerroyals.com
BUTLER ROYALS, PLC
100 Shockoe Slip, 4th Floor
Richmond, Virginia 23219
(804) 648-4848 (PHONE)
(804) 648-6814 (FAX)

**Counsel for Defendant**

/s/ John B. Walker
John B. Walker NC State Bar No. 35631
bwalker@rl-law.com
RAGSDALE LIGGETT, PLLC
Post Office Box 31507
Raleigh, North Carolina 27622
(919) 787-5200 (PHONE)
(919) 783-8991 (FAX)

3

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 28, 2013, I electronically filed the foregoing SECOND

JOINT MOTION TO AMEND SCHEDULING ORDER with the Clerk of Court using the

CM/ECF system which will send notification of such filing to the following:

> John Bowen Walker
> *Attorney for Defendant*
> bwalker@rl-law.com
>
> RAGSDALE LIGGETT, PLLC
> Post Office Box 31507
> Raleigh, North Carolina 27622-1507

This 28th day of February, 2013.

> EMANUEL & DUNN, PLLC
> *Attorneys for Plaintiffs*
>
> /s/ Charles J. Cushman
> Charles J. Cushman, N.C. Bar # 36170

4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:12-cv-00069-H

ROSE LORENZO, individually and on )
behalf of others similarly situated, )
                Plaintiffs, )
                           )      **SECOND AMENDED**
    v.                            )      **SCHEDULING ORDER**
                           )
PRIME COMMUNICATIONS, L.P., a )
Texas General Partnership, )
                Defendant. )

      This matter is before the Court upon joint motion by all parties to amend the Scheduling

Order entered October 4, 2012 [Document 23] and modified by an Amended Scheduling Order

entered January 2, 2013 [Document 25], and for good cause shown, IT IS HEREBY ORDERED:

    1)     That initial discovery will be concluded by April 30, 2013.

    2)     That Plaintiff shall file any motion for Rule 23 class certification no later than May

31, 2013; and

    3)     Except as hereby amended, the Scheduling Order entered October 4, 2012 and

amended January 2, 2013 shall remain in effect.

      This 7th day of March, 2013.

                                  Malcolm J. Howard
                                  Senior United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:12-CV-69-H

ROSE LORENZO, on behalf of          )
herself and all others             )
similarly situated,                )
                                   )
        Plaintiff,                 )
                                   )
                                   )
v.                                 )          **ORDER**
                                   )
                                   )
                                   )
PRIME COMMUNICATIONS, L.P., a      )
Texas General Partnership,         )
                                   )
        Defendant.                 )

This matter is before the court on plaintiff's motion for an order (1) conditionally certifying her Fair Labor Standards Act claim as a collective action pursuant to 29 U.S.C. § 216(b); (2) requiring defendant to provide plaintiff with contact information for all potential class members; and (3) approving plaintiff's proposed notice and opt-in form and authorizing their distribution to the potential opt-in plaintiffs. Defendant has filed a response in opposition, plaintiff has replied, and this matter is ripe for ruling.

## STATEMENT OF THE FACTS

Defendant Prime Communications, L.P. ("Prime") operates approximately 300 AT&T wireless service retail locations in

twelve states from which it sells wireless and cellular communications hardware, as well as wireless service and data plans. From February 10, 2010 until June 17, 2011, plaintiff was employed as Store Manager of one of Prime's retail locations in the Raleigh, North Carolina area. At the time of plaintiff's employment, Prime classified its store managers as exempt from the minimum wage and overtime provisions of the Fair Labor Standards Act ("FLSA"). Consequently, Prime paid its store managers a set salary regardless of the number of hours worked, plus commissions or bonuses based on the store's performance. In July 2012, Prime reclassified its store managers as non-exempt and began paying them overtime for any hours worked in excess of forty hours per week.

Plaintiff asserts that she and Prime's other store managers were incorrectly classified as exempt. She brings this action "to recover unpaid compensation, in the form of overtime" pay (Am. Compl. [DE #15] ¶ 29) as well as liquidated damages, attorney's fees and costs (Am. Compl. ¶ 32). Although plaintiff's complaint also includes claims based on state law, plaintiff seeks certification solely in relation to her FLSA claim.[1]

---

[1] Plaintiff asserts claims under the North Carolina Wage and Hour Act and for breach of contract and unjust enrichment under North Carolina law. The court does not address these claims as they are not the subject of the motion presently before the

2

## COURT'S DISCUSSION

The FLSA permits employees to maintain an action for unpaid overtime wages against an employer on behalf of themselves and all others similarly situated. 29 U.S.C. § 216(b). An employee who desires to participate in a FLSA collective action must "give[] his consent in writing to become such a party." Id. In order to obtain certification of a FLSA collective action, the members of the proposed class must be "similarly situated." Id.; De Luna-Guerrero v. N.C. Growers Ass'n, 338 F. Supp. 2d 649, 654 (E.D.N.C. 2004). Additionally, class members must "opt in" by filing their consent to suit. Id.[2]

Class members are "similarly situated" for purposes of § 216(b) if they "raise a similar legal issue as to coverage, exemption, or nonpayment of minimum wages or overtime arising from at least a manageably similar factual setting with respect to their job requirements and pay provisions." Ellen C. Kearns, The Fair Labor Standards Act § 18.IV.D.3, at 1167 (1999). "[T]heir situations need not be identical. Differences as to time actually worked, wages actually due, and hours involved are . . . not significant to this determination." Id.

---

court.

[2] This procedure is different from the procedure utilized for class actions under Rule 23 where potential plaintiffs are bound by the judgment unless they opt out.

Certification of a FLSA collective action is typically a two-stage process. First, the court makes a preliminary determination whether to conditionally certify the class based upon the limited record before the court. The standard for conditional certification is fairly lenient and requires "'nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy or plan.'" Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1102 (10th Cir. 2001) (quoting Vaszlavik v. Storage Tech. Corp., 175 F.R.D. 672, 678 (D. Colo. 1997)). If the class is conditionally certified, the court typically authorizes plaintiff's counsel to provide putative class members with notice of the lawsuit and their right to opt in.

The second stage of class certification comes later, usually after discovery is complete, and is based upon a more developed factual record. Jimenez-Orozco v. Baker Roofing Co., No. 5:05-CV-34-FL, 2007 WL 4568972, at *6 (E.D.N.C. Dec. 21, 2007). At this stage, the court conducts a detailed review of the claims and defenses in determining whether the suit should proceed as a collective action.

Plaintiff requests that the court conditionally certify the following class:

> [A]ll current and former Prime store [m]anagers employed from May 4, 2009 to date, who have worked more than forty (40) hours in a workweek for Prime,

4

or its predecessor entities, without compensation for their overtime hours worked, and/or who were not paid the minimum wage during the statute of limitations period applicable to each of them.

Defendant opposes plaintiff's motion. Defendant maintains that its store managers were properly classified as exempt employees based on their job duties. According to defendant, all store managers "had the responsibility of running the store, preparing a schedule for all employees, being the first line of hiring for Prime, insuring that deposits were made daily, performing monthly inventory, marketing for their store, and supervising the solution specialists working at their store." (Mem. Opp. Pf.'s Mot. Facilitated Notice [DE #31] at 3 & Ex. 3 (Job Description).) Defendant appears to concede for purposes of this motion that plaintiff may not have been performing managerial duties included in her job description, but contends that plaintiff's situation "was not the norm within the Prime community." (Mem. Opp. Pf.'s Mot. Facilitated Notice [DE #31] at 3.)

In support of her request for conditional certification of the FLSA claim, plaintiff has presented two affidavits. In the first affidavit, plaintiff avers:

During my time as a store manager at Prime, my primary duties were not materially different than those of a salesperson. My key responsibility was to sell mobile devices and AT&T mobile plans to new and existing AT&T/Prime customers. Sales occupied the overwhelming majority of my time. However, some time

5

was spent on other ancillary tasks such as making bank deposits (something sales people did as well) and proposing a work schedule, when I had employees, for approval by the Regional Manager. I had no authority to independently set work schedules. I scanned inventory when it was received in the store, but had no authority or responsibility for determining the type or quantity of inventory as it was predetermined by corporate level management.

. . .

As a Store Manager, I did not file sales tax receipts, payroll taxes or unemployment, or create employee reports. I did not handle financial matters other than sales, and I was not responsible for budgeting, audits, insurance, marketing or marketing research. I was not involved with safety or health issues, or with governmental relations. I did not perform and was not responsible for database administration, computer networking, nor did I handle any legal or regulatory tasks.

During a typical day in the store, I would go into store, clock in, open safe and balance cash drawer . . . . After opening, the remainder of my day was devoted to sales. At the end of the day, I balanced the cash drawer, returned it to the safe, locked the store and left. On days I did not work, these duties would be performed by the sales associate on duty. To the best of my understanding, other Prime retail locations operated in a similar manner.

(Aff. Rose Lorenzo [DE #29-2] ¶¶ 13-16.) The other affidavit upon which plaintiff relies is from Guy A. Rodriguez. Rodriguez was previously employed as Store Manager of another Prime location in the Raleigh, North Carolina area. His affidavit is virtually identical to plaintiff's. (Aff. Guy A. Rodriguez [DE # 32-1].) Although plaintiff estimates that Prime currently employs 300 store managers, plaintiff has not submitted any

6

additional affidavits from current or previously employed store managers.

The court is satisfied that until July 2012, defendant Prime had a uniform policy classifying its store managers as exempt from FLSA's minimum wage and overtime provisions. However, the court is not satisfied that plaintiff has shown that she and the other store managers are "together the victims of a single decision, policy or plan." See Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1102 (10th Cir. 2001). The only evidence plaintiff has presented to support such a finding are her affidavit and the affidavit of one other individual formerly employed as a store manager in the same regional area (Raleigh, North Carolina area). While she and Rodriguez both aver that they did not perform managerial duties, they appear to have no personal knowledge as to the circumstances of other managers employed by Prime, either within or outside of the Raleigh area. The affiants simply declare that "other Prime locations operated in similar manner" "*[t]o the best of my understanding.*" (Lorenzo Aff. ¶ 16 (emphasis added); Rodriguez Aff. ¶ 13 (emphasis added).) Contrary to plaintiff's evidence, defendant has produced evidence suggesting that its store managers were responsible for a number of managerial tasks but plaintiff was not performing those tasks. Even applying the "fairly lenient" standard applicable to conditional class

7

certification, the court is unable to conclude, based on the evidence presently before it, that plaintiff's job requirements were substantially similar to the requirements of the hundreds of other store managers employed by Prime.

## CONCLUSION

For the foregoing reasons, the court DENIES without prejudice plaintiff's motion for conditional certification of her FLSA claim. The court hereby amends its prior scheduling orders to grant plaintiff an additional forty-five (45) days to conduct additional discovery related to 29 U.S.C. § 216(b) conditional certification. Plaintiff shall have until June 14, 2013, to renew her motion for conditional certification pursuant to 29 U.S.C. § 216(b).

This $\frac{R^{D}}{3}$ day of April 2013.

MALCOLM J. HOWARD
Senior United States District Judge

At Greenville, NC
#31

8

ROSE LORENZO, on behalf of herself and
all others similarly situated,

                    Plaintiff,

          v.                                         Case No:  5:12-cv-00069-H

PRIME COMMUNICATIONS, L.P., a
Texas General Partnership,

                    Defendant.

## PLAINTIFFS' RENEWED MOTION FOR FACILITATED NOTICE

Come now, Plaintiffs Rose Lorenzo, on behalf of herself and all others similarly situated (collectively, the "Plaintiffs"), by counsel, and respectfully move the Court for an Order authorizing their claims against Prime Communications, L.P., a Texas General Partnership ("Prime") to proceed as a collective action, and facilitating the collective action through discovery of, and notice to potential parties to the action.  Plaintiffs state as follows in support of the motion:

2.     On or about May 4, 2012 Lorenzo, who was a store "manager" with Prime, filed an Amended Complaint against Prime pursuant to the Fair Labor Standards Act ("FLSA"), *29 U.S.C. § 701, et seq.*, on behalf of herself and other current and former similarly situated employees of Prime, seeking payment of unpaid overtime compensation and unpaid minimum wages.

3.     Pursuant to 29 U.S.C. § 216(b), the FLSA's "collective action" provision, one or more employees may bring an action for overtime compensation "for and in behalf

of himself or themselves and other employees who are similarly situated." Under this provision, those employees who wish to participate in a collective action under the FLSA must affirmatively "opt in" by giving written consent to join in the action as a party.

4. The Plaintiffs are "similarly situated" to all Prime "managers" from May 4, 2009 to the present who were employed at Prime locations where the non-manager sales person(s) they supposedly oversaw worked a combined less than 80 hours in a workweek.

5. Lorenzo worked as a "manager" for Prime for the time period beginning approximately January 2010 and ending June 2011.

6. Prior to July 2012, when it began paying managers overtime, Prime paid all of its "managers" on a salary basis and did not provide for any overtime premium for hours worked in excess of forty (40) in a single week.

7. Plaintiffs have alleged that, during times pertinent to this action, Prime failed to maintain hours worked by "managers" in each workweek, which records are required by the FLSA and for the timely and proper calculation and payment of minimum wage and overtime compensation due employees. Prime misclassified all managers as overtime "exempt." Prime has required all or most of its managers to perform overtime work; however, Prime has not paid overtime compensation to its "managers" during the times at issue in this action. Plaintiffs allege that Prime has required its "managers" to perform work which is unrecorded, "off the clock." Plaintiffs allege that Prime has also required its managers to perform work during times for which it has not compensated employees.

8. The Plaintiffs regularly worked more than forty (40) hours in a workweek

2

without receiving overtime compensation, and were paid less than minimum wage during certain workweeks during their employment at Prime.

9. For these reasons, and for the reasons set forth in the accompanying memorandum, Plaintiffs move this Court for authorization to proceed as a collective action for overtime compensation and minimum wages under 29 U.S.C. § 216(b) on behalf of Prime managers who have worked more than forty (40) hours in a workweek for Prime without compensation for their overtime hours worked who were employed at Prime locations where the non-manager sales person(s) they supposedly oversaw worked a combined less than 80 hours in a workweek beginning May 4, 2009 through the present.

For the foregoing reasons, and for the reasons contained in the accompanying Memorandum in support, the Court should grant this motion to: (1) authorize this matter to proceed as a collective action, (2) require Defendant to provide counsel for Plaintiffs, in electronic format if available from Defendant or from vendors over whom Defendant has control, the names, addresses, e-mail addresses, telephone numbers and last known contact information (and all alternate addresses/contact information) for all persons employed by Defendant, or its predecessors, as managers from May 4, 2009 to the present who were employed at Prime locations where the non-manager sales person(s) they supposedly oversaw worked a combined less than 80 hours in a workweek; (3) authorize mailing and emailing of the proposed Notice, attached as Exhibit 1, to all persons employed by Defendant, or its predecessors, as managers employed from May 4, 2009 to the present who were employed at Prime locations where the non-manager sales person(s) they supposedly oversaw worked a combined less than 80 hours in a workweek.

3

This 14th day of June, 2013.

Rose Lorenzo, on behalf of herself and
all other current and former similarly situated
employees of Prime Communications, L.P.

By:     /s/ Stephen A. Dunn
        Stephen A. Dunn NC State Bar No. 12389
        sdunn@emanuelanddunn.com
        EMANUEL & DUNN, PLLC
        Post Office Box 426
        Raleigh, North Carolina 27602
        (919) 832-0329 (PHONE)
        (919) 832-0731 (FAX)


        /s/ Harris D. Butler, III
        Harris D. Butler, III VA State Bar No. 26483
        Zev H. Antell Virginia State Bar No. 74634
        harris.butler@butlerroyals.com
        zev.antell@butlerroyals.com
        BUTLER ROYALS, PLC
        100 Shockoe Slip, 4th Floor
        Richmond, Virginia  23219
        (804) 648-4848 (PHONE)
        (804) 648-6814 (FAX)

4

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing pleading with the Clerk of the Court, using the CM/ECF/PACER electronic filing system, which will send notification electronically to the defendant's counsel as follows:

> John Bowen Walker
> *Attorney for Defendant*
> RAGSDALE LIGGETT, PLLC
> Post Office Box 31507
> Raleigh, North Carolina 27622-1507
> bwalker@rl-law.com

This 14th day of June, 2013.

> /s/ Stephen A. Dunn
> Stephen A. Dunn
> NC Bar No. 12389
> sdunn@emanuelanddunn.com
> EMANUEL & DUNN, PLLC
> Post Office Box 426
> Raleigh, North Carolina 27602
> (919) 832-0329
> (919) 832-6731 (fax)

5

# Exhibit 1

**IMPORTANT NOTICE ABOUT YOUR RIGHT TO JOIN A LAWSUIT
SEEKING TO RECOVER UNPAID OVERTIME AND MINIMUM WAGES**

TO:     Present and Former Employees of PRIME COMMUNICATIONS, L.P. employed as "Managers" who were employed at Prime locations where the non-manager sales person(s) they supposedly oversaw worked a combined less than 80 hours in a workweek anytime between May 4, 2009 through July 31, 2012.

RE:     Your right to join a lawsuit seeking to recover unpaid overtime compensation and minimum wages.

DATE: _____

## 1.    WHY YOU ARE RECEIVING THIS NOTICE

This Notice is to inform you of a collective action lawsuit in which you may be "similarly situated" to the Named Plaintiff, to advise you of how your rights under the Federal Fair Labor Standards Act may be affected by this suit, and to instruct you on the procedure for participating in this suit, if you choose to do so.

## 2.    DESCRIPTION OF THE LAWSUIT

Rose Lorenzo ("Claimant" or "Named Plaintiff") filed this lawsuit against Defendant PRIME COMMUNICATIONS, L.P. ("Prime" or "Defendant") in the United States District Court for the Western District of North Carolina, Raliegh Division, Civil Action No. 5:12-cv-00069. Claimant seeks to pursue this lawsuit on behalf of herself and all other current or former similarly situated employees of Prime.

Federal overtime laws require an employer to compensate an employee (1) at one and one-half times their normal rate of pay for each compensable hour worked beyond forty in a workweek.

Claimant asserts that Defendant failed to pay her, and other Store Managers, overtime compensation at the rate of one and one-half times his hourly rate for workweeks in which he worked more than forty (40) hours. Specifically, Claimant alleges that she and other Prime Store Managers were misclassified as "exempt" rather than "non-exempt" employees and thus did not receive overtime compensation. Claimant further alleges that duties performed by her and Store Managers were non-exempt duties and she should have been overtime compensation.

Claimant alleges that Defendants' actions violate the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"). Claimant is suing to recover the allegedly unpaid overtime wages and unpaid minimum wages for herself and for any other similarly situated employee. Claimant also seeks to recover for herself and for any other similarly situated employee an additional equal amount as liquidated damages, plus attorneys' fees and costs.

Defendants deny Claimant's claims and deny any violation of the FLSA. Defendants have also averred multiple affirmative defenses, several of which could potentially preclude Claimant's claim in whole or in part. The case is in the early stages of litigation, and the Court has not ruled on Claimant's claims or Defendants' defenses.

## 3.  YOUR RIGHT TO PARTICIPATE IN THIS SUIT

You may join in this lawsuit ("opt-in" as a Party) if: 1) you have performed work as a Store Manager between May 4, 2009 and July 31, 2012; and 2) You were employed at a Prime location where the non-manager sales person(s) you supposedly oversaw worked a combined less than 80 hours in a workweek; and 3) you were not paid overtime wages for all of your hours worked in excess of forty (40) in a workweek. You are not required to join this lawsuit. If, however, you wish to join as a Party, you may sign the enclosed "Consent to Become a Party" form and mail it to Claimant's counsel at either of the following addresses:

Stephen A. Dunn
Raymond E. Dunn, Jr.
Charles J. Cushman
EMANUEL & DUNN, PLLC
Post Office Box 426
Raleigh, North Carolina 27602
(919) 832-0329 (PHONE)
(919) 832-0731 (FAX)
sdunn@emanuelanddunn.com
rdunn@emanuelanddunn.com
ccushman@emanuelanddunn.com

Harris D. Butler, III
Zev H. Antell.
BUTLER ROYALS, PLC
140 Virginia Street, Suite 302
Richmond, Virginia 23219
 (804) 648-4848 (PHONE)
(804) 648-6814 (FAX)
harris.butler@butlerroyals.com
zev.antell@butlerroyals.com

You either must return the signed form to Claimant's counsel or retain other counsel in time for counsel to file your consent to join this action with the United States District Court for the Western District of North Carolina, Raleigh Division, **on or before** _____.
If you fail to file a "Consent to Become a Party" with the court on or before the above deadline, you may not be able to participate in this lawsuit.

If you file a "Consent to Become a Party" form, the Court may decide whether you are, in fact, a proper party.

## 4.    EFFECT OF JOINING THIS SUIT

If you choose to join in the suit, you will be bound by the judgment of the Court, whether it is favorable or unfavorable. You will also give up the right to file suit in a separate action for the claims made in this case.

The attorneys for the Claimant will seek payment of attorneys' fees either on a percentage contingency fee basis out of any recovery; pursuant to a statutory award of attorney's fees paid by Defendant; or a combination of statutory fees paid by Defendant and a percentage contingency fee where such statutory fees offset the percentage contingency fee to be paid to attorneys for Plaintiffs. In no event will Plaintiffs' counsel seek, or be compensated, both the full contingency fee and full statutory fee paid by Defendant. Any payment of attorneys' fees in this matter is subject to the Court's approval.

If there is no recovery, there will be no attorneys' fee. If you join this suit and agree to be represented by Claimant's counsel, then you will be provided a contingency fee agreement by which you will designate the Claimant's counsel as your attorney to make decisions on your behalf concerning the litigation, the method and manner of conducting this litigation, and all other matters pertaining to this lawsuit.

## 5.    NO LEGAL EFFECT IN NOT JOINING THIS SUIT

If you choose not to join this suit, your rights will not be affected by any judgment or settlement rendered in this case, whether favorable or unfavorable to the class. If you choose not to join in this lawsuit, you are free to file your own lawsuit and you may be represented by the attorney of your choice.

## 6.    NO RETALIATION PERMITTED

Federal law prohibits Prime from discriminating or retaliating against you because you have exercised your rights under the FLSA by filing or joining a lawsuit seeking to enforce these rights. Examples of prohibited retaliation include discharge from employment, demotion, suspension, or other adverse actions.

## 7.    YOUR LEGAL REPRESENTATION IF YOU JOIN

If you choose to join this suit, your interests will be represented by Claimant's attorneys, who are:

Stephen A. Dunn
Raymond E. Dunn, Jr.
Charles J. Cushman
EMANUEL & DUNN, PLLC
Post Office Box 426
Raleigh, North Carolina 27602
(919) 832-0329 (PHONE)
(919) 832-0731 (FAX)
sdunn@emanuelanddunn.com
rdunn@emanuelanddunn.com
ccushman@emanuelanddunn.com

Harris D. Butler, III
Zev H. Antell
BUTLER ROYALS, PLC
140 Virginia Street, Suite 302
Richmond, Virginia 23219
 (804) 648-4848 (PHONE)
(804) 648-6814 (FAX)
harris.butler@butlerroyals.com
zev.antell@butlerroyals.com

## 8.   FURTHER INFORMATION

Further information about this Notice, the deadline for filing a "Consent to Become a Party," or questions concerning this lawsuit may be obtained by writing or telephoning Claimant's counsel at the number and address stated above.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| ROSE LORENZO, individually and on behalf of others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | CONSENT TO BECOME PARTY TO COLLECTIVE ACTION UNDER 29 U.S.C. § 216 |
| v. | ) ) | |
| PRIME COMMUNICATIONS, L.P., a Texas General Partnership, | ) ) ) | |
| Defendant. | ) | |

The undersigned, a current or former employee of Prime Communications, Inc., hereby consents to become a party plaintiff in this representative FSLA action pursuant to 29 U.S.C. § 216(b).

_____
Signature

_____
Print Name



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
### Civil Action No. 5:12-cv-69-H

ROSE LORENZO,           )
                              )
         Plaintiff,       )      **DEFENDANT PRIME**
                              )     **COMMUNICATIONS, L.P.'S**
v.                             )     **RESPONSES TO PLAINTIFF'S**
                              )     **SECOND SUPPLEMENTAL**
PRIME COMMUNICATIONS, L.P.,    )     **INTERROGATORIES AND**
                              )     **REQUEST FOR PRODUCTION**
         Defendant.      )       **OF DOCUMENTS**
_____ )

NOW COMES Defendant Prime Communication, L.P. ("Defendant"), by and through its counsel, and provides its responses Plaintiff's Second Supplemental Interrogatories and Request for Production of Documents.

### GENERAL OBJECTIONS

1.     Defendant objects to the definitions and instructions to the extent that they expand or differ from the Federal Rules of Civil Procedure.

2.     Defendant objects to the extent any request seeks confidential or proprietary business data or information.

3.     Defendant objects to the extent any of these requests seek information protected by the attorney/client privilege and/or the work product doctrine.

These general objections are incorporated in full into each and every response given below.

## SECOND SET OF INTERROGATORIES

15.    Please identify each Prime Communication retail store or kiosk location from May 4, 2009 to date in which Defendant's electronic and/or paper records reflect a manager and/or no more than 1 other employee (manager or employee and manager) working on the clock at any one time in such store location, by retail store name, dates, and employee names (with last known contact information for each employee), in each market in which Prime has done business.

**RESPONSE: OBJECTION. Defendant Prime objects to the extent this request seeks documents not kept in the normal course of business and/or documents that are no longer in the possession of Defendant Prime. Defendant Prime objects to the extent this request is overly broad, unreasonably cumulative, and unduly burdensome. Additionally, this request seeks inadmissible information which is not reasonably calculated to lead to the discovery of admissible evidence, seeks discovery of matter which is not relevant to the subject matter involved in the pending action and seeks matters not within the scope of discovery contemplated by the Federal Rules of Civil Procedure. Additionally, this request seeks information that was previously denied by this court in the denial of Plaintiff's Motion for Facilitated Notice where Plaintiff sought (but was denied) the names of all Store Managers, with contact information, since May 4, 2009. Without waiving stated objection, Defendant Prime states: Defendant Prime does not keep track of such information. This type of information is not routinely kept by Defendant Prime and therefore, Defendant Prime does not have access to such information. However, Defendant Prime can produce the number of employees that worked at a given store in a given month for the months of July-December of 2012. Please see attached reports that indicate the number of employees that worked at a store in a given month, in the State of North Carolina for the months of July –December of 2012, "Exhibit E." Sales Associates or Solution Specialists are "RSC" and Store Managers are "RSM." Also, it should be noted that the majority of these stores average 80 phones sold per month, or 2-3 per day.**

16.    Please identify each Prime Communication retail store or kiosk location from May 4, 2009 to date in which Defendant's electronic and/or paper records reflect only one working employee on the clock at any one time in such store location, by retail store name, dates, and employee names (with last known contact information for each employee), in each market in which Prime has done business during such dates.

**RESPONSE: OBJECTION. Defendant Prime objects to the extent this request seeks documents not kept in the normal course of business and/or documents that are no longer in the possession of Defendant Prime. Defendant Prime objects to the extent this request is overly broad, unreasonably cumulative, and unduly burdensome. Additionally, this request seeks inadmissible information which is not reasonably calculated to lead to the discovery of admissible evidence, seeks discovery of matter which is not relevant to the subject matter involved in the pending action and seeks matters not within the scope of discovery contemplated by the Federal Rules of Civil Procedure. Additionally, this request seeks information that was previously denied by this court in the denial of Plaintiff's**

Motion for Facilitated Notice where Plaintiff sought (but was denied) the names of all Store Managers, with contact information, since May 4, 2009. Without waiving stated objection, Defendant Prime states: Defendant Prime does not keep track of such information. This type of information is not routinely kept by Defendant Prime and therefore, Defendant Prime does not have access to such information. However, Defendant Prime can produce the number of employees that worked at a given store in a given month for the months of July-December of 2012. Please see attached reports that indicate the number of employees that worked at a store in a given month, in the State of North Carolina for the months of July –December of 2012, "Exhibit E." Sales Associates or Solution Specialists are "RSC" and Store Managers are "RSM." Also, it should be noted that the majority of these stores average 80 phones sold per month, or 2-3 per day.

17.   Please identify each Prime Communication retail store or kiosk location from May 4, 2009 to date in which Defendant's electronic and/or paper records reflect only two working employees on the clock at any one time in such store location, by retail store name, dates, and employee names (with last known contact information for each employee), in each market in which Prime has done business during such dates.

**RESPONSE: OBJECTION. Defendant Prime objects to the extent this request seeks documents not kept in the normal course of business and/or documents that are no longer in the possession of Defendant Prime. Defendant Prime objects to the extent this request is overly broad, unreasonably cumulative, and unduly burdensome. Additionally, this request seeks inadmissible information which is not reasonably calculated to lead to the discovery of admissible evidence, seeks discovery of matter which is not relevant to the subject matter involved in the pending action and seeks matters not within the scope of discovery contemplated by the Federal Rules of Civil Procedure. Additionally, this request seeks information that was previously denied by this court in the denial of Plaintiff's Motion for Facilitated Notice where Plaintiff sought (but was denied) the names of all Store Managers, with contact information, since May 4, 2009. Without waiving stated objection, Defendant Prime states: Defendant Prime does not keep track of such information. This type of information is not routinely kept by Defendant Prime and therefore, Defendant Prime does not have access to such information. However, Defendant Prime can produce the number of employees that worked at a given store in a given month for the months of July-December of 2012. Please see attached reports that indicate the number of employees that worked at a store in a given month, in the State of North Carolina for the months of July –December of 2012, "Exhibit E." Sales Associates or Solution Specialists are "RSC" and Store Managers are "RSM." Also, it should be noted that the majority of these stores average 80 phones sold per month, or 2-3 per day.**

## SECOND REQUESTS FOR PRODUCTION OF DOCUMENTS

28.     Please provide data, in electronic format, all known contact information (including home, work and/or cellular telephone) for each store manager employed by Prime Communication from May 4, 2009 to date in all markets in which Prime has done business during such dates.

**RESPONSE: OBJECTION.** Defendant Prime objects to the extent this request seeks documents not kept in the normal course of business and/or documents that are no longer in the possession of Defendant Prime. Defendant Prime objects to the extent this request is overly broad, unreasonably cumulative, and unduly burdensome. Additionally, this request seeks inadmissible information which is not reasonably calculated to lead to the discovery of admissible evidence, seeks discovery of matter which is not relevant to the subject matter involved in the pending action and seeks matters not within the scope of discovery contemplated by the Federal Rules of Civil Procedure. Additionally, this request seeks information that was previously denied by this court in the denial of Plaintiff's Motion for Facilitated Notice where Plaintiff sought (but was denied) the names of all Store Managers since May 4, 2009.

Respectfully submitted this the 3rd day of May 2013.

RAGSDALE LIGGETT, PLLC

BY: _____

John B. Walker
N.C. State Bar No.: 35631
Post Office Box 31507
Raleigh, NC27622-1507
Email: bwalker@rl-law.com
Telephone:     (919) 787-5200
Facsimile:     (919) 783-8991
*Attorneys for Defendant Prime*
*Communications, L.P.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of May, 2013, the foregoing **DEFENDANT PRIME COMMUNICATIONS, L.P.'S RESPONSES TO PLAINTIFF'S SECOND SUPPLEMENTAL INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS** have been duly served upon all parties by electronic mail and by mailing a copy of same to the following counsel of record:

Stephen A. Dunn, Esq.
EMANUEL & DUNN, PLLC
Post Office Box 426
Raleigh, NC 27602
*Counsel for Plaintiff*
sdunn@emanuelanddunn.com

Raymond E. Dunn, Jr., Esq.
Charles J. Cushman, Esq.
EMANUEL & DUNN, PLLC
Post Office Box 1389
New Bern, NC 28563
*Counsel for Plaintiff*
rdunn@emanuelanddunn.com
ccushman@emanuelanddunn.com

Harris D. Butler III, Esq.
Zev H. Antell, Esq.
BUTLER ROYALS, PLC
100 Shockoe Slip, 4th Floor
Richmond, VA 23219
Harris.butler@butlerroyals.com
Zev.antell@butlerroyals.com
*Counsel for Plaintiff*

RAGSDALE LIGGETT, PLLC

BY: _____

John B. Walker
Post Office Box 31507
Raleigh, NC 27622-1507
Email: bwalker@rl-law.com
Telephone: (919) 787-5200
Facsimile: (919) 783-8991
*Attorneys for Defendant Prime Communications, L.P.*


**FLSA2006-35**

September 21, 2006

Dear **Name\***:

This is in response to your request for an opinion on behalf of your organization's members concerning whether a store manager must physically or in person supervise two full-time employees or their equivalent under the executive exemption of Fair Labor Standards Act (FLSA) section 13(a)(1). Based on a review of the information provided, it is our opinion that the store manager described below qualifies for the executive exemption.

You state that many retailers have stores that are staffed with the store manager and one other employee at any given time. The store manager, however, is responsible for, and has supervisory authority over, all of the store's employees (often five to eight individuals, depending on the time of the year). This responsibility includes interviewing, selecting, and training employees; setting and adjusting employee rates of pay and hours of work; directing work; maintaining sales records; appraising employees' productivity and efficiency for the purpose of recommending promotions or other change in status; handling employee complaints and grievances; disciplining employees; planning work; providing for the safety and security of the employees and the stores; and planning and controlling the budget.

Even when the store manager is not present in the store, he or she remains responsible for ensuring that company policies and his or her instructions are carried out by all subordinates. This is done by, for example, following up on any assigned tasks on a daily basis, monitoring employee productivity, and ensuring that sales goals are met by reviewing the previous shifts' sales analyses/reports. If a situation results in a store closing, the store manager would be notified and would take responsibility for all aspects of the emergency. When an employee is absent and the assistant manager is unable to locate a replacement, the store manager would be notified as well. Moreover, in most cases, when not on duty, the store manager routinely calls or stops by the store until he or she is confident that the assistant manager can effectively handle situations in the store manager's absence. The store manager is responsible for these types of supervisory activities with respect to all of the store's employees. The employees together work in excess of 80 hours per week. Due to the store's size and staffing levels, however, the store manager would physically or in person supervise less than 80 employee hours per week.

You ask whether the store manager who meets all other requirements for the exemption, including being responsible for the supervision of at least two full-time employees or their equivalent, but who does not physically or in person supervise 80 employee hours per week, may qualify for the executive exemption.

FLSA section 13(a)(1) provides a complete minimum wage and overtime pay exemption for any employee employed in a bona fide executive, administrative, or professional capacity, as those terms are defined in 29 C.F.R. Part 541. An employee may qualify for exemption if all of

the pertinent tests relating to duty and salary, as discussed in the appropriate section of the regulations, are met.

As indicated in 29 C.F.R. § 541.100(a), the term "employee employed in a bona fide executive capacity" means "any employee":

(1) Compensated on a salary basis at a rate of not less than $455 per week . . . ;
(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
(3) Who customarily and regularly directs the work of two or more other employees; and
(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

As stated under 29 C.F.R. § 541.701, "[t]he phrase 'customarily and regularly' means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks."

Under 29 C.F.R. § 541.104(a),

[t]o qualify as an exempt executive under § 541.100, the employee must customarily and regularly direct the work of two or more other employees. The phrase "two or more other employees" means two full-time employees or their equivalent. One full-time and two half-time employees, for example, are equivalent to two full-time employees. Four half-time employees are also equivalent.

As indicated in 29 C.F.R. § 541.104(b),

[t]he supervision can be distributed among two, three or more employees, but each such employee must customarily and regularly direct the work of two or more other full-time employees or the equivalent. Thus, for example, a department with five full-time nonexempt workers may have up to two exempt supervisors if each such supervisor customarily and regularly directs the work of two of those workers.

You ask us to assume that all other requirements of the executive exemption are met in this case; our response, therefore, focuses on whether supervision must be in person to satisfy the requirement that an exempt executive employee "customarily and regularly direct[] the work of two or more other employees." 29 C.F.R. § 541.100(a)(3).

It has been the longstanding position of the Wage and Hour Division that a store manager does not have to work at the same time or within the same establishment as his or her subordinate employees to satisfy the requirement that the store manager "customarily and regularly direct the work of two or more other employees." *See* Wage and Hour Opinion

Letters April 2, 1986; July 11, 1985; November 8, 1979; and November 2, 1976 (copies enclosed). A store manager, even when not present in the store, may satisfy the requirements of 29 C.F.R. § 541.100(a)(3), provided he or she does in fact customarily and regularly direct the subordinate employees' work. Based on the information provided, we believe that the store manager customarily and regularly directs the work of subordinate employees even when he or she is not present in the store because the store manager continues to be responsible for ensuring that company policies and his or her instructions are carried out by all subordinates by following up on any assigned tasks on a daily basis, monitoring employee productivity, and ensuring that sales goals are met by reviewing the previous shifts' sales analyses/reports. Moreover, the store manager plans the work load for the employees, sets and adjusts employees' hours of work, appraises employees' productivity and efficiency, handles employee complaints and grievances, and disciplines employees.

We note that several courts have considered whether supervision must be in person and have held that supervisory employees may qualify for the executive exemption even where they do not physically supervise 80 employee hours per week. *See, e.g., Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1117 (9th Cir. 2001) ("The [managers'] continuous simultaneous physical presence with the assistant managers is not an essential requirement of supervision as long the [managers] supervised the assistant managers' work in other ways."); *Smith v. Heartland Auto. Serv., Inc.*, 418 F. Supp. 2d 1129, 1141 (D. Minn. 2006) ("there is no requirement that, in order to supervise an employee, a manager must be constantly physically present at the store with that employee"); *Haines v. S. Retailers, Inc.*, 939 F. Supp. 441, 446 (E.D. Va. 1996) ("it is not required that the executive employee be actually present at the store at the time the other employees are working to be 'supervising' them").

Therefore, it is our opinion that the store manager qualifies for the executive exemption under FLSA section 13(a)(1).

This opinion is based exclusively on the facts and circumstances described in your request and is given based on your representation, express or implied, that you have provided a full and fair description of all the facts and circumstances that would be pertinent to our consideration of the question presented. Existence of any other factual or historical background not contained in your letter might require a conclusion different from the one expressed herein. You have represented that this opinion is not sought by a party to pending private litigation concerning the issues addressed herein. You have also represented that this opinion is not sought in connection with an investigation or litigation between a client or firm and the Wage and Hour Division or the Department of Labor.

We trust that this letter is responsive to your inquiry.

Sincerely,


Paul DeCamp
Administrator

**\* Note: The actual name(s) was removed to preserve privacy in accordance with 5 U.S.C. § 552(b)(7).**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:12-cv-00069-11

ROSE LORENZO, individually           )
and on behalf of others similarly)
situated,                             )
                         Plaintiffs )
                                      )
    v.                                )
                                      )
PRIME COMMUNICATIONS, L.P., a         )
Texas General Partnership,            )
                         Defendant.  )


*************************************************
ORAL DEPOSITION OF STEPHEN MARTIN
VOLUME 1 OF 1
JUNE 10, 2013
*************************************************


    ORAL DEPOSITION OF STEPHEN MARTIN, produced as a

witness, duly sworn by me, at the instance of the

Plaintiffs, taken in the above-styled and numbered cause

on the 10th day of June, 2013, from 2:58 p.m. to

4:00 p.m., before Audrey L. Waldrop, Certified Shorthand

Reporter No. 6218 in and for the State of Texas, at

Weinstein Spira & Company, 3 Greenway Plaza, Suite 1700,

Houston, Texas, pursuant to the Federal Rules of Civil

Procedure (and the provisions stated on the record or

attached therein).


                         TAXABLE COST:
                         PAID BY:
                         TBA NO.:
                         JOB NUMBER:

Electronically signed by Audrey Waldrop (101-425-145-7819)          184          7a01d285-e04a-4410-8e74-6eb45ca589ee

6

1    Q.    It does.  Okay.

2    A.    Yes.

3    Q.    Thank you.  So in your capacity as -- you are

4    Vice President of Human Resources; is that correct?

5    A.    Yes.

6    Q.    Are you responsible for ensuring or helping to

7    ensure that stores are adequately staffed?

8    A.    Yes.

9    Q.    Okay.  And what is -- when I use -- I mean,

10   what sort of is the typical staffing of a Prime, let's

11   say, retail location?  What would be sort of the typical

12   staffing?

13   A.    There is no -- this sounds cliche, but there is

14   no typical because it's all based upon the store itself.

15   The volume dictates the staffing levels.

16   Q.    Okay.

17   A.    And I would say right now as a general rule,

18   we're shooting for one manager and two reps at each

19   location.

20   Q.    Uh-huh, okay.

21   A.    So the whole staffing model is built around

22   three individuals.

23   Q.    Okay.  And Prime locations, do the hours vary,

24   or is it uniform?

25   A.    Each store has its own hours allotted.  And,

1   Q.   -- on a periodic basis?

2   A.   Yes, they do.

3        MR. ANTELL:  Okay.  All right.  Let me see

4   here.  That may be it.  Let me just check.

5   Q.   (By Mr. Antell)  If you'd turn to -- and I

6   apologize for having you go around.  Maybe I'll just

7   find and I can show it to you.  It's in Exhibit C of 32.

8   A.   Uh-huh.

9   Q.   It's towards the back.  Hang on.  Let me find

10  it first, and then I'll --

11        MR. WALKER:  Exhibit C was the job

12  descriptions that we looked at earlier?

13        MR. ANTELL:  Yeah.  Yeah, I thought there

14  was one for RSC; but there may not be.  I thought there

15  was.  We can go off the record.

16        (Discussion off the record.)

17        MR. ANTELL:  Back on the record.  You

18  know, I can't find it.

19  Q.   (By Mr. Antell)  If I had seen somewhere

20  documentation that indicated that an RSC position had a

21  35-hour-a-week requirement, does that sound reasonable

22  to you?

23  A.   I have personally seen the 32- and 30-hour.  I

24  have not seen a 35.

25  Q.   Okay.

Electronically signed by Audrey Waldrop (101-425-145-7819)          186          7a01d285-e04a-4410-8e74-6eb45ca589ee

1    A.    But back in 2010, I wouldn't -- you know, it

2    wouldn't surprise me.

3    Q.    Okay.  So -- okay.  Good.  All right.  And

4    you've actually seen it lower; is that correct, in the

5    job description?

6    A.    Correct.

7    Q.    Okay.

8         MR. WALKER:  And that, again, was for a

9    solution specialist is what --

10        MR. ANTELL:  Yeah, RSC.

11        THE WITNESS:  Yes, RSC.  Yes.

12        MR. ANTELL:  I said "RSC."

13        MR. WALKER:  No, I was just asking.  I

14   didn't get to look at that one.

15        MR. ANTELL:  I think that is all the

16   questions I have for you today.  I really appreciate you

17   taking the time.

18        THE WITNESS:  Thank you.

19                    EXAMINATION

20   BY MR. WALKER:

21   Q.    I just have one -- one -- I think one question.

22   I should never say one question.

23        Earlier in this deposition you and Mr. Antell were

24   talking about store ratios; and I believe you testified

25   that the goal or the ideal is one store manager and two

Electronically signed by Audrey Waldrop (101-425-145-7819)        187        7a01d285-e04a-4410-8e74-6eb45ca589ee

40

1    solution specialists but then sometimes there's more

2    solution specialists, sometimes less.  Do you remember

3    that conversation?

4         A.    Yes, yes.

5         Q.    And you gave, I believe, one instance where

6    there may be a one-to-one ratio when the store sales

7    just don't indicate having two solution specialists.  Is

8    that correct?

9         A.    Correct.

10        Q.    Are there any other instances where a store may

11   necessitate a one-to-one ratio?  Any other reasons why

12   it would have a one-to-one ratio I guess is the

13   question.

14        A.    It would be, you know, low-volume stores; and

15   that is indicative of either stores that are not

16   performing to standard stores.  It could be stores that

17   are new to Prime as we're trying to build the business.

18   It could also be just in bad retail locations as we're

19   trying to exit.  So there is various reasons.  And I

20   would say on -- on an average, between 15 and 20 percent

21   of our locations would be at that one-to-one ratio.

22        Q.    What about instances where an employee just

23   quits unexpectedly, would that also be an instance where

24   it could drop to one-to-one?

25        A.    There would be that instance; and depending

Electronically signed by Audrey Waldrop (101-425-145-7819)          188          7a01d285-e04a-4410-8e74-6eb45ca589ee

Stephen Martin

42

1     A.   I don't know specifically for that one-to-two.

2     Q.   Uh-huh.

3     A.   But I know one-to-two plus.  It's in excess of

4 about 80 percent of our stores right now.

5     Q.   Well, I believe you testified earlier that

6 one-to-two is sort of the goal.

7     A.   Yeah, uh-huh.

8     Q.   I guess my question is then sort of:  How many

9 stores are fitting sort of that goal, or do you know

10 offhand sort of a percentage of stores that -- and

11 understanding --

12     A.   Yeah.

13     Q.   Understanding that, you know, you may have some

14 stores that are running at temporary one-to-one but

15 they're stores that generally speaking are the

16 one-to-two.

17     A.   That one-to-two is usually about 60 percent of

18 our business, if not more.  And then the others are

19 one-to-three, one-to-four, one-to-five; and then they

20 would make up the remaining difference.

21          MR. ANTELL:  Okay.  Great.  That's all the

22 questions I have.

23          MR. WALKER:  Okay.  No further questions.

24 You want to take a break before we go to --

25          MR. ANTELL:  Yeah, let me take a quick

Electronically signed by Audrey Waldrop (101-425-145-7819)

189

* * *
7a01d285-e04a-4410-8e74-6eb45ca589ee

1

```
1              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF NORTH CAROLINA
2                        WESTERN DIVISION

3    ROSE LORENZO, ON BEHALF OF      *
     HERSELF AND ALL OTHERS          *
4    SIMILARLY SITUATED              *
          PLAINTIFF,                 *
5                                    * CASE NO: 5:12-CV-00069-H
     VS.                             *
6                                    *
     PRIME COMMUNICATIONS, L.P.,     *
7    A TEXAS GENERAL PARTNERSHIP,    *
          DEFENDANT.                 *

8

9

10   ********************************************************

11             DEPOSITION OF ANGELA DUNLAP

12                  DECEMBER 6, 2012

13                   Volume 1 of 1

14   ********************************************************

15

16

17

          DEPOSITION OF ANGELA DUNLAP, produced at the
18   instance of Plaintiff and duly sworn, was taken in the
     above-styled and numbered cause on the 6th day of
19   December, 2012, from 9:31 a.m. until 12:49 p.m., before
     Judy S. Hodges, CSR, in and for the State of Texas,
20   reported by stenograph machine, at the offices of
     Weinstein Spira & Company, PC, Three Greenway Plaza,
21   Suite 1750, Houston, Harris County, Texas, pursuant to
     the Federal Rules of Civil Procedure and the provisions
22   stated on the record.

23

24

25                                JOB NUMBER: _____
```

Electronically signed by judy hodges (101-114-351-9776)          190          d6a3d885-0ab1-443a-9898-110fa43fccc4

1    Q    And then the next kind of -- it's not

2    separately identified, but I think it is a separate

3    category.  We'll call it 3.  G, 2G is the annual --

4    Prime's annual gross and net income for the period

5    February 17, '09, to present.

6    A    I could not talk to that.

7    Q    Okay.  And then 2S and T are kind of

8    organizational.  S is the corporate organization and

9    structure including subsidiaries or sibling companies

10    with control or ownership over kiosk, storefront, or

11    brick and motor retail locations.

12    A    I somewhat can, but I would rather defer

13    to someone with more accurate knowledge.

14    Q    All right.  T would be Prime's corporate

15    bylaws and specific business purposes.

16    A    No, I can't talk to that.

17    Q    Okay.  So going back now to kind of where we

18    had started which is kind of organizationally, you were

19    the director of HR.  What did that kind of encompass?

20    A    During this time period from 2009 till August

21    it kind of changed.  In 2009 I had payroll,

22    commissions, HR generalist type work, compliance,

23    employee relations, benefits, tax issues, basically all

24    HR functions -- I'm just trying to think of all the

25    things we had to do -- training, development.

Electronically signed by judy hodges (101-114-351-9776)                191                d6a3d885-0ab1-443a-9898-110fa43fccc4

1    Q    Probably recruiting?

2    A    Recruiting, disciplinary action, determination

3    on terminations, regulatory compliance, compensation

4    management.  I think that's pretty much

5    all-encompassing.

6    Q    All right.  And did that change through the

7    years?

8    A    In the last year we had hired a CFO, and

9    payroll and commissions moved to finance.

10   Q    And who is the CFO that was hired in 2012?

11   A    Laren Whiddon.  Actually, he was hired in

12   2011.

13   Q    I actually have something on that from the web

14   site we can look at.  It probably has more precise

15   information.

16   A    Yes.

17   Q    But sometime in the 2011-2012 time frame?

18   A    Right.

19   Q    Okay.  And in 2009 how many states as you

20   recollect was Prime Communications operating in?

21   A    In 2009?  Probably at least ten.

22   Q    And just to contrast that with the present,

23   then perhaps Indiana and Ohio may have been added?

24   A    Uh-huh.

25            MR. WALKER:  Is that a yes?

Electronically signed by judy hodges (101-114-351-9776)

192

1    Q    All right.  And for the states and the

2  locations that you were familiar with while you were

3  there between February 17, 2009, and when you left in

4  August, was the HR function for all of these employees

5  handled through the Sugar Land office under your

6  direction?

7    A    Yes.

8    Q    So there's -- essentially Prime used a

9  centralized HR function that controlled its employees

10  throughout the states that are --

11    A    Correct.

12    Q    -- appear in Exhibit 1?

13    A    Correct.  Now, during this time frame I did

14  have an HR generalist that officed out of Georgia that

15  handled the Carolinas and Georgia and that was for one

16  year and then she moved back to Texas.

17         MR. WALKER:  To clarify your question,

18  you called this Exhibit 1.  I think you --

19         MR. BUTLER:  I'm sorry.  You're right.

20  Exhibit 2.

21    Q    (BY MR. BUTLER)  Had this employee previously

22  worked in Houston and then had moved to Georgia?

23    A    No.  We hired her to be in Georgia.  We were

24  experimenting with having a satellite HR

25  representative; but she reported to me, so it still all

1    Q    And what did your HR structure look like?  Who

2  were your direct reports?

3    A    I had HR generalists that were assigned to

4  specific markets that reported to me, and it fluctuated

5  between three and four.  And then during that time

6  frame I did have payroll that reported to me, so I had

7  the two payroll administrators reporting to me.

8    Q    Anybody else on the HR side that reported up

9  through you?

10   A    Training, the trainer, training manager; but

11  that was middle of 2011 until I left.

12   Q    Are you familiar with a position called

13  compensation analyst?

14   A    Yes.

15   Q    And was that within your -- did that person,

16  that role --

17   A    Not between 2009 and 2012.

18   Q    When did that role or function, when was that

19  present in the organization?

20   A    It's been there.  It's had different names but

21  the same function.  There's been a compensation manager

22  and a compensation analyst since I've been employed

23  with Prime.

24   Q    And what does that person do?

25   A    That person --

Electronically signed by judy hodges (101-114-351-9776)          194          d6a3d885-0ab1-443a-9898-110fa43fccc4

1      Q    Or function.

2      A    That job function is the processing of

3 commissions.

4      Q    So after -- I think you mentioned that not

5 2009 through 2012.  Did anybody perform that function

6 in that time period?

7      A    Yes.

8      Q    Maybe under a different title?

9      A    They have been compensation manager or

10 commissions manager, but they reported to our

11 treasurer.

12     Q    So that was a budgeting kind of under --

13     A    Under finance.

14     Q    Under finance or what later became the CFO?

15     A    Yes.

16     Q    And did you have -- with respect to the HR

17 budget function, did you have interaction with the

18 finance side of the shop?

19     A    Yes, uh-huh.

20     Q    Were there reports that you were provided by

21 the treasurer or later the CFO in terms of budgeting

22 for hours?  This would be for regular payroll, overtime

23 payroll, that type of thing.

24     A    Yes.  In fact, the compensation manager would

25 create the report and my team would actually work

Electronically signed by judy hodges (101-114-351-9776)                                 d6a3d885-0ab1-443a-9898-110fa43fccc4

1    through the hours and who was hitting overtime and

2    manage it.

3        Q    And that was, again, your payroll

4    administrators, primarily?

5        A    Generalists.

6        Q    Oh, HR generalists.

7        A    Uh-huh.

8        Q    Was there ever an HR generalist II, or they

9    were always called HR generalist?

10       A    Just HR generalist.

11                   MR. BUTLER:  Let's mark this as Exhibit

12   3.

13                   (Exhibit Number 3 was marked for

14                   identification and is attached hereto)

15       Q    (BY MR. BUTLER)  I'm showing you now what's

16   been marked as Exhibit 3.  This also came from the

17   Prime Communications web site.  There's some

18   introductory information.  It says that Prime's based

19   in Sugar Land.  It's a leading specialty retailer of

20   wireless products, services, and accessories.  Founded

21   in 1999.  It kind of goes through the background.

22                   Then the third paragraph says, "Prime

23   Communications operates through mall kiosks, walk-in,

24   and stand-alone stores located in metropolitan and

25   urban areas alike."  And then it says, "Within six

1      A     No.  They report to the COO.

2      Q     Okay.  So that -- so each regional

3  vice-president reports up to the COO?

4      A     Yes.

5      Q     And that's Mr. Mohamed?

6      A     Correct.

7      Q     Akbar Mohamed?

8      A     Akbar Mohamed.

9      Q     Do you know what type of -- or at what level

10  scheduling occurs within the operations for the -- your

11  managers?  And I believe solution specialists are the

12  other -- that would be below a manager?

13      A     That would be below a manager.  They're now

14  called retail sales associates.

15      Q     Previously they were called solution

16  specialists?

17      A     Yes.

18      Q     So the solution specialist or retail sales

19  associate, that would be the entry level position?

20      A     Correct.

21      Q     In the sales organization?

22      A     Correct.  The schedules were made by the store

23  manager.

24      Q     Do you know if a district manager was involved

25  in scheduling for stores?

31

1     A    The schedules were turned into the district

2    manager.  The district manager then would approve or

3    say -- you know, critique the schedule if he felt or

4    she felt there was an issue with it.

5     Q    Do you know if any solution specialists

6    reported directly to any district managers?

7     A    That would only occur if a store did not have

8    a manager.

9     Q    And in what circumstances would a store not

10    have a manager?

11     A    The manager was fired, the manager quit, the

12    manager was demoted, while we're looking for a

13    replacement.

14     Q    So mainly interim?

15     A    Correct.

16     Q    Were there any stores that were -- let's take

17    an example, the mall kiosk -- where a solution

18    specialist would report directly to a district manager

19    without an assigned store manager?

20     A    No.

21     Q    So even a kiosk would have assigned store

22    managers?

23     A    Correct.

24     Q    Okay.  And who would be responsible for the

25    staffing at the store level?

1       Q    (BY MR. BUTLER)  So at the store, district, or

2  area level that's just not an element?

3       A    I don't believe it's on there.

4       Q    The policies regarding entry of time and

5  timekeeping, are those all on the employee portal or

6  the employee handbook?

7       A    Handbook and portal.

8       Q    Do you know the, again, rough numbers of

9  people -- numbers of Prime Communications employees in

10  the home office versus the retail operations?

11       A    62 in the home office.

12       Q    And do you know -- I think I asked you this

13  and you weren't certain of the numbers in the retail

14  operations.  I think I asked you by store or by kiosk.

15       A    By store and kiosk I don't know.  There's

16  roughly -- I can break it down this way.  There's

17  roughly 45 to 50 sales ops executives -- that would be

18  DMs, RDs, EVPs -- in the field, about 300 store

19  managers, and the bulk or the rest would be your sales

20  reps.

21       Q    And the sales reps for overtime purposes are

22  classified as nonexempt?

23       A    Nonexempt, yes.

24       Q    And the store managers are classified as

25  exempt, correct, exempt from overtime?

Electronically signed by judy hodges (101-114-351-9776)          199          d6a3d885-0ab1-443a-9898-110fa43fccc4

1    A    They were.  I think that's changed.

2    Q    And when did that change?

3    A    Summer of two -- July of 2012.

4    Q    And how are the store managers now classified?

5    A    They are nonexempt.

6    Q    Did that relate in any way to the Department

7  of Labor investigation?

8    A    No.

9    Q    Why did you change the store managers from

10  exempt to nonexempt?

11    A    Part of it had to do with a scheduling

12  analysis.  We had managers that were working 30, 35

13  hours a week and had sales reps working overtime; and

14  in order to get the managers to be there more we had to

15  convert them to an overtime rate.  In other words,

16  force them to be there.

17    Q    So were they still paid salary, the managers?

18    A    Up until July and then they were converted to

19  hourly and they're at $10 an hour or more.

20    Q    How long did this analysis take place?  When

21  did it begin, the analysis of -- consideration of

22  changing from -- the store managers from a nonexempt

23  status to -- or rather an exempt status to a nonexempt

24  status for overtime purposes?

25    A    That was fall 2012 -- fall 2012.  Winter,

1       A      Right.

2       Q      My question is, for periods of time for the

3    same people before the summer of 2012 would you

4    contest -- a store manager who came forward and said,

5    "Wait.  Now you're saying I'm hourly and entitled to

6    overtime," would you contest a position by a store

7    manager saying, "For times before the summer of 2012 I

8    should have been paid -- classified as nonexempt and

9    paid overtime for hours over 40"?

10              MR. WALKER:  Objection; form.

11      A      It's kind of confusing.

12      Q      (BY MR. BUTLER)  Do I need to help you follow

13   it?

14      A      I'm following what you're saying.  I would not

15   question their status in previous times because based

16   on their duties they could be classified as exempt.  We

17   chose to change their compensation without regard to

18   whether they were exempt or nonexempt.

19      Q      Well, you eliminate any issue, correct, by

20   going forward?  I mean, it's not an issue any longer

21   for store managers because you're paying them overtime?

22      A      Yeah, there would be no issue raised.

23      Q      Right.  The job functions before and after the

24   summer of 2012 of a store manager, were they pretty

25   much the same?

Electronically signed by judy hodges (101-114-351-9776)              201              d6a3d885-0ab1-443a-9898-110fa43fccc4

1      A      Yes.

2      Q      All right.  In the summer of 2012 you didn't

3  completely rewrite the job function for a store manager

4  and say, "Now you're going to work different hours.

5  Now you're going to do different things"?

6      A      No.

7      Q      All right.  As I understand your position,

8  Prime Communications made a voluntary decision to do

9  this change of store managers, but it wasn't

10  necessarily related to a legal requirement, that it was

11  voluntary.  Is that correct?

12      A      That's correct.

13      Q      All right.  I understand that.  I may be

14  done.  Let me check.

15              MR. WALKER:  Good, because I'm hungry.

16              MR. BUTLER:  I know.  It's time to eat.

17      Q      (BY MR. BUTLER)  Are there any third-party

18  vendors that we've not discussed for any of these

19  systems that we've talked about?  Most of them are web

20  based, but the payroll systems or the timekeeping

21  systems.  I mean, it's pretty much the provider if

22  they're web based.

23      A      There's no other third-party vendors.

24      Q      In the kiosk where are the FLSA or state

25  overtime posters maintained?

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No: 5:12-cv-00069-H

ROSE LORENZO, on behalf of herself
and all others similarly situated,

Plaintiff,

v.

PRIME COMMUNICATIONS, L.P., a
Texas General Partnership,

Defendant.

**DEFENDANT'S RESPONSES TO
PLAINTIFF'S SUPPLEMENTAL
REQUESTS FOR PRODUCTION OF
DOCUMENTS**

NOW COMES Defendant Prime Communications, LP ("Prime"), by and through

counsel, and hereby responds to Plaintiff's Supplemental Requests for Production of Documents

as follows:

### SUPPLEMENTAL REQUESTS FOR PRODUCTION OF DOCUMENTS

9. For the time period May 4, 2009 through present, he "record layout" or description of
data fields maintained within each of the RQ4, Employee Portal, Ulti-Pro ADP databases
used by Prime Communications; together with code identifiers, logs or other descriptors
for acronyms or abbreviations used in field names for each such system.

**RESPONSE: Please see the Record Layout attached as Exhibit A to these Responses.
Exhibit A consists of "headers" commissions and bonuses previously provided to
Plaintiff in *Defendant Prime's Supplemental Responses to Plaintiff's Discovery* as Exhibit
C, with the addition of "headers" for payroll.**

10. For the time period May 4, 2009 through present, all documents reflecting reports periodically or regularly (i.e. daily, weekly, monthly, quarterly, or annually) generated by the RQ4, Employee Portal, Ulti-Pro ADP software used by Prime Communications in Human Resources (HR), Finance/Treasury, or Sales/Operations personnel for:

- Scheduling retail store personnel (whether mall/kiosk, strip center, or brick and mortar stores);
- Budgeting or analysis of hours, schedules, payroll, overtime, staffing, compensation, bonus commission, sales, chargebacks, or time/clock reporting.

**RESPONSE: OBJECTION. Defendant Prime objects to the extent this request seeks documents not kept in the normal course of business and/or documents that are no longer in the possession of Defendant Prime. Additionally, this request is too broad and unreasonably cumulative. Without waiving stated objections, Defendant Prime states: Defendant Prime does not use RQ4, UltiPro or ADP for the purpose of budgeting hours. The scheduling of retail store personal takes place in one of RQ4's calendar modules, and scheduling is done by each Store Manager, in consultation with his or her District Manager. Scheduling is not determined centrally by Defendant Prime. Therefore, Defendant Prime does not have any reports that are generated by RQ4, UltiPro or ADP for scheduling purposes. As for any analysis of hours worked by Store Managers, Defendant Prime is in the process of compiling information that is responsive to this request and subject to the above objections; however, needs more time and will supplement this response once that information has been compiled.**

11. For the time period May 4, 2009 through present, all analyses regarding the 2012 change in FLSA exemption status of "store manager" job title from salaried "exempt" status to "non-exempt" hourly pay status, including all:

- Computer or other file folders maintained by Angela Dunlop;
- All files, analyses, Excel spreadsheets prepared by Mohammed Ali, Schezad Monin or other compensation analysts.

**RESPONSE: OBJECTION. Defendant Prime objects to the extent this request is overly broad, unreasonably cumulative, and unduly burdensome. Additionally, this request seeks inadmissible information which is not reasonably calculated to lead to the discovery of admissible evidence, seeks discovery of matter which is not relevant to the subject matter involved in the pending action and seeks matters not within the scope of discovery contemplated by the Federal Rules of Civil Procedure. Without waiving stated objection, Defendant Prime states: Please see attached spreadsheet labeled "Exhibit B," which contains the information for calculating each Store Manager's rate of pay after the conversion from "exempt" to "non-exempt" status. This spreadsheet has been redacted for names and personal information and contains information for all North Carolina Store Managers. The analysis regarding the FLSA exemption status of "store manager" from "exempt" to "non-exempt" consisted of taking each Store Manager's previously fixed salary and recalculating it on the basis of a full work week,**

2

with paid OT. Additionally, please see the 30(b)(6) deposition testimony of Angela Dunlap on behalf of Defendant Prime that discusses Defendant Prime's decision-making process for this change. Also, Mohammed Ali and Shehzad Momin were not involved in the decision process for changing Store Managers from "exempt" to "non-exempt." Ali and Momin were/are essentially clerks. Ali no longer works for Defendant Prime.

12. For the time period May 4, 2009 through present, all files relating to the job functions analysis performed by Angela Dunlop, Jessica Alderete and/or Jennifer Ayala.

**RESPONSE: OBJECTION.** Defendant objects to the extent that this request seeks documents not kept in the normal course of business and/or documents that are no longer in the possession of Defendant Prime. Additionally, this request is too broad and unreasonably cumulative. Without waiving stated objections, Defendant Prime states: Angela Dunlap no longer works for Defendant Prime. When she left the company certain files were maintained from her computer that were pertinent to the day-to-day operations of the company at the time of her departure. The specific documents requested in this request were not kept and Defendant Prime is uncertain whether these items were deleted prior to or after Ms. Dunlap's departure from her position. However, please see attached as "Exhibit C" the job descriptions for 2012, 2011, and 2006. Please note that in 2012, Defendant Prime slowly integrated the change from "exempt" to "non-exempt" status for Store Managers, and therefore you will find two job descriptions in 2012 for Store Managers: Store Manager I and Store Manager II.

13. For the time period May 4, 2009 through present, all evaluations performed on each of Defendant's store managers, region managers and district managers.

**RESPONSE:** Defendant Prime objects to the extent this request is overly broad, unreasonably cumulative, and unduly burdensome. Additionally, this request seeks information that was previously denied by this court in the denial of Plaintiff's Motion for Facilitated Notice where Plaintiff sought (but was denied) the names of all Store Managers since May 4, 2009. Additionally, this request seeks inadmissible information which is not reasonably calculated to lead to the discovery of admissible evidence, seeks discovery of matter which is not relevant to the subject matter involved in the pending action and seeks matters not within the scope of discovery contemplated by the Federal Rules of Civil Procedure. Without waiving stated objection, Defendant Prime states: See attached as "Exhibit D" performance reviews for the Plaintiff and the three "opt-in" Plaintiffs.

14. For the time period May 4, 2009 through present, all documents reflecting the numbers of sales associates used to staff each of Defendant's retail store locations during each of the weeks in the identified time period.

**RESPONSE: Defendant Prime objects to the extent this request is overly broad, unreasonably cumulative, and unduly burdensome. Additionally, this request seeks inadmissible information which is not reasonably calculated to lead to the discovery of admissible evidence, seeks discovery of matter which is not relevant to the subject matter involved in the pending action and seeks matters not within the scope of discovery contemplated by the Federal Rules of Civil Procedure. Without waiving stated objection, Defendant Prime states: No such documents exist. Additionally, Defendant Prime does not keep track of such information in this form. However, Defendant Prime can produce the number of employees that worked at a given store in a given month for the months of July-December of 2012. This type of information is not routinely kept by Defendant Prime and therefore, Defendant Prime does not have access to such information. Please see attached reports that indicate the number of employees that worked at a store in a given month, in the State of North Carolina for the months of July –December of 2012, "Exhibit E." Sales Associates or Solution Specialists are "RSC" and Store Managers are "RSM." Also, it should be noted that the majority of these stores average 80 phones sold per month, or 2-3 per day.**

15. For the time period May 4, 2009 through present, all documents reflecting the numbers of sales managers used to staff each of Defendant's retail store locations, by retail store location, during each of the weeks in the identified time period.

**RESPONSE: OBJECTION. Defendant Prime objects to the extent this request is overly broad, unreasonably cumulative, and unduly burdensome. Additionally, this request seeks inadmissible information which is not reasonably calculated to lead to the discovery of admissible evidence, seeks discovery of matter which is not relevant to the subject matter involved in the pending action and seeks matters not within the scope of discovery contemplated by the Federal Rules of Civil Procedure. Without waiving stated objection, Defendant Prime states: There is no position within Defendant Prime known as "sales managers." However, it is Defendant Prime's policy that each store has a Store Manager. Occasionally, a store may periodically be without a Store Manager in the case of unexpected terminations or resignations. However, it is Defendant Primes policy to ensure that every store is run by a Store Manager, and therefore, no store runs permanently without a Store Manager. In regards to Store Managers, no such documents exist to this request. Additionally, Defendant Prime does not keep track of such information in this form. However, Defendant Prime can produce the number of employees that worked at a given store in a given month, during July-December of 2012. This type of information is not routinely kept by Defendant Prime and therefore, Defendant Prime does not have access to such information. Please see attached reports that indicate the number of employees that worked at a store in a given month, in the State of North Carolina for July-December of 2012, "Exhibit E." Sales Associates or Solution Specialists are "RSC" and Store Managers are "RSM."**

**Also, it should be noted that the majority of these stores average 80 phones sold per month, or 2-3 per day.**

16. For the time period May 4, 2009 through present, all emails, files, notes of meetings, conference calls. calendar notations, meeting agendas, meeting minutes, and post meeting summaries/task assignments by, between, or including Angela Dunlop, Akbar Mohammed, and/or Laren Whiddon regarding the consideration of matters involving the staffing of retail stores and compensation of retail store managers, including retail store managers' compensation, hours and/or scheduling.

**RESPONSE: OBJECTION. Defendant Prime objects to the extent this request is vague, overly broad, unreasonably cumulative, and unduly burdensome. Also, this request seeks documents not kept in the normal course of business and/or documents that are no longer in the possession of Defendant Prime. Additionally, this request seeks inadmissible information which is not reasonably calculated to lead to the discovery of admissible evidence, seeks discovery of matter which is not relevant to the subject matter involved in the pending action and seeks matters not within the scope of discovery contemplated by the Federal Rules of Civil Procedure. Without waiving stated objection, Defendant Prime states: This request is entirely too broad and with no direction on what type of documents to produce. Akbar Mohammed and Laren Whiddon are not in the Human Resources Department. Additionally, Angela Dunlap no longer works for Defendant Prime and therefore, some of her documents were not kept by Defendant Prime. Additionally, Defendant Prime does not keep minutes of any meetings, and generally does not keep the type of records that this request seeks. Due to the nature of sales, Defendant Prime does not find any value for their business operations in storing or retaining information regarding compensation and staffing for any significant length of time, and therefore, Defendant Prime does not regularly archive or maintain any such information. However, please see attached documents labeled "Exhibit F" which contains all the documents found from a search of Angela Dunlap's remaining files and e-mails that pertain to this request.**

17. For the time period May 4, 2009 through present, all emails, files, notes of meetings, conference calls, calendar notations, meeting agendas, meeting minutes, and post meeting summaries/task assignments by, between, or including Schezad Monin regarding the consideration of matters involving retail store managers' compensation, hours and/or scheduling, by market and/or nationwide.

**RESPONSE: OBJECTION. Defendant Prime objects to the extent this request is vague, overly broad, unreasonably cumulative, and unduly burdensome. Also, this request seeks documents not kept in the normal course of business and/or documents that are no longer in the possession of Defendant Prime. Additionally, this request seeks inadmissible information which is not reasonably calculated to lead to the discovery of admissible evidence, seeks discovery of matter which is not relevant to the subject matter involved in the pending action and seeks matters not within the scope of**

5

discovery contemplated by the Federal Rules of Civil Procedure. Without waiving stated objection, Defendant Prime states: This request is entirely too broad and with no direction on what type of documents to produce. Additionally, Shehzad Momin is a clerk and would not be involved with any of the discussions, meetings, conference calls, agenda, etc, related to any of the above referenced discussions. Additionally, Defendant Prime does not keep minutes of any meetings, and generally does not keep the type of records that this request seeks. Due to the nature of sales, Defendant Prime does not find any value for their business operations in storing or retaining information regarding compensation and staffing for any significant length of time, and therefore, Defendant Prime does not regularly archive or maintain any such information.

18. For the time period May 4, 2009 through present, all emails, files, notes of meetings, conference calls, calendar notations, meeting agendas, meeting minutes, and post meeting summaries/task assignments by, between, or including Michael Palmieri regarding the consideration of matters involving retail store managers' compensation, hours and/or scheduling, by market and/or nationwide.

**RESPONSE: OBJECTION. Defendant Prime objects to the extent this request is vague, overly broad, unreasonably cumulative, and unduly burdensome. Also, this request seeks documents not kept in the normal course of business and/or documents that are no longer in the possession of Defendant Prime. Additionally, this request seeks inadmissible information which is not reasonably calculated to lead to the discovery of admissible evidence, seeks discovery of matter which is not relevant to the subject matter involved in the pending action and seeks matters not within the scope of discovery contemplated by the Federal Rules of Civil Procedure. Without waiving stated objection, Defendant Prime states: This request is entirely too broad and with no direction on what type of documents to produce. Additionally, Michael Palmieri started his position as Executive Vice President for the Southeast Region on January 1, 2012; and therefore, was not in this position during the time of Plaintiff Rose Lorenzo's employment. Additionally, Defendant Prime does not keep minutes of any meetings, and generally does not keep the type of records that this request seeks. Due to the nature of sales, Defendant Prime does not find any value for their business operations in storing or retaining information regarding compensation and staffing for any significant length of time, and therefore, Defendant Prime does not regularly archive or maintain any such information.**

19. For the time period May 4, 2009 through present, all documents regarding any state or federal Department of Labor investigation of Defendant for the classification of "store managers" as exempt from overtime compensation.

**RESPONSE: OBJECTION. Defendant objects to the extent that this request seeks inadmissible information which is not reasonably calculated to lead to the discovery of admissible evidence, seeks discovery of matter which is not relevant to the subject matter involved in the pending action and seeks matters not within the scope of**

discovery contemplated by the Federal Rules of Civil Procedure. Without waiving stated objection, Defendant Prime states: No such documents exists. Defendant Prime has not had any Department of Labor investigations regarding classification of "store managers" as exempt from overtime compensation.

20. For the time period May 4, 2009 through present, all notices to employees regarding Defendant's change of their employee overtime status from "exempt" to "non-exempt."

**RESPONSE: See attached as "Exhibit G" an example of the notice provided to Store Managers regarding overtime status change.**

21. For the time period May 4, 2009 through present, all computer created data files on online and offline systems, including but not limited to pc's (as described in Angela Dunlop's deposition) regarding job descriptions and modifications to such job descriptions for all retail store positions, including sales associates, assistant managers and store managers.

**RESPONSE: OBJECTION. Defendant Prime objects to the extent this request is vague, overly broad, unreasonably cumulative, and unduly burdensome. Also, this request seeks documents not kept in the normal course of business and/or documents that are no longer in the possession of Defendant Prime. Additionally, this request seeks inadmissible information which is not reasonably calculated to lead to the discovery of admissible evidence, seeks discovery of matter which is not relevant to the subject matter involved in the pending action and seeks matters not within the scope of discovery contemplated by the Federal Rules of Civil Procedure. Without waiving stated objection, Defendant Prime states: This request is entirely too broad and with no direction on what type of documents to produce. Additionally, Angela Dunlap no longer works for Defendant Prime and therefore, some of her documents were not kept by Defendant Prime. When she left the company certain files were obtained from her computer that were pertinent to the day-to-day operations of the company at the time of her departure. However, please see attached documents labeled "Exhibit F" which contains all the documents found from a search of Angela Dunlap's remaining files and e-mails that pertain to this request.**

22. For the time period May 4, 2009 through present, all records regarding market "roll-out" to employees of the change in "store manager" exemption status from exempt to non-exempt, including but not limited to power point or other guidelines or talking points prepared for use by District Managers in describing the change in status.

**RESPONSE: OBJECTION. Defendant Prime objects to the extent this request is vague, overly broad, unreasonably cumulative, and unduly burdensome. Also, this request seeks documents not kept in the normal course of business and/or documents that are no longer in the possession of Defendant Prime. Additionally, this request seeks**

7

inadmissible information which is not reasonably calculated to lead to the discovery of admissible evidence, seeks discovery of matter which is not relevant to the subject matter involved in the pending action and seeks matters not within the scope of discovery contemplated by the Federal Rules of Civil Procedure. Without waiving stated objection, Defendant Prime states: Please see the power point found in "Exhibit F"

23. For the time period May 4, 2009 through present, all paper and electronically created files, notes, or records/data regarding store manager compensation, hours worked, scheduling, entitlement to overtime, or exempt status created by, sent to and/or maintained by:

    (a) Hassan Ahmad, and/or any successor Director of Sales;
    (b) Akbar Mohammed, and/or any successor Chief Operating Officer;
    (c) Laren Whiddon, and/or any successor Chief Financial Officer;
    (d) Steve Martin, and/or any successor Director of Human Resources;
    (e) Binay Gupta; or any successor employee with similar or the same duties;
    (f) Brennan Salassi, or any successor IT Manager;
    (g) Schezad Monin; or an successor with similar or the same duties;
    (h) All persons who served in capacity as Treasurer;
    (i) All Division and Regional Vice-Presidents, including those for the South/Central, North Central, Northeast and Southeast, California, and other, Regions/Divisions.

**RESPONSE: OBJECTION. Defendant Prime objects to the extent this request is vague, overly broad, unreasonably cumulative, and unduly burdensome. Also, this request seeks documents not kept in the normal course of business and/or documents that are no longer in the possession of Defendant Prime. Additionally, this request seeks inadmissible information which is not reasonably calculated to lead to the discovery of admissible evidence, seeks discovery of matter which is not relevant to the subject matter involved in the pending action and seeks matters not within the scope of discovery contemplated by the Federal Rules of Civil Procedure. Without waiving stated objection, Defendant Prime states: This request is entirely too broad and with no direction on what type of documents to produce. This request needs to be narrowed in order for Defendant Prime to even begin to reply to this request. This request essentially seeks every document, e-mail, note, etc. within Defendant Prime's business, the majority of which is entirely irrelevant and unduly burdensome to produce. However, Plaintiff and Defendant Prime can compile a list of search terms that would aid in narrowing the focus of this request to obtain the documents that are discoverable and relevant to the pending lawsuit.**

24. For the time period May 4, 2009 through present, all computer maintained data in the RQ4 database, in native format, regarding compensation, scheduling, hours worked for each retail store managers.

RESPONSE: OBJECTION. Defendant Prime objects to the extent this request is vague, overly broad, unreasonably cumulative, and unduly burdensome. Also, this request seeks documents not kept in the normal course of business and/or documents that are no longer in the possession of Defendant Prime. Additionally, this request seeks inadmissible information which is not reasonably calculated to lead to the discovery of admissible evidence, seeks discovery of matter which is not relevant to the subject matter involved in the pending action and seeks matters not within the scope of discovery contemplated by the Federal Rules of Civil Procedure. Without waiving stated objection, Defendant Prime states: Defendant Prime can run certain queries from RQ4's database to produce information requested by the Plaintiff; however, Defendant Prime needs parameters in which to run said queries. Defendant Prime objects to providing the entire RQ4 database due to personal information, as well as irrelevant material contained therein. Additionally, Defendant Prime is not prepared or equipped with the personal to perform this tedious and time consuming task.

25. For the time period May 4, 2009 through present, all computer maintained data in the Employee Portal database(s), in native format, regarding compensation, scheduling, hours worked for each of Defendant's retail store managers.

RESPONSE: OBJECTION. Defendant Prime objects to the extent this request is vague, overly broad, unreasonably cumulative, and unduly burdensome. Also, this request seeks documents not kept in the normal course of business and/or documents that are no longer in the possession of Defendant Prime. Additionally, this request seeks inadmissible information which is not reasonably calculated to lead to the discovery of admissible evidence, seeks discovery of matter which is not relevant to the subject matter involved in the pending action and seeks matters not within the scope of discovery contemplated by the Federal Rules of Civil Procedure. Without waiving stated objection, Defendant Prime states: No such data exists. Employee Portal simply retrieves information from RQ4.

26. For the time period May 4, 2009 through present, all computer maintained data in the Ulti-Pro ADP database(s), in native format, regarding compensation, scheduling, hours worked for each of Defendant's retail store managers.

RESPONSE: OBJECTION. Defendant Prime objects to the extent this request is vague, overly broad, unreasonably cumulative, and unduly burdensome. Also, this request seeks documents not kept in the normal course of business and/or documents that are no longer in the possession of Defendant Prime. Additionally, this request seeks inadmissible information which is not reasonably calculated to lead to the discovery of admissible evidence, seeks discovery of matter which is not relevant to the subject

matter involved in the pending action and seeks matters not within the scope of discovery contemplated by the Federal Rules of Civil Procedure. Without waiving stated objection, Defendant Prime states: The only data stored in Ulti-Pro is demographic information of employees and store managers.

27. For the time period May 4, 2009 through present, all computer maintained data in any other database, in native format, used by Defendant regarding compensation, scheduling, hours worked for each of Defendant's retail store managers.

**RESPONSE: OBJECTION. Defendant Prime objects to the extent this request is vague, overly broad, unreasonably cumulative, and unduly burdensome. Also, this request seeks documents not kept in the normal course of business and/or documents that are no longer in the possession of Defendant Prime. Additionally, this request seeks inadmissible information which is not reasonably calculated to lead to the discovery of admissible evidence, seeks discovery of matter which is not relevant to the subject matter involved in the pending action and seeks matters not within the scope of discovery contemplated by the Federal Rules of Civil Procedure. Without waiving stated objection, Defendant Prime states: Please see attached "Exhibit B," and "Exhibit E." Names of store managers and other personal information has been redacted.**

Submitted this 30th day of April, 2013.

RAGSDALE LIGGETT, PLLC

BY: _____
John B. Walker
N.C. State Bar No.: 35631
Post Office Box 31507
Raleigh, NC 27622-1507
Email: bwalker@rl-law.com
Telephone:    (919) 787-5200
Facsimile:    (919) 783-8991
*Attorneys for Defendant Prime*
*Communications, L.P.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of April, 2013, a copy of the foregoing **DEFENDANT'S RESPONSES TO PLAINTIFF'S SUPPLEMENTAL REQUESTS FOR PRODUCTION OF DOCUMENTS** was served on the persons hereinafter named and at the addresses stated below, which is the last known addresses for said persons, by depositing said document in an envelope addressed to them as indicated with proper postage attached thereto and depositing same in the United States mail, first-class, postage prepaid, addressed to the following counsel of record:

Attorneys for Plaintiff

Stephen A. Dunn, Esq.
EMANUEL & DUNN, PLLC
Post Office Box 426
Raleigh, NC 27602
sdunn@emanuelanddunn.com

Raymond E. Dunn Jr., Esq.
Charles J. Cushman, Esq.
EMANUEL & DUNN, PLLC
Post Office Box 1389
New Bern, NC 28563
rdunn@emanuelanddunn.com
ccushman@emanuelanddunn.com

RAGSDALE LIGGETT, PLLC

BY: _____

John B. Walker
Post Office Box 31507
Raleigh, NC 27622-1507
Email: bwalker@rl-law.com
Telephone:   (919) 787-5200
Facsimile:   (919) 783-8991
*Attorneys for Defendant Prime Communications, L.P.*

11

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

ROSE LORENZO, on behalf of herself and
all others similarly situated,

        Plaintiff,

v.

PRIME COMMUNICATIONS, L.P., a
Texas General Partnership,

        Defendant.

Case No: 5:12-cv-00069-H

## Declaration of Rose Lorenzo

I, Rose Lorenzo, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.     My name is Rose Lorenzo. I am 52 years of age, suffer no mental disabilities, and am otherwise competent to make this Declaration. I have personal knowledge of the information contained in this Declaration, and I give this Declaration of my own free will.

2.     I was employed by Prime Communications, L.P. ("Prime") from October 24, 2009 to June 17, 2011 and served in several capacities as a Prime employee.

3.     I was initially hired as a Sale Associate at Prime's Fuquay location, but after three (3) months in that position, I was asked to take a store manager's position at another Raliegh area location.

4.     I became a manager of the Middle Creek Commons store on February 10, 2010, and remained in that position until I left Prime in June 2011.

5.     In my capacity as Sales Associate I received an hourly rate, plus the opportunity for commissions on sales. I was also subjected to Prime's various chargeback policies for certain cancelled sales. As a Sale Associate, I was classified as non-exempt and was eligible for overtime. To the best of my knowledge, all of Prime's Sales Associates were compensated and classified in a similar manner.

6.     In my capacity as a Store Manager I received a salary, plus the opportunity for commissions on sales. I was also subjected to Prime's various chargeback policies for certain cancelled sales. As a Store Manager, I was classified as exempt and was not eligible for overtime. To the best of my knowledge, all of Prime's Store Managers were compensated and classified in a similar manner.

7.     Store Managers were regularly scheduled to (and did) work hours well in excess of forty (40) in a single week. For instance, at my store I was often the only employee which meant I had to open and close the store and physically be at the store during all business hours in between.

8.     During my time as a Store Manager, there was never more than one other employee at the store and often we would be there on different days from each other.

9.     During my time as Store Manager, I regularly worked hours well in excess of forty (40) in a single week. Because Defendant classified me exempt, I was not paid any additional premium for overtime hours worked. I have personal knowledge of other store managers who have worked over forty (40) hours in a workweek and were classified as exempt and did not receive overtime compensation.

10.    Because Prime employees were required to log on to and off of Prime's "point of sale" and/or timekeeping systems at the beginning and end of their shifts, I believe the precise in-

store hours worked by myself and other store managers is ascertainable and within Prime's possession. (Except those times when system was down, I was in outside meetings or working in other stores – in those instances, I could not clock in at other stores, I would have to give sales to other employees or have the Store Manager log the sale under my name, in which event I did not receive a commission because it was not given to my store)

11.     My direct supervisors and other corporate management level employees were aware that store managers, including myself, regularly worked in excess of forty (40) hours in a week without overtime compensation.

12.     Though classified as an exempt employee, Prime's store managers, in my experience, performed nearly all of the same functions as Prime's salespeople and vice-versa.

13.     During my time as a store manager at Prime, my primary duties were not materially different than those of a salesperson. My key responsibility was to sell mobile devices and AT&T mobile plans to new and existing AT&T/Prime customers. Sales occupied the overwhelming majority of my time. However, some time was spent on other ancillary tasks such as making bank deposits (something sales people did as well) and proposing a work schedule, when I had employees, for approval by the Regional Manager. I had no authority to independently set work schedules. I scanned inventory when it was received in the store, but had no authority or responsibility for determining the type or quantity of inventory as it was pre-determined by corporate level management.

14.     Store Managers at Prime do not have authority to hire or fire employees, and are required to have company approval for additional employees. Upon approval for an employee, Store Managers are permitted to screen applicants, but final candidates are re-interviewed and all background investigations and actual hiring is performed by Regional Managers or other

corporate level management persons.

15.     As a Store Manager, I did not file sales tax receipts, payroll taxes or unemployment, or create employee reports. I did not handle financial matters other than sales, and I was not responsible for budgeting, audits, insurance, marketing or marketing research. I was not involved with safety or health issues, or with government relations. I did not perform and was not responsible for database administration, computer networking, nor did I handle any legal or regulatory tasks.

16.     During a typical day in the store, I would go into store, clock in, open safe and balance cash drawer (we were permitted to have $100 cash). After opening, the remainder of my day was devoted to sales. At the end of day, I balanced the cash drawer, returned it to the safe, locked the store and left. On days I did not work, these duties would be performed by the sales associate on duty. To the best of my understanding, other Prime retail locations operated in similar manner.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 17 day of January, 2013 in the City of Raleigh, North Carolina.

Rose Lorenzo

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2013, I electronically filed the foregoing

DECLARATION OF ROSE LORENZO with the Clerk of Court using the CM/ECF system

which will send notification of such filing to the following:

John Bowen Walker
*Attorney for Defendant*
bwalker@rl-law.com

RAGSDALE LIGGETT, PLLC
Post Office Box 31507
Raleigh, North Carolina 27622-1507

This 17 day of January, 2013.

EMANUEL & DUNN, PLLC
*Attorneys for Plaintiffs*

/s/ Charles J. Cushman
Charles J. Cushman, N.C. Bar # 36170

# Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

ROSE LORENZO, on behalf of herself and
all others similarly situated,

     Plaintiff,

            Case No: 5:12-cv-00069-H

v.

PRIME COMMUNICATIONS, L.P., a
Texas General Partnership,

     Defendant.

### Declaration of Guy A. Rodriguez

 I, Guy A. Rodriguez, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

 1. My name is Guy A. Rodriguez. I am 42 years of age, suffer no mental disabilities, and am otherwise competent to make this Declaration. I have personal knowledge of the information contained in this Declaration, and I give this Declaration of my own free will.

 2. I was employed by Prime Communications, L.P. ("Prime") from November 1, 2010 through April 2011 as the Store Manager at Prime's Holly Springs location.

 3. In my capacity as a Store Manager I received a salary, plus the opportunity for commissions on sales. I was also subjected to Prime's various chargeback policies for certain cancelled sales. As a Store Manager, I was classified as exempt and was not eligible for overtime. To the best of my knowledge, all of Prime's Store Managers were compensated and classified in a similar manner.

4.      Store Managers were regularly scheduled to (and did) work hours well in excess of forty (40) in a single week.  For instance, at my store I was often the only employee which meant I had to open and close the store and physically be at the store during all business hours in between.

5.      During my time as a Store Manager, there was never more than one other employee at the store and often we would be there on different days from each other.

6.      During my time as Store Manager, I regularly worked hours well in excess of forty (40) in a single week.  Because Defendant classified me exempt, I was not paid any additional premium for overtime hours worked. I have personal knowledge of other store managers who have worked over forty (40) hours in a workweek and were classified as exempt and did not receive overtime compensation.

7.      Because Prime employees were required to log on to and off of Prime's "point of sale" and/or timekeeping systems at the beginning and end of their shifts, I believe the precise in-store hours worked by myself and other store managers is ascertainable and within Prime's possession. (Except those times when system was down, I was in outside meetings or working in other stores – in those instances, I could not clock in at other stores, I would have to give sales to other employees, in which event I did not receive a commission because it was not given to my store)

8.      My direct supervisors and other corporate management level employees were aware that store managers, including myself, regularly worked in excess of forty (40) hours in a week without overtime compensation.

9.      Though classified as an exempt employee, Prime's store managers, in my experience, performed nearly all of the same functions as Prime's salespeople and vice-versa.

10.     During my time as a store manager at Prime, my primary duties were not materially different than those of a salesperson. My key responsibility was to sell mobile devices and AT&T mobile plans to new and existing AT&T/Prime customers. Sales occupied the overwhelming majority of my time. However, some time was spent on other ancillary tasks such as making bank deposits and proposing a work schedule, which was reviewed by my Regional Manager. I scanned inventory when it was received in the store, but had no authority or responsibility for determining the type or quantity of inventory as it was pre-determined by corporate level management.

11.     Store Managers at Prime do not have authority to hire or fire employees, and are required to have company approval for additional employees. Upon approval for an employee, Store Managers are permitted to screen applicants, but final candidates are re-interviewed and all background investigations and actual hiring is performed by Regional Managers or other corporate level management persons.

12.     As a Store Manager, I did not file sales tax receipts, payroll taxes or unemployment, or create employee reports. I did not handle financial matters other than sales, and I was not responsible for budgeting, audits, insurance, marketing or marketing research. I was not involved with safety or health issues, or with government relations. I did not perform and was not responsible for database administration, computer networking, nor did I handle any legal or regulatory tasks.

13.     During a typical day in the store, I would go into store, clock in, open safe and balance the cash drawer (we were permitted to have $100 cash). After opening, the remainder of my day was devoted to sales. At the end of day, I balanced the cash drawer, returned it to the safe, locked the store and left. On days I did not work, these duties would be performed by the

3

sales associate on duty. To the best of my understanding, other Prime retail locations operated in similar manner.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 19 day of February, 2013 in the City of Raleigh, North Carolina.

_____
Guy A. Rodriguez

4

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2013, I electronically filed the foregoing

DECLARATION with the Clerk of Court using the CM/ECF system which will send notification

of such filing to the following:

John Bowen Walker
*Attorney for Defendant*
bwalker@rl-law.com

RAGSDALE LIGGETT, PLLC
Post Office Box 31507
Raleigh, North Carolina 27622-1507

This 20th day of February, 2013.

EMANUEL & DUNN, PLLC
*Attorneys for Plaintiffs*

/s/ Charles J. Cushman
Charles J. Cushman, N.C. Bar # 36170

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:12-cv-00069-H

ROSE LORENZO, individually and on )
behalf of others similarly situated, )
                       Plaintiffs, )
                              )
      v. )         **PLAINTIFF'S MOTION FOR**
                              )         **CLASS CERTIFICATION**
PRIME COMMUNICATIONS, L.P., a )    **UNDER RULE 23 F.R.CIV.P**
Texas General Partnership, )
                      Defendant. )

      Plaintiff Rose Lorenzo, by and through her undersigned counsel, and pursuant to Rule 23

of the Federal Rules of Civil Procedure, hereby submits the following Motion for Class

Certification. The class requested to be certified is defined as follows:

> All natural persons employed by Prime Communications, L.P. in retail stores and
> kiosks in the state of North Carolina from February 17, 2006 to present who were
> paid commissions or bonuses based on sales.

      Specifically, Plaintiff seeks class certification of her claim that Prime Communications,

L.P. ("Prime") practices with respect to the calculation, payment and deduction of commission

wages violates North Carolina's payday statute, N.C.G.S. § 95-25.6, by failing to pay its

employees all wages when due, and North Carolina's wage deduction statutes, N.C.G.S. §§ 95-

25.8 and 95-25.13, by failing to obtain written authorization and advance written notice of intent

to make wage deductions in a manner required by NCWHA.

      The proposed class is easily ascertainable because the number and identity of NCWHA

class members are determinable from Prime's payroll records which easily identifies all current

and/or former employees who were employed in Prime's retail stores and kiosks in North

Carolina and received commission wages. Each and every element of Fed. R. Civ. P. 23 is

satisfied to certify the class under Rule 23(a) and (b)(3). In support of this Motion, Plaintiff's Brief in Support of Motion for Class Certification and Proposed Order accompany this motion.

Plaintiff also moves the Court for an Order:

1.  Appointing named Plaintiff Rose Lorenzo as class representative on behalf of all current and/or former employees employed by Prime Communications, L.P. in retail stores and kiosks in the state of North Carolina from February 17, 2006 to present who were promised or paid commission wages based upon sales of wireless products, services and accessories; and

2.  Appointing Plaintiff's counsel of record as class counsel for the Rule 23 class.

This Motion is based upon all of the pleadings and documents contained in the Court's file, including the Brief, declarations, affidavits, documents and arguments submitted in support of this Motion.

WHEREFORE, pursuant to Rule 23 and upon consideration of her Motion and Brief, Plaintiff respectfully requests that this Court grant her Motion for Class Certification and enter the proposed Order which is attached to this Motion.

This 14th day of June, 2013.

*Attorneys for Plaintiff*

/s/ Stephen A. Dunn
Stephen A. Dunn NC State Bar No. 12389
sdunn@emanuelanddunn.com
EMANUEL & DUNN, PLLC
Post Office Box 426
Raleigh, North Carolina 27602
(919) 832-0329 (PHONE)
(919) 832-0731 (FAX)

2

/s/ Harris D. Butler, III

Harris D. Butler, III VA State Bar No. 26483
Zev H. Antell Virginia State Bar No. 74634
harris.butler@butlerroyals.com
zev.antell@butlerroyals.com
BUTLER ROYALS, PLC
100 Shockoe Slip, 4th Floor
Richmond, Virginia  23219
(804) 648-4848 (PHONE)
(804) 648-6814 (FAX)

3

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing PLAINTIFF'S MOTION FOR

CLASS CERTIFICATION with the Clerk of Court using the CM/ECF system which will send

notification of such filing to the following:

> John Bowen Walker
> *Attorney for Defendant*
> bwalker@rl-law.com
> RAGSDALE LIGGETT, PLLC
> Post Office Box 31507
> Raleigh, North Carolina 27622-1507

This 14th day of June, 2013.

> /s/ Stephen A. Dunn
> Stephen A. Dunn NC State Bar No. 12389
> sdunn@emanuelanddunn.com
> EMANUEL & DUNN, PLLC
> Post Office Box 426
> Raleigh, North Carolina 27602
> (919) 832-0329 (PHONE)
> (919) 832-0731 (FAX)

4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

ROSE LORENZO,                              )
      Plaintiff;                       )
                                    )
      v.                               )
                                      )
PRIME COMMUNICATIONS, L.P.,                )
      Defendant.                       )

_____

DEPOSITION OF ROSE EMILY LORENZO

_____

In Raleigh, North Carolina
Friday, December 14, 2012
Reported by Robbie W. Worley

Worley Reporting
P.O. Box 91447
Raleigh, NC 27675
919-870-8070


80

```
1              around Thanksgiving when you're finally a
2              salesperson, is that correct?
3    A         That's correct.
4    Q         Or a solution specialist?
5    A         Uh-huh.
6    Q         A question that kind of led us into that, we were
7              talking about commissions.  How did you earn
8              commissions as a solution specialist?
9    A         Based on the sales.
10   Q         Okay.  Tell me a little bit more about that.
11   A         So, a client would come in and they want to
12             activate a new phone.  Then, based on the rate plan
13             that they chose, if it was a single line or a
14             family plan line, the rate plan, the phone that
15             they picked out, the features that they would
16             select to be on the account, you would get paid
17             commission on all of those.
18                  So, the higher the rate plan, the more
19             money, right, that goes into your commission
20             bucket.  The higher cost of the phone, not
21             necessarily, but sometimes the cheaper phones
22             provided a higher commission rate because the buy-
23             down, or whatever the cost of the phone was, was
24             less.  But an iPhone or a Blackberry or one of
```

Page 81

```
 1              those high-price phone, could generate a higher
 2              commission.  And then if they wanted all of the
 3              features, you know data, text messaging, roadside
 4              assistance, GPS, whatever AT&T was offering as, we
 5              will give this to you for free for two months or
 6              whatever, if you could get them to agree to it,
 7              then you would get paid commission on all of that
 8              as well.
 9   Q          Got you.  And when were you paid commissions?
10   A          Two months after you actually did the sale.
11   Q          One of the issues in this case, is the chargeback
12              policy by Prime Communications.  Do you know what I
13              mean when I say chargeback policy?
14   A          Yes, I do.
15   Q          What's your understanding of the chargeback policy?
16   A          That if there was a sale that was not valid, then
17              Prime would charge back whatever AT&T charged them
18              back.
19   Q          Okay.  Explain that to me.  What do you mean, not
20              valid?
21   A          So if there was a sale that cancelled within the
22              first 30 days or it's happened where a customer
23              came in, they bought a phone, they get no reception
24              for AT&T in their neighborhood or in their home,
```

88

```
 1              but you cannot delete it from your account.

 2      Q       For instance, I guess the only way to delete it or

 3              to cancel it, would be to bring the whole phone

 4              back in and turn the whole thing in within 30 days;

 5              is that correct?

 6      A       Yes.

 7      Q       Okay.  Did you ever have a situation arise either

 8              as a solution specialist or a store manager,

 9              where -- well, strike that.

10                      A customer comes in and buys a phone with

11              a cell phone plan.  We won't worry about the data

12              plan for now, just a cell phone plan and maybe a

13              couple of features.  What programs do you have to

14              plug in that sale in the store?

15      A       Are you saying a brand-new account or --

16      Q       A brand-new account.

17      A       Okay.  So the first thing you would have to do is,

18              you would have to log in to POS, which is -- I

19              don't know what it means.  I'm thinking it's point

20              of sale, but it's AT&T's proprietary software that

21              all of the stores use, not -- AT&T Corporate

22              included.  In POS, you would have to put in all of

23              their information, their social, their driver's

24              license, and you would have to generate a credit
```

1          report.

2                    So, the corporate office or AT&T's

3          software would generate a credit report.  Of

4          course, we would not be able to see it.  We would

5          just see the results that yes, this person

6          qualifies or this people doesn't qualify or this

7          person requires a $500.00 deposit, right?

8     Q    Uh-huh.

9     A    At that point, you can advise the client what the

10         standing is.  Oh, yep, you qualify for one line or

11         two lines, or no, you know you qualify but you have

12         to pay a deposit of this much, and the deposit has

13         to be paid in cash to AT&T, right?  And so, they at

14         that point can make a choice.  If they decide they

15         qualify with zero deposit, you know, yes, we want

16         to do it, then we would go and figure out what kind

17         of phone they want, talk about the features that

18         they want, the accessories they might need with

19         their phone, and you would proceed in assigning

20         them a phone number.

21    Q    Okay.  And so after all this information is in POS,

22         and you've made the sale, they have picked out the

23         phone, they have picked out the features, kind of

24         walk me through that process.  What do you do next?

90

1   A       You would go in and you would select the phone plan

2           that they want, the rate plan.  Because if it's an

3           individual line, they would pick, you know, however

4           many minutes they want.

5   Q       And where would you put that?  Where would you

6           select that data plan?

7   A       In POS.

8   Q       In POS, okay.

9   A       Right, you are doing all of this in POS.  You would

10          select the data plan.  You would select the city

11          that they live in.  You know, if they live in

12          Durham, then you might want a Durham phone number.

13          The system will generate five phone numbers for you

14          to choose.  They can pick the phone number they

15          want, and you go on to the next screen and it would

16          ask you what kind of features does this client

17          want.  Do they need a data plan?  Do they want text

18          messaging?

19                  And you would select everything they want

20          and you would go on to the next screen.  And once

21          you got to the end of all of that, and the client

22          understands this is what they're getting, you would

23          submit it and it would generate a sales report that

24          would tell them everything that they just did.

Worley Reporting
Case 5:12-cv-00069-H   Document 44-1   Filed 06/14/13   Page 7 of 32
234                                    7c1f2586-4382-4846-a94e-b4511cd8b517

1        You're in a two-year contract.  It starts on this

2        day.  These are the features that you have added.

3        This is the rate plan that you added.  This is what

4        your first bill might look like because you are

5        going to have a prorated charge for this month, and

6        AT&T bills a month in advance, so your first bill

7        might look like this.  Your following bills will

8        probably be this amount.

9            And the client needs to initial all of

10       that so they are initialing their rate plan that

11       they chose, all the features that they chose, that

12       they understand their first bill is going to be X

13       dollar amount, their recurring bill is going to be

14       this amount.  It gives them all the options on you

15       know, how to pay your bill and all the AT&T jargon,

16       and then they sign it, right?  Once they have done

17       all of that, you take their phone, you turn it on,

18       you dial 611 to activate and it will activate their

19       phone, and that part is ready to go.

20           Then you have to go to Prime system,

21       which is RQ4.  You have to generate a new invoice.

22       So you put in all their customer information

23       exactly the way it was on POS, their name, their

24       address, and the new phone number.  And then you

Worley Reporting
Case 5:12-cv-00069-H   Document 44-1   Filed 06/14/13   Page 8 of 32
235                                    7c1f2586-4382-4846-a94e-b4511cd8b517

92

1          scan the box of the phone with the scanning part,

2          and it will pop up and you will say this is a new

3          account, this is the rate plan that they're

4          getting.

5                  You include all of the features that you

6          included on POS in there, and then it's going to

7          say this is how much the client has to pay today.

8          And then you take their credit card because at

9          Prime they don't accept cash. So, we take their

10         credit card. You run it through the machine, set

11         up their phone, put the screen saver on there, the

12         protector, all of their accessories, and have a

13         nice day.

14    Q    So essentially, it sounds like you've got to almost

15         compute these things into two different systems,

16         POS, which is AT&T to kind of activate the phone,

17         and set up an AT&T account that that person can

18         then go on and pay their AT&T bill online or

19         however they want to do it, and get their bill

20         submitted, correct?

21    A    That's correct.

22    Q    And then you've got RQ4, which is a Prime

23         Communications feature that also records the sale

24         and who made the sale, and things like that; is

93

| | | |
|---|---|---|
| 1 | | that correct? |
| 2 | A | That's correct.  It's their invoicing system. |
| 3 | Q | And is it your understanding that RQ4 is also the |
| 4 | | system that is used to calculate commissions and |
| 5 | | things like that? |
| 6 | A | My understanding is that the numbers from RQ4 are |
| 7 | | used to calculate the commissions of the sale. |
| 8 | Q | Have you ever had an instance where -- just to make |
| 9 | | up payment plan figures, I don't know if these are |
| 10 | | actual ones, but just for an analogy or |
| 11 | | hypothetical.  Let's say a customer comes in and |
| 12 | | buys a $39.99 plan from AT&T, that's what they |
| 13 | | want.  Have you ever had a situation where in POS |
| 14 | | you or another employee have put in $39.99 as the |
| 15 | | plan under AT&T, but when you put it in RQ4, you |
| 16 | | accidentally put it in as a $59.99 plan?  Has that |
| 17 | | ever happened to you? |
| 18 | A | No, that has not. |
| 19 | Q | Okay.  Do you know what would happen if that |
| 20 | | mistake occurred? |
| 21 | A | Well, it would generate a difference in the |
| 22 | | commission. |
| 23 | Q | Okay. |
| 24 | A | Because if the $39.00 plan, say paid $25.00, and |

* * *
7c1f2586-4382-4846-a94e-b4511cd8b517

```
 1            agree that it would be in -- it would be acceptable
 2            in your understanding of the chargeback policy for
 3            Prime Communications to pay the employee the
 4            commission for a $39.99 plan as opposed to the
 5            $59.99 plan because the $39.99 plan was what was in
 6            POS and what the customer has been paid?
 7    A       That's correct.
 8    Q       And do you recall when you were told about the
 9            chargeback policy of Prime Communications?
10    A       I don't think I understood the chargeback policy
11            until I actually became a manager at Middle Creek.
12    Q       Uh-huh.
13    A       And I started when I got my first check as a
14            manager of Middle Creek.  I didn't even know where
15            to go to verify the commissions.  And I contacted
16            the district manager and said, "How do I verify
17            what I'm getting paid is actually what I should be
18            getting paid?"
19                    "Oh, you got to go to this site."
20                    "Well, how do I get access to it?"
21                    "You need to call the corporate office
22            and they will give."
23                    I called Crystal, who was my old manager
24            and said, "How do I get access to this?"  She made
```

Page 98

```
 1              a phone call to somebody at corporate and said,

 2              she's a new manager, can you give her access?  And

 3              I got access, right?

 4   Q          Uh-huh.

 5   A          And when I got that access, I discovered that I was

 6              being charged for the previous manager's sales.

 7              Sales that occurred prior to me even being employed

 8              with Prime.  And I brought that to the district

 9              manager's attention.  I brought that to the

10              regional manager's attention.  I took that to

11              corporate.  And the response I got was, you took

12              over the store, and this is how we do business.

13   Q          Do you know the amount of chargebacks that you were

14              charged back for the previous manager's sales?

15   A          Offhand, no, I don't know the exact dollar amount,

16              but it was a lot.

17   Q          Were you compensated for the previous manager's

18              sales?

19   A          No.

20   Q          Okay.  Then, how did -- to your understanding, how

21              were you only given the chargebacks and not credit

22              for the sales?

23   A          Because she got paid the sales prior to me even

24              being employed.  Those sales were paid to Amy, was
```

1        the old manager.

2   Q    Do you know Amy's last name?

3   A    I want to think it's White, but no, it's not White.

4        Amy -- no, I don't remember right offhand what her

5        last name was.  She was the manager of that store

6        and she got paid her commissions.  When she left

7        that store, they asked her to step down, and she

8        went to Holly Springs to be a solution specialist.

9             When I was able to get in and verify

10       commissions, the sales that occurred months -- for

11       six months, I was charged back Amy's sales.  And I

12       had no way of verifying whether those sales were

13       actually -- whether that chargeback was actually

14       accurate because I didn't have any information.  I

15       couldn't go into the customer's account and see

16       whether or not that feature was still on the

17       account, whether the account was cancelled.

18             There was no verification to them saying,

19       we're charging you back -- oh, this is a

20       chargeback.  Well, I didn't even do that sale but

21       you are going to charge me back the commission on

22       it.  And how can I verify that that actually is

23       true, right?  Because in order for me to get into

24       POS and verify that customer's account, I would

Page 100

```
 1            need the last four of their Social.  I don't have

 2            that because the customer is not in my store.

 3   Q        Right.

 4   A        And those were sales that happened six months.  So

 5            for six months, I was getting chargebacks off of

 6            Amy's sales that I don't even know if they were

 7            even accurate, you know, to be charged back.  And

 8            when I would question it, their response all the

 9            way up the chain was, well, you took over the store

10            and this is just how we do it.

11   Q        When you're looking up these chargebacks, what

12            system are you in again?

13   A        RQ4.

14   Q        RQ4.  When you're looking at RQ4 at these

15            chargebacks, how do you determine which ones are

16            Amy's sales versus your sales?

17   A        It tells you who the salesperson was.

18   Q        Okay.  And so you just knew that Amy had left

19            before you got there; is that correct?

20   A        Well, we kind of -- I took over her store.  So,

21            when I took over, she went to Holly Springs.

22   Q        Was there any time period that you overlapped where

23            she worked as a solution specialist in the store

24            when you were a store manager?
```

* * *

Page 118

1    Q    If I asked you this question earlier, I apologize.

2         When you were a sales associate, did you ever have

3         any complaints about the chargeback policy on your

4         commissions?

5    A    When I was sales associate, I didn't even know I

6         could verify my commissions.  And I only had the

7         one month that I worked that I actually got a

8         commission check out of the Fuquay store before I

9         went to the Middle Creek store.  I didn't even have

10        access to verify the commissions.  It wasn't until

11        I got to Middle Creek that my check was, I don't

12        know, a couple hundred dollars or something, and it

13        was shocking to me so I questioned it and I wanted

14        to verify.  But my commission check at the Fuquay

15        store for the one month that I worked there, was

16        somewhere around $1,500.00.  So I wasn't thinking

17        about, are they charging me back because I was

18        happy that I made a $1,500.00 commission check.

19   Q    Right.

20   A    You know, it wasn't until afterwards where I

21        thought I did all this work, and I want to verify

22        this because this doesn't seem right to me, you

23        know.  And their response was, you know, you took

24        over the store and so you take over all the

Page 119

1  commissions, and I was being charged back Amy's

2  stuff.  Then, you know, those responses went on,

3  well, we only charge you back what AT&T charges us

4  back, which is not true.

5  Q  Why is that not true?

6  A  Because they charged me back on my own account.  My

7  own personal account that I did an upgrade on, two

8  lines, they charged me back as those accounts being

9  deactivated, accounts cancelled.  And those

10  accounts have been active for six years and have

11  never even been disconnected.  But they charged me

12  back those sales.

13  They charged me back the phone sale.

14  They charged me back the rate plan, and they

15  charged me back the text messaging and the data

16  plan on those two lines, which are my own personal

17  accounts.  So that's how I know that they don't

18  verify that, that that's not correct.

19  Q  If you had the phone for six years, how did the

20  sale even enter into the system?

21  A  Because I did an upgrade.

22  Q  Okay.

23  A  My son and daughter-in-law have -- I have three

24  lines on my account.  My personal line and two

120

1          other lines, and my son and daughter-in-law needed

2          new phones, right?  I said, "Well, your accounts

3          are eligible for an upgrade, so let's upgrade the

4          phones in the store, and you know pick the phone

5          you want," and so we did the upgrade, right?  All

6          was fine.

7                When I started verifying -- got access to

8          verify the commissions, I was verifying invoices to

9          the commission reports, right?  And lo and behold,

10         there's my account deactivated phone chargeback.

11         You know want to know how shocked I was to see my

12         own phone line.  I'm like, I'm paying AT&T $258.00

13         every month on my bill, and you're telling me that

14         AT&T is telling you that that line has been

15         canceled?  It's not likely.

16  Q     Did you ever ask anybody what that line entry meant

17         or why it said deactivated?

18  A     Yeah, I called.  I called the district manager at

19         the time.  I called Binay.  I called the corporate

20         office.

21               "I want to know why this says I'm being

22         charged back on this?"

23               "Well, because that's what is on the AT&T

24         report."

121

1          "Show me that report. I want to see it

2     because I'm paying $258.00 every month on my bill,

3     and my account has never even been disconnected for

4     lack of payment. And you're going to tell me that

5     the upgrade I did, I'm going to be charged back on

6     both of those lines when those were legitimate

7     sales and those accounts are still active?" That's

8     why I know that it's not true.

9  Q  Okay. And do you still have copies of these

10    documents or whatever that you saw these specific

11    deactivations?

12 A  Yes, I do.

13 Q  Okay.

14 A  And those copies you can get right out of RQ4.

15 Q  Okay. All right. Oh, I'm sorry. And do you

16    recall specifically who you spoke to about your

17    complaints about the specific deactivation of your

18    phone?

19 A  You know what, I want to say it was the commission

20    analyst at the time, and I'm thinking that it was

21    Shabnaz that I spoke to. This is also something

22    that I also spoke to Angela Dunlap about. When

23    they came, and I can't remember exactly what month

24    it was, but there was a managers' meeting where

Worley Reporting
Case 5:12-cv-00069-H   Document 44-1   Filed 06/14/13   Page 18 of 32
245                                    7c1f2586-4382-4846-a94e-b4511cd8b517

122

1          Angela Dunlap and Myshia came to Raleigh to discuss

2          this whole commissions issue.

3                    And that was one of the things that I

4          brought up at the managers' meeting to Angela

5          Dunlap.  And I also brought up the issue of being

6          charged back for all of Amy's sales and why that

7          was happening.  And the month after that happened,

8          they sent out an email saying that new managers

9          taking over stores were no longer going to be

10         charged back for previous managers, you know.

11                   And that was after the meeting that we

12         had with Angela Dunlap, where it seemed like of all

13         the managers that were there, I was the only one

14         speaking up because nobody wanted to -- they were

15         just sitting there, you know, and they were talking

16         about the commissions, and, you know, the

17         responsibility of the employees to make their

18         request to the corporate office if there was a

19         commission discrepancy.

20    Q    Uh-huh.

21    A    And I brought up all of my concerns.  You know, to

22         me, I found this as a problem.  None of it was

23         resolved.  They never gave me a resolution of why I

24         was being charged back on accounts that were still

Worley Reporting
Case 5:12-cv-00069-H   Document 44-1   Filed 06/14/13   Page 19 of 32
246                                  7c1f2586-4382-4846-a94e-b4511cd8b517

123

1           active, why my own personal account was being --

2           had been charged back.  Why I got charged back from

3           Amy.  There was never any resolution to that and

4           they never paid me any of that money back.  You

5           know, so it was like, yeah I told you, you know,

6           this was what was going on, but they didn't say,

7           this is how we are going to fix it.

8     Q     Now, you mentioned this managers' meeting where

9           they came down to Raleigh to discuss different

10          issues.  Was that a managers meeting for all the

11          store managers in North Carolina?

12    A     That was the managers' meeting for the managers in

13          North Carolina, that's correct.

14    Q     How often did you have those managers meeting?

15    A     Once a month.

16    Q     Any other meetings that you had to take a part of?

17    A     Yes.  We had daily meetings, weekly meetings.  The

18          district manager would hold an hour to an hour and

19          a half, sometime two-hour, meetings before the

20          store opened.  Typically, around 8:00 in the

21          morning, sometimes 7:30 to 9:30, because my store

22          opened at 10:00, to go over the numbers, the goal

23          of the district, problems that we were having,

24          whatever.

* * *
7c1f2586-4382-4846-a94e-b4511cd8b517

Examination of Rose Emily Lorenzo
Rose Lorenzo v. Prime Communications, LP

| | | |
|---|---|---|
| 1 | Q | The mall hours. |
| 2 | A | So during the holiday season, they were open later, |
| 3 | | they opened earlier.  And then during the regular |
| 4 | | times, they were open when the mall opened and when |
| 5 | | the mall closed. |
| 6 | Q | My understanding is, when you were a solution |
| 7 | | specialist, you were paid an hourly wage plus |
| 8 | | commissions.  Is that correct? |
| 9 | A | Plus commissions, plus overtime. |
| 10 | Q | Okay.  And then as a manager, you were paid a |
| 11 | | salary; is that correct? |
| 12 | A | That's correct. |
| 13 | Q | Plus commissions.  Did you also receive, I don't |
| 14 | | know if they called it a commission or a bonus, |
| 15 | | based on the store's productivity? |
| 16 | A | I didn't get paid commissions and the store's |
| 17 | | commissions.  I got paid the store's commission. |
| 18 | Q | Okay. |
| 19 | A | Okay.  So, I didn't get paid for my own personal |
| 20 | | sales.  I got paid for the store, whatever the |
| 21 | | store did. |
| 22 | Q | And if you sold it in the store, then you would get |
| 23 | | paid because the store made the sale; is that |
| 24 | | correct? |

Examination of Rose Emily Lorenzo
Rose Lorenzo v. Prime Communications, LP

130

| | | |
|---|---|---|
| 1 | A | So if Billy or Suleika had a chargeback, then that |
| 2 | | reflected off of the store, which ultimately was |
| 3 | | what I would get paid off of. |
| 4 | Q | Basically, the store's net sales of all the sales |
| 5 | | in the store, minus all the chargebacks for that |
| 6 | | store, would be where you would get your |
| 7 | | commissions off of; is that correct? |
| 8 | A | That's correct. |
| 9 | Q | Okay. I want to kind of show you some exhibits and |
| 10 | | just ask you some questions. Let me show you one |
| 11 | | that's been already marked in a previous deposition |
| 12 | | as Exhibit 8. This is a three-page document that |
| 13 | | was marked by Mr. Butler at the deposition of Prime |
| 14 | | Communications. It's - and I will represent to |
| 15 | | you, that I believe the first page -- all three |
| 16 | | pages are a wage deduction authorization agreement. |
| 17 | | They are the same -- reportedly the same agreement. |
| 18 | | The first one is signed and then the next two are |
| 19 | | just cleaner or more clear copies of the wage |
| 20 | | deduction authorization agreement. If you look on |
| 21 | | the first page, the signature at the bottom that |
| 22 | | looks like to me Rose E. Lorenzo; is that your |
| 23 | | signature? |
| 24 | A | Yes, it is. |

131

1    Q       Okay, and that date, October 20, 2009, would that

2            be the date that you started employment as a

3            solution specialist in the Fuquay-Varina store?

4    A       That would be the date that I went in and signed

5            the paperwork, the W-4, the I-9, that stuff.

6    Q       All the other kind on employee paperwork and things

7            of that nature?

8    A       That's correct.

9    Q       At the start of a hire.  Did anyone go over this

10           agreement with you?

11   A       No.

12   Q       Who made you sign this?

13   A       Crystal.

14   Q       Did you have a chance to read the document before

15           you signed it?

16   A       I don't believe I did.  I just believe that she

17           said -- well, Jessie was there and Crystal, and

18           this is your hiring packet that you need to sign

19           these because we need this off to the corporate

20           office today.

21   Q       Okay.

22   A       You know, so I just went through, filled out the W-

23           4, the I-9, and just signed the paperwork, and off

24           they went.

* * *

Examination of Rose Emily Lorenzo
Rose Lorenzo v. Prime Communications, LP

| | | |
|---|---|---|
| 1 | A | My understanding is that the client has 30 days to |
| 2 | | return the item, whether it's an accessory -- well, |
| 3 | | accessories was 14 days, but a phone.  If they |
| 4 | | wanted to cancel the line, it's within 30 days. |
| 5 | | They can't come back six months later -- |
| 6 | Q | Right. |
| 7 | A | -- and say, I want to cancel my -- I want to return |
| 8 | | this phone, six months later. |
| 9 | Q | What about like deactivation of certain add-ons or |
| 10 | | accessories -- not accessories, but -- |
| 11 | A | Features? |
| 12 | Q | Features, thank you.  That's the word I was looking |
| 13 | | for.  What about features, when could they |
| 14 | | deactivate those or take those off their plan? |
| 15 | A | Yes, a client could deactivate any feature, except |
| 16 | | for data from their plan at any time. |
| 17 | Q | Okay.  And so for instance, under this paragraph, |
| 18 | | if a person changed a feature within the 180-day |
| 19 | | window, that would affect your chargebacks or that |
| 20 | | would necessitate a chargeback to your commissions; |
| 21 | | is that correct? |
| 22 | A | It would if AT&T charged it back. |
| 23 | Q | Okay.  If they charged back Prime; is that correct? |
| 24 | A | That's correct. |

138

| | | |
|---|---|---|
| 1 | A | Oh, the FM. |
| 2 | Q | Yeah. |
| 3 | A | Yeah, the signature is an I. |
| 4 | Q | Yeah, I was talking about just the description box. |
| 5 | | Do you know what FM stands for? |
| 6 | A | No. |
| 7 | Q | Or the GM? |
| 8 | A | I don't think that they actually use those, because |
| 9 | | it's usually DM and RM, but this may be an old |
| 10 | | form. |
| 11 | Q | Okay. I got you. Looking at this date, February |
| 12 | | 1, 2010, would this be the date that we were |
| 13 | | talking about earlier where Jessie was in the store |
| 14 | | with you and said, "We've got to go right now and |
| 15 | | take you to Middle Creek to do the inventory"? |
| 16 | | Would this be the date? |
| 17 | A | Actually, yes. It became effective on that date, |
| 18 | | but I don't actually think that happened on the |
| 19 | | 1st. I think they back-dated it to the 1st, |
| 20 | | because I think actually my first day there was not |
| 21 | | on the first of the month. I think it was a couple |
| 22 | | days after. |
| 23 | Q | I got you. And so it's showing that it is signed |
| 24 | | on the first. Do you think you back-dated your |

155

1    You know, because you can't go into that

2    customer's account.  They don't provide you with a

3    report from AT&T to say, this is actually what

4    you're getting charged back, and this is why.  And

5    you can't go into that account to actually verify

6    that that feature was taken off on the day that

7    they say it was taken off because there is no way

8    to verify that.

9    You know, so with that in mind, you might

10   end the month thinking I did an awesome job.  I hit

11   that 80 percent or the 90 percent, and I'm going to

12   get paid 8 percent commission because I did all of

13   this, and get zero because you have all of this

14   chargeback that you can't verify and it will knock

15   you into 53 percent or into the 60 percent range,

16   and then you get either zero or a really small

17   amount.  And you get a lot of really unhappy

18   solution specialists.

19   Because how do you explain it?  You know,

20   even being a store manager as a title, you know,

21   how do you explain that to someone without saying,

22   okay, we have to look at every single sale that

23   happened two months ago, and we have to look at

24   every single account that you can't access because

156

```
1        you don't have their Socials.  So, there's no way

2        to verify.

3   Q    Okay.  And so, when you say verify -- let me back

4        up a step.  You had talked about that you got

5        access to see what the specific chargebacks were

6        that were being charged back from your commissions;

7        is that correct?

8   A    That is correct.  Between RQ4 you could run a

9        report for all the sales that occurred in that

10       month.  And on the commission side, there was

11       Prime's website or portal or whatever, for the

12       commissions that I finally got access to, that

13       allows you to print out the report that has all the

14       commissions, all the sales, what they charged you

15       back, what it was charged back for, deactivation

16       feature taken off.  And it basically has the

17       customer's phone number, their name, and the amount

18       that was taken off, right?  It doesn't have the

19       last four of the social, it doesn't have any other

20       personal information.  Just whatever the feature

21       was that was removed from the account and the phone

22       number.

23            You would have to -- you could compare --

24       you could do a stare and compare and, well, okay,
```

157

1          we did it on this day.  You could go back and pull

2          all the invoices if you wanted and verify that you

3          actually rang it up correctly.  You know, and then

4          you would have to go into AT&T POS to verify the

5          account to see whether or not the feature is

6          actually still on there or it was actually removed,

7          right?  You can't verify that, because if you don't

8          have the last four of the person's Social to get

9          into the account, you can't access the account.

10          And it would be against company policy to access

11          somebody's account if they're not in the store.

12    Q    Okay.  So if I understand you correctly, you can go

13          into RQ4, you can see your sales for a given month,

14          correct?

15    A    Uh-huh.

16    Q    Is that a yes?

17    A    Yes.

18    Q    You can see the specific accounts where they are

19          stating a chargeback occurred by phone number and

20          customer's name or just phone number?

21    A    That's correct.  Both, phone number and customer's

22          name.

23    Q    Okay.  So for instance, you can go in there and see

24          Bo Walker, my phone number and what I've deleted

| 1 | | that's causing the chargeback and how much that |
| 2 | | charge back is. Is that correct? |
| 3 | A | That's correct. |
| 4 | Q | And that would be by month that the chargeback |
| 5 | | occurred? |
| 6 | A | That's correct. |
| 7 | Q | Okay. So you can see that but what you're saying |
| 8 | | is, there's no way for you to verify that that |
| 9 | | chargeback actually occurred. |
| 10 | A | That's correct. |
| 11 | Q | Without the Social Security number. |
| 12 | A | That's correct. Or an accounting from Prime that |
| 13 | | says, here's a report from AT&T that says this is |
| 14 | | what you're being charged back. |
| 15 | Q | Okay. |
| 16 | A | Right? So since they're on the store level, |
| 17 | | there's no report that says, AT&T charged Prime |
| 18 | | back this and in essence we have to charge you |
| 19 | | back. You can't -- there's no verification. And |
| 20 | | especially when you're going back six months to a |
| 21 | | sale, or a sale that you didn't even do. You know, |
| 22 | | it's somebody else's sale and you're getting -- you |
| 23 | | can't verify it. |
| 24 | Q | What would you want to verify it to, the person's |

Page 159

1          actual account to see that they took it off?

2     A    That's correct.

3     Q    Okay.

4     A    If they in actuality took that feature off of their

5          account.  Say you came in and five months later,

6          you're like you know what, I've been paying

7          roadside assistance for five months, I don't need

8          it anymore because Geico covers me or AAA, and you

9          call customer service or you go into a store or you

10         go online, and you remove that feature from your

11         account, I don't have any way of going -- looking

12         at the commission report and saying, I need to go

13         into Mr. Walker's account and verify if he actually

14         did take that off.  I have to take Prime's word and

15         say, this is what you're being charged back because

16         AT&T says that this is what -- these no longer

17         exist.

18              And my own personal experience is that

19         that's not accurate because when they charged me

20         back my own account, they said this is what AT&T

21         says about this account.  These phone lines have

22         been cancelled.  They no longer exist.  They are

23         closed on POS.  And that's not true because those

24         lines are still active, and they've been active for

Page 160

```
 1            six years.

 2    Q       Okay.  Because that's when you were talking about

 3            where you did your own upgrade, is that correct?

 4    A       That's correct.

 5    Q       Okay.  Is that the only time you've seen a mistake

 6            that you can pinpoint as a deactivation not being

 7            correct?

 8    A       No.

 9    Q       When you've gone to look in the system?

10    A       No.

11    Q       What other times have you seen it?

12    A       Numerous.

13    Q       Well, give me an example.

14    A       A specific example?

15    Q       Yes, ma'am.

16    A       Well, there are hundreds of examples, so I couldn't

17            give you one specific example, but there was a

18            client, Mr. White, who I was charged back for his

19            phone sale, and I want to say it was a Blackberry.

20            I'm not positive.  Where it said his account was

21            closed, and his account was still active.  And I

22            couldn't tell you today because I don't work for

23            Prime or AT&T, whether or not the account is still

24            active, but at the date that I checked the
```

* * *

190

| | | |
|---|---|---|
| 1 | A | '11. |
| 2 | Q | '11. Okay. And then lastly, when did you quit |
| 3 | | working for Prime Communications? |
| 4 | A | June of '12. Are we in '12? |
| 5 | Q | We're in '12. |
| 6 | A | So it would have been '11. |
| 7 | Q | And why did your employment end at Prime |
| 8 | | Communications? |
| 9 | A | Because I was told from Michael Castelli and Jeremy |
| 10 | | that Middle Creek store would no longer have a |
| 11 | | manager, that the store was only going to be run |
| 12 | | with one solution specialist, that it was not going |
| 13 | | to have a manager, and that I had an option to go |
| 14 | | to another store as a solution specialist or be |
| 15 | | fired. |
| 16 | Q | And which job -- where were they going to put you |
| 17 | | as a Solution specialist? |
| 18 | A | Cary Towne Mall. |
| 19 | Q | Okay. And I assume you didn't want to go to Cary |
| 20 | | Towne Mall. |
| 21 | A | Nope, because they were going to close that store. |
| 22 | | So I would have been in the same boat. |
| 23 | Q | How do you know they were going to close that |
| 24 | | store? |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:12-cv-00069-H

| | | |
|---|---|---|
| ROSE LORENZO, individually and on behalf of others similarly situated, | ) ) | |
| Plaintiffs, | ) ) | **AFFIDAVIT OF ROSE LORENZO** |
| v. | ) ) | |
| PRIME COMMUNICATIONS, L.P., a Texas General Partnership, | ) ) | |
| Defendant. | ) | |

I, Rose Lorenzo, being duly sworn, say as follows:

1.    My name is Rose Emily Lorenzo. I am older than 18 years of age, of sound mind, and am otherwise competent to make this Affidavit. I am the named plaintiff in the above-captioned lawsuit and have personal knowledge of the matters and things hereinafter set forth.

2.    On or about October 20, 2009, I began working for Prime Communications, L.P. ("Prime") as a Solutions Specialist in Prime's retail store located in Fuquay-Varina, North Carolina. Prime promised to pay me as a Solutions Specialists commissions upon sales of wireless products, services and accessories. Prime distributed a Sales Compensation Plan to describe the commission structure for Solutions Specialists, a true and correct example of which is attached as Exhibit A.

3.    On or about February 1, 2010, I accepted Prime's offer to become the Store Manager of Prime's Middle Creek Commons store. Prime promised to pay me as a Store Manager commissions upon store sales of wireless products, services and accessories. Prime distributed a Sales Compensation/Bonus Plan to describe the commission structure for Store Managers, a true and correct example of which is attached as Exhibit B.

4. After I became a Store Manager and was given access to RQ4 reports, I was able to receive commission reports, however those commission reports were posted by Prime and could be accessed by Store Managers only after commission payments were made by Prime.

5. Following receipt of my first commission check as a Store Manager, I viewed the commission report for February 2010 and discovered that I had been charged back for store sales made prior to the date I took over as Store Manager at Middle Creek Commons and prior to my employment date. Attached as Exhibit C are reports I printed from RQ4 identifying those features Prime reported as deactivated and charged back in February 2010. The report reveals charge backs for deactivations in the amount of $638.70 for sales as far back as August 2009, six months prior to the date I took over as Store Manager at Middle Creek Commons and prior to my employment date.

6. Sometime later, I discovered a charge back for my own personal accounts. When I raised this issue with Prime, the only explanation I received is "that's what is on the AT&T report." I never received a commission on my own personal phone upgrade.

7. In subsequent efforts to verify the accuracy of commissions and deductions, I discovered examples sales being omitted from gross profit, including:

a. By Invoice MIDDLIN1327 dated November 2010 generated by Solutions Specialists Suleika Coffey at Middle Creek Commons (MIDDLIN), Customer A purchased a Blackberry Torch and a data plan, PDA Personal DataPlus 200MB. By invoice MIDDLIN1379 issued by Shehzad Momin, a company employee in Spring, Texas, the data plan was reversed and no corresponding gross profit was ever credited to Middle Creek. Access to POS on February 3, 2011 revealed the data plan remained in place. True and correct copies of MIDDLIN1327, MIDDLIN1379, and POS commission

verification are hereto attached as Exhibit D.

b. By Invoice MIDDLIN1360 dated November 2010, Middle Creek Commons Customer B purchased a Pantech Ease phone, a 2 year upgrade service plan, a protective case accessory, and added the Family Messaging Unlimited feature. AT&T reports produced in discovery reveal commissions paid to Prime, $275 on the phone, $130 for the upgrade service plan, and $60 for the Family Messaging Unlimited feature. RQ4 reveals a commission deduction to Middle Creek Commons for $60 contemporaneous with the sale. True and correct copies of MIDDLIN1360, AT&T Report November 2010, and features unpaid deduction are hereto attached as Exhibit E.

c. By Invoice MIDDLIN924 dated June 2010, Middle Creek Commons Customer C purchased an iPhone 4, an iPhone rate plan, a 2 year activation with media, Family Messaging Unlimited, Voicedial, iPhone Data plan, and Navigator for iPhone. According to Prime, AT&T only reported a new iPhone activation with Navigator and Voicedial. Prime charged back $120 gross profit for the Family Messaging Unlimited feature and $13.98 for Navigator. Access to POS on September 21, 2010 revealed both the Family Messaging Unlimited feature and Navigator remain on this account. True and correct copies of MIDDLIN924, an AT&T Report produced by Prime in discovery, and POS commission verification are hereto attached as Exhibit F.

8. Throughout my employment with Prime, neither I, as Store Manager or Solutions Specialists, nor anyone I knew working at Prime as a Store Manager or Solutions Specialists, received from Prime advance written notice of the actual amount deducted from their commission wages, or advance written notice of their right to withdraw their wage deduction authorization, or any opportunity to withdraw their wage deduction authorization.



Rose Lorenzo

Sworn to and subscribed before me this
the 14 day of June , 2013.

Brandi M Crosmer
Notary Public

My Commission expires: 6/24/17

BRANDI G. CROSMER
Notary Public
Wake County
NORTH CAROLINA

# Exhibit 2A

 **PRIME**
COMMUNICATIONS

**Sales Compensation Plan**

June 2010

**POSITION: Solution Specialist**

**TARGET EARNINGS $22,800 - $42,892**

*Hourly Wage – Determined by position, tenure, and individual performance*

**Minimum $7.60 - Maximum $8.00**

| Gross Profit Payout Range | | Net Gross Profit % Payout | Commission¹ | Total Potential |
|---|---|---|---|---|
| $- | $3,500 | 5.00% | - | 5.0% |
| $3,501 | $6,000 | 8.00% | - | 8.0% |
| $6,001 | $8,000 | 10.00% | - | - |
| $8,001 | $12,500 | 12.00% | 2.5% | 12.5% |
| $12,501 | & Above | 14.00% | 3.0% | 15.0% |
| | | | 3.5% | 17.5% |

**(i) Commission Accelerators:**
1. $40.00 Accessories per Opportunity
2. 30 Total Opportunities

**Bonus GP:**
1. Sell FIVE wireline solutions and earn **2X GP** on ALL wireline solutions sold for the month!

❖ Commission is calculated from Gross Profit (GP) with factored discounts and features, net of costs, chargeback's, and deductions
❖ Post Paid, Upgrades, Pre-Paid, Rate Plan re-rates, and Features subject to 180 day chargeback towards GP
❖ Monthly quota is **$6,000**. Non-performance (below 85% quota attainment) may lead to termination
❖ Unpaid commissions are subject to a 180 day holdback period for chargeback when employee leaves

"Pursuant to Company policy as detailed in the current Employee Handbook, to receive a bonus you **must** be actively employed by the Company on the day that such bonus is actually paid. Bonus payment dates may vary and are solely within the discretion of the Company."

Note: Special spifs can be granted when deemed appropriate by Executive Management.

Version 1.1                    *Prime Communications confidential for internal company use only.*



Case 5:12-cv-00069-H   Document 44-3   Filed 06/14/13   Page 2 of 2

# Exhibit 2B



**PRIME** COMMUNICATIONS

Sales Compensation/Bonus Plan

June 2010

**POSITION: Store Manager**

**TARGET EARNINGS $40,000 - $65,000**
(Salary at target plus 100% achievement of quotas)

Annual Base Salary – *Determined by store size, incumbent experience, and job responsibilities*

Minimum $23,700 – Maximum $30,000

| Gross Profit (GP) Achievement to Budget* | | % GP Earned* | Bonus¹ | Total Potential |
|---|---|---|---|---|
| 60% | 79.99% | 3.0% | – | 3.0% |
| 80% | 99.99% | 5.0% | 1.0% | 6.0% |
| 100% | 119.99% | 6.0% | 2.0% | 8.0% |
| 120.0% | and above | 7.0% | 3.5% | 10.5% |

*(I) Bonus Accelerators:*

1. Attain 100% of total phone target
2. Personal GP achieved in Solutions Floor Training > $2,500
3. Attain a 75% Net Rep Satisfaction CFT score as per AT&T's DSR

*Bonus GP:*

1. Surpass total handset target by 10% and earn 1.1 GP credit on total market GP.

❖ *Gross Profit calculated is net of costs and chargeback's with factored discounts and features.*
❖ *Must be employed at time of payout to earn bonus*
❖ *More than three months under quote (70%) may lead to termination and/or demotion from position*
❖ *Bonus deductions include, but are not limited to: unsupported inventory shrinkages and missing deposits*

*Pursuant to Company policy as detailed in the current Employee Handbook, to receive a bonus you must be actively employed by the Company on the day that such bonus is actually paid. Bonus payment dates may vary and are solely within the discretion of the Company."*

Note: Special splits can be granted when deemed appropriate by Executive Management

Version 1.1

Prime Communications confidential for internal company use only.

# Exhibit 2C



*feb. 2010*

:: Home :: :: File Commission Discrepancy ::    :: Help

| Rose Lorenzo | |
|---|---|
| Middle Creek Commons (S) | |

| Transaction Type | Amount |
|---|---|
| **Phone GP** | $ 5,591 |
| **Phone Unpaid** | $ -46 |
| **Phone Deactivation** | $ -274 |
| **Phone Adjustment** | $ -320 |
| **Features GP** | $ 3,142 |
| **Features Unpaid** | $ -1,139 |
| **Features Deactivation** | $ -639 |
| **Feature Adjustment** | $ 54 |
| **Upsell GP** | $ 120 |
| **Upsell Unpaid** | $ 0 |
| **Upsell Deactivation** | $ 0 |
| **Upsell Adjustment** | $ -0 |
| **Parent Product GP** | $ 980 |
| **Parent Product Unpaid** | $ 0 |
| **Parent Product Deactivation** | $ 0 |
| **Parent Product Adjustment** | $ 0 |
| **I-Shield GP** | $ 140 |
| **I-Shield Unpaid** | $ 0 |
| **I-Shield Deactivation** | $ 0 |
| **I-Shield Adjustment** | $ 0 |
| **Accessories** | $ 1,264 |
| **Total GP** | 8,873 |
| **GM Goal** | 7,072 |
| **% to Goal** | 125.46% |
| **% Payout** | 7.00% |
| **Gross Payout** | $ 621.08 |
| **Audit** | $ 0 |
| **Tio / DataScape** | $ 0 |
| **Excess Discount** | $ 0 |
| **Shrinkage** | $ 0 |
| **Bank Deposits** | $ 0 |
| **Misc. Adjustment** | $ 0 |
| **Mis. Adj. Comments** | |

*Handwritten annotations:*
(707.08)   431.92
99*
11237
10529.92
7072
148.89
737.09
over 116.09
500.⁰⁰  owed from enP.

| Final Payment | $ 621.08 |
|---|---|
| Comments | |



:: Home :: :: File Commission Discrepancy ::
Print    Save    Format

:: Help

| | | | Features Deactivation | | | | | |
| | | | Lorenzo, Rose | | | | | |

| Location | GM | Trans. Date | Transaction# | Customer Last Name | Customer First Name | Zip Code | Option Name | Mobile# | Family Name |
|---|---|---|---|---|---|---|---|---|---|
| Middle Creek Commons (S) | $-20.00 | 1/15/2010 4:03:59 PM | MIDDLIN369 | ▓ | ▓ | 0 | AN02 NAV ROUTES UNL 9.99 | ▓ | Telenav |
| Middle Creek Commons (S) | $-12.00 | 1/16/2010 2:21:07 PM | MIDDLIN374 | ▓ | ▓ | | RSRA Roadside Assistance 2.99 | ▓ | Roadside Assistance |
| Middle Creek Commons (S) | $-20.00 | 1/16/2010 2:21:07 PM | MIDDLIN374 | ▓ | ▓ | | VAD1 VOICEDIAL *8 4.99 | ▓ | Voice Connect |
| Middle Creek Commons (S) | $-20.00 | 1/16/2010 2:21:07 PM | MIDDLIN374 | ▓ | ▓ | | AN02 NAV ROUTES UNL 9.99 | ▓ | Telenav |
| Middle Creek Commons (S) | $-12.00 | 1/18/2010 4:31:22 PM | MIDDLIN378 | ▓ | ▓ | | RSRA Roadside Assistance 2.99 | ▓ | Roadside Assistance |
| Middle Creek Commons (S) | $-12.00 | 1/20/2010 3:22:37 PM | MIDDLIN383 | ▓ | ▓ | 0 | RSRA Roadside Assistance 2.99 | ▓ | Roadside Assistance |
| Middle Creek Commons (S) | $-12.00 | 1/20/2010 3:22:37 PM | MIDDLIN383 | ▓ | ▓ | 0 | RSRA Roadside Assistance 2.99 | ▓ | Roadside Assistance |
| Middle Creek Commons (S) | $-12.00 | 1/25/2010 12:19:38 PM | MIDDLIN397 | ▓ | ▓ | ▓ | RSRA Roadside Assistance 2.99 | ▓ | Roadside Assistance |
| Middle Creek Commons (S) | $-20.00 | 1/25/2010 12:19:38 PM | MIDDLIN397 | ▓ | ▓ | | AN02 NAV ROUTES UNL 9.99 | ▓ | Telenav |
| Middle Creek Commons (S) | $-20.00 | 1/25/2010 12:19:38 PM | MIDDLIN397 | ▓ | ▓ | | VAD1 VOICEDIAL *8 4.99 | | Voice Connect |
| Middle Creek Commons (S) | $-12.00 | 10/12/2009 3:41:02 PM | MIDDLIN35 | | | ▓ | CRS ROADSIDE ASSISTANCE 2.99 | | Roadside Assistance |
| Middle Creek | $- | 10/23/2009 | MIDDLIN73 | ▓ | | ▓ | VAD1 VOICEDIAL *8 | ▓ | Voice Connect |



| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Commons (S) | 20.00 | 2:33:23 PM | | | | 4.99 | | |
| Middle Creek Commons (S) | $-12.00 | 10/23/2009 2:33:23 PM | MIDDLIN73 | | | CRS ROADSIDE ASSISTANCE 2.99 | | Roadside Assistance |
| Middle Creek Commons (S) | $-12.00 | 10/30/2009 7:09:38 PM | MIDDLIN108 | | | CRS ROADSIDE ASSISTANCE 2.99 | | Roadside Assistance |
| Middle Creek Commons (S) | $-12.00 | 11/14/2009 1:35:08 PM | MIDDLIN160 | | | CRS ROADSIDE ASSISTANCE 2.99 | | Roadside Assistance |
| Middle Creek Commons (S) | $-12.00 | 11/18/2009 5:48:57 PM | MIDDLIN170 | | | CRS ROADSIDE ASSISTANCE 2.99 | | Roadside Assistance |
| Middle Creek Commons (S) | $-12.00 | 11/25/2009 4:45:20 PM | MIDDLIN190 | | | CRS ROADSIDE ASSISTANCE 2.99 | | Roadside Assistance |
| Middle Creek Commons (S) | $-20.00 | 11/7/2009 10:42:48 AM | MIDDLIN142 | | | VAD1 VOICEDIAL *8 4.99 | | Voice Connect |
| Middle Creek Commons (S) | $-20.00 | 11/7/2009 10:42:48 AM | MIDDLIN142 | | | VAD1 VOICEDIAL *8 4.99 | | Voice Connect |
| Middle Creek Commons (S) | $-12.00 | 12/10/2009 2:58:33 PM | MIDDLIN223 | | | RSRA Roadside Assistance 2.99 | | Roadside Assistance |
| Middle Creek Commons (S) | $-12.00 | 12/10/2009 2:58:33 PM | MIDDLIN223 | | | RSRA Roadside Assistance 2.99 | | Roadside Assistance |
| Middle Creek Commons (S) | $-12.00 | 12/12/2009 1:10:57 PM | MIDDLIN236 | | | RSRA Roadside Assistance 2.99 | | Roadside Assistance |
| Middle Creek Commons (S) | $-12.00 | 12/12/2009 1:10:57 PM | MIDDLIN236 | | | RSRA Roadside Assistance 2.99 | | Roadside Assistance |
| Middle Creek Commons (S) | $-20.00 | 12/2/2009 1:44:14 PM | MIDDLIN206 | | | VAD1 VOICEDIAL *8 4.99 | | Voice Connect |
| Middle Creek Commons (S) | $-12.00 | 12/2/2009 1:44:14 PM | MIDDLIN206 | | | CRS ROADSIDE ASSISTANCE 2.99 | | Roadside Assistance |
| Middle Creek Commons (S) | $-12.00 | 12/2/2009 1:44:14 PM | MIDDLIN206 | | | CRS ROADSIDE ASSISTANCE 2.99 | | Roadside Assistance |
| Middle Creek | $- | 12/2/2009 | MIDDLIN206 | | | VAD1 VOICEDIAL *8 | | Voice Connect |



| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Commons (S) | 20.00 | 1:44:14 PM | | | | 4.99 | | |
| Middle Creek Commons (S) | $-20.00 | 12/22/2009 2:31:02 PM | MIDDLIN269 | | | VAD1 VOICEDIAL *8 4.99 | | Voice Connect |
| Middle Creek Commons (S) | $-12.00 | 12/22/2009 2:31:02 PM | MIDDLIN269 | | | RSRA Roadside Assistance 2.99 | | Roadside Assistance |
| Middle Creek Commons (S) | $-20.00 | 12/22/2009 2:31:02 PM | MIDDLIN269 | | | VAD1 VOICEDIAL *8 4.99 | | Voice Connect |
| Middle Creek Commons (S) | $-12.00 | 12/22/2009 2:31:02 PM | MIDDLIN269 | | | RSRA Roadside Assistance 2.99 | | Roadside Assistance |
| Middle Creek Commons (S) | $-12.00 | 12/23/2009 8:00:25 PM | MIDDLIN284 | | | RSRA Roadside Assistance 2.99 | | Roadside Assistance |
| Middle Creek Commons (S) | $-40.00 | 12/27/2009 2:33:17 PM | MIDDLIN304 | | | AN02 NAV ROUTES UNL 9.99 | | Telenav |
| Middle Creek Commons (S) | $-40.00 | 12/29/2009 4:01:51 PM | MIDDLIN312 | | | AN02 NAV ROUTES UNL 9.99 | | Telenav |
| Middle Creek Commons (S) | $-80.00 | 8/14/2009 5:16:06 PM | 3013194001676 | | | Messaging Unlimited $20 | | Text Messaging |

| Total Count | 35 |
|---|---|
| SubTotal | $ -640.00 |

Disclaimer : This website is offered to Prime Communication employees for tracking sales transactions only. This website represents un-audited / unreconciled. It does not represent final commission amounts which may vary significantly from the amounts shown. This website contains restricted and/or privileged employee information and is intended for authorized screening only.

# Exhibit 2D



POS.com II
Account Administration:
Change Market | Change Password
Thu Feb 3 16:36:53 EST 2011

011

Timeout in: 28:02

**1) Feature Selection**    2) Feature Change Summary

## Feature Change Flow
## Step One: Feature Selection

Customer Name:
Wireless Number:
BAN:                534082834967
Authorized Users:   None
Technology Type:    UMTS
Billing Indicator:  ADVANCE
Customer Type:      Orange

→ **IMPORTANT!** Removing and adding features or any other services to an account without customer consent is considered to be commission fraud. This is a serious violation of the AT&T Dealer Agreement which may result in Dealer termination.

→ **IMPORTANT!** Changes to the customer's monthly recurring charges could affect future upgrade discounts. If removing a f please confirm/inform customer of the potential impacts. To cancel Click Cancel. To continue Click Next.

**Current Features**                    Monthly Recurring Charges*        $

| | Feature | Description | Rate | Effective Date |
|---|---|---|---|---|
| Existing Features - Check a box to remove a feature. | | | | |
| ☐ | TDSBB1 | DATAPLUS 200MB BB | $15.00 | 11/11/2010 |
| ☐ | BBVV | VISUAL VOICEMAIL | $0.00 | 11/11/2010 |
| ☐ | UMTS | UMTS COMPATIBLE | $0.00 | 11/11/2010 |
| ☐ | 5KNW96O | 5000 N&W | $0.00 | 11/11/2010 |

| Added These Features. | | | |
|---|---|---|---|
| | Feature | Description | Rate |
| | | | |

→ **IMPORTANT!** *Below are available features available for this plan. Select the tabs to see features within that category. Select a fe clicking its radio button or check box. Click Next to proceed.*

## Available Features

| Data | Voice | BlackBerry | PDA | Other Data | Premium Downloads | Misc |


**Authorized Retailer**

# Invoice



||||||||||||||||||||||||||||||||||||||||||||||||

Invoice : MIDDLIN1327

**Middle Creek Commons (S)**

7277 NC Highway 42, Suite 122

Raleigh  NC  USA  27603

(919)772-7325

Merchant ID: 8013051829

| | |
|---|---|
| Tendered On: | 11-Nov-2010 03:16 PM |
| Sales Person: | Suleika Coffey |
| Tendered By: | Suleika Coffey |
| Tendered At: | Middle Creek Commons |

**Bill To:**

| Product SKU | Description | Tracking # | Qty | List Price | Disc % | Total Disc | Your Total |
|---|---|---|---|---|---|---|---|
| ACPHBL000673 | RIM Blackberry Torch 9800 | 353491041844758 | 1 | $1,399.00 | 92.85 | $1,299.01 | $99.99 |
| ACCINS001000 | Voice-Rate Plan $0-$45.00 | | 1 | $0.00 | 0.00 | $0.00 | $0.00 |
| ACCIRB000007 | 2 YR Act w/ media | 9199173560 | 1 | $0.00 | 0.00 | $0.00 | $0.00 |

**Payment:**

| | | | |
|---|---|---|---|
| Cash | $45.14 | Subtotal: | $99.99 |
| | | North Carolina 7.75%: | $7.75 |
| Visa | $62.60  Ref #: 390348 | **Total:** | **$107.74** |

Total Discount Applied: $1,299.01

agree to pay the above total according to the card holders agreement.

| | |
|---|---|
| Change: | $15.01 |

**Contract Details:**

| Tracking # | Contract # |
|---|---|
| 353491041844758 | 534082834967 |
| 9199173560 | 534082834967 |

**Comments:**

Shield Monthly Plan $4.99: ~ Feature

GSMT1 PDA Personal DataPlus 200MB $15 (New/Renew): Feature

**RETURN POLICY- PHONES:** There is a 30-day return/exchange period of devices (phones, PDA's, and other wireless communications instruments). Phone must be in its original box with all original items and returned in "like new" condition. A $35 restocking fee will apply to all non-iPhone wireless device returns/exchanges. iPhone returns/exchanges require the following restocking fees: 8GB - $10, 16GB - $20, 32GB - $30. Additionally, any missing items will result in an additional restocking fee of $25 item. Refunds will be issued based on the method of payment. All refunds over $50 will be issued a refund check by mail within 30 days from the date of return. Debit and Credit Card refunds will be processed within three business days from the date of return. Retail online purchases are non-refundable. ACCESSORIES: We honor refunds on or before fourteen (14) days after your purchase.

T-Mobile has agreed to sell me a wireless handset, USB modem, PC Card or Express Card, hereinafter referred to as equipment, at a substantially discounted price. This offer is based upon my unconditional agreement to maintain service on a specified rate plan with AT&T during the term of such agreement, beginning on the effective date shown above. I acknowledge that the purchase of this equipment is not for the purpose of replacing any equipment which has been stolen or lost during the six (6) month period prior to the

Case 5:12-cv-00069-H   Document 44-6   Filed 06/14/13   Page 3 of 4

 **at&t**
Authorized Retailer

# Refund

**Invoice : MIDDLIN1379**

**Middle Creek Commons (S)**
7277 NC Highway 42, Suite 122
Raleigh  NC  USA  27603
(919)772-7325

Original Invoice: MIDDLIN1327

| | |
|---|---|
| Tendered On: | 30-Nov-2010 07:15 PM |
| Sales Person: | Suleika Coffey |
| Tendered By: | Shehzad Momin |
| Tendered At: | Middle Creek Commons |

**Bill To:**


| Product SKU | Description | Tracking # | Qty | List Price | Disc % | Total Disc | Your Total |
|---|---|---|---|---|---|---|---|
| Payment: | | | | | | Subtotal: | $0.00 |
| Change: | $0.00 | | | | | | |
| | | | | | | **Total:** | **$0.00** |

**Comments:**
Refund: Refund
Refunded as per Feature RTA Process policy

rDSMT1 PDA Personal DataPlus 200MB $15 (New/Renew): Feature 

RETURN POLICY- PHONES: There is a 30-day return/exchange period of devices (phones, PDA's, and other wireless communications instruments). Phone must be in its original box with all original items and returned in "like new" condition. A $35 restocking fee will apply to all non-iPhone wireless device returns/exchanges.  iPhone returns/exchanges require the following restocking fees: 8GB - $10, 16GB - $20, 32GB - $30. Additionally, any missing items will result in an additional restocking fee of $25 per item. Refunds will be issued based on the method of payment. All refunds over $50 will be issued a refund check by mail within 30 days from the date of return. Debit and Credit Card refunds will be processed within three business days from the date of return. Retail phone purchases are non-refundable.  ACCESSORIES: We honor refunds on or before fourteen (14) days after your purchase.

PrimeMobile has agreed to sell me a wireless handset, USB modem, PC Card or Express Card, hereinafter referred to as equipment, at a substantially discounted price.  This offer is based upon my unconditional agreement to maintain  service on a specified rate plan with AT&T during the term of such agreement, beginning on the effective date shown above.  I acknowledge that the purchase of this equipment is not for the purpose of replacing any equipment which has been stolen or lost during the six (6) month period prior to the effective date of this Agreement.  I will pay PrimeMobile the sum of Three Hundred Seventy Five Dollars ($375) per 'Smartphone' device purchased, or Two Hundred Dollars ($200) each for any other pieces of equipment if I breach, cancel, or deactivate the Agreement with AT&T prior to the expiration of 60 days following the effective date. If I do not pay, I acknowledge that PrimeMobile may charge the purchaser's credit card for the applicable $375/$200 equipment subsidy recovery fee, or commence collection procedures immediately. The parties agree that the actual damages would be difficult to calculate and that the sum of $375/$200 is a reasonable estimate of the damages incurred by PrimeMobile. To secure my obligations hereunder, I grant PrimeMobile a security interest under the Uniform Commercial Code in the equipment purchased hereunder.  In the event it is necessary to collect any amount due hereunder, including instituting legal proceedings, PrimeMobile shall be entitled to recover all costs and expenses so incurred, including reasonable attorney's and collection fees, from me.

Customer Signature: _____        Date: _____

# Exhibit 2E



**Authorized Retailer**

# Invoice



Invoice : MIDDLIN1360

**Middle Creek Commons (S)**

7277 NC Highway 42, Suite 122

Raleigh  NC  USA  27603

(919)772-7325

Merchant ID: 8013051829

| | |
|---|---|
| Tendered On: | 22-Nov-2010 07:17 PM |
| Sales Person: | Suleika Coffey |
| Tendered By: | Rose Lorenzo |
| Tendered At: | Middle Creek Commons |

**Bill To:**

| Product SKU | Description | Tracking # | Qty | List Price | Disc % | Total Disc | Your Total |
|---|---|---|---|---|---|---|---|
| ACPHPB000652 | Pantech Ease | 012252003672576 | 1 | $240.00 | 47.92 | $115.01 | $124.99 |
| ACCINS000217 | Exception Upgrade 2 Year | | 1 | $0.00 | 0.00 | $0.00 | $0.00 |
| ACCIRB001012 | Exception Upgrade | 9195646702 | 1 | $0.00 | 0.00 | $0.00 | $0.00 |
| ASCAAF000240 | Incipio Clr Ease Case | | 1 | $29.99 | 20.00 | $6.00 | $23.99 |

| | | |
|---|---|---|
| | Subtotal: | $148.98 |
| **Payment:** | North Carolina 7.75%: | $11.55 |
| Visa          $160.53   Ref #: 02236B | **Total:** | **$160.53** |

I agree to pay the above total according to the card holders agreement. Total Discount Applied: $121.01

X _____

Change:          $0.00

**Contract Details:**

| Tracking # | Contract # |
|---|---|
| 012252003672576 | 534020038458 |
| 9195646702 | 534020038458 |

**Comments:**

Discount: Other

MSG4 FAMILY MSG UNLIMITED 30 (New/Renew): Feature

RETURN POLICY/RESTOCKING FEE—PHONES: Handsets, Smartphones, PDA's and other wireless communications instruments (a "Device") purchased from PrimeMobile may be returned within 30 days of the "Tendered On" date set forth above if the Device is returned in its original box along with all of the items originally included in the box and the Device and such other items are in "like new" condition. PrimeMobile will charge a restocking fee equal to $35 for each Device (other than an Apple™ Device), and a restocking fee equal to 10% of the purchase price of each Apple ™ Device. No restocking fee will be charged for a defective Device which is exchanged for a Device of the same manufacturer and model.  PrimeMobile will charge the retail price for each item originally included in the box with the Device which is missing or in a condition other than "like new." Any retail wireless device purchases (without AT&T rate plan) are non-refundable/exchangeable.

ACCESSORIES: The purchase price of accessories purchased from PrimeMobile will be refunded or exchanged if such accessories are returned in "like new" condition within 14 days of the "Tendered On" date set forth above. PrimeMobile will charge $10.00 restocking fee for any accessory return with a retail value of $50.00 (List Price) or higher per item. Refunds will be issued based on the original method of payment. All cash refunds over $55.00 will be issued via check from Prime Communications by mail within 30 days from date

| Agent Code | IMEI | Action Date | Contract Name | Action Type | SIM | BAN |
|---|---|---|---|---|---|---|
| W8467 | 0123500001244727 | 1/13/2010 | CAR_RATE_PLAN | Disconnect | 890141032433600074089 | 000053401206424249 |
| W8467 | 3560080270075691 | 1/14/2010 | CAR_RATE_PLAN | Disconnect | 890141032433600074113 | 000053409046174 |
| W8467 | 0121480009247860 | 1/17/2010 | CAR - PAY AS YOU GO | Disconnect | 890141042325098899927 | 000053409115934 |
| W8467 | 3598230139909538 | 1/18/2010 | CAR_RATE_PLAN 2 YR | Connect | 890141052433537261566 | 000053409851159 |
| W8467 | 3555576013137194 | 1/5/2010 | CAR_RATE_PLAN 2 YR | Connect | 890141052433537261644 | 000053409046174 |
| W8467 | 3598230165446830 | 1/9/2010 | CAR_RATE_PLAN 2 YR | Connect | 890141052433537261449 | 000053401949089955 |
| W8467 | 0121410065006701 | 1/22/2010 | CAR_RATE_PLAN 2 YR | Connect | 890141052432246500031 | 000053409054900 |
| W8467 | 3598230116616150 | 1/22/2010 | CAR_RATE_PLAN 2 YR | Connect | 890141052432246500049 | 000053409054900 |
| W8467 | 3585960033569523 | 1/22/2010 | CAR_RATE_PLAN 2 YR | Connect | 890141052432246500056 | 000053409054900 |
| W8467 | 3534900047011586 | 1/28/2010 | CAR_RATE_PLAN 2 YR | Connect | 890141052432246500080 | 000053409259752 |
| W8467 | 3534910434440415 | 1/19/2010 | CAR_RATE_PLAN 2 YR | Connect | 890141042438194115775 | 000053402828089089 |
| W8467 | 3534910418844758 | 1/11/2010 | CAR_RATE_PLAN 2 YR | Connect | 890141042438194115718 | 000053402833467 |
| W8467 | 3562710193441053 | 1/11/2010 | CAR_RATE_PLAN 2 YR | Connect | 890141052433537261115 | 000053409863654 |
| W8467 | 3534900469705692 | 1/29/2010 | CAR_RATE_PLAN 2 YR | Connect | 890141052432246500106 | 000053409553463637 |
| W8467 | 3519040022026213 | 1/20/2010 | CAR_RATE_PLAN 2 YR | Connect | 890141042438194157863 | 000053402003845858 |
| W8467 | 3524260413356166 | 1/19/2010 | CAR_RATE_PLAN 2 YR | Connect | 890141042438353726099 | 000053409892385851 |
| W8467 | 3534910433693415 | 1/22/2010 | CAR_RATE_PLAN 2 YR | Connect | 890141052432246500064 | 000053409054900 |
| W8467 | 3534910433770786 | 1/28/2010 | CAR_RATE_PLAN 2 YR | Connect | 890141052432246500072 | 000053409259752 |
| W8467 | 0122670032085799 | 1/16/2010 | IPHONE_NEW | Feature Add |  | 143966666 |
| W8467 | 0161400098383168 | 1/18/2010 | IPHONE_NEW | Feature Add |  | 534017441345 |
| W8467 | 11111111111111 | 1/20/2010 | CAR_PAY AS YOU GO | Connect | 890141042438194215742 | 000053409989970571 |
| W8467 | 11111111111111 | 1/10/2010 | CAR_PAY AS YOU GO | Connect | 890141052433537226131 | 000053409860045 |
| W8467 | 3533880041538671 | 1/15/2010 | CAR_PAY AS YOU GO | Connect | 890141042366772869 | 000053409878734444 |
| W8467 | 3534900046439002 | 1/2/2010 | CAR_STD_UPGRADE | Feature Add | 890141042436316557636 | 000053401545512555 |
| W8467 | 3519040020209191 | 1/16/2010 | CAR_STD_UPGRADE | Feature Add | 890141032228463153988 | 000053408354420 |
| W8467 | 0123500000524707 | 1/4/2010 | CAR_STD_UPGRADE | Feature Add | 890141032120800092531 | 000053401768135555 |
| W8467 | 0122520003672576 | 1/22/2010 | CAR_EXC_UPGRADE | Feature Add | 890141032417657281244 | 000053402003845858 |
| W8467 | 3519040022239048 | 1/20/2010 | CAR_EXC_UPGRADE | Feature Add | 890141042330455753724 | 000053408354420 |
| W8467 | 3598230143448900 | 1/29/2010 | CAR_STD_UPGRADE | Feature Add | 890141022322004417 | 000053402489433331 |
| W8467 | 3524260413352334 | 1/26/2010 | CAR_STD_UPGRADE | Feature Add | 890141022212165550297 | 000053401633744444 |
| W8467 | 3534910418463841 | 1/19/2010 | CAR_STD_UPGRADE | Feature Add | 890141032130071336262 | 000053402145303331 |
| W8467 | 3539320413087716 | 1/16/2010 | CAR_STD_UPGRADE | Feature Add | 890141042130251730644 | 000053402693402444 |
| W8467 | 3585950034945193 | 1/29/2010 | CAR_STD_UPGRADE | Feature Add | 890141042009090624500 | 000053401878340433 |
| W8467 | 0121410065006511 | 1/26/2010 | CAR_STD_UPGRADE | Feature Add | 890141042438194158090 | 000053402609099477 |
| W8467 | 0122520036328818 | 1/18/2010 | NA_STD_UPGRADE | Feature Add | 890141042114342527330 | 000000006027955311 |
| W8467 | 0124230058311706 | 1/17/2010 | IPHONE_QUAL_UPG | Feature Add |  | 534022891155114 |
| W8467 | 0125400064799605 | 1/22/2010 | IPHONE_QUAL_UPG | Feature Add |  | 534021055667373 |

280

| | | | | | |
|---|---|---|---|---|---|
| W8467 | 0125430054199861 | 11/18/2010 | IPHONE_QUAL_UPG | Feature Add | 534023521773 |
| W8467 | 0122630036479055 | 11/4/2010 | IPHONE_QUAL_UPG | Feature Add | 534017233659 |
| W8467 | | 11/3/2010 | CAR_FEATURE | Feature Backout | 534026517385 |
| W8467 | | 11/3/2010 | CAR_FEATURE | Feature Renewal Backout | 534017020824 |
| W8467 | | 11/14/2010 | CAR_FEATURE | Feature Backout | 534004068174 |
| W8467 | | 11/3/2010 | CAR_FEATURE | Feature Backout | 534026517385 |
| W8467 | | 11/3/2010 | CAR_FEATURE | Feature Backout | 534026517385 |
| W8467 | | 11/11/2010 | CAR_FEATURE | Feature Backout | 534026934024 |
| W8467 | | 11/17/2010 | CAR_FEATURE | Feature Backout | 534029645997 |
| W8467 | | 11/22/2010 | CAR_FEATURE_DWN | Feature Backout | 534092761635 |
| W8467 | | 11/25/2010 | CAR_FEATURE_DWN | Feature Backout | 534084147102 |
| W8467 | | 11/18/2010 | CAR_FEATURE_DWN | Feature Backout | 534016283817 |
| W8467 | | 11/22/2010 | CAR_FEATURE_COMP_DWN | Feature Backout | 534027221846 |
| W8467 | | 11/6/2010 | CAR_FEATURE_DWN | Feature Backout | 534028884637 |
| W8467 | | 11/8/2010 | CAR_FEA_COMP | Feature Backout | 534016283817 |
| W8467 | | 11/22/2010 | CAR_FEA_COMP | Feature Backout | 534027221846 |
| W8467 | | 11/18/2010 | CAR_FEATURE | Feature Add | 534028100714 |
| W8467 | | 11/6/2010 | NA_FEATURE | Feature Add | 143965666 |
| W8467 | | 11/11/2010 | CAR_FEATURE | Feature Add | 534009863654 |
| W8467 | | 11/22/2010 | CAR_FEATURE | Feature Add | 534099054900 |
| W8467 | | 11/22/2010 | CAR_FEATURE | Feature Add | 534099054900 |
| W8467 | | 11/22/2010 | CAR_FEATURE | Feature Add | 534099054900 |
| W8467 | | 11/20/2010 | CAR_FEATURE | Feature Add | 534099054900 |
| W8467 | | 11/19/2010 | CAR_FEATURE | Feature Add | 534020038458 |
| W8467 | | 11/29/2010 | CAR_FEATURE | Feature Add | 534021453031 |
| W8467 | | 11/11/2010 | CAR_FEATURE | Feature Add | 534018783403 |
| W8467 | | 11/19/2010 | CAR_FEATURE | Feature Add | 534082834967 |
| W8467 | | 11/26/2010 | CAR_FEATURE | Feature Renewal Add | 534021453031 |
| W8467 | | 11/14/2010 | CAR_FEATURE | Feature Renewal Add | 534026090947 |
| W8467 | | 11/19/2010 | CAR_FEATURE | Feature Add | 534017233659 |
| W8467 | | 11/20/2010 | CAR_FEATURE | Feature Add | 534028289089 |
| W8467 | | 11/16/2010 | CAR_FEATURE | Feature Add | 534023211005 |
| W8467 | | 11/28/2010 | CAR_FEATURE | Feature Add | 534026934024 |
| W8467 | | 11/28/2010 | CAR_FEATURE | Feature Add | 534099259752 |
| W8467 | | 11/2/2010 | CAR_FEATURE | Feature Add | 534015451255 |
| W8467 | | 11/29/2010 | CAR_FEATURE | Feature Add | 534095534637 |
| W8467 | | 11/18/2010 | CAR_FEATURE | Feature Add | 534017441345 |
| W8467 | | 11/17/2010 | CAR_FEATURE | Feature Renewal Add | 534029691514 |
| W8467 | | 11/20/2010 | CAR_FEATURE | Feature Add | 534020038458 |

| | | | | |
|---|---|---|---|---|
| W8467 | 11/29/2010 | CAR_FEATURE | Feature Add | 53402494331 |
| W8467 | 11/19/2010 | CAR_FEATURE | Feature Add | 53408923851 |
| W8467 | 11/26/2010 | CAR_FEATURE | Feature Add | 53401633744 |
| W8467 | 11/22/2010 | CAR_FEATURE | Feature Add | 53409054900 |
| W8467 | 11/28/2010 | CAR_FEATURE | Feature Add | 53409259752 |
| W8467 | 11/2/2010 | CAR_FEATURE | Feature Renewal Add | 53401545125 |
| W8467 | 11/16/2010 | CAR_FEATURE | Feature Renewal Add | 53408354942 |
| W8467 | 11/23/2010 | UV_INTERNET | Affiliate Add | 26245702 |
| W8467 | 11/23/2010 | UV_INTERNET | Affiliate Add | 9196616763 |

| Bill Code | | Bill Code Descr | Ref Bill Code | | Reconnect Date | Disconnect Date | Init Svc Date | Bc Isd | value |
|---|---|---|---|---|---|---|---|---|---|
| CN1NM0A60 | S | NTN450RUMM5KNW | 39.99 CN1NM0A60 | S | | 11/3/2010 | 10/23/2010 | 10/23/2010 | -165.00 |
| FN3NM0A60 S | S | FT9NTN1400RUMMUNW | 9.99 FN3NM0A60 S | S | | 11/14/2010 | 10/26/2010 | 10/26/2010 | -165.00 |
| GPA1 | S | RETIRE Flat Rate | | | | 11/7/2010 | 5/12/2010 | 5/12/2010 | -35.00 |
| CN1NM0A60 | S | NTN450RUMM5KNW | 39.99 CN1NM0A60 | S | | | 11/8/2010 | 11/8/2010 | 165.00 |
| FN3NM0A60 S | S | FT9NTN1400RUMMUNW | 9.99 FN3NM0A60 S | S | | | 11/5/2010 | 11/5/2010 | 165.00 |
| FN2NM0A60 S | S | FT9NTN700RUMMUNW | 9.99 FN2NM0A60 S | S | | | 11/9/2010 | 11/9/2010 | 165.00 |
| FN3NM0A60 S | S | FT9NTN1400RUMMUNW | 9.99 FN3NM0A60 S | S | | | 11/22/2010 | 11/22/2010 | 165.00 |
| FN3NM0A60 S | S | FT9NTN1400RUMMUNW | 9.99 FN3NM0A60 S | S | | | 11/22/2010 | 11/22/2010 | 165.00 |
| FN3NM0A60 S | S | FT9NTN1400RUMMUNW | 9.99 FN3NM0A60 S | S | | | 11/22/2010 | 11/22/2010 | 165.00 |
| FN3NM0A60 S | S | FT9NTN1400RUMMUNW | 9.99 FN3NM0A60 S | S | | | 11/28/2010 | 11/28/2010 | 165.00 |
| FN3NM0A60 S | S | FT9NTN1400RUMMUNW | 9.99 FN3NM0A60 S | S | | | 11/19/2010 | 11/19/2010 | 165.00 |
| CN1NM0A60 | S | NTN450RUMM5KNW | 39.99 CN1NM0A60 | S | | | 11/11/2010 | 11/11/2010 | 165.00 |
| FN9NM0A61 S | S | FTNTN.UNLIMITED | 49.99 FN9NM0A61 | S | | | 11/29/2010 | 11/29/2010 | 200.00 |
| CN3NM0A60 | S | NTN900RUMMUNW | 59.99 CN3NM0A60 | S | | | 11/11/2010 | 11/11/2010 | 200.00 |
| FN3NM0A60 P | S | FT9NTN1400RUMMUNW | 80.00 FN3NM0A60 P | P | | | 11/20/2010 | 11/20/2010 | 275.00 |
| CN9NM0A61 | S | NTN.UNLIMITED | 69.99 CN9NM0A61 | S | | | 11/19/2010 | 11/19/2010 | 275.00 |
| FN3NM0A60 P | S | FT9NTN1400RUMMUNW | 80.00 FN3NM0A60 P | P | | | 11/22/2010 | 11/22/2010 | 275.00 |
| FN3NM0A60 P | S | FT9NTN1400RUMMUNW | 80.00 FN3NM0A60 P | P | | | 11/28/2010 | 11/28/2010 | 275.00 |
| 44PLNEW2 | E | iPhone 3G New Activation | | | | | 1/6/2010 | 1/6/2010 | 400.00 |
| 44PLNEW2 | E | iPhone 3G New Activation | | | | | 11/18/2010 | 11/18/2010 | 400.00 |
| GP01 | S | $.10 SIMPLE PLAN | | | | | 11/20/2010 | 11/20/2010 | 35.00 |
| GP01 | S | $.10 SIMPLE PLAN | | | | | 11/10/2010 | 11/10/2010 | 35.00 |
| GP03 | S | $2 DAILY TLK/TXT | | | | | 11/15/2010 | 11/15/2010 | 35.00 |
| UPGT | F | Upgrade Fee | 80.00 GACFN3NM0A60P | D | | | 7/18/2009 | 11/2/2010 | 275.00 |
| UPGT | F | Upgrade Fee | 80.00 GACFN3NM0A60P | D | | | 10/28/2009 | 11/16/2010 | 275.00 |
| UPGT | F | Upgrade Fee | 60.00 GACQF12XXX3WP | D | | | 8/8/2008 | 11/14/2010 | 200.00 |
| XCPT | F | Upgrade Exception | 9.99 GACFN3NM0A60S | D | | | 7/10/2008 | 11/22/2010 | 130.00 |
| XCPT | F | Upgrade Exception | 9.99 GACFN3NM0A60S | D | | | 11/6/2009 | 11/20/2010 | 130.00 |
| UPGT | F | Upgrade Fee | 9.99 GACNFT5XXX6WS | D | | | 6/17/2006 | 11/29/2010 | 165.00 |
| XCPT | F | Upgrade Exception | 39.99 GACCSM1XXX1W | D | | | 10/10/2001 | 11/26/2010 | 165.00 |
| UPGT | F | Upgrade Fee | 9.99 GACD01FXXX2WS | D | | | 10/8/2007 | 11/19/2010 | 165.00 |
| UPGT | F | Upgrade Fee | 9.99 GACFN2NM0A60S | D | | | 2/17/2009 | 11/16/2010 | 185.00 |
| UPGT | F | Upgrade Fee | 9.99 GACNP45XXX6WS | D | | | 9/13/2006 | 11/29/2010 | 185.00 |
| UPGT | F | Upgrade Fee | 9.99 GACNP45XXX6WS | D | | | 7/30/2005 | 11/26/2010 | 165.00 |
| UPGT | F | Upgrade Fee | 14.99 GACNF21XXX6WS | D | | | 12/6/2006 | 11/18/2010 | 275.00 |
| 4APLQUPGT | E | iPhone 3G Qualified Upgrade | 69.99 NWSCN9NM0A61 | D | | | 4/9/2005 | 11/17/2010 | 400.00 |
| 4APLQUPGT | E | iPhone 3G Qualified Upgrade | | | | | 10/12/2004 | 11/22/2010 | 400.00 |

Case 5:12-cv-00069-H   Document 44-7   Filed 06/14/13   Page 6 of 11

| Code | | Description | Value Code | | | Date 1 | Date 2 | Amount |
|---|---|---|---|---|---|---|---|---|
| 4APLQUPGT | E | iPhone 3G Qualified Upgrade | | | | 5/11/2004 | 11/18/2010 | 400.00 |
| 4APLQUPGT | E | iPhone 3G Qualified Upgrade | | | | 8/17/2007 | 1/14/2010 | 400.00 |
| MSG4 | P F | FAMILY MSG UNLIMITED | 30.00 MSG4 | P F | | 6/3/2005 | 10/22/2010 | -60.00 |
| MSG4 | P F | FAMILY MSG UNLIMITED | 30.00 MSG4 | P F | | 9/21/2007 | 9/4/2010 | -60.00 |
| TDBB2 | F | DATAPRO 2GB BB | 25.00 TDBB2 | F | | 10/26/2010 | 10/26/2010 | -50.00 |
| DTAU | F | FAMILY DATA UNLIMITD | 10.00 DTAU | F | | 10/2/2010 | 10/2/2010 | -20.00 |
| DTAU | F | FAMILY DATA UNLIMITD | 10.00 DTAU | F | | 6/3/2008 | 10/2/2010 | -20.00 |
| MSGINTL | F | INTL_LD_MSG_100 | 10.00 MSGINTL | F | | 4/16/2008 | 8/21/2010 | -20.00 |
| MSG1 | F | MESSAGING 200 | 5.00 MSG1 | F | | 1/27/2010 | 8/19/2010 | -20.00 |
| FA02 | F | AT&T FamilyMap | 14.99 FA02 | F | | 6/20/2010 | 6/20/2010 | -15.00 |
| VAD1 | F | VOICEDIAL *8 | 4.99 VAD1 | F | | 9/8/2010 | 9/8/2010 | -14.99 |
| FA01 | F | AT&T FamilyMap | 9.99 FA01 | F | | 6/27/2005 | 6/6/2010 | -14.97 |
| AN02 | F | NAVIGATOR UNL DATA | 9.99 AN02 | F | | 7/15/2009 | 7/21/2010 | -9.99 |
| CRS | F | Roadside Assistance | 2.99 CRS | F | | 6/27/2005 | 6/16/2010 | -9.99 |
| CRS | F | Roadside Assistance | 2.99 CRS | F | | 7/5/2005 | 6/15/2010 | -8.87 |
| SLW1 | F | Smart Limit/Wireless | 4.99 SLW1 | F | | 4/6/2009 | 11/18/2010 | 9.98 |
| MSG1 | F | MESSAGING 200 | 5.00 MSG1 | F | | 1/16/2010 | 1/16/2010 | 10.00 |
| MSG1 | F | MESSAGING 200 | 5.00 MSG1 | F | | 11/11/2010 | 11/11/2010 | 10.00 |
| DTAU | F | FAMILY DATA UNLIMITD | 10.00 DTAU | F | | 11/22/2010 | 11/22/2010 | 20.00 |
| DTAU | F | FAMILY DATA UNLIMITD | 10.00 DTAU | F | | 11/22/2010 | 11/22/2010 | 20.00 |
| DTAU | F | FAMILY DATA UNLIMITD | 10.00 DTAU | F | | 11/22/2010 | 11/22/2010 | 20.00 |
| DTAU | F | FAMILY DATA UNLIMITD | 10.00 DTAU | F | | 11/22/2010 | 11/22/2010 | 20.00 |
| DTAU | F | FAMILY DATA UNLIMITD | 10.00 DTAU | F | | 11/15/2009 | 11/20/2010 | 20.00 |
| TDSBB1 | F | DATAPLUS 200MB BB | 15.00 TDSBB1 | F | | 10/6/2007 | 11/19/2010 | 30.00 |
| MN21 | F | DATA UNLIMITED | 15.00 MN21 | F | | 9/13/2006 | 11/29/2010 | 30.00 |
| TDSBB1 | F | DATAPLUS 200MB BB | 15.00 TDSBB1 | F | | 11/11/2010 | 11/11/2010 | 30.00 |
| MSG3 | F | MESSAGING UNLIMITED | 20.00 MSG3 | F | | 10/8/2007 | 11/19/2010 | 40.00 |
| MSG3 | F | MESSAGING UNLIMITED | 20.00 MSG3 | F | | 7/30/2005 | 11/28/2010 | 40.00 |
| MSG3 | F | MESSAGING UNLIMITED | 20.00 MSG3 | F | | 8/17/2007 | 1/14/2010 | 40.00 |
| TDBB2 | F | DATAPRO 2GB BB | 25.00 TDBB2 | F | | 10/8/2008 | 11/19/2010 | 50.00 |
| IP63 | F | DATAPRO 2GB IP | 25.00 IP63 | F | | 10/27/2006 | 11/20/2010 | 50.00 |
| TDBB2 | F | DATAPRO 2GB BB | 25.00 TDBB2 | F | | 2/17/2009 | 11/16/2010 | 50.00 |
| TDBB2 | F | DATAPRO 2GB BB | 25.00 TDBB2 | F | | 11/28/2010 | 11/28/2010 | 50.00 |
| TDBB2 | F | DATAPRO 2GB BB | 25.00 TDBB2 | F | | 11/28/2010 | 11/28/2010 | 50.00 |
| TDBB2 | F | DATAPRO 2GB BB | 25.00 TDBB2 | F | | 7/18/2009 | 11/2/2010 | 50.00 |
| TDBB2 | F | DATAPRO 2GB BB | 25.00 TDBB2 | F | | 11/29/2010 | 11/29/2010 | 50.00 |
| MSG4 | P F | FAMILY MSG UNLIMITED | 30.00 MSG4 | P F | | 10/31/2005 | 11/18/2010 | 60.00 |
| MSG4 | P F | FAMILY MSG UNLIMITED | 30.00 MSG4 | P F | | 4/9/2005 | 11/17/2010 | 60.00 |
| MSG4 | P F | FAMILY MSG UNLIMITED | 30.00 MSG4 | P F | | 11/20/2010 | 11/20/2010 | 60.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| MSG4 | P | F | FAMILY MSG UNLIMITED | 30.00 MSG4 | P | F | 6/17/2006 | 11/29/2010 | 60.00 |
| MSGD | | F | MESSAGING + DATA UNL | 30.00 MSGD | | F | 11/19/2010 | 11/19/2010 | 60.00 |
| MSGD | | F | MESSAGING + DATA UNL | 30.00 MSGD | | F | 10/10/2001 | 11/26/2010 | 60.00 |
| MSG4 | P | F | FAMILY MSG UNLIMITED | 30.00 MSG4 | P | F | 11/22/2010 | 11/22/2010 | 60.00 |
| MSG4 | P | F | FAMILY MSG UNLIMITED | 30.00 MSG4 | P | F | 11/28/2010 | 11/28/2010 | 60.00 |
| MSG4 | P | F | FAMILY MSG UNLIMITED | 30.00 MSG4 | P | F | 7/8/2009 | 11/2/2010 | 60.00 |
| HDXTR6C | | | HSI-Direct Xtreme 6.0 | 47.95 HDXTR6C | | | 10/28/2009 | 11/16/2010 | 125.00 |
| HDXTR6C | | | HSI-Direct Xtreme 6.0 | 47.95 HDXTR6C | | | | | 125.00 |

| LocationCode | LocationName | Features Unpaid GP | TransactionDate | TransactionNo | TransactionType | ReturnsOriginalInvNo |
|---|---|---|---|---|---|---|
| 0535 | Middle Creek Commons (S) | -$19.98 | Nov 22, 2010 5:33 PM | MIDDLIN1357 | | |
| 0535 | Middle Creek Commons (S) | -$40.00 | Nov 6, 2010 5:56 PM | MIDDLIN1318 | | |
| 0535 | Middle Creek Commons (S) | -$40.00 | Nov 17, 2010 6:02 PM | MIDDLIN1336 | | |
| 0535 | Middle Creek Commons (S) | -$40.00 | Nov 22, 2010 5:33 PM | MIDDLIN1357 | | |
| 0535 | Middle Creek Commons (S) | -$40.00 | Nov 18, 2010 1:17 PM | MIDDLIN1338 | | |
| 0535 | Middle Creek Commons (S) | -$40.00 | Nov 20, 2010 1:15 PM | MIDDLIN1351 | | |
| 0535 | Middle Creek Commons (S) | -$40.00 | Nov 4, 2010 3:42 PM | MIDDLIN1311 | | |
| 0535 | Middle Creek Commons (S) | -$40.00 | Nov 18, 2010 4:59 PM | MIDDLIN1342 | | |
| 0535 | Middle Creek Commons (S) | -$30.00 | Nov 22, 2010 5:33 PM | MIDDLIN1357 | | |
| 0535 | Middle Creek Commons (S) | -$10.00 | Nov 11, 2010 12:55 PM | MIDDLIN1325 | | |
| 0535 | Middle Creek Commons (S) | -$10.00 | Nov 18, 2010 1:17 PM | MIDDLIN1338 | | |
| 0535 | Middle Creek Commons (S) | -$60.00 | Nov 5, 2010 10:26 AM | MIDDLIN1312 | | |
| 0535 | Middle Creek Commons (S) | -$60.00 | Nov 9, 2010 12:28 PM | MIDDLIN1320 | | |
| 0535 | Middle Creek Commons (S) | -$60.00 | Nov 22, 2010 7:17 PM | MIDDLIN1360 | | |

**Total**    -$529.98

| ReturnsOriginalInvDate | ZipCode | ServicePlanName | OptionName | OptionIncluded |
|---|---|---|---|---|
| | 27577 | | INT'T 100INT'L TEXTMSGS 9.99 (New) | |
| | 92079 | | Auto Attach iPhone Data Feature | |
| | 27603 | | Auto Attach iPhone Data Feature | |
| | 27577 | | Auto Attach iPhone Data Feature | |
| | 27603 | | Auto Attach iPhone Data Feature | |
| | 27592 | | Auto Attach iPhone Data Feature | |
| | 27529 | | Auto Attach iPhone Data Feature | |
| | 27504 | | Auto Attach iPhone Data Feature | |
| | 27577 | | MSG6 IPHONE TXT MSG 1500 15 (New) | |
| | 27529 | | MSG1 MESSAGING 200 5 (New) | |
| | 27603 | | MSG1 MESSAGING 200 5 (New) | |
| | 27501 | | MSG4 FAMILY MSG UNLIMITED 30 (New/Renew) | |
| | 27529 | | MSG4 FAMILY MSG UNLIMITED 30 (New/Renew) | |
| | 27592 | | MSG4 FAMILY MSG UNLIMITED 30 (New/Renew) | |

Case 5:12-cv-00069-H   Document 44-7   Filed 06/14/13   Page 10 of 11

| CarrierCommission | DateReturned | BillCode | PlanMonth | PlanYear | Familyname |
|---|---|---|---|---|---|
| | INTT | | 11 | 2010 | International Text Messaging |
| | Auto | | 11 | 2010 | Internet |
| | Auto | | 11 | 2010 | Internet |
| | Auto | | 11 | 2010 | Internet |
| | Auto | | 11 | 2010 | Internet |
| | Auto | | 11 | 2010 | Internet |
| | Auto | | 11 | 2010 | Internet |
| | Auto | | 11 | 2010 | Internet |
| | MSG6 | | 11 | 2010 | Text Messaging |
| | MSG1 | | 11 | 2010 | Text Messaging |
| | MSG1 | | 11 | 2010 | Text Messaging |
| | MSG4 | | 11 | 2010 | Text Messaging |
| | MSG4 | | 11 | 2010 | Text Messaging |
| | MSG4 | | 11 | 2010 | Text Messaging |

# Exhibit 2F

 **at&t**
Authorized Retailer

# Invoice

Invoice : MIDDLIN924

**Middle Creek Commons (S)**
7277 NC Highway 42, Suite 122
Raleigh  NC  USA  27603
(919)772-7325
Merchant ID: 8013051829

Tendered On:   29-Jun-2010 07:03 PM
Sales Person:   Rose Lorenzo
Tendered By:   Rose Lorenzo
Tendered At:   Middle Creek Commons

**Bill To:** 

| Product SKU | Description | Tracking # | Qty | List Price | Disc % | Total Disc | Your Total |
|---|---|---|---|---|---|---|---|
| ACPHIP000658 | iPHONE 4 16GB BLACK | 012339005483795 | 1 | $774.00 | 74.16 | $574.01 | $199.99 |
| ACCINS000929 | iPhone Rate Plan | | 1 | $0.00 | 0.00 | $0.00 | $0.00 |
| ACCIRB000007 | 2 YR Act w/ media | 9197808606 | 1 | $0.00 | 0.00 | $0.00 | $0.00 |

| Payment: | | | |
|---|---|---|---|
| Cash | $100.00 | Subtotal: | $199.99 |
| | | North Carolina 7.75%: | $15.50 |
| Visa ********** | $115.49   Ref #: 372543 | **Total:** | **$215.49** |

Total Discount Applied: $574.01

I agree to pay the above total according to the card holders agreement.

X _____

Change:            $0.00

## Contract Details:

| Tracking # | Contract # |
|---|---|
| 012339005483795 | 534028703547 |
| 919780860O6 | 534028703547 |

**Comments:**
  Discount:   Other

MSG4 FAMILY MSG UNLIMITED 30 (New/Renew): Feature

VAD1 VOICEDIAL *8 4.99 (New): Feature

Auto Attach iPhone Data Feature: Feature

ANIP6 Navigator for iPhone $6.99 (New): Feature

iPHONE 4 16GB BLACK: All iPhone warranty claims must be processed directly with Apple, we are not authorized to process warranty exchanges for any iPhone device.

RETURN POLICY/RESTOCKING FEE—PHONES: Handsets, Smartphones, PDA's and other wireless communications instruments (a 'Device") purchased from PrimeMobile may be returned within 30 days of the "Tendered On" date set forth above if the Device is

Page 1 of 2       MIDDLIN924

returned in its original box along with all of the items originally included in the box and the Device and such other items are in "like new" condition. PrimeMobile will charge a restocking fee equal to $35 for each Device (other than an Apple™ Device), and a restocking fee equal to 10% of the purchase price of each Apple ™ Device. No restocking fee will be charged for a defective Device which is exchanged for a Device of the same manufacturer and model. PrimeMobile will charge the retail price for each item originally included in the box with the Device which is missing or in a condition other than "like new." Any retail wireless device purchases (without AT&T rate plan) are non-refundable/exchangeable.

ACCESSORIES: The purchase price of accessories purchased from PrimeMobile will be refunded or exchanged if such accessories are returned in "like new" condition within 14 days of the "Tendered On" date set forth above. PrimeMobile will charge $10.00 restocking fee for any accessory return with a retail value of $50.00 (List Price) or higher per item. Refunds will be issued based on the original method of payment. All cash refunds over $55.00 will be issued via check from Prime Communications by mail within 30 days from date of return. Debit and Credit Cards refunds will be processed to the original card within three business days from the date of return. Returns of BOGO items will be applied at the lowest price on the invoice. We are not responsible for any equipment containing any confidential, proprietary or personal information. Users must remove all personal information before returning equipment. Any rebate associated with the equipment subsequently returned will be voided.

I acknowledge that PrimeMobile's return policy and restocking fee, as set forth above, has been clearly explained to me.

_____ (Purchaser's Initial).


PrimeMobile has agreed to sell me a wireless handset, other wireless communications instrument (a "Device") at substantially discounted price. This offer is based upon my unconditional agreement to maintain service on a specified rate plan with AT&T during the term of such agreement beginning "Tendered On" date shown above. I agree to pay PrimeMobile the sum of Four Hundred Dollars ($400) per 'Smartphone/ PDA" device purchased, or Two Hundred Dollars ($200) each for any other Wireless Device if I breach, cancel, or deactivate the Agreement with AT&T prior to the expiration of 60 days following the "Tendered On" date shown above. If I do not pay, I acknowledge that PrimeMobile may charge the purchaser's credit card for the applicable $400/$200 device subsidy recovery fee, or commence collection procedures immediately. In the event it is necessary to collect any amount due hereunder, including instituting legal proceedings, PrimeMobile shall be entitled to recover all costs and expenses so incurred, including reasonable attorney's and collection fees, from me.

_____ (Purchaser's Signature) _____ (Date)



## POS.com II

**Account Administration:**
Change Market | Change Password
Tue Sep 21 17:31:56 EDT 2010

010

Dealer: W8467
Market: Georgia/Carolinas
Location: W8467 - PRIME COMMUNIC
Rep ID: 30029815

Return to Account Profile

Step **1** of 2

Timeout in 29:01

1) Feature Selection    2) Feature Change Summary

# Feature Change Flow
## Step One: Feature Selection

Customer Name:
Wireless Number: 53402870345?
BAN:
Authorized Users: N/A
Min Number: ADVANCE
Billing Indicator: Orange
Customer Type:

➡ **IMPORTANT!** Removing and adding features or any other services to an account without customer consent is considered to be commission fraud. This is a serious violation of the AT&T Dealer Agreement which may result in Dealer termination.

**Current Features**

| | | | Monthly Recurring Charges* | $69.98 | |
|---|---|---|---|---|---|

**Existing Features - Check a box to remove a feature.**

| | Feature | Description | | Rate | Effective Date |
|---|---|---|---|---|---|
| ☐ | IPB3 | DATAPRO 2GB IP | | $25.00 | 06/29/2010 |
| ☐ | UMTS | UMTS COMPATIBLE | | $0.00 | 06/29/2010 |
| ☐ | 7APL | IPHONE 4 TRKG | | $0.00 | 06/29/2010 |
| ☐ | ANA6 | ATT NAV FOR IPHONE | | $9.99 | 06/29/2010 |

**Added These Features.**

| | Feature | Description | | Rate |
|---|---|---|---|---|

296

| IPB3 | DATAPRO 2GB IP | $25.00 | | 06/29/2010 | |
|---|---|---|---|---|---|
| ☐ | UMTS | $0.00 | UMTS COMPATIBLE | 06/29/2010 | |
| ☐ | 7APL | $0.00 | IPHONE 4 TRKG | 06/29/2010 | |
| ☐ | ANA6 | $9.99 | ATT NAV FOR IPHONE | 06/29/2010 | |
| ☐ | MSG4 | $30.00 | FAMILY MSG UNLIMITED | 06/30/2010 | |

1

```
 1            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2                     WESTERN DIVISION

 3   ROSE LORENZO, ON BEHALF OF    *
     HERSELF AND ALL OTHERS        *
 4   SIMILARLY SITUATED            *
         PLAINTIFF,                *
 5                                 * CASE NO: 5:12-CV-00069-H
     VS.                           *
 6                                 *
     PRIME COMMUNICATIONS, L.P.,   *
 7   A TEXAS GENERAL PARTNERSHIP,  *
         DEFENDANT.                *
 8

 9


10   ********************************************************

11              DEPOSITION OF ANGELA DUNLAP

12                  DECEMBER 6, 2012

13                  Volume 1 of 1

14   ********************************************************

15

16

17

          DEPOSITION OF ANGELA DUNLAP, produced at the
18   instance of Plaintiff and duly sworn, was taken in the
     above-styled and numbered cause on the 6th day of
19   December, 2012, from 9:31 a.m. until 12:49 p.m., before
     Judy S. Hodges, CSR, in and for the State of Texas,
20   reported by stenograph machine, at the offices of
     Weinstein Spira & Company, PC, Three Greenway Plaza,
21   Suite 1750, Houston, Harris County, Texas, pursuant to
     the Federal Rules of Civil Procedure and the provisions
22   stated on the record.

23

24

25                              JOB NUMBER: _____
```

Electronically signed by judy hodges (101-114-351-9776)          298          d6a3d885-0ab1-443a-9898-110fa43fccc4

ANGELA DUNLAP

1    basis.  Was that part of his duties?

2         A    Yes.

3         Q    The manager commissions and bonuses, where --

4    what would he be looking at to process and analyze

5    those?

6         A    He would pull a file from RQ4 with all the

7    sales data.  Then employees rang up within the point of

8    sale system.  We would receive a commission carrier

9    file from AT&T that would validate what actually was

10   rung up and what they were going to pay us for, and

11   then he would blend the two reports to determine

12   commissions.

13        Q    Okay.  And that's -- that was commission?

14        A    Commission, bonuses.

15        Q    So they're called commission bonuses?  I mean,

16   are they two things?

17        A    Well, it's commissions and bonuses, yes.

18        Q    Okay.  They work on the same format, but

19   they're different animals?

20        A    Correct.

21        Q    Okay.  How is the bonus calculated?

22        A    How is the bonus calculated?  The bonuses are

23   based -- well, there's several bonuses that go into

24   play.  Manager bonuses are based off production of the

25   store.  District manager, regional director, their

## WAGE DEDUCTION AUTHORIZATION AGREEMENT

I understand and agree that my employer, Prime Communications, L.P. (the Company), may deduct money from my pay from time to time for reasons that fall into the following categories up to the maximum amount permitted by law per pay period:

- my share of the premiums for the Company's group medical plan, and the amount/deductions I may make into a retirement, 401(k) or pension plan as authorized or changed by the Company;
- installment payments on loans, store credit, or wage advances given to me by the Company, including the value of merchandise that I purchase or have purchased on my employee charge account, and if there is a balance remaining when I leave the Company, the balance of such loans, store credit, or advances;
- if I receive an overpayment of wages for any reason, repayment to the Company of such overpayments;
- the cost to the Company of personal long-distance calls I may make on Company phones or on Company accounts, and of personal faxes sent by me or Company equipment or at my direction;
- the cost of repairing or replacing any Company supplies, materials, equipment, property or person that I may damage (other than normal wear and tear) due to my actions or that I do not return after appropriate authorization from the Company during my employment, the actual replacement cost or fair market value of the individual, appropriate garage, Company property that I do not return after appropriate demand for return, or other costs the Company has advanced, in accordance with applicable laws;
- my pro rated share that prepaid sales are subject to a finance charge, these items may not be personal transactions, both of which may be deducted from my pay when the Company so informs me of same; and
- in the event of separation from the company, the Company is authorized to withhold my final compensation check for a period of 90 days in the event of internal investigation.

I understand that the Company may deduct money from my pay under the above authorizations, but only if the above deductions noted.

For You:    *[signature]* Roll E Young
            10/20/09



# WAGE DEDUCTION AUTHORIZATION AGREEMENT

I understand and agree that my employer, Prime Communications, L.P. (the Company), may deduct money from my pay from time to time for reasons that fall into the following categories up to the maximum amount permitted by law per pay period:

1. my share of the premiums for the Company's group medical/dental plan;
2. any contributions I may make to a retirement, 401k, or pension plan sponsored, controlled, or managed by the Company;
3. installment payments on loans, store credit, or wage advances given to me by the Company, including the value of merchandise that I purchase or have purchased on any employee charge account, and if there is a balance remaining when I leave the Company, the balance of such loans, store credit, or advances;
4. if I receive an overpayment of wages for any reason, repayment to the Company of such overpayments;
5. the cost to the Company of personal long-distance calls I may make on Company phones or on Company accounts, and of personal faxes sent by me using Company equipment or Company accounts;
6. the cost of repairing or replacing any Company supplies, materials, equipment, money, or other property that I may damage (other than normal wear and tear), lose, fail to return, or take without appropriate authorization from the Company during my employment;
7. administrative fees in connection with court-ordered garnishments or legally required wage attachments of my pay, limited in extent to the amount or amounts allowed under applicable laws;
8. the post paid and pre-paid sales are subject to a 180-day deactivation deduction as are vertical commissions, both of which may be deducted from my pay when the Company is informed of same; and
9. in the event of separation from the company, the Company is authorized to withhold my final commission check for a period of 90 days in lieu of future de-activation charge-backs.

I agree that the Company may deduct money from my pay under the above circumstances, or if any of the above situations occur.

Full Name:

Date:

# WAGE DEDUCTION AUTHORIZATION AGREEMENT

I understand and agree that my employer, Prime Communications, L.P. (the Company), may deduct money from my pay from time to time for reasons that fall into the following categories up to the maximum amount permitted by law per pay period:

1. my share of the premiums for the Company's group medical/dental plan;
2. any contributions I may make into a retirement, 401k, or pension plan sponsored, controlled, or managed by the Company;
3. installment payments on loans, store credit, or wage advances given to me by the Company, including the value of merchandise that I purchase or have purchased on my employee charge account, and if there is a balance remaining when I leave the Company, the balance of such loans, store credit, or advances;
4. if I receive an overpayment of wages for any reason, repayment to the Company of such overpayments;
5. the cost to the Company of personal long-distance calls I may make on Company phones or on Company accounts, and of personal faxes sent by me using Company equipment or Company accounts;
6. the cost of repairing or replacing any Company supplies, materials, equipment, money, or other property that I may damage (other than normal wear and tear), lose, fail to return, or take without appropriate authorization from the Company during my employment;
7. administrative fees in connection with court-ordered garnishments or legally-required wage attachments of my pay, limited in extent to the amount or amounts allowed under applicable laws;
8. the post paid and pre-paid sales are subject to a 180-day deactivation deduction as advertised commissions, both of which may be deducted from my pay when the Company is informed of same; and
9. in the event of separation from the company, the Company is authorized to withhold my final commission check for a period of 90 days in lieu of future de-activation charge-backs.

I agree that the Company may deduct money from my pay under the above circumstances, or if any of the above situations occur.

Full Name:

Date:



Search...

- Home
- Store Locator
- About Us
- Career
- Customer Zone

| AT&T California | AT&T Texas |
| AT&T Louisiana | AT&T South Carolina |
| AT&T North Carolina | AT&T Indiana |
| AT&T Ohio | AT&T Pennsylvania |
| AT&T Georgia | AT&T New York |
| NEW AT&T Florida | NEW: AT&T Vermont |



Store Location | Contact Us | Privacy | Terms & Condition

EXHIBIT
2

PENGAD 800-681-6989



Search...

- Home
- Store Locator
- About Us
- Career
- Customer Zone

| AT&T Greensboro | AT&T Charlotte | AT&T Ashboro |
|---|---|---|
| AT&T Concord | AT&T Charlotte | AT&T Raliegh |
| AT&T Denver | AT&T Dunn | AT&T Greensboro |
| AT&T Raleigh | AT&T Fuquay-Varina | AT&T Holly Springs |
| AT&T Jacksonville | AT&T Kernersville | AT&T Charlotte |
| AT&T Lenoir | AT&T Cary | AT&T Morrisville |
| AT&T Raleigh | AT&T Wilmington | AT&T Greensboro |
| AT&T Reidsville | AT&T Rocky Mountain | AT&T Sanford |
| AT&T Smithfield | AT&T Durham | AT&T Wake Forest |

Store Location | Contact Us | Privacy | Terms & Condition



© Copyright 2012 AT&T Locations. Cell Phones, U-verse, Digital TV, DSL Internet, and Phone Service All Rights Reserved. PrimeMobile. AT&T, the AT&T logo and all other AT&T marks contained herein are trademarks of Prime Communications, AT&T Intellectual Property and/or AT&T affiliated companies.



# Employee Commissions/Bonus Payout Procedures

Below are the steps Prime follows to pay our employees commissions/bonuses earned:

- The initial transactions are processed by the employee through RQ4.
- AT&T pays Prime for all commissionable transactions 30-45 days after the close of the month.
  1. AT&T provides Prime a detailed file with all commissioned transactions
     1. These include sales & chargebacks for any commissioned transaction that has been disconnected within the 180-day chargeback period defined by AT&T.
        1. If Prime employees received commissions/bonuses for transactions that are later 'charged back' by AT&T, this will result in a GP reversal for the employee in the next month's commissions/bonus calculations.
- Prime reconciles RQ4 transactional data against AT&T's file in order to ensure proper gross profit is calculated for the correct sales person and location.
  1. All transactions that match properly according to AT&T's file will apply to the commission/bonus calculations for the next month.
  2. Any transactions that do not match properly from RQ4 to AT&T's file results in an 'unpaid transaction' that is to be reviewed for reconcile eligibility.
     1. After research from Prime to ensure that payment should have been received for the transaction, we submit these transactions to AT&T for review as defined by AT&T.
        1. If AT&T pays Prime for any reconciled transaction, thesewill be applied to commissions/bonus calculations for the next month.
        2. If these transactions are not due any payment due to employee error, then Prime will issue a chargeback to the employee's commission or adjustment to the store GP according to the nature of the transaction.

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:12-cv-00069-11

1

2

3

ROSE LORENZO, individually        )
and on behalf of others similarly)
situated,                         )
                     Plaintiffs   )
                                  )
    v.                            )
                                  )
PRIME COMMUNICATIONS, L.P., a     )
Texas General Partnership,        )
                     Defendant.   )

4

5

6

7

8

9

10

11

12

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ORAL DEPOSITION OF LAREN WHIDDON
AS THE CORPORATE REPRESENTATIVE OF
PRIME COMMUNICATIONS, L.P.
VOLUME 1 OF 1
JUNE 10, 2013
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

13      ORAL DEPOSITION OF LAREN WHIDDON AS THE CORPORATE

14  REPRESENTATIVE OF PRIME COMMUNICATIONS, L.P., produced

15  as a witness, duly sworn by me, at the instance of the

16  Plaintiffs, taken in the above-styled and numbered cause

17  on the 10th day of June, 2013, from 1:34 p.m. to

18  4:00 p.m., before Audrey L. Waldrop, Certified Shorthand

19  Reporter No. 6218 in and for the State of Texas, at

20  Weinstein Spira & Company, 3 Greenway Plaza, Suite 1700,

21  Houston, Texas, pursuant to the Federal Rules of Civil

22  Procedure (and the provisions stated on the record or

23  attached therein).

                              TAXABLE COST:
24                            PAID BY:
                              TBA NO.:
25                            JOB NUMBER:

Electronically signed by Audrey Waldrop (101-425-145-7819)          306          360ed638-0b00-4584-8895-5b07be83f443

1    Q.    Okay.  Sort of can you give me sort of the
2    30,000-foot overview as to how Prime calculates gross
3    profit?
4    A.    Yes.  Gross profit consists of commissionable
5    earnings from AT&T Mobility as well as equipment margins
6    and accessory margins.
7    Q.    Okay.  Could you repeat that just one more
8    time?
9    A.    Sure.
10   Q.    I just want to make sure I caught it a
11   second --
12   A.    Commissionable earnings from AT&T Mobility.
13   Q.    Uh-huh.
14   A.    Equipment margins and accessory margins.
15   Q.    Okay.  What does the term "commissionable
16   earnings" mean?
17   A.    Commissionable earnings are the commissions
18   that we earn from AT&T related to either activating or
19   upgrading existing customer service with AT&T.
20   Q.    Okay.  So is that essentially, you know, I
21   coming in and purchase -- well, I guess my question is:
22   I mean, is there such a thing as an uncommissionable
23   earning?
24   A.    Explain.
25   Q.    Sure.  Well, you said -- you used the term

Electronically signed by Audrey Waldrop (101-425-145-7819)       307       360ed638-0b00-4584-8895-5b07be83f443
* * *

17

1   inventory management system; and we reconcile those two

2   payments to ensure that, number one, we're getting paid

3   what we assumed we were going to get paid as a result of

4   that transaction.

5       Q.  Uh-huh.  And what is the commission structure

6   for, you know, a salesperson?  I mean, do they get a set

7   percentage based on the type of transaction?  Does it

8   vary?

9       A.  It doesn't.  It's a set percentage.

10        MR. WALKER:  And just for clarification,

11   you said "salesperson."  I think you guys are both on

12   the same page, but will you clarify "salesperson."  Do

13   you mean a store manager or a solution specialist?

14   Because I don't know if you're grouping them both as

15   "salesperson."

16        MR. ANTELL:  Sure.

17       Q.  (By Mr. Antell)  For the purposes of this

18   deposition, when I use "salesperson," I mean the -- I

19   mean the salesperson.  I'll say "sales manager" if I in

20   fact --

21       A.  Got it.

22       Q.  -- you know, mean a sales manager.  Or manager.

23        MR. WALKER:  Store manager.

24       Q.  (By Mr. Antell)  Store manager.

25        MR. WALKER:  Yeah.

Electronically signed by Audrey Waldrop (101-425-145-7819)          * * *
360ed638-0b00-4584-8895-5b07be83f443

Laren Whiddon  As the Corporate Representative of Prime Communications

25

1    commissionable file at the end of the subsequent month;

2    and that commission is going to be paid out at the end

3    of the next month.  So it's basically a 60-, 90-day

4    waiting period.

5        Q.   Okay.  If you sell a service or something that

6    costs $20 a month, do you receive a commission on that

7    in perpetuity; or is it just sort of a one-shot deal

8    that AT&T pays you a commission on it?

9        A.   I'll need to clarify that a little bit.

10       Q.   Sure.

11       A.   We do receive a one-time commission, yes.

12       Q.   Okay.

13       A.   But we also per the terms of our agreement

14   receive a residual payment that is not part of our

15   commission plan.  It's a residual for the life of the

16   customer in perpetuity.

17       Q.   And is that part of gross profit for the

18   purpose --

19       A.   No.

20       Q.   It's not?

21       A.   No.

22       Q.   Okay.  And why is that?

23       A.   It's basically a residual stream that sits out

24   of our books.  So we're a partnership, and those

25   commissionable earnings are not part of our commission

26

1    plan.

2         Q.    Okay.  Okay.  So just so I'm clear, this sort

3    of residual payment that you receive on an ongoing basis

4    or that, you know, you may receive on an ongoing basis,

5    that is not part of the calculation for gross profit --

6         A.    Correct.

7         Q.    -- is that correct?

8         A.    That's correct.

9         Q.    Okay.  And does that residual payment structure

10   attach to all lines of service, or is it only specific

11   products?

12        A.    It's -- it attaches to all lines that are

13   activated by Prime, but it is -- there are certain

14   restrictions on what revenue receives residual income

15   and what doesn't.

16        Q.    Okay.  Can you --

17        A.    So --

18        Q.    I'm sorry.  Go ahead.  I interrupted.

19        A.    No, that's okay.  So as an example, the voice

20   plan would be included.  So it's the monthly recurring

21   revenue the customer generates.

22        Q.    Uh-huh.

23        A.    And, basically, any recurring revenue stream

24   versus a one-time download would be included.

25        Q.    Okay.

Electronically signed by Audrey Waldrop (101-425-145-7819)          310                    360ed638-0b00-4584-8895-5b07be83f443

1    A.    One-time downloads are not.

2    Q.    Sure.

3    A.    Yeah.

4    Q.    Do you know why those are not included, the

5    recurring revenue stream is not included in gross

6    profit?

7    A.    That's a -- really, it's the discretion of our

8    two owners.  What we do is our business is to basically

9    generate current activity, and the residual stream is

10   just a back-end profit for the investment that those

11   guys have made in the business.

12   Q.    Okay.

13   A.    So everyone from our executive team on down is

14   driven on either EBIT production at the store level or

15   gross profit attainment.

16   Q.    And what is EBIT production?

17   A.    Earnings before interest and taxes.

18   Q.    Okay.  Does anyone else besides the owners take

19   part in -- it may have a technical title -- but in the

20   recurring revenue steam, or is that strictly the owners?

21   A.    Not to my knowledge.

22   Q.    And is Prime wholly owned by these two

23   individuals?

24   A.    Yes.

25   Q.    Okay.  And what are these individuals' names?

Electronically signed by Audrey Waldrop (101-425-145-7819)          311          360ed638-0b00-4584-8895-5b07be83f443

28

1    A.    Farid Virani, V-I-R-A-N-I.

2    Q.    Okay.

3    A.    And Akbar Mohamed.

4    Q.    Okay.  That's what I thought.  All right.  I'll

5    try and get back to where we were.

6         Okay.  If you look at Topic 4 on the notice, what

7    we're talking about here, what we're inquiring about is

8    processes and procedures for carrier and vendor rebates

9    and subsidies.  Do carriers often offer rebates or

10   anything -- or carrier.  I guess you guys really only

11   work with AT&T.  Is that correct?

12   A.    Correct.

13   Q.    So does AT&T have a rebate program?

14   A.    You're going to need to define a rebate.

15   Q.    Sure.  Some sort of promotion that AT&T wants,

16   you know, "x" phones sold, you know, more often than not

17   and so they sort of incentivize it to you by offering

18   some sort of a rebate.

19   A.    Yeah.  We call that a spiff.

20   Q.    Okay.

21   A.    But they do offer spiffs for certain activities

22   for defined periods of time.

23   Q.    Okay.  Are spiffs included in gross profit?

24   A.    May or may not.  It's -- it's really at our

25   discretion as to what we pass along and what we don't.

31

1    activation would qualify for a spiff.

2        Q.   Okay, okay.  I think we talked a little about

3    Topic 5 earlier.  As I understand it -- and I think this

4    has been testified to by a couple of people -- AT&T's

5    POS system and RQ4, they do or do not talk to each

6    other?

7        A.   They do not.

8        Q.   They do not talk to each other.  So do you, do

9    Prime locations have a POS -- an AT&T POS portal, or how

10   does the information get to AT&T?

11       A.   Yes, they -- actually, it's unfortunate, but

12   the reps have to enter into two separate systems.  So

13   they'll enter the transaction into RQ4 to relieve the

14   inventory, and it's a cash register.  The POS system is

15   to activate the account within AT&T's system.

16       Q.   Is there any sort of fail-safe to make sure

17   that the information going into one is the same as the

18   information going into the other?

19       A.   Unfortunately not.

20       Q.   Okay.  Do you have any sort of protocol where

21   your -- what do you guys do to maintain the fidelity of

22   RQ4 versus POS?

23       A.   We do a -- when the commission files are

24   received monthly from AT&T, we reconcile those back to

25   RQ4 data.

Electronically signed by Audrey Waldrop (101-425-145-7819)          313          360ed638-0b00-4584-8895-5b07be83f443

32

1    Q.    Okay.  And are you doing that by hand, or are

2    you doing that through a computer program?

3    A.    It's basically we are extracting data from both

4    files and manipulating those and sorting the information

5    in Excel.

6    Q.    Okay, okay.  And so using Excel to do that,

7    not -- not sort of -- I forget what the program is.

8    It's like Excel on steroids.  But it's Excel?

9    A.    It's Excel.

10   Q.    Excel is what you're using?

11   A.    Correct.

12   Q.    Okay.  And I imagine you have sort of a

13   standard spreadsheet that you're using to handle these

14   reconciliations?

15   A.    Yes.

16   Q.    Okay.  And has that been the case since, well,

17   as far back as you know?

18   A.    Yes.

19   Q.    Okay.  Do you know if that was the case before

20   you joined Prime?

21   A.    I can't say for sure.

22   Q.    Okay.  Okay.  Jumping ahead to Topic 6, so how

23   exactly does Prime calculate what a salesperson or a

24   sales manager is -- well, first let's say salesperson --

25   what a salesperson is owed and then what a sales manager

1    Q.    Uh-huh.

2    A.    For an OEM, no.

3    Q.    Okay.  What's the difference?

4    A.    An OEM would be a Samsung or a BlackBerry, a

5    Motorola.  We're buying those products directly from

6    AT&T.

7    Q.    Okay.

8    A.    So these guys are providing us back-end

9    incentives to help us buy the product down to a better

10    price for the consumer.

11    Q.    Okay.  So just so I'm clear, you might purchase

12    a Nokia phone from AT&T; but you might have a secondary

13    agreement with Nokia that has to do with sort of various

14    terms of that phone?

15    A.    It would be basically not necessarily terms

16    with the purchase of the phone but would provide us

17    back-end moneys for reaching certain levels of sales or

18    purchases from AT&T.

19    Q.    And would those be included in gross profit?

20    A.    They -- for the most part, yes; but there might

21    be situations where they're not.  So not in 100 percent

22    of situations.

23    Q.    Can you tell me why they wouldn't be included

24    in a hundred percent of the situations?

25    A.    As an example, what might occur is a credit

38

1   might come to Prime and we spend those moneys on

2   marketing activities, shirts, bags, retail radio within

3   the store, so things that, you know, prohibit us from

4   being able to pass the dollars down to the associate.

5   We're covering costs in another area of the business.

6        Q.   But if you're recovering costs, I guess my --

7   so gross profit does not take into account sort of

8   Prime's, like, costs of retail leasing or anything like

9   that?

10       A.   Correct.

11       Q.   Okay, okay.  So on occasion, as I understand

12  it, various agreements with Nokia or whomever might

13  result in some sort of incentive or payment to Prime.

14  Is that accurate?

15       A.   That's accurate.

16       Q.   And for the most part, those moneys that flow

17  to Prime from those agreements are included in gross

18  profit; is that correct?

19       A.   That's correct.

20       Q.   On occasion, they are not?

21       A.   That's correct.

22       Q.   And is that sort of done on a one-off basis, or

23  is that -- I mean, sort of how do you guys reach the

24  determination that, you know --

25       A.   It is a one-off.  Every -- every agreement's a



## Chargeback Policy

Prime Communications, L.P., is paid directly by carriers and 3rd party vendors for products and services sold on their behalf. The agreement between these carriers and vendors is dependant upon transactions being conducted accordingly by the specified carrier or vendor policies. As such, when an employee does not follow policy, the carrier or vendor charges Prime Communications back against commissions. Because chargeback's are caused when an employee does an activity incorrectly Prime Communications will charge back against earned commission. The list below is a list of the few potential Chargeback's. Please initial the left hand box indicting that you have read and understand about potential Chargeback's in each area.

| | |
|---|---|
| ABB | 1. Carrier Depds is NOT collected or refunded and incorrectly collected. |
| ABB | 2. Special Payments Discrepancies:-<br>• TIO (Bill Payment)<br>• PayGO (prepaid Refills)<br>• Netspend (debit Cards)<br>• Datapipe (Verizon prepaid and bill payment system) |
| ABB | 3. Activations/Upgrades/Prepaid Activity (Non commissionable or not allowed by Prime Communications from carrier):.<br>• Missing contracts<br>• Incorrect Activations<br>• Ineligible Upgrades<br>• Commitment Differences<br>• Out of market activity (Non commissionable or not allowed by Prime Communications).<br>• Unpaid Verticals<br>• Cancellations |
| ABB | 4. Sales and Media Audit:<br>• Any exceptions to any promotions which are not validated by TPFM (More discounts are given out then what are validated by Prime Communications). |
| ABB | 5. Signing for packages from UPS:<br>• Do not inform supply chain of missing items.<br>• Accept damaged boxes. |
| ABB | 6. Flipswap is a handset trade-in program:<br>• Fraudulent Transactions~ the phones don't exist.<br>• Phones don't get sent in on time, phones lose value over time which results in a smaller reimbursement from flipswap.<br>• Phones are rated improperly. |
| ABB | I acknowledge the above outlined policy and that if I resign voluntarily or involuntary I will have all my unpaid commissions held for 90 days. During this time period, any and all chargeback's from our vendors will be deducted from final commissions based on their individual chargeback's. |
| ABB | The final commission check will be paid out on the following scheduled commission pay date. |

Printed Name: Ashley Barnette

Signature: _(signature)_        Date: 10/27/08

## WAGE DEDUCTION AUTHORIZATION AGREEMENT

I understand and agree that my employer, Prime Communications, L.P. (the Company), may deduct money from my pay from time to time for reasons that fall into the following categories up to the maximum amount permitted by law per pay period:

1. my share of the premiums for the Company's group medical/dental plan;
2. any contributions I may make into a retirement, 401k, or pension plan sponsored, controlled, or managed by the Company;
3. installment payments on loans, store credit, or wage advances given to me by the Company, including the value of merchandise that I purchase or have purchased on my employee charge account, and if there is a balance remaining when I leave the Company, the balance of such loans, store credit, or advances;
4. if I receive an overpayment of wages for any reason, repayment to the Company of such overpayments;
5. the cost to the Company of personal long distance calls I may make on Company phones or on Company accounts, and of personal faxes sent by me or my Company equipment or Company accounts;
6. the cost of repairing or replacing any Company supplies, materials, equipment, money, or other property that I may damage (other than normal wear and tear), lose, fail to return, or take without appropriate authorization from the Company during my employment;
7. administrative fees in connection with court-ordered garnishments or legally required wage attachments of my pay, limited in extent to the amount or amounts allowed under applicable laws;
8. the post-paid and pre-paid sales are subject to a 180-day deactivation deduction or any vertical commissions, both of which may be deducted from my pay when the Company is informed of same; and
9. in the event of separation from the company, the Company is authorized to withhold my final commission check for a period of 90 days in lieu of future de-activation charge-backs.

I agree that the Company may deduct money from my pay under the above circumstances, or if any of the above situations occur.

Full Name: Ashley Brooke Barnett

Date: 10/27/08



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 5:11-cv-69-H

ROSE LORENZO,

        Plaintiff,

vs.

PRIME COMMUNICATIONS, L.P.,

        Defendant.

DEPOSITION OF

ASHLEY BARNETTE

WEDNESDAY, FEBRUARY 27, 2013
10:15 A.M.

LAW OFFICES OF SMITH & JONES
272 ANYWHERE STREET
RALEIGH, NORTH CAROLINA

Page 89

1    entitle you to overtime, correct?

2            A    Exactly.  That fulfill managerial duties.

3            Q    Okay.  When you were promoted to store

4    manager, did you do so under the understanding that you

5    were going to be receiving a salary and not eligible for

6    overtime?

7            A    When I became a store manager?  Yes.  I did

8    know that I was going to be put on salary.

9            Q    What else was told to you about the changes

10   in your pay from being a solution specialist to a manager?

11           A    That I was going to be paid commission on my

12   store's progress.

13           Q    So you would get a bonus on the store's

14   progress, not just your own personal sales; is that right?

15           A    Exactly.

16           MR. WALKER:    Was this (indicating) 22?

17           MR. BUTLER:    The next will be 23.  Yeah,

18       that was 22.

19                           (Defendant's Exhibit No. 23 was

20                           marked for identification.)

21       BY MR. WALKER:

22           Q    Let me show you what's been marked as

23   Exhibit 23.  Do you recall this document?

24           A    (Witness reviews exhibit.)  I do not.

25           Q    Is that your handwriting on the bottom there

```
 1    where it says, ''Ashley Brooke Barnette, 10-27-2008''?
 2             A    I believe so.
 3             Q    But you said you don't -- you don't recall
 4    ever receiving this document?
 5             A    I don't recall it, personally.  It was in
 6    2008.
 7             Q    Okay.  And that -- that's around the same
 8    time you started with Prime Communications?
 9             A    Yes.
10             Q    Looking at paragraph eight of this document,
11    which is entitled "Wage Deduction Authorization
12    Agreement," if you'll read along with me, it says, "The
13    post-paid and pre-paid sales are subject to 180-day
14    deactivation deductions'' -- I can't read the rest of
15    that -- ''or vertical commissions, both of which may be
16    deducted from my pay when the Company is informed of the
17    same."  The ''180-day,'' was that the six-month chargebacks
18    that you were talking about earlier?
19             A    Yes.
20             Q    Okay.  And was it explained to you when you
21    first joined Prime Communications in October or November
22    of 2008 that you would be charged back for any sales that
23    customers returned phones or cancelled any -- what do they
24    call it?
25                  MR. DUNN:      Features.
```

1          A     I don't, but he hit such a high percentage

2   he should have got something. It should have been at

3   least 100 bucks, something.

4          Q     And what was that employee's name?

5          A     Justin Jernigan.

6          Q     Can you spell ``Jernigan'' for me?

7          A     J-e-r-n-i-g-a-n.

8          Q     Okay. Thank you. Have you ever made any

9   complaints to the North Carolina Department of Labor about

10   your employment at Prime Communications?

11          A     No.

12          Q     We talked about, as a solution specialist,

13   any issues or problems that you had with Prime. We didn't

14   limit it to solution specialist. We didn't talk about

15   store manager, but any issues or problems that you had

16   with Prime as a store manager?

17          A     Just the things that I've spoken to you

18   about.

19          Q     Okay. And I understand that -- that part of

20   your complaint about the chargeback policy is that you

21   haven't -- you don't have a way to verify the charge back

22   policies, or you don't have any way to verify the charge

23   backs that are brought against you or against your sales.

24   But other than that, do you have any problems with the

25   chargeback policy as the way it exists?

Page 132

1          A    Just not being paid what I'm supposed to get

2     paid for --

3          Q    Okay.

4          A    -- and then not being able to check it; my

5     employees not getting their paycheck when they leave.

6          Q    Okay.

7          A    That's, pretty much, it.  I mean, just not

8     being paid, and not knowing what I get paid, and why I get

9     paid it.

10         Q    Let me do this.  We'll do a hypothetical.  I

11    think it might answer --

12         A    Uh-huh (yes).

13         Q    -- help me answer the question.  You sell a

14    phone to someone.  Within six months, they just return the

15    phone to AT&T.  But before they return it, you were paid a

16    commission on that sale of the phone.

17         A    Uh-huh (yes).

18         Q    Okay?  And then AT&T chargebacks Prime,

19    Prime then charges you back for that phone, because they

20    have paid you a commission that you didn't actually earn

21    because it was within that six-month window.  Do you

22    follow me?

23         A    Yeah, but how do I know that?

24         Q    Okay.  Other than the fact that you don't

25    know if they actually turned the phone in --

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION
## Civil Action No. 5:12-cv-69-H

| | | |
|---|---|---|
| ROSE LORENZO, | ) | |
| | ) | |
| Plaintiff, | ) | **DEFENDANT PRIME** |
| | ) | **COMMUNICATIONS, L.P.'S** |
| v. | ) | **RESPONSES TO PLAINTIFF'S** |
| | ) | **FIRST INTERROGATORIES AND** |
| PRIME COMMUNICATIONS, L.P., | ) | **REQUEST FOR PRODUCTION** |
| | ) | **OF DOCUMENTS** |
| Defendant. | ) | |
| | ) | |

NOW COMES Defendant Prime Communication, L.P. ("Defendant"), by and through its counsel, and responds to Plaintiff's First Interrogatories and Request for Production of Documents.

### GENERAL OBJECTIONS

1.    Defendant objects to the definitions and instructions to the extent that they expand or differ from the Federal Rules of Civil Procedure.

2.    Defendant objects to the extent any request seeks confidential or proprietary business data or information.

3.    Defendant objects to the extent any of these requests seek information protected by the attorney/client privilege and/or the work product doctrine.

These general objections are incorporated in full into each and every response given below.

1

## INTERROGATORIES

1.    Describe how You calculate gross profit and if any of the factors You use to calculate gross profit have changed since January 1, 2009, identify those factors and describe how they impacted Your gross profit calculation. If gross profit is calculated differently for different purposes, identify and describe in detail, each gross profit calculation and the purpose for which it is calculated.

**RESPONSE: Gross Profit is calculated as all the revenues from the sale of a handset, minus its wholesale cost. Revenues from the sale of a handset come primarily from three sources: (1) Commissions paid by AT&T for signing a customer to a 2-year agreement, (2) Subsidies paid by AT&T to lower the retail price of a handset, when sold on a 2-year contract, and (3) the retail price paid by the customer at point of sale. The wholesale cost of the handset is the full cost of the handset, which is much higher than the amount paid by a customer on a 2-year contract. Method of Calculation has not changed since 2009, though the handset selection and payments made by AT&T have changed since then.**

2.    Identify and describe all documents evidencing all sales made by commission earned by and chargebacks made to Plaintiff during her employment.

**RESPONSE: The Commission Statements of Rose Lorenzo, including chargebacks, are attached as Exhibit A.**

3.    Identify and describe all documents evidencing all sales originating in the Middle Creek Commons store from February 1, 2010 through August 1, 2011.

**RESPONSE: OBJECTION. Defendant objects to the extent this request is too broad, unreasonably cumulative, unduly burdensome, and seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Without waiving objection, Defendant states: Please see Exhibit A, which is the Commission Statements of Rose Lorenzo during her employment.**

4.    Identify and describe all documents evidencing sales originating in the Middle Creek Commons store from February 1, 2010 through August 1, 2011 that were omitted from calculations of store gross profit and the reason therefore.

**RESPONSE: OBJECTION. Defendant objects to the extent this request is too broad, unreasonably cumulative, unduly burdensome, and seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Without waiving objection, Defendant states: Please see Exhibit A, which is the Commission Statements of Rose Lorenzo during her employment.**

5.     Identify and describe all documents evidencing all chargebacks made to Middle Creek Commons store and to any employee who worked at the Middle Creek Commons store from February 1, 2010 through August 1, 2011, specifying the basis therefore.

**RESPONSE: Defendant objects to the extent this request is too broad, unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Without waiving objection, Defendant states: Please see Exhibit A, which is the Commission Statements of Rose Lorenzo during her employment.**

6.     Identify and describe all documents evidencing all chargebacks made to the Middle Creek Commons store and to any employee who worked at the Middle Creek Commons store, based upon sales occurring between August 1, 2009 and February 1, 2010.

**RESPONSE: Defendant objects to the extent this request is too broad, unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Without waiving objection, Defendant states: Please see Exhibit A, which is the Commission Statements of Rose Lorenzo during her employment.**

7.     Identify and describe all documents evidencing all process(es) by which Your inventory is tracked, ordered, distributed and accounted for and Your inventory shortages are charged back to store managers.

**RESPONSE: OBJECTION. Defendant objects to the extent this request is overly broad unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Without waiving any stated objection, Defendant states: Inventory gross profit (the device sales price to consumer less cost) is tracked in RQ4 and included in the commission payout calculations provided. Shrinkage is determined based upon monthly physical inventory counts performed by store personnel, which is reconciled to the book balance in RQ4. Any shrinkage is noted and adjusted from commission/bonus payments due.**

8.     Identify and describe all documents evidencing the inter-relationship between AT&T's POS system and your RQ4 system, including all systems, hardware, software, data transfers or other means by which the two systems communicate, access or share information, including in your answer all process(es) by which you correlate sales and/or commissions.

**RESPONSE: OBJECTION. Defendant objects to the extent this request is overly broad unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Additionally Defendant does not own POS or RQ4 and simply can't provide the breadth of information that is being requested by the Plaintiff.**

3

9. Describe in detail the process(es) by which you confirm sales for purposes of commissions and any change(s) in those process(es) from January 1, 2009 to present, identifying all documents related to such process(es).

**RESPONSE: OBJECTION. Defendant objects to the extent this request is overly broad unreasonably cumulative, and unduly burdensome. Without waiving any stated objection, Defendant states: Please see attached as Exhibit B, a step-by-step process for paying Defendant employees commissions/bonuses earned.**

10. Describe in detail the process(es) by which you confirm carrier or vendor chargebacks and any change(s) in those process(es) from January 1, 2009 to present, identifying all documents related to such process(es).

**RESPONSE: OBJECTION. Defendant objects to the extent this request is overly broad unreasonably cumulative, and unduly burdensome. Without waiving any stated objection, Defendant states: Please see attached as Exhibit B, a step-by-step process for paying Defendant employees commissions/bonuses earned.**

11. Identify and describe all documents evidencing all carrier or vendor policies in effect from January 1, 2009 through present for which a failure to follow results in a carrier or vendor chargeback.

**RESPONSE: OBJECTION. Defendant objects to the extent this request is overly broad, unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Additionally, this request calls for proprietary information of Defendant and third parties which Defendant does not unilaterally have the authority to disclose. Without waiving any objection, Defendant states: Defendant is willing to produce applicable portions of the dealer agreement and payment schedule/addenda with their carriers and vendors that relate to dealer commissions and chargebacks on the condition that a confidentiality agreement is executed between the parties.**

12.     Identify and describe each written agreement between you and AT&T, including any and all agreements related to commission, rebates and/or chargebacks.

**RESPONSE: OBJECTION. Defendant objects to the extent this request is overly broad, unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Additionally, this request calls for proprietary information of Defendant and third parties which Defendant does not unilaterally have the authority to disclose. Without waiving any objection, Defendant states: Defendant is willing to produce applicable portions of the dealer agreement and payment schedule/addenda with their carriers and vendors that relate to dealer commissions and chargebacks on the condition that a confidentiality agreement is executed between the parties.**

13.     Identify and describe each written agreement between you and any vendor of communications devices including, but not limited, devices commonly referred to as Nokia, Samsung, LG, Apple, iPhone, Blackberry and Palm.

**RESPONSE: OBJECTION. Defendant objects to the extent this request is overly broad, unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Additionally, this request calls for proprietary information of Defendant and third parties which Defendant does not unilaterally have the authority to disclose.**

14.     Identify all sales, upgrades, features added or cancelled, activations, deactivations, commissions and chargebacks occurring between January 1, 2009 and the present, for telephone numbers (919) 449-5965, (919) 601-4691 and (919) 536-9909.

**RESPONSE: OBJECTION. Defendant objects to the extent this request is overly broad, unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Additionally, this request calls for proprietary information of Defendant and third parties which Defendant does not unilaterally have the authority to disclose. Additionally, Defendant cannot respond to this request without worry of violating CPNI covenants which prevent unauthorized disclosure of customer information.**

## REQUEST FOR PRODUCTION OF DOCUMENTS

1.     All documents identified, consulted, reviewed or referenced in your response to Plaintiff's First Interrogatories.

**RESPONSE: OBJECTION. Defendant objects to the extent this request is overly broad, unduly burdensome, unreasonably cumulative and vague.   Additionally, this request seeks documents that are privileged, proprietary and/or protected by the attorney-client privilege and seeks documents or things prepared in anticipation of litigation or for trial by a representative of defendant without the requisite showing.   Without waiving stated objection, Defendant states:   All documents, not otherwise privileged, proprietary, or protected and that pertain to the responses above are attached to these discovery.**

2.     Sales reports, commission reports and chargeback reports for Middle Creek Commons or for all employees who worked at the Middle Creek Commons store from February 1, 2010 through August 1, 2011.

**RESPONSE: OBJECTION. Defendant objects to the extent this request is too broad, unreasonably cumulative, unduly burdensome, unduly expensive, and seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Without waiving objection, Defendant states: Please see Exhibit A, which is the Commission Statements of Rose Lorenzo during her employment.**

3.     All documents by which You confirmed sales for purposes of commissions and by which You confirmed carrier or vendor chargebacks from January 1, 2009 to present.

**RESPONSE: OBJECTION. Defendant objects to the extent this request is too broad, unreasonably cumulative, unduly burdensome, unduly expensive, and seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Without waiving objection, Defendant states: Please see Exhibit A, which is the Commission Statements of Rose Lorenzo during her employment.**

4.     All carrier or vendor policies in effect from January 1, 2009 through present for which a failure to follow results in a carrier or vendor chargeback.

**RESPONSE: OBJECTION. Defendant objects to the extent this request is overly broad, unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action.   Additionally, this request calls for proprietary information of Defendant and third parties which Defendant does not unilaterally have the authority to disclose.   Without waiving any objection, Defendant states:   Defendant is willing to produce applicable portions of the dealer agreement and payment schedule/addenda with their carriers and vendors that relate to dealer commissions and chargebacks on the condition that a confidentiality agreement is executed between the parties.**

5.     All written agreements between You and AT&T having any bearing on compensation of Your retail location employees.

**RESPONSE: OBJECTION. Defendant objects to the extent this request is overly broad, unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Additionally, this request calls for proprietary information of Defendant and third parties which Defendant does not unilaterally have the authority to disclose. Without waiving any objection, Defendant states: Defendant is willing to produce applicable portions of the dealer agreement and payment schedule/addenda with their carriers and vendors that relate to dealer commissions and chargebacks on the condition that a confidentiality agreement is executed between the parties.**

6.     All written agreements between You and AT&T having any bearing on the permissible responsibilities and duties of Your retail location employees.

**RESPONSE: OBJECTION. Defendant objects to the extent this request is overly broad, unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Additionally, this request calls for proprietary information of Defendant and third parties which Defendant does not unilaterally have the authority to disclose. Without waiving any objection, Defendant states: Defendant is willing to produce applicable portions of the dealer agreement and payment schedule/addenda with their carriers and vendors that relate to dealer commissions and chargebacks on the condition that a confidentiality agreement is executed between the parties.**

7.     All written agreements between you and AT&T having any bearing on how You operate Your retail locations.

**RESPONSE: OBJECTION. Defendant objects to the extent this request is overly broad, unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Additionally, this request calls for proprietary information of Defendant and third parties which Defendant does not unilaterally have the authority to disclose. Without waiving any objection, Defendant states: Defendant is willing to produce applicable portions of the dealer agreement and payment schedule/addenda with their carriers and vendors that relate to dealer commissions and chargebacks on the condition that a confidentiality agreement is executed between the parties.**

8.     All written agreements between You and any vendor of communications devices, including but not limited, devices commonly referred to as Nokia, Samsung, LG Apply, iPhone, Blackberry and Palm.

**RESPONSE: OBJECTION. Defendant objects to the extent this request is overly broad, unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Additionally, this request calls for proprietary information of Defendant and third parties which Defendant does not unilaterally have the authority to disclose.**

Respectfully submitted this the 11th day of February 2013.

RAGSDALE LIGGETT, PLLC

BY: _____

John B. Walker
N.C. State Bar No.: 35631
Post Office Box 31507
Raleigh, NC27622-1507
Email: bwalker@rl-law.com
Telephone:     (919) 787-5200
Facsimile:     (919) 783-8991
*Attorneys for Defendant Prime Communications, L.P.*

8

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of February, 2013, the foregoing **DEFENDANT PRIME COMMUNICATIONS, L.P.'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS** have been duly served upon all parties by electronic mail and by mailing a copy of same to the following counsel of record:

Stephen A. Dunn, Esq.
EMANUEL & DUNN, PLLC
Post Office Box 426
Raleigh, NC 27602
*Counsel for Plaintiff*
sdunn@emanuelanddunn.com

Raymond E. Dunn, Jr., Esq.
Charles J. Cushman, Esq.
EMANUEL & DUNN, PLLC
Post Office Box 1389
New Bern, NC 28563
*Counsel for Plaintiff*
rdunn@emanuelanddunn.com
ccushman@emanuelanddunn.com

Harris D. Butler III, Esq.
Zev H. Antell, Esq.
BUTLER ROYALS, PLC
100 Shockoe Slip, 4th Floor
Richmond, VA 23219
Harris.butler@butlerroyals.com
Zev.antell@butlerroyals.com
*Counsel for Plaintiff*

**RAGSDALE LIGGETT, PLLC**

BY: _____
John B. Walker
Post Office Box 31507
Raleigh, NC 27622-1507
Email: bwalker@rl-law.com
Telephone:    (919) 787-5200
Facsimile:    (919) 783-8991
*Attorneys for Defendant Prime
Communications, L.P.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
#### Civil Action No. 5:12-cv-69-H

|  |  |  |
|---|---|---|
| ROSE LORENZO, | ) | |
| | ) | |
| Plaintiff, | ) | **DEFENDANT PRIME** |
| | ) | **COMMUNICATIONS, L.P.'S** |
| v. | ) | **SUPPLEMENTAL RESPONSES** |
| | ) | **TO PLAINTIFF'S FIRST** |
| PRIME COMMUNICATIONS, L.P., | ) | **INTERROGATORIES AND** |
| | ) | **REQUEST FOR PRODUCTION** |
| Defendant. | ) | **OF DOCUMENTS** |
| | ) | |

NOW COMES Defendant Prime Communication, L.P. ("Defendant"), by and through its counsel, and provides its **supplemental responses** to Plaintiff's First Interrogatories and Request for Production of Documents.

## GENERAL OBJECTIONS

1.    Defendant objects to the definitions and instructions to the extent that they expand or differ from the Federal Rules of Civil Procedure.

2.    Defendant objects to the extent any request seeks confidential or proprietary business data or information.

3.    Defendant objects to the extent any of these requests seek information protected by the attorney/client privilege and/or the work product doctrine.

These general objections are incorporated in full into each and every response given below.

# INTERROGATORIES

1.    Describe how You calculate gross profit and if any of the factors You use to calculate gross profit have changed since January 1, 2009, identify those factors and describe how they impacted Your gross profit calculation.  If gross profit is calculated differently for different purposes, identify and describe in detail, each gross profit calculation and the purpose for which it is calculated.

**PRIOR RESPONSE:**       Gross Profit is calculated as all the revenues from the sale of a handset, minus its wholesale cost. Revenues from the sale of a handset come primarily from three sources: (1) Commissions paid by AT&T for signing a customer to a 2-year agreement, (2) Subsidies paid by AT&T to lower the retail price of a handset, when sold on a 2-year contract, and (3) the retail price paid by the customer at point of sale.  The wholesale cost of the handset is the full cost of the handset, which is much higher than the amount paid by a customer on a 2-year contract.  Method of Calculation has not changed since 2009, though the handset selection and payments made by AT&T have changed since then.

**SUPPLEMENTAL RESPONSE:  Without waiving prior objection, Defendant states:** The vast majority of the Gross Profit is derived from handset and accessory sales. Gross Profit for accessories is determined by the sale of the accessory minus the cost of the accessory.  Other potential sources for Gross Profit come from "wireline" transactions (i.e. cable TV, namely U-Verse by AT&T), high speed internet, iShield, and any processing fees, such as restocking fees or features sold without an activation.  However, these sources of profit are de minimis in comparison to the Gross Profit derived from handset and accessory sales.  Also, please refer to the previously provided Exhibit A which provides the potential sources of Gross Profit on the tab labeled "Payout Summary" for each month of data provided.

2.    Identify and describe all documents evidencing all sales made by commission earned by and chargebacks made to Plaintiff during her employment.

**PRIOR RESPONSE:** The Commission Statements of Rose Lorenzo, including chargebacks, are attached as Exhibit A.

**SUPPLEMENTAL RESPONSE:  Without waiving prior objection, Defendant states:** Prime is essentially a "paperless" company and therefore, does not retain any documents that would be responsive to this request. However, the information for all sales is maintained in the RQ4 database located on Prime's local server. A list of the type of information retained by Prime in the RQ4 database is attached as Exhibit C.  The information obtained for Exhibit A was to provide Plaintiff with all transactions and chargebacks at the Middle Creek Commons store while Rose Lorenzo was store manager. Any documents evidencing a sale, such as a receipt, are provided to the customer at the time of sale.  A copy of a sales receipt is retained by each Store Manager for 6 months from the date of sale and then shredded, in order to ensure that customer CPNI information is

2

protected. This is a requirement of AT&T that the information is shredded on a periodic basis in order to protect their customer information. For the shredding process, prior to October 2012, all documents held by a Store Manager would be sent to Prime after 6 months, and then held by Prime at their storage facility. Prime would contract with Southern Shredding to perform the shredding of these documents on-site. The frequency varied on how quickly the paperwork accumulated. After October 2012, Prime hired Iron Mountain, a third party vendor, that supplies bins for documents to be shredded at each store location. Iron Mountain performs a monthly pick-up of these documents to be shredded.

3.    Identify and describe all documents evidencing all sales originating in the Middle Creek Commons store from February 1, 2010 through August 1, 2011.

**PRIOR RESPONSE: OBJECTION.** Defendant objects to the extent this request is too broad, unreasonably cumulative, unduly burdensome, and seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Without waiving objection, Defendant states: Please see Exhibit A, which is the Commission Statements of Rose Lorenzo during her employment.

**SUPPLEMENTAL RESPONSE:** Without waiving prior objection, Defendant states: Prime is essentially a "paperless" company and therefore, does not retain any documents that would be responsive to this request. However, the information for all sales is maintained in the RQ4 database located on Prime's local server. A list of the type of information retained by Prime in the RQ4 database is attached as Exhibit C. The information obtained for Exhibit A was to provide Plaintiff with all transactions and chargebacks at the Middle Creek Commons store while Rose Lorenzo was store manager. Any documents evidencing a sale, such as a receipt, are provided to the customer at the time of sale. A copy of a sales receipt is retained by each Store Manager for 6 months from the date of sale and then shredded, in order to ensure that customer CPNI information is protected. This is a requirement of AT&T that the information is shredded on a periodic basis in order to protect their customer information. For the shredding process, prior to October 2012, all documents held by a Store Manager would be sent to Prime after 6 months, and then held by Prime at their storage facility. Prime would contract with Southern Shredding to perform the shredding of these documents on-site. The frequency varied on how quickly the paperwork accumulated. After October 2012, Prime hired Iron Mountain, a third party vendor, that supplies bins for documents to be shredded at each store location. Iron Mountain performs a monthly pick-up of these documents to be shredded.

3

4. Identify and describe all documents evidencing sales originating in the Middle Creek Commons store from February 1, 2010 through August 1, 2011 that were omitted from calculations of store gross profit and the reason therefore.

**PRIOR RESPONSE: OBJECTION. Defendant objects to the extent this request is too broad, unreasonably cumulative, unduly burdensome, and seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Without waiving objection, Defendant states: Please see Exhibit A, which is the Commission Statements of Rose Lorenzo during her employment.**

**SUPPLEMENTAL RESPONSE: Without waiving prior objection, Defendant states: Prime is essentially a "paperless" company and therefore, does not retain any documents that would be responsive to this request. However, the information for all sales is maintained in the RQ4 database located on Prime's local server. A list of the type of information retained by Prime in the RQ4 database is attached as Exhibit C. The information obtained for Exhibit A was to provide Plaintiff with all transactions and chargebacks at the Middle Creek Commons store while Rose Lorenzo was store manager. Any documents evidencing a sale, such as a receipt, are provided to the customer at the time of sale. A copy of a sales receipt is retained by each Store Manager for 6 months from the date of sale and then shredded, in order to ensure that customer CPNI information is protected. This is a requirement of AT&T that the information is shredded on a periodic basis in order to protect their customer information. For the shredding process, prior to October 2012, all documents held by a Store Manager would be sent to Prime after 6 months, and then held by Prime at their storage facility. Prime would contract with Southern Shredding to perform the shredding of these documents on-site. The frequency varied on how quickly the paperwork accumulated. After October 2012, Prime hired Iron Mountain, a third party vendor, that supplies bins for documents to be shredded at each store location. Iron Mountain performs a monthly pick-up of these documents to be shredded.**

5. Identify and describe all documents evidencing all chargebacks made to Middle Creek Commons store and to any employee who worked at the Middle Creek Commons store from February 1, 2010 through August 1, 2011, specifying the basis therefore.

**PRIOR RESPONSE: Defendant objects to the extent this request is too broad, unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Without waiving objection, Defendant states: Please see Exhibit A, which is the Commission Statements of Rose Lorenzo during her employment.**

**SUPPLEMENTAL RESPONSE: Without waiving prior objection, Defendant states: Prime is essentially a "paperless" company and therefore, does not retain any documents that would be responsive to this request. However, the information for all sales is maintained in the RQ4 database located on Prime's local server. A list of the type of information retained by Prime in the RQ4 database is attached as Exhibit C. The**

307687

information obtained for Exhibit A was to provide Plaintiff with all transactions and chargebacks at the Middle Creek Commons store while Rose Lorenzo was store manager. Any documents evidencing a sale, such as a receipt, are provided to the customer at the time of sale. A copy of a sales receipt is retained by each Store Manager for 6 months from the date of sale and then shredded, in order to ensure that customer CPNI information is protected. This is a requirement of AT&T that the information is shredded on a periodic basis in order to protect their customer information. For the shredding process, prior to October 2012, all documents held by a Store Manager would be sent to Prime after 6 months, and then held by Prime at their storage facility. Prime would contract with Southern Shredding to perform the shredding of these documents on-site. The frequency varied on how quickly the paperwork accumulated. After October 2012, Prime hired Iron Mountain, a third party vendor, that supplies bins for documents to be shredded at each store location. Iron Mountain performs a monthly pick-up of these documents to be shredded.

6.      Identify and describe all documents evidencing all chargebacks made to the Middle Creek Commons store and to any employee who worked at the Middle Creek Commons store, based upon sales occurring between August 1, 2009 and February 1, 2010.

**PRIOR RESPONSE: Defendant objects** to the extent this request is too broad, unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Without waiving objection, Defendant states: Please see Exhibit A, which is the Commission Statements of Rose Lorenzo during her employment.

**SUPPLEMENTAL RESPONSE: Without waiving** prior objection, Defendant states: Prime is essentially a "paperless" company and therefore, does not retain any documents that would be responsive to this request. However, the information for all sales is maintained in the RQ4 database located on Prime's local server. A list of the type of information retained by Prime in the RQ4 database is attached as Exhibit C. The information obtained for Exhibit A was to provide Plaintiff with all transactions and chargebacks at the Middle Creek Commons store while Rose Lorenzo was store manager. Any documents evidencing a sale, such as a receipt, are provided to the customer at the time of sale. A copy of a sales receipt is retained by each Store Manager for 6 months from the date of sale and then shredded, in order to ensure that customer CPNI information is protected. This is a requirement of AT&T that the information is shredded on a periodic basis in order to protect their customer information. For the shredding process, prior to October 2012, all documents held by a Store Manager would be sent to Prime after 6 months, and then held by Prime at their storage facility. Prime would contract with Southern Shredding to perform the shredding of these documents on-site. The frequency varied on how quickly the paperwork accumulated. After October 2012, Prime hired Iron Mountain, a third party vendor, that supplies bins for documents to be shredded at each store location. Iron Mountain performs a monthly pick-up of these documents to be shredded.

307687

7.     Identify and describe all documents evidencing all process(es) by which Your inventory is tracked, ordered, distributed and accounted for and Your inventory shortages are charged back to store managers.

**PRIOR RESPONSE: OBJECTION.** Defendant objects to the extent this request is overly broad unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Without waiving any stated objection, Defendant states: Inventory gross profit (the device sales price to consumer less cost) is tracked in RQ4 and included in the commission payout calculations provided. Shrinkage is determined based upon monthly physical inventory counts performed by store personnel, which is reconciled to the book balance in RQ4. Any shrinkage is noted and adjusted from commission/bonus payments due.

**SUPPLEMENTAL RESPONSE:**  Without waiving prior objection, Defendant states: Inventory is tracked in RQ4. When new inventory arrives at a location it is checked and recorded into RQ4 by the Store Manager. The Store Manager is in charge of conducting IMEI audits to catch any discrepancies with the inventory. IMEI are the bar codes on the packing slip and are scanned into RQ4 when the inventory is received. As inventory is sold, it is removed from RQ4 when the sale is tendered. Once a month a "blind" inventory reconciliation is performed by Prime to account for inventory shrinkage. Any inventory shrinkage is charged 100% to the manager. It is the manager's responsibility to receive, account for and manage the inventory for their store. The Store Manager is also responsible for reporting any discrepancy with any inventory shipments immediately. This can be done by comparing a given shipment with the package slip that accompanies each shipment that is provided by the third party shipping company (UPS, FedEx, etc.) These package slips are not required to be held by the store once inventory is checked and entered in to RQ4.

8.     Identify and describe all documents evidencing the inter-relationship between AT&T's POS system and your RQ4 system, including all systems, hardware, software, data transfers or other means by which the two systems communicate, access or share information, including in your answer all process(es) by which you correlate sales and/or commissions.

**PRIOR RESPONSE: OBJECTION.** Defendant objects to the extent this request is overly broad unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action.  Additionally Defendant does not own POS or RQ4 and simply can't provide the breadth of information that is being requested by the Plaintiff.

**SUPPLEMENTAL RESPONSE:** Without waiving prior objection, Defendant states: RQ4 and POS do not "talk" to each other.  Prime uses a double entry system.  It is the responsibility of the Store Manager to ensure that sale entry information is properly put into both systems.  Every morning the Store Manager should ensure that the prior day's paperwork matches the sales entered into each system.  In order to calculate commissions and/or bonuses earned, AT&T provides a report of all paid commissions for sales and chargebacks. This information is matched with RQ4 to assign those sales and/or

6

chargebacks to the proper store and employee. Prime first uses the CTN to track customer records to locate the store and/or employee. If no matches occur with CTN, Prime next uses the customer's name to track the sale or the chargeback. If a match cannot be made, Prime pays the chargeback.

9.    Describe in detail the process(es) by which you confirm sales for purposes of commissions and any change(s) in those process(es) from January 1, 2009 to present, identifying all documents related to such process(es).

**PRIOR RESPONSE: OBJECTION. Defendant objects to the extent this request is overly broad unreasonably cumulative, and unduly burdensome. Without waiving any stated objection, Defendant states: Please see attached as Exhibit B, a step-by-step process for paying Defendant employees commissions/bonuses earned.**

**SUPPLEMENTAL RESPONSE: Without waiving prior objection, Defendant states: RQ4 and POS do not "talk" to each other. Prime uses a double entry system. It is the responsibility of the Store Manager to ensure that sale entry information is properly put into both systems. Every morning the Store Manager should ensure that the prior day's paperwork matches the sales entered into each system. In order to calculate commissions and/or bonuses earned, AT&T provides a report of all paid commissions for sales and chargebacks. This information is matched with RQ4 to assign those sales and/or chargebacks to the proper store and employee. Prime first uses the CTN to track customer records to locate the store and/or employee. If no matches occur with CTN, Prime next uses the customer's name to track the sale or the chargeback. If a match cannot be made, Prime pays the chargeback.**

10.    Describe in detail the process(es) by which you confirm carrier or vendor chargebacks and any change(s) in those process(es) from January 1, 2009 to present, identifying all documents related to such process(es).

**PRIOR RESPONSE: OBJECTION. Defendant objects to the extent this request is overly broad unreasonably cumulative, and unduly burdensome. Without waiving any stated objection, Defendant states: Please see attached as Exhibit B, a step-by-step process for paying Defendant employees commissions/bonuses earned.**

**SUPPLEMENTAL RESPONSE: Without waiving prior objection, Defendant states: RQ4 and POS do not "talk" to each other. Prime uses a double entry system. It is the responsibility of the Store Manager to ensure that sale entry information is properly put into both systems. Every morning the Store Manager should ensure that the prior day's paperwork matches the sales entered into each system. In order to calculate commissions and/or bonuses earned, AT&T provides a report of all paid commissions for sales and chargebacks. This information is matched with RQ4 to assign those sales and/or chargebacks to the proper store and employee. Prime first uses the CTN to track customer**

307687

records to locate the store and/or employee. If no matches occur with CTN, Prime next uses the customer's name to track the sale or the chargeback. If a match cannot be made, Prime pays the chargeback.

11.    Identify and describe all documents evidencing all carrier or vendor policies in effect from January 1, 2009 through present for which a failure to follow results in a carrier or vendor chargeback.

**PRIOR RESPONSE: OBJECTION. Defendant objects to the extent this request is overly broad, unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Additionally, this request calls for proprietary information of Defendant and third parties which Defendant does not unilaterally have the authority to disclose. Without waiving any objection, Defendant states: Defendant is willing to produce applicable portions of the dealer agreement and payment schedule/addenda with their carriers and vendors that relate to dealer commissions and chargebacks on the condition that a confidentiality agreement is executed between the parties.**

**SUPPLEMENTAL RESPONSE: Without waiving prior objection, Defendant states: Prime has an Exclusive South East Regional Dealer Agreement with AT&T, which is confidential and contains proprietary information. However, Prime is willing to share applicable portions of this agreement after execution of a mutually agreed upon Protective Order. Also, Prime has similar vendor agreements with third-party accessory companies such as Tessco. These agreements are also confidential and contain proprietary information, none of which is relevant to the issues in this pending lawsuit.**

12.    Identify and describe each written agreement between you and AT&T, including any and all agreements related to commission, rebates and/or chargebacks.

**PRIOR RESPONSE: OBJECTION. Defendant objects to the extent this request is overly broad, unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Additionally, this request calls for proprietary information of Defendant and third parties which Defendant does not unilaterally have the authority to disclose. Without waiving any objection, Defendant states: Defendant is willing to produce applicable portions of the dealer agreement and payment schedule/addenda with their carriers and vendors that relate to dealer commissions and chargebacks on the condition that a confidentiality agreement is executed between the parties.**

**SUPPLEMENTAL RESPONSE: Without waiving prior objection, Defendant states: Prime has an Exclusive South East Regional Dealer Agreement with AT&T, which is confidential and contains proprietary information. However, Prime is willing to share applicable portions of this agreement after execution of a mutually agreed upon Protective Order.**

13.    Identify and describe each written agreement between you and any vendor of communications devices including, but not limited, devices commonly referred to as Nokia, Samsung, LG, Apple, iPhone, Blackberry and Palm.

**PRIOR RESPONSE: OBJECTION. Defendant objects to the extent this request is overly broad, unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Additionally, this request calls for proprietary information of Defendant and third parties which Defendant does not unilaterally have the authority to disclose.**

**SUPPLEMENTAL RESPONSE: Without waiving prior objection, Defendant states: Prime has an Exclusive South East Regional Dealer Agreement with AT&T, which is confidential and contains proprietary information. However, Prime is willing to share applicable portions of this agreement after execution of a mutually agreed upon Protective Order. Prime sells phones from other carriers, but there is no written agreement with those companies. However those sales are de minimis in comparison to the overall gross profit of Prime.**

14.    Identify all sales, upgrades, features added or cancelled, activations, deactivations, commissions and chargebacks occurring between January 1, 2009 and the present, for telephone numbers (919) 449-5965, (919) 601-4691 and (919) 536-9909.

**PRIOR RESPONSE: OBJECTION. Defendant objects to the extent this request is overly broad, unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Additionally, this request calls for proprietary information of Defendant and third parties which Defendant does not unilaterally have the authority to disclose. Additionally, Defendant cannot respond to this request without worry of violating CPNI covenants which prevent unauthorized disclosure of customer information.**

**SUPPLEMENTAL RESPONSE: Without waiving prior objection, Defendant states: Prime cannot provide customer information due to FCC and the Federal Communications Act of 1934. Additionally, Prime is prohibited by AT&T to disclose this information, and Prime will provide the applicable section of the dealer agreement that pertains to this prohibition once a mutually agreed upon protective order has been executed by the parties as discussed *supra*.**

9

307687

## REQUEST FOR PRODUCTION OF DOCUMENTS

1.      All documents identified, consulted, reviewed or referenced in your response to Plaintiff's First Interrogatories.

**PRIOR RESPONSE: OBJECTION. Defendant objects to the extent this request is overly broad, unduly burdensome, unreasonably cumulative and vague. Additionally, this request seeks documents that are privileged, proprietary and/or protected by the attorney-client privilege and seeks documents or things prepared in anticipation of litigation or for trial by a representative of defendant without the requisite showing. Without waiving stated objection, Defendant states: All documents, not otherwise privileged, proprietary, or protected and that pertain to the responses above are attached to these discovery.**

**SUPPLEMENTAL RESPONSE: Without waiving prior objection, Defendant states: See attached document.**

2.      Sales reports, commission reports and chargeback reports for Middle Creek Commons or for all employees who worked at the Middle Creek Commons store from February 1, 2010 through August 1, 2011.

**PRIOR RESPONSE: OBJECTION. Defendant objects to the extent this request is too broad, unreasonably cumulative, unduly burdensome, unduly expensive, and seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Without waiving objection, Defendant states: Please see Exhibit A, which is the Commission Statements of Rose Lorenzo during her employment.**

**SUPPLEMENTAL RESPONSE: Prime is essentially a "paperless" company and therefore, does not retain any documents that would be responsive to this request. However, the information for all sales is maintained in the RQ4 database located on Prime's local server. A list of the type of information retained by Prime in the RQ4 database is attached as Exhibit C. Any documents evidencing a sale, such as a receipt, are provided to the customer at the time of sale. A copy of a sales receipt is retained by each Store Manager for 6 months from the date of sale and then shredded, in order to ensure that customer CPNI information is protected. This is a requirement of AT&T that the information is shredded on a periodic basis in order to protect their customer information. For the shredding process, prior to October 2012, all documents held by a Store Manager would be sent to Prime after 6 months, and then held by Prime at their storage facility. Prime would contract with Southern Shredding to perform the shredding of these documents on-site. The frequency varied on how quickly the paperwork accumulated. After October 2012, Prime hired Iron Mountain, a third party vendor, that supplies bins for documents to be shredded at each store location. Iron Mountain performs a monthly pick-up of these documents to be shredded.**

307687

3.    All documents by which You confirmed sales for purposes of commissions and by which You confirmed carrier or vendor chargebacks from January 1, 2009 to present.

**PRIOR RESPONSE: OBJECTION.** Defendant objects to the extent this request is too broad, unreasonably cumulative, unduly burdensome, unduly expensive, and seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Without waiving objection, Defendant states: Please see Exhibit A, which is the Commission Statements of Rose Lorenzo during her employment.

**SUPPLEMENTAL RESPONSE:** Prime is essentially a "paperless" company and therefore, does not retain any documents that would be responsive to this request. However, the information for all sales is maintained in the RQ4 database located on Prime's local server. A list of the type of information retained by Prime in the RQ4 database is attached as Exhibit C. The information obtained for Exhibit A was to provide Plaintiff with all transactions and chargebacks at the Middle Creek Commons store while Rose Lorenzo was store manager. Every month, AT&T would generate the information found under the tab labeled "AT&T Data Reference" in Exhibit, which include the chargebacks and commissions that AT&T is crediting Prime. Prime first uses the CTN to track customer records to locate the store and/or employee. If no matches occur with CTN, Prime next uses the customer's name to track the sale or the chargeback. If a match cannot be made, Prime pays the chargeback.

4.    All carrier or vendor policies in effect from January 1, 2009 through present for which a failure to follow results in a carrier or vendor chargeback.

**PRIOR RESPONSE: OBJECTION.** Defendant objects to the extent this request is overly broad, unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Additionally, this request calls for proprietary information of Defendant and third parties which Defendant does not unilaterally have the authority to disclose. Without waiving any objection, Defendant states: Defendant is willing to produce applicable portions of the dealer agreement and payment schedule/addenda with their carriers and vendors that relate to dealer commissions and chargebacks on the condition that a confidentiality agreement is executed between the parties.

**SUPPLEMENTAL RESPONSE:** Without waiving prior objection, Defendant states: Prime has an Exclusive South East Regional Dealer Agreement with AT&T, which is confidential and contains proprietary information. However, Prime is willing to share applicable portions of this agreement after execution of a mutually agreed upon Protective Order. Also, Prime has similar vendor agreements with third-party accessory companies such as Tessco. These agreements are also confidential and contain proprietary information, none of which is relevant to the issues in this pending lawsuit.

11

5. All written agreements between You and AT&T having any bearing on compensation of Your retail location employees.

**PRIOR RESPONSE: OBJECTION.** Defendant objects to the extent this request is overly broad, unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Additionally, this request calls for proprietary information of Defendant and third parties which Defendant does not unilaterally have the authority to disclose. Without waiving any objection, Defendant states: Defendant is willing to produce applicable portions of the dealer agreement and payment schedule/addenda with their carriers and vendors that relate to dealer commissions and chargebacks on the condition that a confidentiality agreement is executed between the parties.

**SUPPLEMENTAL RESPONSE:** Without waiving prior objection, Defendant states: Prime has an Exclusive South East Regional Dealer Agreement with AT&T, which is confidential and contains proprietary information. However, Prime is willing to share applicable portions of this agreement after execution of a mutually agreed upon Protective Order.

6. All written agreements between You and AT&T having any bearing on the permissible responsibilities and duties of Your retail location employees.

**PRIOR RESPONSE: OBJECTION.** Defendant objects to the extent this request is overly broad, unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Additionally, this request calls for proprietary information of Defendant and third parties which Defendant does not unilaterally have the authority to disclose. Without waiving any objection, Defendant states: Defendant is willing to produce applicable portions of the dealer agreement and payment schedule/addenda with their carriers and vendors that relate to dealer commissions and chargebacks on the condition that a confidentiality agreement is executed between the parties.

**SUPPLEMENTAL RESPONSE:** Without waiving prior objection, Defendant states: Prime has an Exclusive South East Regional Dealer Agreement with AT&T, which is confidential and contains proprietary information. However, Prime is willing to share applicable portions of this agreement after execution of a mutually agreed upon Protective Order.

7. All written agreements between you and AT&T having any bearing on how You operate Your retail locations.

**PRIOR RESPONSE: OBJECTION.** Defendant objects to the extent this request is overly broad, unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Additionally, this request calls for proprietary information of Defendant and third parties which Defendant does not unilaterally have the authority to disclose. Without waiving any

12

objection, Defendant states: Defendant is willing to produce applicable portions of the dealer agreement and payment schedule/addenda with their carriers and vendors that relate to dealer commissions and chargebacks on the condition that a confidentiality agreement is executed between the parties.

**SUPPLEMENTAL RESPONSE:** Without waiving prior objection, Defendant states: Prime has an Exclusive South East Regional Dealer Agreement with AT&T, which is confidential and contains proprietary information. However, Prime is willing to share applicable portions of this agreement after execution of a mutually agreed upon Protective Order.

8.    All written agreements between You and any vendor of communications devices, including but not limited, devices commonly referred to as Nokia, Samsung, LG Apply, iPhone, Blackberry and Palm.

**PRIOR RESPONSE: OBJECTION.** Defendant objects to the extent this request is overly broad, unreasonably cumulative, unduly burdensome, seeks discovery of matter which is not relevant to the subject matter involved in the pending action. Additionally, this request calls for proprietary information of Defendant and third parties which Defendant does not unilaterally have the authority to disclose.

**SUPPLEMENTAL RESPONSE:** Without waiving prior objection, Defendant states: Prime has an Exclusive South East Regional Dealer Agreement with AT&T, which is confidential and contains proprietary information. However, Prime is willing to share applicable portions of this agreement after execution of a mutually agreed upon Protective Order. Also, Prime has similar vendor agreements with third-party accessory companies such as Tessco. These agreements are also confidential and contain proprietary information, none of which is relevant to the issues in this pending lawsuit.

Respectfully submitted this the 4th day of April 2013.

RAGSDALE LIGGETT, PLLC

BY: _____

John B. Walker
N.C. State Bar No.: 35631
Post Office Box 31507
Raleigh, NC27622-1507
Email: bwalker@rl-law.com
Telephone:     (919) 787-5200
Facsimile:     (919) 783-8991
*Attorneys for Defendant Prime Communications, L.P.*

13

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of March, 2013, the foregoing **DEFENDANT PRIME COMMUNICATIONS, L.P.'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS** have been duly served upon all parties by electronic mail and by mailing a copy of same to the following counsel of record:

Stephen A. Dunn, Esq.
EMANUEL & DUNN, PLLC
Post Office Box 426
Raleigh, NC 27602
*Counsel for Plaintiff*
sdunn@emanuelanddunn.com

Raymond E. Dunn, Jr., Esq.
Charles J. Cushman, Esq.
EMANUEL & DUNN, PLLC
Post Office Box 1389
New Bern, NC 28563
*Counsel for Plaintiff*
rdunn@emanuelanddunn.com
ccushman@emanuelanddunn.com

Harris D. Butler III, Esq.
Zev H. Antell, Esq.
BUTLER ROYALS, PLC
100 Shockoe Slip, 4th Floor
Richmond, VA 23219
Harris.butler@butlerroyals.com
Zev.antell@butlerroyals.com
*Counsel for Plaintiff*

RAGSDALE LIGGETT, PLLC

BY: John B. Walker
Post Office Box 31507
Raleigh, NC 27622-1507
Email: bwalker@rl-law.com
Telephone:    (919) 787-5200
Facsimile:    (919) 783-8991
*Attorneys for Defendant Prime Communications, L.P.*

14

307687

# LORENZO V. PRIME COMMUNICATIONS

## EXHIBIT C

| Store Manager Headers | |
|---|---|
| Month | Month |
| SMID | Store Manager ID |
| SM | Store Manager |
| LOCLD | Location ID |
| Location Name | Location Name |
| Phone GM | Gross Margin from Phone Sales |
| Phone Unpaid | Phone sales in RQ4 not paid by AT&T (either customer cancels in first 30 days, it was not rung correctly by rep, or transaction did not really occur but was entered into RQ4 anyway) |
| Phone Deact | Customer refunds within six months for phone activations (AT&T charges back commission for any return/cancellation in first 180 days) |
| Phone Adjust | Adjustments to phone selling price (ie coupons and discounts at point of purchase etc) |
| Feature GM | Gross Margin from Feature Sales |
| Feature Unpaid | Feature sales in RQ4 not paid by AT&T |
| Feature Deact | Customer refunds within six months for features (AT&T charges back commission) |
| Feature Adjust | Adjustments to feature selling price (ie coupons etc) |
| Upsell GM | Gross Margin for selling a feature by itself (normally these are sold when handset is sold) |
| Upsell Unpaid | "Solo" Feature sales in RQ4 not paid by AT&T |
| Upsell Deact | Customer refunds within six months for "solo" features (AT&T charges back commission) |
| Upsell Adjust | Adjustments to "solo" feature selling price (ie coupons etc) |
| PP GM | "Parent Product," these are wireline sales (AT&T home phone, TV, etc.) |
| PP Unpaid | PP sales in RQ4 not paid by AT&T |
| PP Deact | Customer refunds within six months for PP (AT&T charges back commission) |
| PP Adjust | Adjustments to PP selling price (ie coupons etc) |
| CG GM | Gross Margin for Cell Guard (insurance) sales |
| CG Unpaid | Cell Guard sales in RQ4 not paid by AT&T |
| CG Deact | Customer refunds within six months for Cell Guard (AT&T charges back commission) |
| CG Adjust | Adjustments to Cell Guard selling price (ie coupons etc) |
| Accessories | Accessories Gross Margin |
| Total GM | Total Gross Margin from all sources |

| Store Manager Headers | |
|---|---|
| GM Goal | Store's Gross Margin goal (assigned to manager at beginning of month, and they work to attain through sales coaching/training, hiring of productive salespeople, ordering and management of inventory to ensure holding of adequate supply of popular devices, management of discount usage,etc.) |
| Percent to Goal | Percentage towards Store's Gross Margin goal |
| Pay Percent | Depending on % to goal, manager earns a different bonus payout. The higher the % to goal, the higher bonus they earn as a % of the store's gross profit |
| Gross | Bonus payout |
| Audit | These are adjustments, positive or negative, that occur from the audit of cash that was actually tendered by customer. For example, if customer should have paid $100 but paid $95, there is a negative $5 adjustment. If the customer actually paid $100 but the employee accidentally rung $50 tendered, there would be a positive $50 adjustment, etc. |
| Pay Go | Losses from failure to accept tendered cash for prepaid refill minutes |
| Excess Discount | Losses from discounts given above maximum allowable amount |
| Shrinkage | Inventory losses at store for which the manager is responsible. (e.g., we do not deduct in cases of overt theft by third party, if confirmed via police report) |
| DOA | Damaged phones that do not get returned by manager for credit from AT&T |
| Misc. Adjustment | Positive or negative adjustments for spiffs or spiff credits |
| Misc. Adjustment Comment | Description of source of misc. adjustment |

| Commission Headers | |
|---|---|
| Phone Adjustment GP | Gross Profit from Phone sale |
| Service Plan Name | Voice plan purchased by customer, as rung in RQ4 (for reference) |
| Carrier Plan | Voice plan purchased by customer, as rung in AT&T POS (we pay on this) |
| POS Plan GP | Gross Profit from Voice Plan in RQ4 (for reference) |
| Carrier Plan GP | Gross Profit from Voice Plan in AT&T POS (we pay on this) |
| Plan Month | Month |
| Plan Year | Year |
| Features Unpaid GP | Negative GP from features that AT&T does not compensate us for (we only get commission if customer keeps feature for 6 months, and if it is a |

Case 5:12-cv-00069-H   Document 44-15   Filed 06/14/13   Page 7 of 9

348

| Commission Headers | |
|---|---|
| | monthly recurring fee) |
| Carrier Bill Code | Carrier Bill Code |
| Carrier Amount | Gross Profit from Carrier Plan |
| Upsell Adjustment GP | Adjustments to "solo" feature gross profit (ie coupons etc) |
| Wireline GP | Gross Profit from Wireline sales |
| iShield GP | Gross Profit from iShield sales |
| iShield Unpaid GP | Negative gross profit from cancelled iShield |
| Accessories GP | Gross Profit from accessories |
| Category Name | Example: Type of product (phone, etc.) |
| Item Name | Example: Name of product sold (description of unit) |
| Phone Name | Phone Number of phone sold to customer |
| Transaction Type | Example: New Activation, Upgrade, Bill Pay, etc. |
| Transaction Date | Date of transaction |
| Transaction No. | Transaction number |
| Type of Sale | Example: Cash, Credit Card, etc. |
| Original Invoice No. | Invoice Number |
| Original Invoice Date | Date item sold |
| Customer Zip Code | Customer's Zip Code |
| Date Returned | Date item returned |
| Carrier Commission | Commission earned by Carrier (ex: AT&T) |
| Selling Price | Price of unit |
| SRP | Retail Price |
| Discounts | Any deductions in Price |
| Cost of Phone | Cost of Phone |
| Multiplier | Occasionally some features earned an extra multiplier, though this fell into disuse by AT&T |
| Phone Margin | Sales Price of Phone minus Cost of Phone |
| New Account Sales Rep Plan | Additional equipment credits from AT&T, this fell into disuse by AT&T but was retained for consistency |
| New Account Sales Rep Plan Phone | Other special equipment credits, this fell into disuse but was retained for consistency. |
| Plan Date | Dates plan is active |
| Quantity | Number of units |
| Serial Number | Serial Number |
| Original Unit Cost | Cost of unit |
| Item Discount | Discount on particular item |
| Item Discount Percentage | Percent of Discount |
| Item Total Price | Item Total Price |
| Item Commission | Commission on item |
| Invoice Number | Invoice Number |
| Sale Type | Type of Sale (ex: Upgrade, New Activation, etc.) |
| Item Notes | Any notes provided by salesperson |
| Agent Code | Agent code assigned by AT&T |

308045

3

| Commission Headers | |
|---|---|
| Phone Unpaids GP | Gross Profit of phone sales in RQ4 not paid by AT&T |
| Phone Deacts GP | Gross profit from Customer refunds within six months for phones (AT&T charges back commission) |
| Phone GP | Gross Profit of phone sales |
| Upsell Feature GP | Gross Profit for selling a feature by itself (normally these are sold when handset is sold) |
| IMEI | Electronic serial number of phone |
| Features GP | Gross Profit from Feature Sales |
| Returns Original Invoice No. | If appl |
| Returns Original Invoice Date | If appl |
| Zip Code | Zip Code |
| Option Name | Assigned by AT&T and listed for reference |
| Option Included | Assigned by AT&T and listed for reference |
| Bill Code | Assigned by AT&T and listed for reference |
| Family Name | Assigned by AT&T and listed for reference |
| Location Code | Store location code |
| Location Name | Store location name |
| Feature Deact GP | Gross profit from customer refunds within six months for features (AT&T charges back commission) |
| Feature Adjust GP | Adjustments to feature gross profit (ie coupons etc) |
| Mobile No. | Phone number of new phone |
| POS Option Name | Assigned by AT&T and listed for reference |
| POS Family Name | Assigned by AT&T and listed for reference |
| POS Amount | Commission paid by AT&T |
| Upsell GP | Gross Profit for selling a feature by itself (normally these are sold when handset is sold) |
| Upsell Unpaid GP | Gross profit of "Solo" Feature sales in RQ4 not paid by AT&T |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

ROSE LORENZO, Individually
and on Behalf of Others
Similarly Situated,

        Plaintiff,

    vs.        CIVIL ACTION NO. 5:12-cv-00069-H

PRIME COMMUNICATIONS, L.P.,
a Texas General Partnership,

        Defendant.


DEPOSITION OF:  MICHAEL PALMIERI

DATE:          June 6, 2013

TIME:          9:42 a.m.

LOCATION:      Law Offices of
                 Jones, Simpson & Newton, P.A.
                 18 Pope Avenue
                 Hilton Head, SC

TAKEN BY:      Counsel for the Plaintiff

REPORTED BY:   TRISHA M. THOMAS


A. WILLIAM ROBERTS, JR. & ASSOCIATES

Fast, Accurate & Friendly

| Charleston, SC | Hilton Head, SC | Myrtle Beach, SC |
|---|---|---|
| (843) 722-8414 | (843) 785-3263 | (843) 839-3376 |
| Columbia, SC | Greenville, SC | Charlotte, NC |
| (803) 731-5224 | (864) 234-7030 | (704) 573-3919 |

```
 1        A.    Okay.   In our business and what the

 2   model has been for 25-plus years now is you

 3   basically are losing money selling the phone, all

 4   at the chance of -- customer, recurring revenue,

 5   that all that's going to work out, but it's a --

 6   it's a strange retail model.  Most retailers would

 7   make money on selling a washer, a dryer, a

 8   refrigerator.  We actually take something at a high

 9   cost and sell it at a cost lower.

10        Q.    So you take a loss on every phone you

11   sell?

12        A.    We do.

13        Q.    And you make that back up in the

14   commissions you receive on service contracts?

15        A.    That's the -- the model.

16        Q.    That's the model?

17        A.    Yeah.

18        Q.    How's it working?

19        A.    It's -- it works okay.

20        Q.    Okay.

21        A.    You know, it's different.  It changes.

22   The business changes, so -- you know, it's a

23   smartphone world now.  It's an expensive model that

24   we operate in, so --

25        Q.    Does your region make a profit?
```

1    reports is the actual cost of the phone to Prime?

2              MR. WALKER:  Versus --

3              THE WITNESS:  Which report?

4    BY MR. DUNN:

5         Q.   Well, on any report.  You have to

6    measure the loss or you have to measure the profit

7    on the phone, and I'm assuming that you would

8    calculate the cost as a part of the net pay because

9    didn't you talk about this a minute ago that on the

10   commission report there's a net pay?  Does that not

11   include --

12        A.   It's not -- it's not a --

13        Q.   That's not an issue there?

14        A.   No, no.

15        Q.   Let me go back to the commission report

16   and make sure I understand that.  The net pay that

17   appears on your monthly commission report is -- net

18   pay is really gross commissions less deductions?

19        A.   Correct.

20        Q.   So it has nothing to do with the cost

21   of the equipment or anything else?

22        A.   That's separate.

23        Q.   Okay.  So is the commission based on

24   sales?

25        A.   Which commission?

1       Q.   The commissions on your commission

2  report.  You've got people on there, a location,

3  and dollars.  I'm assuming those dollars on this

4  commission report relate to the commissions that

5  are due these people?

6       A.   Based on sales, not profits.

7       Q.   Okay.  And based on sales.  So what

8  percentage of that dollar is -- I mean, how do you

9  get the dollars amount on that commission report?

10  Is it a flat percentage of whatever features were

11  sold?  Is it a flat percentage of -- I mean, how is

12  that number derived?

13       A.   It's not a flat percentage.

14       Q.   Okay.

15       A.   It varies based on their performance,

16  and there are tiers in the commissions schedule

17  based on the total sales performance that an

18  individual attains they can earn.

19       Q.   You're talking about commission now.

20  Excuse me.

21       A.   Yeah.

22       Q.   I don't mean to interrupt.  You're

23  speaking of commissions, but before you told me in

24  the -- and maybe I'm just confused, but you told me

25  in your commission report you have categories of

1    location, people, dollars sold, incentives, net

2    pay.  Now, dollars sold, is that -- that dollar, is

3    that a commission dollars to the employee, or is

4    that total product sold?

5            A.    That, for them, is what -- what is

6    driving the commission.  That's the gross dollars

7    that they're getting credited for sales based on

8    rate plans --

9            Q.    That's all sales?

10           A.    Yes.

11           Q.    Okay.  And so then net pay is a

12   function of that but after deductions.  So if your

13   category of sold that we just discussed --

14           A.    Uh-huh.

15           Q.    -- is the dollar sales, the total gross

16   sale at the store, at the location or that person

17   or whatever you're looking at --

18           A.    Uh-huh.

19           Q.    -- that's for all features, all phones,

20   all accessories.  And would it be correct to say

21   that in that situation if the phone was sold at a

22   discount that the items sold would be less?  Is

23   that a category, or does that category of sold

24   include the price of the phone that was sold?

25           A.    That's been factored, so when you get

1    to the gross dollars for the individual, that phone

2    cost, that was already taken care of over on the

3    side.  We're subsidizing that on the front.  That's

4    not coming -- coming on an individual level.  That

5    happens as part of the sale, right.  Every unit

6    that's going out is going out at a loss.  All

7    right.  But the rep -- we don't fixate on the loss.

8    We fixate on selling the -- the best plan, the best

9    features that you can.

10           They get assigned a gross dollar amount

11   for making the sale.  At the end of the month they

12   get their bucket of gross dollars.  If they have

13   any deductions, they would come out.  You can also

14   not have any deductions, so your gross could turn

15   into your net.

16       Q.   Does that gross figure include what the

17   phone sold for, whether or not it was sold for a

18   profit?

19       A.   It's -- well, I would have to pull or

20   get data to understand -- each transaction's

21   different.  Again, we don't put that over there on

22   their process because you're dealing with hundreds

23   of dollars' worth of phones' cost and we're

24   subsidizing them, okay, so the rep -- that math

25   does not show up.

* * *

1  were employed as executive vice president of the

2  southeast region where store managers were paid

3  differently, i.e., there was a group of store

4  managers paid on an hourly basis and a group of

5  store managers paid on a salary basis?

6         MR. DUNN:  Objection.

7         THE WITNESS:  Yes.

8  BY MR. WALKER:

9      Q.  But as far as their duties as store

10 managers, there wasn't a distinction between the

11 two; is that correct?

12     A.  Correct.

13     Q.  You also talked a lot about taking a

14 loss on the phone, and I think it was cleared up

15 eventually, but just so it's -- the record is a

16 hundred percent clear, any loss that Prime takes on

17 the sale of a phone, does that loss on the sale of

18 the phone ever count against either the store

19 manager or the solution specialists or sales

20 associate when they sell that phone?

21     A.  No.

22     Q.  So for instance, if you buy -- if Prime

23 buys a $650 iPhone and sells it to the consumer at

24 $200 and there's a $450 loss on that phone, the

25 solution specialist and/or store manager, whoever

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:11-cv-69-11

ROSE LORENZO,

      Plaintiff,

vs.

PRIME COMMUNICATIONS, L.P.,

      Defendant.

DEPOSITION OF

GUY A. RODRIGUEZ

WEDNESDAY, JANUARY 16, 2013
10:00 A.M.

LAW OFFICES OF EMANUEL & DUNN, P.L.L.C.
130 SOUTH SALISBURY STREET
RALEIGH, NORTH CAROLINA

Page 92

1       associates, I could see how many hours they worked.

2               Q    So you'd keep track of, for example, how

3       many hours Kelly had clocked in during the week?

4               A    Absolutely.

5               Q    And you could see how many hours you'd work

6       in a given week?

7               A    Absolutely.

8               Q    Could you also keep up with -- Could you

9       also, excuse me, see the gross profit or the sales of the

10      store for a given week in RQ4?

11              A    Yes, you could.

12              Q    Could you see or keep track of your

13      commissions in a given week through RQ4?

14              A    Absolutely not.

15              Q    Okay.  Could you ever keep track of your

16      commissions or see where your commissions were in any

17      program?

18              A    They had a program, but it would always be

19      down.  It would always be down the day that it would come

20      out.  They would be like, "Oh, we need a few days to get

21      it back up and running."  And then if it did come back up

22      and running, it wouldn't show everything that was supposed

23      to be in there, so they would always be missing things

24      like they wouldn't show you -- they'd show you, oh, you

25      grossed this, but they wouldn't show you all the charge

1     back they were charging back so you couldn't see

2     everything.  So it wasn't like -- but they had a separate

3     and it wasn't part of RQ4.  I don't even remember what's

4     the name of it at all, but it was just a separate place

5     where you would log in and you should be able to see what

6     your commission check was why it was the way that it was.

7          Q     Okay.  And so there was a program, but

8     you're saying it was always down when the checks came out?

9          A     Yes.  And then even when like when I got it,

10    they wouldn't even let me see it for like two months

11    before I got it.  Like I think I got one commission check

12    the whole time I was there.

13         Q     Do you remember when you got that commission

14    check?

15         A     I don't.  I never even counted on it after

16    so much because my store was so slow that at one point it

17    was like I just knew I wasn't going to get one.  They just

18    weren't going to give me one even if we did good.  Say we

19    had a great month and we might have did better than like

20    last year's month to month, the goals were so ridiculous.

21    If they did five thousand last year in that month it would

22    be ten thousand this year.  They would make it so

23    ridiculous; how did they come up with that number?  That

24    if you only did five last month, why do you expect ten

25    this month.

**Butler Royals, PLC**

Mr. Butler has been engaged in the concentrated practice of employment law for thirty years, since 1981, and has developed a reputation and an expertise in the subject area as well as in the procedural peculiarities of class and collective actions asserting statutory employment claims. Mr. Butler is a Fellow of the American College of Trial Lawyers, and a member of the National Employment Lawyers Association and the Virginia Employment Lawyers Association. Mr. Butler primarily focuses his practice on the litigation of employment related cases, almost exclusively representing plaintiffs. Mr. Butler has successfully prosecuted FLSA representative cases and procedurally-related ADEA representative actions in both the Western and Eastern Districts of Virginia as well as in jurisdictions outside Virginia. Mr. Butler has been regularly recognized by peers for inclusion in the Virginia *Super Lawyers* magazine in the areas of "Employment Litigation" and "Top Virginia Lawyers," Virginia Business Magazine's *Legal Elite* and The Best Lawyers in America. Butler Royals' employment practice has been recognized in U.S. News and World Report's listing of Best Law Firms.

Mr. Antell is Mr. Butler's associate and has been engaged in the concentrated practice of employment law since 2007 and has developed a reputation and an expertise in the subject area, as the primary associate working on Butler Royals, PLC's multi-plaintiff class and collective actions. Mr. Antell is a member of the National Employment Lawyers Association and the Virginia Employment Lawyers Association and has recently lectured at a CLE on the topic of FLSA collective Actions. Mr. Antell primarily focuses his practice on the litigation of employment related cases, almost exclusively representing plaintiffs. Mr. Antell has also successfully prosecuted FLSA and FLSA/Rule 23 hybrid representative cases in both the Western and Eastern Districts of Virginia.

Outside its multi-plaintiff practice, Butler Royals, PLC also performs considerable work in various single plaintiff discrimination cases and employment torts as well as in matters of executive compensation.

Within the last ten years, Butler Royals, PLC and its predecessor firm have prosecuted many collective and class action employment suits, winning certification each time it was moved for. In these matters the firm has successfully represented well over a thousand Plaintiffs. Such matters include, but may not be limited to:

**Age Discrimination**
> *Feltman et al. v. Capital One Services C.A.* 3:02CV894 (EDVA)
> *Merritt et al. v. Wellpoint, Inc.* Civil Action No. 3:08cv272 (EDVA)

**Gender/Race Discrimination**
> *Jackson et al. v. Utica Mutual Insurance Company* Civil Action No. 3:10cv562 (EDVA)
> *Pearce et al. v. Lowe's Home Centers, Inc.* Civil Action No. 5:04CV19 (WDNC)

**FLSA and/or State Law Wage & Hour**
> *Bonsall et al. v. Great Eastern Resort Corporation* Case No. CL06-00600 (Circuit Ct. Rockingham County, VA)
> *Kisamore et al. v. Great Eastern Resort Corporation* Case No. 3:10cv00009-nkm (WDVA)
> *McVicker et al. v. Recreational Resorts, LTD.* Case No.: 3:10-CV-00039 (WDVA)
> *Addisson et al. v. Mclaughlin Communications, Inc.* Case No. 5:09-CV-00087 (WDVA)
> *Rogers et al. v. City of Richmond, Virginia* Civil Action No. 3:11cv620 (EDVA)
> *Davenport et al. v City of Richmond, Virginia* Civil Action No. 3:12cv710 (EDVA)
> *Carroll et al. v. County of Henrico, Virginia* Civil Action No. 3:12cv00105 (EDVA)
> *Washington et al. v. Sheriff's Office of the City of Richmond et al.* Civil Action No. 3:11-cv-00725 (EDVA)
> *Bryner v. Sheriff's Office of the County of Spotsylvania, Virginia et al.* CIVIL ACTION NO: 3:13-cv-00034 (EDVA)
> *Harris et al. v. Kerkim et al.* Civil Action 3:10-cv-00799 (EDVA)

Emanuel & Dunn, PLLC is a North Carolina law firm engaged in, among other things, a general civil practice involving litigation, business and employment law. It has extensive litigation experience in life insurance and ERISA matters, for which it has appeared in each of the three U. S. District Courts in the State of North Carolina, as well as, pro hac vice, in the U. S. District Courts in the State of South Carolina.

## Stephen A. Dunn

Stephen A. Dunn is a partner with Emanuel & Dunn. He practices in the areas of state and federal court litigation, administrative law, employment and real estate law. His notable litigation experience includes federal court cases involving the Employee Retirement Income Security Act (ERISA). He has appeared in the United States District Courts for the Eastern, Middle and Western Districts of North Carolina; in the United States District Courts for the Eastern and Western Districts of South Carolina; and in the U.S. Court of Appeals for the Fourth Circuit.

Mr. Dunn also provides transactional support for regional and national clients in a variety of business and property matters, including contract negotiations and drafting, acquisition and development real property interests.

He received a Bachelor of Arts in Business and a Bachelor of Science in Economics from North Carolina State University in 1981 and graduated from the Cumberland School of Law at Samford University in 1984.

Representative complex litigation matters include: Palacios v. United Turf, U. S. District Court, EDNC, Case No. 5:94-cv-00181-BR (defended FLSA class action); Woods, et al. v. The American Tobacco Company et al, U. S. District Court, MCNC, Case No. 1:98-cv-138-NCT (represented Plaintiffs in North Carolina taxpayers suit); Pro v. Hertz Equipment Rental Corporation, U. S. District Court, DNJ, Case No. 06-cv-3830-DMC-JAD (represent individual class representative (pending)); Doherty v. The Hertz Corporation, American Traffic Solutions, Inc. and PlatePass, LLC, U. S. District Court, DNJ, Case No. 1:10-cv-00359-NLH-KMW (representing nationwide class of renters (pending)).

ROSE LORENZO,

        Plaintiff,

v.

PRIME COMMUNICATIONS, L.P.,

        Defendant.

    **Civil Action No. 5:12-cv-69-H**

## DEFENDANT PRIME COMMUNICATIONS, L.P.'S
## MOTION AND DEMAND FOR ARBITRATION

    NOW COMES Defendant Prime Communications, L.P. ("Defendant Prime"), by and through counsel, and moves this court, pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16 to stay these proceeding and order the parties to arbitration in accordance with the Dispute/Conflict Resolution Program.

    Defendant Prime states that in the 2010 Employee Handbook, under the section entitled, "Conflict/Dispute Resolution," (page 23) the parties to this action have agreed to the procedure in which disputes are to be handled concerning employment related issues, including wage disputes. Under this section, among other things, the parties are to resolve employment related issues through binding arbitration in accordance with the Dispute/Conflict Resolution Program. In support of this Motion, Defendant Prime has contemporaneously filed a Memorandum of Law.

    THEREFORE, Defendant Prime moves this court to stay these proceedings, so that the parties may conduct arbitration in accordance with the Dispute/Conflict Resolution Program.

Respectfully submitted this 19th day of June, 2013.

RAGSDALE LIGGETT, PLLC

BY: _/s/ John B. Walker_____
John B. Walker
N.C. State Bar No.: 35631
Post Office Box 31507
Raleigh, NC27622-1507
Email: bwalker@rl-law.com
Telephone: (919) 787-5200
Facsimile: (919) 783-8991
_Attorneys for Defendant Prime Communications, L.P._

2

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of June, 2013, I electronically filed the foregoing **DEFENDANT PRIME COMMUNICATIONS, L.P.'S MOTION AND DEMAND FOR ARBITRATION** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

Stephen A. Dunn, Esq.
EMANUEL & DUNN, PLLC
Post Office Box 426
Raleigh, NC 27602
Email: sdunn@emanuelanddunn.com
*Counsel for Plaintiff*

Harris D. Butler III, Esq.
Zev H. Antell, Esq.
BUTLER ROYALS, PLC
100 Shockoe Slip, 4th Floor
Richmond, VA 23219
Email: Harris.butler@butlerroyals.com
Email: Zev.antell@butlerroyals.com
*Counsel for Plaintiff*

Raymond E. Dunn, Jr., Esq.
Charles J. Cushman, Esq.
EMANUEL & DUNN, PLLC
Post Office Box 1389
New Bern, NC 28563
Email: rdunn@emanuelanddunn.com
Email: ccushman@emanuelanddunn.com
*Counsel for Plaintiff*

### RAGSDALE LIGGETT, PLLC

BY: */s/ John B. Walker*
John B. Walker
N.C. State Bar No.: 35631
Post Office Box 31507
Raleigh, NC27622-1507
Email: bwalker@rl-law.com
Telephone: (919) 787-5200
Facsimile: (919) 783-8991
*Attorneys for Defendant Prime Communications, L.P.*

( PR:ME

**Employee Handbook Acknowledgement**

Employees of Prime Communications ("Company") are one of our most valuable resources, and managing these resources is one of most important responsibilities. To aid in day-to-day decisions, we have designed our Employee Handbook combining Policies and Guidelines.

I _____ understand I am responsible for reviewing Prime Communications' Employee Handbook, which outlines goals, policies, benefits and expectations.

I understand this handbook is not intended to cover every situation, which may arise during my employment, but is simply a general guide to the goals, policies and priorities, benefits and expectations of the Company.

I understand that Prime Communications' Employee Handbook is not a contract of employment and does not change the employment-at-will status of its employees. Moreover, no provision should be construed to create any binding promises or contractual obligations between the Company and employees (management or non-management).

Prime Communications reserves the right to alter or amend these policies and guidelines at any time without notice. In addition, Prime Communications reserves the right to exercise its discretion in any particular situation notwithstanding the existence of a provision to the contrary.

By my signature below, I acknowledge, understand, accept and agree to comply with the information contained in the Employee Handbook. If hired, I acknowledge that I will review and read the Company Handbook (which is on the Company's website for employees), and that I will have the opportunity to ask my Manager questions about this Handbook. I further acknowledge that I fully understand or will make sure that I do understand the contents thereof, as they relate to my employment with Prime Communications. I understand that the information contained in the Handbook are guidelines only, and are in no way to be interpreted as a contract. I also understand that the Handbook may be modified or amended from time to time, and that such modifications may be found on the Company's website for employees. I agree to periodically review the Handbook for such modifications as may be applicable to me.

Print Name: Charlotte D. Woodruff   Social Security: 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

Date: 3/23/2010

### Acknowledgment of Employee Handbook

### Acknowledgment of Wage Deduction

### Acknowledgment of Chargeback

10/25/10

**PRIME**


Celebrating 10 Years of
**Excellence**



## PRIME COMMUNIATIONS iPHONE POLICY AGREEMENT
### Solution Specialists

*Purpose of the Agreement:* Prime Communications has the opportunity to sell the Apple iPhone in our stores. However, this product is different from any other product we have ever sold because it is the most expensive device we will carry, AND it produces the smallest amount of gross profit when sold to a guest. To protect the profitability and security of these devices, all employees are expected to abid by the policies set forth below.

### Requirements:

1. All employees must complete all required trainings per AT&T or Prime Communications policies.
2. iPhones will only be sold with a 2-year contracts (no 1yr. contracts, prepaid or outright phone sales permitted).
3. Employees can carry the iPhone in-store while at work under the following conditions: the iPhone is active on an AT&T-approved account (iPhones may NOT be added to an ANR account), the iPhone must be in 'like-new' condition and the iPhone must be kept in a case/clip/holster **purchased** from a Prime location at all times.
4. iPhones should never be brought from the safes until they are ready to be sold to prevent theft.
5. All iPhone sales require legible copies of the guests photo state-issued ID and valid credit card! (NO DEBIT CARDS) prior to purchase. Without these copies made, the iPhone should never be handed to the guest.
6. iPhone sales will be limited to two per customer and/or AT&T account, per year, from Prime Communications. No exceptions.
7. iPhone PO's must be received immediately into RQ4 as soon as the shipment comes in and put into the safe.
    1. iPhones being sent out for RMA's must remain locked in the safe until the UPS driver is on the property.

### Sales Management

1. All employees are expected to meet minimum Gross Profit quotas. Selling an iPhone without additional features, accessories, wired products or additional lines of service will earn a total gross profit of only $25. A comparable sale with any other device would earn up to $250+ of gross profit.
2. All iPhone invoices will be audited for profitability. If you're GP per iPhone transaction is below acceptable levels, the company may reduce or restrict iPhone orders until improvements are made.
3. All iPhone returns or exchanges require a mandatory re-stocking fee of $50, plus an additional charge of $25 per missing item (box, charger, manual etc.). AppleCare and MobileMe products cannot be returned after opened. Failure to collect the mandatory restocking fees will result in a deduction from the returning associates commission payout equal to the uncollected restocking fees.
4. iPhones are not eligible for phone discounts. Likewise, excessive accessory discounts to offset the iPhone cost will be subject to disciplinary action.
5. All in-store demo devices must be maintained and secured following the current demo-line procedures.

### Sales Integrity

1. Fraudulent behavior that affects any guest, employee, demo lines, AT&T or Prime Communications will not be tolerated and will result in immediate disciplinary action up to including termination.
2. Employee actions/inactions that result in company loss of assets (cash or inventory) will result in termination and criminal prosecution where applicable.
3. Prime Employees are expected to sell all phones, features and accessories the RIGHT way, with integrity.
4. Prime Employees advising/directing/completing the process of 'unlocking' iPhones will result in termination.

*I HAVE READ AND UNDERSTOOD THE ABOVE POLICIES AND UNDERSTAND THAT FAILURE TO FOLLOW THESE POLICIES COULD RESULT IN DISCIPLINARY ACTIONS UP TO AND INCLUDING TERMINATION.*

Employee Name: ~~Rose Lorenzo~~          Date: 11/16/09

Employee Signature: _____          DM
                                             SM Signature: _____

## WAGE DEDUCTION AUTHORIZATION AGREEMENT

I understand and agree that my employer, Prime Communications, L.P. (the "Company"), may deduct money from my pay from time to time for reasons that fall into the following categories, up to the maximum amount permitted by law per pay period:

- my share of the premiums for the Company's group medical plan, and for any deductions I may make into a retirement, 401(k), or pension plan sponsored or administered by the Company;
- installment payments on loans, store credit, or wage advances given to me by the Company, including the value of merchandise that I purchase or have purchased on my employee charge account, and if there is a balance remaining when I leave the Company, the balance of such loans, store credit, or advances;
- if I receive an overpayment of wages for any reason, repayment to the Company of such overpayments;
- the cost to the Company of personal long-distance calls I may make on Company phones, or of Company accounts, and of personal faxes sent by me using Company phones, machines or accounts;
- the cost of repairing or replacing any Company supplies, materials, equipment, or other property that I may damage (other than normal wear and tear) or fail to return ... authorize ... express authorization from the Company during my employment ...
- ... applicable laws.
- ... retail point and pre-paid sales are subject to a holdback except ... vested commissions, both of which may be deducted from my pay when, in Company's ... allowed or owed; and
- in the event of separation from the company, the Company is authorized to withhold my final commission check for a period of 90 days in lieu of future commission charge-backs.

I understand that the Company may deduct money from my pay under the above circumstances or as a result of various situations occur.

BY: [signature: Rod E. Young]

DATE: 10/20/09

1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION


ROSE LORENZO,                                    )

      Plaintiff;                              )

                                             )

      v.                                      )

                                             )

PRIME COMMUNICATIONS, L.P.,                       )

      Defendant.                              )

_____

DEPOSITION OF ROSE EMILY LORENZO

_____


In Raleigh, North Carolina

Friday, December 14, 2012

Reported by Robbie W. Worley

Worley Reporting

P.O. Box 91447

Raleigh, NC 27675

919-870-8070


```
                                                          170
 1   Q      Okay.

 2          _____

 3                   (DEPOSITION EXHIBIT 14

 4                   MARKED FOR IDENTIFICATION)

 5          _____

 6   A      We've already talked about this a little bit, the

 7          iPhone policy.  This is just a different one.  Is

 8          that your signature at the bottom?

 9   A      Yes, it is.

10   Q      Okay.  And so this was given to you when you were a

11          sales associate -- I'm sorry, a Solution

12          specialist.  I keep calling it the wrong thing.

13   A      Yeah.  Yes.

14          _____

15                   (DEPOSITION EXHIBIT 15

16                   MARKED FOR IDENTIFICATION)

17          _____

18   Q      Okay.  Lastly, number 15.  Have you ever seen this

19          document before?

20   A      Yeah.  The cover is different, though.

21                   (DISCUSSION OFF RECORD)

22   Q      Have you had a chance to look at Exhibit 15?

23   A      I have actually seen this, although the cover of

24          this has the wrong date.  Because the document that
```

171

| | | |
|---|---|---|
| 1 | | I saw with this that says April 1, 2010, is the one |
| 2 | | that I saw with this, which I didn't actually see |
| 3 | | this document until like June or July -- |
| 4 | Q | Okay. |
| 5 | A | -- of 2000 -- maybe it was 2011 -- |
| 6 | Q | Okay. |
| 7 | A | -- that I actually saw this document.  No, 2010 |
| 8 | | probably.  But it said, April 1, 2010, here.  It |
| 9 | | was in black and gray.  It wasn't all pretty in |
| 10 | | color. |
| 11 | Q | Okay.  And that was given to you when? |
| 12 | A | It wasn't given to me.  I went looking for it on |
| 13 | | the portal, the Prime portal. |
| 14 | Q | Got you. |
| 15 | A | I went looking for it but I never -- no one ever |
| 16 | | said, "Here's the employee handbook, you need to |
| 17 | | read it." |
| 18 | Q | Okay. |
| 19 | A | You know -- |
| 20 | Q | But -- I'm sorry.  I didn't mean to interrupt you. |
| 21 | | Go ahead. |
| 22 | A | That's okay.  And so I printed it out, but the one |
| 23 | | that I saw was in black and gray and it said April |
| 24 | | 1, 2010. |

172

1   Q   Was it black and gray when you printed it out or on

2       the screen when you were looking at it?

3   A   On the screen.

4   Q   Okay.  And that was in your employee portal?

5   A   It was in the employee portal.

6   Q   Okay.  And that's different than the RQ4 and the

7       POS that you were talking about earlier, right?

8   A   That's correct.

9   Q   What is the employee portal?

10  A   It was a website that they created.  I guess it was

11      kind of new, an intranet site that would give you

12      information about medical insurance, handbooks, you

13      know those types of things.  If you needed to know

14      how to change something in the system and you

15      weren't really sure -- I can't even think of a

16      specific, but they had like how to do different

17      types of transactions.

18          If you needed to port a number from

19      another carrier, it would have like a step-by-step

20      procedure of how you do that without having to call

21      somebody and say, okay, walk me through this

22      procedure because those porting different numbers

23      or transferring lines, ownership of an account to

24      another person, was really complicated.  And they

173

1           didn't really train you on that, so you had to find

2           a way.  So I would always go on and see what's in

3           there that I could learn just in case this would

4           happen in my store, you know.

5  Q     Uh-huh.

6  A     And occasionally somebody would come in and wanted

7           to transfer ownership, you know, to their parent or

8           take somebody off of a line.  And how do you do all

9           of that stuff without having to bother a district

10          manager or another manager and say, okay, how do

11          you this, because it's not something that you do

12          every day.

13  Q    Right.  So basically, it was just like -- it's just

14         an information source for employees?

15  A    Yes.

16  Q    Was the employee portal available when you started

17         in October of 2009?

18  A    No.

19  Q    When did he become part of Prime's system?

20  A    I think it was months later.  I'm going to say

21         June, July, somewhere around there, they were

22         working on it.  They had a separate -- what they

23         called the employee portal, but really what it was,

24         because Binay was in charge of it, was a sales goal

174

1         portal that basically you went in and said, this is

2         my goal, I'm going to do 10 phones, I'm going to do

3         4 wirelines, whatever, and it would generate kind

4         of an activity based on RQ4. So you could go in

5         there at anytime and say, okay I'm on track, I'm

6         not on track, basically, because I think the two

7         were kind of linked.

8  Q     Uh-huh.

9  A     Or actually, I think Binay would go in from the

10        numbers and put in what everybody did into kind of

11        like an access database that kind of linked to that

12        sight. And so it would generate this like, yes

13        green you're doing great or red you're not doing so

14        great. You need to improve here because you've

15        only done 2 of these and your goal is 6 and you

16        have 15 days left. You know, so it was more to

17        help the solution specialist track their goal so

18        that they could achieve it, you know. Because the

19        philosophy there was that if you knew where you

20        were every day, then you could achieve your goal by

21        tracking it properly, instead of waiting to the

22        last week of the month and go, oh my gosh, I've got

23        to sell 30 phones this week in order to hit my

24        goal.

1   Q       Uh-huh.

2   A       So the goal that Binay had created this sales

3           portal for was to make sure people went on there

4           and tracked where they were.  So if he called you

5           and said, so where are you?  Then you could say,

6           well, I've done this, and this is what I've got to

7           do to get to here.  You know, you could have a plan

8           and not wait to the end, and that's basic sales.

9   Q       And that -- and I guess, like you said, it's just

10          something for the employees to keep track of their

11          performance.

12  A       That's correct.

13  Q       Would it also show chargebacks on that system or

14          was it just sales?

15  A       No, that system was just your sales goal and where

16          you were.

17  Q       Got you.  But if I understand your testimony, back

18          to the employee handbook, you never received this

19          upon your first date of hire or somewhere around

20          there?

21  A       No.

22  Q       And the first time you saw it was when it was on

23          employee portal and you printed it off?

24  A       That's correct.

176

1    Q     Okay.  And I'm not going to make you read through

2          this whole thing because I don't think you would

3          probably remember all the differences between the

4          one you printed off and this one, but I do

5          understand that the date at the top was different

6          than the one you printed off.  Is that correct?

7    A     That's correct.

8    Q     Okay.  If you just flip one page in this handbook,

9          it says, Employee Handbook 2010.  Did yours say

10         Employee Handbook 2010 on it?

11   A     To my recollection.

12   Q     Okay.  Do you still have a copy of the one that you

13         printed off?

14   A     Yes, I do.  And there was a handbook prior to this

15         one.

16   Q     What do you mean?

17   A     There was another handbook prior to this that

18         was -- that I printed out.

19   Q     You mean, like a 2009 handbook?

20   A     I don't think it had a date on it.  I think it

21         wasn't as detailed as this one, like with the table

22         of contents and all of that.  It was more a generic

23         type of a handbook.  And so -- but it's what they

24         had at the time.

177

1    Q    And is that something you printed off when you

2         printed off the one that you said was in black and

3         white or --

4    A    I printed that one off prior to.

5    Q    Prior to -- when did you print that one off?

6    A    Probably shortly after I went to Middle Creek.

7    Q    Going back to your duties as a store manager, would

8         you agree that the duty of the store manager was to

9         work with the appropriate departments or business

10        partners to ensure efficient courteous handling of

11        all customer requests?

12   A    I'm not really sure what that means.

13   Q    Okay.  We'll go to the next one.

14   A    Like, which departments are you talking about?

15   Q    Well, what about this?  Do you think it was the

16        store manager's responsibility to maintain the

17        store's appearance and presentation standards?

18   A    Yeah, I think that -- you know, I don't think it

19        was exclusive to the store manager because I wasn't

20        there 24 hours.

21   Q    Right.

22   A    But to the staff of the store, whether it was

23        myself or Billy, to make sure that the store was

24        vacuumed, that it wasn't dusty, and that all the

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

ROSE LORENZO,                               )
     Plaintiff;                            )
                                  )
     v.                                    )
                                    )
PRIME COMMUNICATIONS, L.P.,                  )
     Defendant.                            )

---

DEPOSITION OF ROSE EMILY LORENZO

---

In Raleigh, North Carolina

Friday, December 14, 2012

Reported by Robbie W. Worley

Worley Reporting

P.O. Box 91447

Raleigh, NC 27675

919-870-8070

EXHIBIT

1

73

| | | |
|---|---|---|
| 1 | A | Uh-huh. |
| 2 | Q | Is that a yes? |
| 3 | A | Yes. |
| 4 | Q | I'm sorry, it's for the record.  Do you know how |
| 5 | | many employees was at that Fuquay store when you |
| 6 | | first started? |
| 7 | A | It was Crystal and Ashley Barnett, and they were |
| 8 | | the only two working in that store when I started. |
| 9 | Q | Okay.  And what job did you take initially with |
| 10 | | Prime Communications? |
| 11 | A | Solution specialist. |
| 12 | Q | And what were your job duties as a Solution |
| 13 | | Specialist? |
| 14 | A | Sales. |
| 15 | Q | Any other job requirements? |
| 16 | A | No. |
| 17 | Q | Didn't have to make any deposits or do any deposits |
| 18 | | or -- |
| 19 | A | No, sir. |
| 20 | Q | Okay.  Who did the scheduling? |
| 21 | A | The scheduling was done through -- the district |
| 22 | | manager would -- my understanding was, the |
| 23 | | scheduling came from the district manager, he said |
| 24 | | this is how many hours for your employees and you |

1          need to put the schedule in RQ4 as to who is

2          working when.

3    Q     And who would put the schedule into RQ4?

4    A     Crystal would.

5    Q     So the allotment of the hours that the store could

6          operate, was given by the district manager, but

7          Crystal would actually assign you the times that

8          you would be working within that store?

9    A     She would.  The district manager would have to

10         approve it and he could change it and say, "No, I

11         think your busier times are here," and he would

12         change the schedule and say, "These are your

13         hours."

14   Q     Got you.  How often did you work in October -- in

15         that first time frame in October or fall of 2010

16         when you initially started with Prime

17         Communications?

18   A     I worked full-time.

19   Q     And what is full-time?

20   A     Eight hours a day, nine hours a day, five days a

21         week, sometimes six days a week.

22   Q     And when would you work six days a week?

23   A     When there was just one other person in the store.

24         At the time when I started at Prime, Ashley Barnett

1    active, why my own personal account was being --

2    had been charged back.  Why I got charged back from

3    Amy.  There was never any resolution to that and

4    they never paid me any of that money back.  You

5    know, so it was like, yeah I told you, you know,

6    this was what was going on, but they didn't say,

7    this is how we are going to fix it.

8  Q  Now, you mentioned this managers' meeting where

9    they came down to Raleigh to discuss different

10   issues.  Was that a managers meeting for all the

11   store managers in North Carolina?

12 A  That was the managers' meeting for the managers in

13   North Carolina, that's correct.

14 Q  How often did you have those managers meeting?

15 A  Once a month.

16 Q  Any other meetings that you had to take a part of?

17 A  Yes.  We had daily meetings, weekly meetings.  The

18   district manager would hold an hour to an hour and

19   a half, sometime two-hour, meetings before the

20   store opened.  Typically, around 8:00 in the

21   morning, sometimes 7:30 to 9:30, because my store

22   opened at 10:00, to go over the numbers, the goal

23   of the district, problems that we were having,

24   whatever.

124

1           You know, whenever he was getting slammed

2     with corporate, we had a meeting every day.  And

3     that was for his ten stores that he had.  Then once

4     a week, there was a three-hour meeting that was for

5     all the stores in Eastern North Carolina, which

6     included the whole eastern district, which included

7     South Carolina and Atlanta, where all of the

8     managers would get on this meeting and Binay, who

9     was the Regional, would host this meeting.

10          And sometimes somebody from corporate

11    would join the meeting and they would talk about

12    whatever the new thing that was happening or some

13    policy change on AT&T's side that we needed to be

14    aware of.  Any promotions or, you know, contests

15    that they were going to have, would be discussed in

16    this meeting.  They would talk about, you know,

17    what market was doing better, what we were going to

18    differently, what they expected, you know, the

19    market.

20          And that was once a week for anywhere

21    from two hours to -- you know, sometimes it could

22    go over the two hours, but usually typically about

23    two hours once a week.  And then there was the

24    once-a-month managers' meeting, which was out of

125

| | | |
|---|---|---|
| 1 | | the store.  The other meetings were on the phone, |
| 2 | | and those meetings were out of the store.  We went |
| 3 | | to Situs Court, which is where is AT&T's corporate |
| 4 | | office is.  And they had a conference room there |
| 5 | | and that would be pretty much four, six, a whole- |
| 6 | | day meeting you would have there.  Sometimes it |
| 7 | | would be four hours, most times it was about six |
| 8 | | hours. |
| 9 | Q | And when were those meetings usually held? |
| 10 | A | Once a month.  I'm not -- they were random days |
| 11 | | so -- |
| 12 | Q | They weren't like the last Friday of every month or |
| 13 | | something like that? |
| 14 | A | No, it was random.  I think it was based on when |
| 15 | | they could get a conference room at Situs Court or |
| 16 | | based on whenever the corporate office said, you |
| 17 | | need to have your meeting this week.  You know, but |
| 18 | | there was no system of we're going to have it the |
| 19 | | second week of every month or we're going to have |
| 20 | | it the first week of every month.  It was pretty |
| 21 | | random. |
| 22 | Q | Speaking of store, the Middle Creek store, what |
| 23 | | were the hours of operation? |
| 24 | A | It was 10:00 to 7:00, Monday through Saturday, and |

126

```
1              11:00 to 6:00 on Sunday.

2    Q    Now, you -- as a sales associate or as a solution

3         specialist, you didn't have to attend any of these

4         meetings.  Is that correct?

5    A    No.

6    Q    Okay.

7    A    I did have to attend trainings at Situs Court,

8         though.

9    Q    Okay.

10   A    Which was equivalent to the managers' meeting,

11        usually about -- it would be like an all-day or

12        half-day meeting that they would have.

13   Q    And were those monthly training sessions?

14   A    They were.

15   Q    And what did they teach you about in these monthly

16        training sessions as a solution specialist?

17   A    Whatever the product that they wanted to push that

18        month, AT&T wanted to push, because the training

19        was conducted by AT&T employees, not by Prime.  So

20        say their push was wireline, they wanted to push U-

21        verse, you know, and home phones, so then the

22        training would be about the benefits of you know,

23        the wireline or this is what we're doing and this

24        is how we're promoting U-verse this month.  And you
```

Examination of Rose Emily Lorenzo
Rose Lorenzo v. Prime Communications, LP

128

```
 1   Q    The mall hours.

 2   A    So during the holiday season, they were open later,

 3        they opened earlier.  And then during the regular

 4        times, they were open when the mall opened and when

 5        the mall closed.

 6   Q    My understanding is, when you were a solution

 7        specialist, you were paid an hourly wage plus

 8        commissions.  Is that correct?

 9   A    Plus commissions, plus overtime.

10   Q    Okay.  And then as a manager, you were paid a

11        salary; is that correct?

12   A    That's correct.

13   Q    Plus commissions.  Did you also receive, I don't

14        know if they called it a commission or a bonus,

15        based on the store's productivity?

16   A    I didn't get paid commissions and the store's

17        commissions.  I got paid the store's commission.

18   Q    Okay.

19   A    Okay.  So, I didn't get paid for my own personal

20        sales.  I got paid for the store, whatever the

21        store did.

22   Q    And if you sold it in the store, then you would get

23        paid because the store made the sale; is that

24        correct?
```

Worley Reporting

129

1                    MR. DUNN:  Objection.

2    Q    Well, let me clarify my question.  You said you

3         didn't get paid your commissions on your sales, but

4         you got commissions on what the store made on their

5         sales, correct?

6    A    That's correct.

7    Q    Okay.  But your sales were a part of the store's

8         sales, correct?

9    A    That's correct.

10   Q    Okay.

11   A    So to clarify, because you said, was I -- I got

12        paid a salary plus commission plus a bonus.

13   Q    Okay.

14   A    I was not getting paid the commission.  I was

15        getting paid the store commission.

16   Q    Okay.

17   A    Not a personal commission in addition to.

18   Q    Got you.  Because what that meant was that you also

19        paid bonuses based on the sales of either Billy or

20        Suleika while they were working in your store at

21        Middle Creek.

22   A    That's correct, but I also received their

23        chargeback too.

24   Q    Yeah.

1   Q   You would be in charge of reporting it?

2   A   Yeah, I would tell -- well, if I saw it, yeah.  It

3       would be my responsibility to not ignore it.  And

4       in the same respect, if I did something that they

5       weren't supposed to do, they could also report me.

6   Q   Do you agree that the manger is ultimately

7       responsible for the activities of the location and

8       will be held accountable for any discrepancy in the

9       store's paperwork, sales, deposits, and inventory?

10  A   I believe that that's what they say.

11  Q   Do you disagree with that being a job

12      responsibility of a store manager?

13  A   Well, because I'm not responsible for all of the

14      activities of the sales for every associate or

15      salesperson in that store.

16  Q   Why not?

17  A   Because I don't -- I'm not really managing them.

18      Number one, I was -- I would be responsible for

19      myself because I worked by myself 90 percent of the

20      time.  So, you know, if I was -- I wasn't with

21      Suleika because I had to have two days off.  She

22      had to have two days off.  So we maybe worked

23      together one day, maybe two, on different shifts.

24      So it would be impossible for me to see everything

1          that she's doing, and for her to see everything

2          that I'm doing.  So I can't say that in my position

3          at Middle Creek, that I was responsible for all the

4          activities that Suleika was doing because I wasn't

5          even in the store.  I wasn't even working.

6     Q    Well, how often did you work in the store?

7     A    Well, I worked -- my shifts, I worked every day.

8          When Suleika wasn't there and Billy wasn't there, I

9          worked seven days a week.  When I got Suleika, then

10         I worked every day but Suleika was off two days and

11         I was off one day, and then we closed on Sunday,

12         right?  So, we only worked together maybe two days,

13         maybe one day, and we worked opposite shifts.

14              Like she would work in the morning and

15         then I would come in and I would close, or I would

16         work in the morning and then she would go home like

17         around 2:00 or 3:00, depending on how many hours

18         they allotted her.  You know, because Suleika was

19         more of a part-timer/full-timer.  She worked maybe

20         30 hours, you know, unless I was on vacation.  You

21         know, then she would have to work 40 hours that

22         week because I was on vacation.

23    Q    So Suleika didn't work a full-time job?

24    A    She didn't work 40 hours a week.  That store wasn't

194

1        your previous testimony, that would be about

2        another -- I think you said it was like a 2- to 3-

3        hour meeting once a week and then an hour meeting

4        every morning.

5    A   Yeah.

6    Q   So that would be another 7 to 10 hours a week?

7    A   7 to 10 hours, maybe more, on average.

8    Q   When you took the job as a manager, or store

9        manager, were you explained that you were not going

10       to be receiving overtime?

11   A   No.  Well, I was explained that if I worked -- as a

12       store manager, I was going to get this salary but I

13       was required to work 45 hours.  But I was not told

14       that if I worked 50 hours or 60 hours, that I was

15       not going to be compensated for that, you know. And

16       so that is something that I addressed all the way

17       up to Michael Castelli.  That you want me to work

18       all these hours by myself with no support.  If you

19       take my salary, I may be making ten bucks an hour.

20           Now I'm working 70 hours a week; you're

21       paying me five bucks an hour.  You know, that has

22       to change.  Well, no, because store managers don't

23       make overtime.  Well, I'm not really managing

24       anybody but myself.  You know, so how am I -- you

1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF NORTH CAROLINA
2                  WESTERN DIVISION

3   ROSE LORENZO, ON BEHALF OF    *
    HERSELF AND ALL OTHERS        *
4   SIMILARLY SITUATED            *
         PLAINTIFF,               *
5                                 * CASE NO: 5:12-CV-00069-H
    VS.                           *
6                                 *
    PRIME COMMUNICATIONS, L.P.,   *
7   A TEXAS GENERAL PARTNERSHIP,  *
         DEFENDANT.               *

8

9

10  ********************************************************

11            DEPOSITION OF ANGELA DUNLAP

12                 DECEMBER 6, 2012

13                  Volume 1 of 1

14  ********************************************************

15

16

17

        DEPOSITION OF ANGELA DUNLAP, produced at the
18  instance of Plaintiff and duly sworn, was taken in the
    above-styled and numbered cause on the 6th day of
19  December, 2012, from 9:31 a.m. until 12:49 p.m., before
    Judy S. Hodges, CSR, in and for the State of Texas,
20  reported by stenograph machine, at the offices of
    Weinstein Spira & Company, PC, Three Greenway Plaza,
21  Suite 1750, Houston, Harris County, Texas, pursuant to
    the Federal Rules of Civil Procedure and the provisions
22  stated on the record.

23

                                    EXHIBIT
24                                     2

25                         JOB NUMBER: _____

ROSS REPORTING SERVICES, INC.              281-484-0770

Electronically signed by judy hodges (101-114-351-9776)                     d6a3d885-0ab1-443a-9898-110fa43fccc4

1   be a regional director if the market was large enough

2   to so need. Below that would be district managers. To

3   kind of give you a feel for that, you would have a

4   vice-president of the Southeast Region. Underneath

5   that they had like Georgia and North and South

6   Carolina. North and South Carolina might have a

7   regional director and Georgia have a regional

8   director. Then underneath that you have district

9   managers reporting to that regional.

10           Most district managers had 10 to 12

11   stores unless they were in a geographical area that was

12   very spread out. Then they might have as few as five

13   because of the driving distance and having to get to

14   all those locations. Underneath district manager would

15   then be -- each store would have a store manager.

16   Underneath the store manager there would be at least

17   two sales reps, two or more sales reps.

18      Q   And who -- so each region had a

19   vice-president, and your example was Southeast Region?

20      A   Uh-huh.

21      Q   And that's yes, right?

22      A   Yes.

23      Q   So is there a vice-president of sales and

24   operations in Sugar Land at corporate that oversees the

25   regional VPs?

Electronically signed by judy hodges (101-114-351-9776)      d6a3d885-0ab1-443a-9898-110fa43fccc4

* * *

31

1     A    The schedules were turned into the district

2  manager.  The district manager then would approve or

3  say -- you know, critique the schedule if he felt or

4  she felt there was an issue with it.

5     Q    Do you know if any solution specialists

6  reported directly to any district managers?

7     A    That would only occur if a store did not have

8  a manager.

9     Q    And in what circumstances would a store not

10  have a manager?

11     A    The manager was fired, the manager quit, the

12  manager was demoted, while we're looking for a

13  replacement.

14     Q    So mainly interim?

15     A    Correct.

16     Q    Were there any stores that were -- let's take

17  an example, the mall kiosk -- where a solution

18  specialist would report directly to a district manager

19  without an assigned store manager?

20     A    No.

21     Q    So even a kiosk would have assigned store

22  managers?

23     A    Correct.

24     Q    Okay.  And who would be responsible for the

25  staffing at the store level?

Electronically signed by judy hodges (101-114-991-9776) Case 5:12-cv-00069-H   Document 52-2   Filed 07/19/13   Page 3 of 6   dea8d885-9ab1-443a-9898-110fa43fccc4

1      A     The store manager is responsible for

2    recruiting for their location.  As long as -- and they

3    had a certain protocol to follow as far as who was

4    qualified to work for Prime.  If a store was really

5    short staffed a district manager might assist in

6    finding candidates.  But it was up to the store manager

7    to keep their store staffed.

8      Q     And from a budget dollars standpoint did the

9    store manager have the ability without approval to

10   hire?  In other words, upstream approval.  So could a

11   store manager hire an employee without the district

12   manager's approval?

13     A     All stores were allotted two -- three head

14   count which is two sales reps and a manager.  If a

15   store wanted to add a fourth person, then yeah.  If

16   they went outside the box, they would have to get

17   approval for additional head count than what was

18   allotted to each store.

19     Q     And do you know how many stores, for instance,

20   were fully staffed during the times that you were --

21   the full three head count during the times that we're

22   talking about?

23     A     I would say at least 20 percent of the stores

24   were always -- we always had at least 20 percent of the

25   stores where we were actively recruiting to fill

Electronically signed by judy hodges (101-114-391-9776) Case 5:12-cv-00069-H   Document 52-2   Filed 07/19/13   Page 45 of 6   8c03d839-0a9f-443c-989f-110fa43fccc4

1    A    They were.  I think that's changed.

2    Q    And when did that change?

3    A    Summer of two -- July of 2012.

4    Q    And how are the store managers now classified?

5    A    They are nonexempt.

6    Q    Did that relate in any way to the Department

7    of Labor investigation?

8    A    No.

9    Q    Why did you change the store managers from

10   exempt to nonexempt?

11   A    Part of it had to do with a scheduling

12   analysis.  We had managers that were working 30, 35

13   hours a week and had sales reps working overtime; and

14   in order to get the managers to be there more we had to

15   convert them to an overtime rate.  In other words,

16   force them to be there.

17   Q    So were they still paid salary, the managers?

18   A    Up until July and then they were converted to

19   hourly and they're at $10 an hour or more.

20   Q    How long did this analysis take place?  When

21   did it begin, the analysis of -- consideration of

22   changing from -- the store managers from a nonexempt

23   status to -- or rather an exempt status to a nonexempt

24   status for overtime purposes?

25   A    That was fall 2012 -- fall 2012.  Winter,

Electronically signed by judy hodges (101-114-351-9776)                    d6a3d885-0ab1-443a-9898-110fa43fccc4

ANGELA DUNLAP

1    A    Yes.

2    Q    All right.  In the summer of 2012 you didn't

3    completely rewrite the job function for a store manager

4    and say, "Now you're going to work different hours.

5    Now you're going to do different things"?

6    A    No.

7    Q    All right.  As I understand your position,

8    Prime Communications made a voluntary decision to do

9    this change of store managers, but it wasn't

10    necessarily related to a legal requirement, that it was

11    voluntary.  Is that correct?

12    A    That's correct.

13    Q    All right.  I understand that.  I may be

14    done.  Let me check.

15             MR. WALKER:  Good, because I'm hungry.

16             MR. BUTLER:  I know.  It's time to eat.

17    Q    (BY MR. BUTLER)  Are there any third-party

18    vendors that we've not discussed for any of these

19    systems that we've talked about?  Most of them are web

20    based, but the payroll systems or the timekeeping

21    systems.  I mean, it's pretty much the provider if

22    they're web based.

23    A    There's no other third-party vendors.

24    Q    In the kiosk where are the FLSA or state

25    overtime posters maintained?

Electronically signed by judy hodges (101-114-351-9776)

# Rose Lorenzo v. Prime Communications, L.P.

### Ashley Barnette
### 2/27/2013



919-676-1502
FAX: 919-676-2277
www.garrettreportingservices.com
office@grsnc.com

EXHIBIT
3

1          Q    As a solution specialist, how did you -- how

2    were you scheduled to work?

3          A    Forty (40) hours a week, some overtime; two

4    days off a week, which did change.

5          Q    How did that change?

6          A    Days were different.

7          Q    Oh, you mean the days changed?

8          A    Yes.

9          Q    Okay.

10         A    The days off.

11         Q    But you always got two days off a week as a

12   solution specialist?

13         A    Yes.

14         Q    Okay.  And as far as the scheduling which

15   days you got off, did you make requests to Billy or

16   I -- is it Isa?

17         A    To both.

18         Q    To both of them?  Tell me how that process

19   happened.

20         A    I would ask Billy.  Sometimes Billy would

21   approve; others he would tell me to speak to the district

22   manager.

23         Q    Okay.  And did you -- while working as a

24   solution specialist at the Fuquay-Varina store did you

25   consider Billy Moan to be your boss or a superior?

1    representative -- which mine was Miesha -- she would set

2    up web pages advertising for employment at specific

3    locations.  We also had a Prime Communications website

4    where you could sign up to be an employee.  You could put

5    in your resume.

6            Q    Gotcha.  When you started, or when you were

7    moved to the Cary Towne Mall as a store manager, were you

8    told what type of responsibilities were expected of you as

9    a store manager?

10           A    Yes.

11           Q    Okay.

12           A    But a lot of them were the same things I did

13   as a solution specialist.

14           Q    Okay.  And what are -- well, tell me the

15   different responsibilities that a store manager has that a

16   solution specialist does not have.

17           A    The only things that I can think of are

18   setting the schedule, which is subject to change due to

19   the district manager's discretion, and making sure that my

20   store hit their goals.  That's really it.

21           Q    Okay.  Did you have any type of training

22   responsibility for your solution specialists to make sure

23   they were doing their jobs?

24           A    Actually, that is another thing.  I did have

25   to train the employees, but that was also done by the DM

1    and the RM, as well.

2                    And, also, I did have to do a monthly

3    ordering of phones and accessories, but we would not get

4    what was ordered.  Headquarters would send us what they

5    wanted to send us for our store location.  So I actually

6    quit ordering, because I never got what I needed.

7            Q    Okay.  Anything else?

8            A    That's it; that I can think of.

9            Q    We also talked a little earlier about doing,

10   kind of, the first round of interviews.  Did you ever have

11   that responsibility as a solution specialist?

12           A    No.  Not with interviews.

13           Q    Okay.  So would that be another

14   responsibility of a store manager that a solution

15   specialist didn't have to worry about the --

16           A    Yes.

17           Q    -- kind of, marketing [sic] -- not the

18   marketing, but the recruiting of new employees?

19           A    Yes.  Like we discussed earlier, that is

20   something that managers do, but we do not have the final

21   say so on who's hired and who's not.

22           Q    Okay.  What about marketing for the store;

23   who's responsibility is that?

24           A    Employees and managers.

25           Q    Okay.  As a solution specialist, do you

1      take -- is it their responsibility to take initiative in

2      the marketing or is it -- or how does -- how does even

3      marketing efforts come about in a store?

4                A      As a solution specialist, I made fliers.

5                Q      Uh-huh (yes).

6                A      I handed out fliers.  I helped with events.

7                Q      Uh-huh (yes).

8                A      I went to businesses and spoke to them about

9      business deals.

10               Q      Uh-huh (yes).

11               A      So we all did the same thing as far as

12     marketing.  Managers did the same exact thing.  I may say

13     to an employee, "How about going here?"

14               Q      Uh-huh (yes).

15               A      But that was my only duty, as far as

16     marketing, that was different than theirs.  I could tell

17     them to go somewhere.

18               Q      So as far as marketing is concerned, as a

19     solution specialist, were you told by a manager to go to

20     certain places, or were you told by a manager to pass out

21     fliers?

22               A      Not all of the time.

23               Q      Okay.

24               A      I took initiative, and a lot of employees

25     took initiative.  If we did do the marketing ourselves,

## Important Information

The FLSA requires that covered employees in the United States be paid at least the federal minimum wage for each hour they work and overtime pay at one and one-half the employee's regular rate of pay for all hours worked over 40 in a workweek. If you are unsure about whether a particular employment situation is covered by the FLSA, you should review the FLSA Coverage and Employment Status Advisor. One particular exemption, FLSA section 13(a)(1), exempts from both minimum wage and overtime pay protections bona fide executive, administrative, professional and outside sales employees. FLSA sections 13(a)(1) and 13(a)(17) also exempt certain employees in computer-related occupations. The FLSA contains several other exemptions from the minimum wage and/or overtime pay protections which are not covered in this Advisor.

For the FLSA section 13(a)(1) exemptions to apply, an employee generally must be paid on a salary basis of no less than $455 per week and perform certain types of work that:

* is directly related to the management of his or her employer's business, or
* is directly related to the general business operations of his or her employer or the employer's clients, or
* requires specialized academic training for entry into a professional field, or
* is in the computer field, or
* is making sales away from his or her employer's place of business, or
* is in a recognized field of artistic or creative endeavor.

FLSA Section 13(a)(17) exempts hourly paid employees who perform certain types of work in the computer field if they are paid at a rate of not less than $27.63 per hour.

Exemptions are determined based on each specific employment situation. Job titles alone do not determine the exempt or non-exempt status of any employee. Each determination is based on the specific job duties performed and compensation received. Therefore, you should run the Advisor for each specific employee or for each group of employees who perform essentially the same duties and receive essentially the same compensation package.

A number of states have also enacted minimum wage and overtime pay laws, some of which provide greater worker protections than those provided by FLSA. In those situations where an employee is covered by both Federal and state wage laws, the employee is entitled to the greater benefit or more generous rights provided under the different parts of each law. Learn more about state laws.

Before continuing, you may want to review the glossary of terms. You may also want to review the FLSA Coverage and Employment Status Advisor and/or the FLSA Hours Worked Advisor.

Continue

https://www.dol.gov/elaws/esa/flsa/overtime/info.htm

EXHIBIT
4

|   |   |   |
|---|---|---|
| ROSE LORENZO | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 5:12-cv-69-H |
| v. | ) | |
| | ) | |
| PRIME COMMUNICATIONS, L.P. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## AFFIDAVIT

I, Aslam Hussain, acting in my capacity as custodian of employment records for Prime Communications, L.P. hereby declare as follows:

1.      The time clock records of Rose Lorenzo attached hereto as Exhibits A and B are copies of the time clock records of Rose Lorenzo for the calendar years 2010 and 2011. Exhibits A and B were copied from copied from the employee time clock records maintained by Prime Communications, L.P. in accordance with its regular practices and procedures.

2.      The documents provided herewith are true and authentic copies of what they purport to be.

3.      The documents provided herewith were kept in the course of a regularly conducted activity of Prime Communications, L.P.

Dated: February 7, 2013

_____
Aslam Hussain, V.P. Finance

EXHIBIT
5

Subscribed and Sworn to before me
this 7th day of February, 2013

Sarai Cebollero
Notary Public



2

Exhibit A

Employee Payroll Report For Prime Communications From 01-Jan-2010 To 31-Dec-2010
[Date: 06-Feb-2013 05:20 PM]

| Employee | ID # | Location | Scheduled | Regular Clocked | Overtime Clocked | Double OT Clocked | Total Clocked | Part Time | PT Vacation Earned |
|---|---|---|---|---|---|---|---|---|---|
| Rosa Lorenzo | 8193 | Falls Point (S) | 0 | 15.05 | 6.15 | 0 | 21.2 | No | 0 |
| Rosa Lorenzo | 8193 | ZZ - Closed - Middle Creek Commons (S) | 19.0 | 1851.68 | 180.42 | 0 | 1822.1 | No | 0 |
| Rosa Lorenzo | 8193 | Fuquay Crossings (3) | 185 | 33.47 | 0 | 0 | 33.47 | No | 0 |
| Rosa Lorenzo | 3193 | PRIME FULFILLMENT | 0 | 9 | 0 | 0 | 9 | No | 0 |
| Rosa Lorenzo | 8193 | ZZ - Closed - Holly Springs Crossing (S) | 0 | 0 | 0 | 0 | 0 | No | 0 |
| | | | 2169 | 1709.2 | 186.57 | 0 | 1895.77 | | |
| | | | 2169 | 1709.2 | 186.57 | 0 | 1895.77 | | |

# Exhibit B

Employee Payroll Report For Prime Communications From 01-Jan-2011 To 31-Dec-2011
[Date: 06-Feb-2013 05:24 PM]

| Employee | ID # | Location | Scheduled | Regular Clocked | Overtime Clocked | Double OT Clocked | Total Clocked |
|---|---|---|---|---|---|---|---|
| Rosa Lorenzo | 8193 | ZZ - Closed - Middle Creek Commons (5) | 929.75 | 801.3 | 4 | 0 | 805.3 |
| | | | 929.75 | 801.3 | 4 | 0 | 805.3 |
| | | | 929.75 | 801.3 | 4 | 0 | 805.3 |

# Lorenzo v Prime Communications, LP

Deposition of
Guy Rodriguez
1/16/2013



919-676-1502
FAX: 919-676-2277
www.garrettreportingservices.com
office@grsnc.com



EXHIBIT
6

1          A    Yes.

2          Q    All right.  Tell me about those.

3          A    When you went to meetings, if you worked at

4    another store you couldn't log in and out of their system

5    because you're only capable of doing it at your own store.

6    And you had to fingerprint, so it only knows the

7    fingerprint.  That's how you would log in and log out.

8          Q    Tell me about the meetings.  What type of

9    meetings did you have?

10         A    They would have meetings at the AT&T office.

11         Q    And where is that?

12         A    That would be, I guess, in Cary, considered

13   Cary.

14         Q    And what type of meeting was that?

15         A    It would be like a sales meeting.  You'd sit

16   like at a big desk like this (indicating to conference

17   table).

18         Q    And how often did those sales meetings

19   occur?

20         A    Every month.  And then you had every morning

21   before you went to work you would have a half hour to an

22   hour phone call meeting almost every day that wasn't

23   clocked.

24         Q    And what time would that occur?

25         A    That would occur before the store opened.

1    So say if your store opened at ten o'clock, so if you're

2    supposed to be at work at ten, it would be a nine o'clock

3    meeting every day on the phone.  And sometimes it could be

4    15 minutes or it could be as long as an hour until you get

5    to the store.

6         Q    And where were you usually during these

7    phone meetings?

8              A    Home.

9         Q    Were you at the store, at home?

10             A    Yeah, home, in my car.

11        Q    But you would just do them on your cell

12   phone?

13             A    That's correct.

14        Q    Any other meetings that you attended?

15             A    That would be it.

16        Q    The sales meeting, who would be at those

17   meetings?

18             A    It would be Jeremy, AT&T, maybe a guest from

19   Texas, one of the guys from Texas.  It could be HR from

20   Texas just going over new things.

21        Q    And were those for just store managers or

22   store managers and sales associates?

23             A    Only just managers.  They were the managers

24   only.

25        Q    And what about the morning meetings, were

## WAGE DEDUCTION AUTHORIZATION AGREEMENT

I understand and agree that my employer, Prime Communications, L.P. (the "Company") may withhold or deduct pay from time to time for reasons that fall into the following categories up to the maximum amount permitted by law per pay period:

- any loss to the premiums for the Company's group medical coverage or any contributions I may make to a retirement, 401(k), or pension plan sponsored or maintained by the Company;
- installment payments on loans, store credit, or wage advances given to me by the Company, including the value of merchandise that I purchase at the Company's employee charge account, and if there is a balance remaining when I leave the Company, the balance of such loans, store credit, or advances;
- if I receive an overpayment of wages for any reason, repayment to the Company of any overpayments;
- the cost to the Company of personal long-distance calls I may make on Company phones, of Internet accounts, and of personal faxes sent by me on the Company's machinery or equipment;
- the cost of repairing or replacing any Company supplies, materials, equipment, property, or merchandise that I may damage (other than normal wear and tear) or that I lose or fail to return, or any theft or unauthorized use by Company, damage, or employee theft. I also understand and agree that the Company is not required to pay commissions until it actually receives payment from the customer and any commission advanced to me will be subject to repayment obligations if a customer fails to pay. I understand that all commissions are earned;
- any personal loans and prepaid sales are subject to a chargeback against future earned commissions, both of which may be deducted from my pay when the Company is obligated to same; and
- in the event of a separation from the company, the Company is authorized to withhold my final commission check for a period of 90 days in lieu of future chargeback charges.

I understand that the Company may deduct money from my pay under the above circumstances if any of the above situations occur.

Full Name:  *Roel Echrange*

*10/20/09*

DEFENDANT'S
EXHIBIT
2

# WAGE DEDUCTION AUTHORIZATION AGREEMENT

I understand and agree that my employer, Prime Communications, L.P. (the Company), may deduct money from my pay from time to time for reasons that fall into the following categories up to the maximum amount permitted by law per pay period:

1. my share of the premiums for the Company's group medical/dental plan;

2. any contributions I may make into a retirement, 401k, or pension plan sponsored, controlled, or managed by the Company;

3. installment payments on loans, store credit, or wage advances given to me by the Company, including the value of merchandise that I purchase or have purchased at my employee charge account, and if there is a balance remaining when I leave the Company, the balance of such loans, store credit, or advances;

4. if I receive an overpayment of wages for any reason, repayment to the Company of such overpayment;

5. the cost to the Company of personal long distance calls I may make on Company phones or on Company accounts, and of personal faxes sent by me using Company equipment or Company accounts;

6. the cost of repairing or replacing any Company supplies, materials, equipment, money, or other property that I may damage (other than normal wear and tear), lose, fail to return, or take without appropriate authorization from the Company during my employment;

7. administrative fees in connection with court-ordered garnishments or legally required wage attachments of my pay, limited in return to the amount or amounts allowed under applicable laws;

8. the post paid and pre-paid sales are subject to a 180-day deactivation deduction as converted commissions, both of which may be deducted from my pay when the Company is informed of same; and

9. in the event of separation from the company, the Company is authorized to withhold my final commission check for a period of 90 days in lieu of future deactivation charge-backs.

I agree that the Company may deduct money from my pay under the above circumstances, or if any of the above situations occur.

Full Name:

Date:

# WAGE DEDUCTION AUTHORIZATION AGREEMENT

I understand and agree that my employer, Pinco Communications, L.P. (the Company), may deduct money from my pay from time to time for reasons that fall into the following categories or to the maximum amount permitted by law per pay period:

1. my share of the premiums for the Company's group medical/dental plan;

2. any contributions I may make into a retirement, 401k, or pension plan sponsored, controlled, or managed by the Company;

3. installment payments on loans, store credit, or wage advances given to me by the Company, including the value of merchandise that I purchase or have purchased on my employee charge account, and if there is a balance remaining when I leave the Company, the balance of such loans, store credit, or advances;

4. if I receive an overpayment of wages for any reason, repayment to the Company of such overpayment;

5. the cost to the Company of personal long-distance calls I may make on Company phones or on Company accounts, and of personal faxes sent by me using Company equipment or Company accounts;

6. the cost of repairing or replacing any Company supplies, materials, equipment, money, or other property that I may damage (other than normal wear and tear), lose, fail to return, or take without appropriate authorization from the Company during my employment;

7. administrative fees in connection with court-ordered garnishments or legally required wage assessment of my pay, limited in extent to this amount or amounts allowed under applicable laws;

8. the post paid and pre-paid sales are subject to a 180-day deactivation deduction on all verbal commissions, both of which may be deducted from my pay when the Company is informed of same; and

9. in the event of separation from the company, the Company is authorized to withhold my final commission check for a period of 90 days in lieu of future de-activation charge-backs.

I agree that the Company may deduct money from my pay under the above circumstances, or if any of the above situations occur.


Full Name:

Date:

4/1/2011





FIELD EMPLOYEE HANDBOOK AND POLICY MANUAL

# Prime Communications

Case 5:12-cv-00069-H   Document 53-3   Filed 07/19/13   Page 1 of 31

# Table of Contents

Purpose of Handbook

- Handbook Disclaimer                    Page 4
- Equal Employment Opportunity           Page 5
- Employment-At-Will                     Page 5
- Proprietary and Confidentiality        Page 5-6
- Inventions and Discoveries             Page 6
- Ethics Hotline                         Page 6

Employment Questions

- New Employee                           Page 6
- Hiring of Family Members               Page 6
- Re-hire of Employees                   Page 7-8
- Promotion/Demotion Criteria            Page 8
- Frequently Asked Payroll Questions     Page 9
  - Pay Days                             Page 9
  - Overtime                             Page 9
  - W-4 Withholdings                     Page 9
  - W-2 Forms                            Page 9
  - Reporting hours worked               Page 9
  - Processing payroll changes           Page 10
  - Direct deposit                       Page 10
- Commissions                            Page 10
  - When Commissions are paid            Page 10
- Employment Verification                Page 11
- Trial Period                           Page 11
- Work Schedule                          Page 12
- Employee Classifications               Page 12
- Performance Review                     Page 13
- Progressive Disciplinary Action        Page 13

Benefits

- Vacation                               Page 14
- Holidays                               Page 14-15
- Bereavement                            Page 15
- Jury Duty                              Page 15-16
- Leave of Absence                       Page 16
- Military Leave                         Page 17
- Health/Dental/Vision Insurance         Page 17-18

Policies

- Business Professional Conduct — Page 19
- Payment of Bonuses — Page 19-20
- Non-Negotiable Behavior — Page 20
- Anti-Harassment Policy — Page 21
- Workplace Violence, Firearms and Weapons — Page 22
- Smoking/Tobacco Usage — Page 22
- Drug/Alcohol Policy — Page 22
- Occupational Injuries and Illnesses — Page 23
- Conflict of Interest — Page 23
- Conflict/Dispute Resolution Policy — Page 23-24
- External Employment — Page 24
- Dress Code Policy — Page 25-26
- Driving Policy — Page 27-28
- Electronic Communication Acceptable Usage — Page 28
- Social Networking Sites — Page 29
- Acceptance of Gifts — Page 29
- Company Communications — Page 29
- Business Related Travel — Page 29
- Cell Phone Usage — Page 30
- Inclement Weather and Temporary Shut Down of Company Operations — Page 30
- Protection of Company Assets — Page 30-31
- Restitution for Company Losses — Page 31

## Handbook Disclaimer

This Employee Handbook is provided as a guide and is not to be considered a contract nor does it in any way change the employment-at-will doctrine. Prime Communications reserves the right to make changes to the policies, procedures and other statements made in this Employment Handbook. Business conditions, federal and state law and organizational needs are constantly in flux and may require that portions of the handbook be rewritten. This is necessary to successfully provide the appropriate employment relationship and to obtain the goals of the organization. The Handbook may be modified or amended from time to time, and such modifications may be found on the Company's website and ADP Self-Service site. It is the responsibility of the employee to periodically review the Handbook for modifications that maybe applicable to them.

When policies change they may not become part of the Handbook immediately. Such changes that are sent to employees will be documented and enforced until such time as the Employee Handbook can be updated to reflect the new policies.

However, the Dispute/Conflicts Resolution Program referenced in this Employee Handbook is contractual in nature for as long as it remains in effect. Although that Program may be changed, any disputes occurring prior to the effective date of the change, will be processed in accord with its provisions, which existed at the time.



# Purpose of Handbook

## Equal Opportunity Employer

It is the policy of Prime Communications not to discriminate against any associate or applicant for employment because of race, color, religion, sex, national origin, age, disability, marital/familial status or veteran status. This policy relates to all phases of employment, including, but not limited to, recruiting, hiring, transfers, promotions, compensation, training, benefits and terminations.

## Employment-At-Will

All individuals employed by Prime Communications or its divisions, subsidiaries and affiliated companies are employed on an at-will basis. As such, each employee may choose to resign his/her employment at any time, for any reason or for no reason at all. Similarly, the Company may choose to terminate an employee's employment at any time, for any reason or for no reason at all.

It is not, nor has it ever been, the Company's intention to modify, alter, or eliminate the employment-at-will relationship for any employee or group of employees through any statement, document, computer message, telephone message, video presentation, or by any other means, whether express or implied. Nor is any Company representative, employee, supervisor, manager, or individual owner authorized to modify, alter or eliminate this at-will employment arrangement.

## Proprietary and Confidentiality

During the performance of your job, Prime Communications will share a lot of information with you that is confidential. In fact, almost everything you learn about Prime Communications is confidential and should not be disclosed to anyone outside of Prime Communications. Every Associate has the responsibility to keep this information within Prime Communications so that Prime Communications can maintain its competitive edge. All customer and employee personal and performance matters must be held in the strictest confidence. Employees must maintain confidentiality of all information relating to the Company's clients, customers, fellow associates and their business operations, including but not limited to, services, systems, pricing, billing, customer lists, technology, securities information and employee Social Security numbers. No Prime Communications or Prime Communications-related information, including without limitation, documentation, notes, files, records, oral information, computer

files or similar materials (except in the ordinary course of performing duties on behalf of Prime Communications) may be removed from a Prime Communications' premises without permission from a member of Executive Management. These obligations of confidentiality continue after an individual's employment with Prime Communications ends.

## Inventions and Discoveries

During your employment by the Company and for a period of one year after the termination of your employment for any reason, any and all articles and processes invented or discovered by you or with your participation (whether or not patented or patentable), trademarks, patents, designs, and theories of production, management, operations, and marketing, and, in general, anything of value received or created by you, relating to Company or the business of Company or to any of its affiliates, or the business of its affiliates, and all rights of every kind and nature whatsoever there under are and shall immediately be and become the property of Company and not of you. You shall promptly notify the Company's management of all such items and shall assign, transfer, and deliver to Company all patents, copyrights, royalties, designs, copy, and theories and any and all rights and interests whatsoever thereto and there under, without further compensation, immediately upon the request of the Company's management.

Employees will be subject to disciplinary action including termination for knowingly or unknowingly revealing information of a confidential or proprietary nature. Employees and ex-employee's will be subject to legal recourse by the Company to prevent disclosure or use of confidential information.

## Ethics Hotline

Prime Communications is dedicated to providing a safe and ethical environment for our employees to work. If an employee feels that they are being subjected to or are aware of unethical behavior such as harassment or theft, they may contact the Service Center through the portal Ethics Hotline in order to report this issue. This is an anonymous service, but in the event that you identify yourself and the information provided leads to the discontinuation of practice being reported there is a $100 reward. Your concerns are very important and we encourage you to call at any time.

# Employment Questions

Here are the answers to most questions that you will have regarding your employment with Prime and what Prime's Policy is regarding them.



### New Hire Paper work

New employees will be required to complete New Hire paperwork before beginning employment to ensure proper and timely payroll and benefit processing. All newly hired employees must complete the following paperwork and submit to People Service before beginning employment:

- W-4
- State withholding form, if applicable
- I-9 Employment Eligibility Form
- Direct Deposit Form
- Copy of two ID's

## How old do you have to be to work for Prime?

An employee must be at least 18 years of age or older to meet state regulations on contracts.

## Can I work with a Family Member?

Prime Communications was built on family and community values. We will employ multiple persons of the same family, whether as an employee or contractor. However, in order to avoid a potential conflict of interest, Prime Communications will not allow family members to work in the same department, section, store or directly supervise a family member. This includes any other area where there may be a conceived or real conflict of interest.

## What is the policy on Re-hiring Employees?

To be eligible for rehire an employee must have given and fulfilled a two-week notice period. The employee must not have been on written warning at the time of resignation, must not have been terminated for misconduct and must have returned all Company property in good condition.

Employees that are being rehired within three months of termination are eligible to use their original hire date for all company benefits except insurance benefits.

Any employee rehired after 3 months of termination will be considered a new hire.

Rehires will be subject to a background check like any other applicant if they have been gone for longer than 3 months.

## Promotion/Demotion Criteria

Opportunities are granted to those individuals who maintain a professional work ethic and demonstrate consistent high performance through consistently achieving quota requirements, continuously learning and taking on more leadership responsibilities. In general, an employee must be employed with the Company for six (6) months before he/she is eligible to apply for another position within the Company. However, the Company may at its discretion transfer or promote an employee based on the needs of the Company.

In order to qualify for a management position, the candidate must meet 3 criteria.

1. Completed Carrier and Prime Training.
2. Have at least 2 years prior management experience.
3. If no prior management experience at least 1 year of employment with Prime Communications.



Field Step-Progression

Regional Director
District Manager
Store Manager
Solution Specialist

## Frequently Asked Payroll Questions

### When am I paid?

Prime Communications is on a bi-weekly payroll cycle. We pay our associates every other Friday.

### If I work overtime, am I paid extra?

Hourly associates are paid time and one-half for hours worked in excess of 40 hours in one (1) week. All overtime must be approved in advance by the manager. However, if the state guidelines are different to the federal rule as outlined above, we will follow the state guideline.

### How do I change my W-4 withholding?

You can find the W-4 Form on ADP self-serve site to make any changes to the total number of allowances withheld from your paycheck. The total number of allowances includes filing status of single or married.

### How do I get my W-2?

W-2's are posted electronically on the ADP I-pay website. You may access this information for up the 3 years upon departure from the Company. When you create your I-pay login with ADP, you automatically set up W-2 access as well.

### How do I report the hours I work?

Hourly employees are responsible for the proper and timely reporting of hours worked in the time reporting system according to established procedures. All employees are expected to clock in and out of the RQ4 POS system. Only hours clocked through the Punch Clock are processed. If you forget to clock in, clock in as soon a possible and send a correction to your District Manager with the actual time you were at work. Employees must approve their payroll hours in order to get paid. If an employee does not approve their hours they will have to wait until the following payday to get paid once the hours are finally approved. The only exceptions to this policy are new hires.

### How do I get paid?

Prime Communications pays employees with either a Check Card or Direct Deposit.



Check Card – You will receive a Check Card from Payroll upon being hired if direct deposit information is not received. Should an employee choose to continue receiving their pay via the check card they will incur usage charges from Secure Cash, the Company that process the Check Card transactions. Therefore we strongly recommend setting up Direct Deposit. If a check card is lost or stolen it is the employee's responsibility to notify payroll.



Direct Deposit – You will need to fill out the direct deposit form found on portal or in your new hire paperwork. This form requires that you attach a voided check or document from bank that confirms your bank information. Your direct deposit form will need to be forwarded to People Service Department. If you close or change bank accounts it is your responsibility to notify Payroll.

Prime Communications is not liable or responsible for being misinformed as to how an employee wants to receive their paycheck or if the instructions are incorrect. Providing wrong or incorrect information can result in you not receiving your compensation in a timely manner. Please make certain that you keep Payroll informed of how and where you wish to receive your pay check via the two methods outlined above.

### When are Commissions Paid?

Commissions are paid on a separate payroll from regular earnings. The Commissions Payroll Schedule is posted on the Employee Portal for your review. New employees will receive their first commission check after the first 60 days of employment. All Commissions are subject to Carrier and Company charge backs. Please refer to the Chargeback Policy found on ADP self-serve website under the Payday tab.

Due to the fact that commissions are subject to carrier charge backs, **ALL** unpaid commissions, upon termination are paid 180 days after termination.



## What should I do if I need a Verification of Employment?

Information regarding employment will only be provided with written authorization from the associate. Inquiring parties should be informed that all requests need to be made in writing to the People Services Department by three methods;

Email: psd@primecomms.com

Mail: Prime Communications
Attn: People Services Department
12550 Reed Road #100
Sugar Land, Texas 77478

Phone: 281-240-7800 Ext. 4817

Note that we will not give out any information without your written consent.

## *Does Prime give out my information to anyone who inquires?*

Prime Communications complies with requests for information from federal, state or local authorities, including officials and authorized representatives of the courts, law enforcement and other government agencies. Prime also provides information in response to subpoenas and orders issued by courts and administrative agencies. Requests for information from government agencies, including subpoenas and orders, should be forwarded to the People Services Dept. immediately upon receipt.

## *Who should I contact if my personal information changes?*

If any personal information about you changes (name, telephone number, address, etc...), notify your manager in writing or go to People Services Information System, HRB and change your personal information.

## *Trial Period*

All employees begin with a 60-day introductory period, which will be used for training purposes. This period begins on the first full day of employment and will end on the completion of 60 days of service. During this time, initial performance, job compatibility and attendance will be closely monitored. Upon completion of this period employees are expected to be at a 100% quota attainment. Prime Communications may end the at-will employment relationship at any time during or after the trial period.

### Work Schedule

Prime Communications work week is considered to begin on Saturday and end on Friday. Store and Mall locations will have varying hours of operation.

Regular work hours for the Service Center are from 9:00 am to 6:00 pm. However, depending on business needs, departments may establish flexible work arrangements for individual employees or for the entire department with advance approval from the appropriate business leader and the People Services Department.

### What is my schedule?

Schedules will be determined by management. If there are certain times when an associate cannot work, this must have been discussed and agreed upon with his/her manager during the interview process. However, we do not guarantee any set or fixed schedule and hours may be subject to change.

### What if I cannot make it to work as scheduled?

If an associate is going to be late or must be absent, he/she must personally notify his/her manager or supervisor at the start of the work week schedule to advise the supervisor of the reason for the absence and the expected date or time to return to work. Employees who are habitually late and who do not give prior notice will be subject to disciplinary action up to and including termination. Employees who fail to report for a scheduled shift without prior notification and approval will be considered to have voluntarily resigned their position.

### How are employees Classified?

Employees will be classified as one of the following:

Hourly, non-exempt, full-time: Employees who are hired to regularly work thirty-two (32) hours or more each week for a period to exceed six (6) months. Under special circumstances, such as illness, a regular, full-time employee may work less than normal hours a week for a specified, short-term period without losing full-time employee benefits. This period generally will not exceed three (3) months.
Hourly, non-exempt, part-time: Employees who are hired to regularly work less than thirty-two (32) hours each week.

Salary, exempt: Employees who work on salary and who are not paid based on hours worked. These employees do not have any set minimum or maximum hours to work. However, are required to meet all of their job duties regardless of how long it takes to accomplish. Management reserves the right to require that an exempt employee work a specific day or attend a specific meeting.

Temporary/Seasonal: Employees who are hired to perform a specific job or assignment, normally for a specified period of time that does not constitute full-time employment. Temporary employees are not eligible for paid-time benefits. Temporary/Seasonal employees are still subject to the same pre-screening as regular employees prior to hire.

### Does Prime give Performance Reviews?

The Company has three ways of assessing employee performance.



1. Probationary Review: Used to assess performance at the end of the employee's probationary period.
2. Discretionary Review: Conducted on a case-by-case basis to address performance issues, availability for promotions, etc…
3. Annual Review: Based on employee position and anniversary date.
4. Monthly Performance Review: Sales Associates will participate in a monthly review of performance dependent upon performance issues.

Communication between employees and their manager should be a continuous process throughout the year.

The completion of a performance review does not guarantee a change in compensation or position. The Company at its discretion can choose not to give an Annual Review if it is felt unwarranted at the time.

## Progressive Disciplinary Action

The purpose of Prime Communications Progressive Disciplinary Program is to provide a progressive step-by-step discipline system that conveys to its employees expectations for performance in the work place and the actions taken if those standards are not met.

Inadequate performance will be discussed and reviewed with the employee with an emphasis on correction and improvement. It is expected that informal discussions such as coaching or verbal warnings will be sufficient to resolve problems and concerns. However, if the problem or issue persists progressive formal discipline will be initiated.

Progressive Discipline Steps



1. Verbal Warning
2. Written Warning
3. Final Written Warning
4. Termination

Behaviors that are considered "non-negotiable" will be excluded from the Progressive Disciplinary Program and subject to immediate termination.

# BENEFITS

## Paid Time Off (PTO)

|  | Service Time | PTO Benefit |
|---|---|---|
| Store Manager | 1 year | 5 days (40 hours) |
|  | 2+ years | 10 days (80 hours) |

PTO is based on a normal work week and paid at their regular hourly wage. PTO is not accrued but awarded after the specified service time as outlined below is completed.

<u>Scheduling and Approval</u>
PTO should be scheduled in such a way as to not hamper the normal operating efficiency of the business. Scheduling of PTO will be made by employee preference if consistent with business needs and pre-approved by the employee's supervisor. Supervisors have the right to deny a vacation request if not consistent with business needs.

<u>Black Out Periods for PTO</u>
During the Christmas shopping season between November 15 and January 15, PTO time is not allowed due to the nature of our business.

<u>PTO Carry Forward</u>
Employees may not carry forward PTO. Any unused vacation will not roll over to the following vacation year.

<u>PTO Effect on Overtime</u>
PTO hours do not count as hours worked for purposes of overtime calculations.

<u>Payment upon Termination</u>
Unless required by State law, upon termination, the employee will not receive payment for any unused vacation, regardless of whether the termination was voluntary or involuntary.

## Holidays



Prime recognizes the following holidays:

| | |
|---|---|
| New Years Day | Easter Sunday |
| Memorial Day | July 4th |
| Labor Day | Thanksgiving |
| Christmas Day | |

Temporary and seasonal employees are not eligible for holiday benefits.

Due to operational requirements, it may be necessary for some of our employees to work on a holiday. Non-exempt, hourly employees who are required to work a holiday will receive time and one-half for hours worked. Sales Associates who are not scheduled to work on a holiday will not receive holiday pay.

To be eligible for benefits, an employee must work the regularly scheduled shift before and after a holiday unless the absence is a paid absence approved by the supervisor.

Holiday hours do not count as hours worked for purposes of overtime calculations.

## Bereavement

Prime Communications provides paid time off to regular full-time and part-time employees in the event of a death in the employee's immediate family.

For the death in the employee's family, the Company will provide up to 24 hours of paid leave for full-time employees or up to 12 hours of paid leave for part-time employees.

"Immediate Family" is defined as an employee's spouse, parents, children, siblings, mother/father-in-law, grandparents and grandchildren.

Temporary and seasonal employees are not eligible for bereavement pay.

Supervisors should consider an employee's request for leave for bereavement purposes based upon individual circumstances. Paid leave should be limited to what is necessary and reasonable. This guideline does not guarantee the maximum amount of paid leave will be granted in all circumstances. Subject to supervisory approval, employees may request to use earned vacation time for additional days off beyond this Bereavement Guideline.

Verification of the employee's relationship to deceased or the death e.g. obituary or confirmation from a hospital, mortuary or doctor) may be required, at the supervisor's discretion, in order for an employee to qualify for paid bereavement leave benefits.

Bereavement leave hours do not count as hours worked for purposes of overtime calculation.

## Jury Duty

Full-time and Part-time employees who are summoned to jury duty will be paid for their regularly scheduled work hours. An employee will receive his/her regular rate of pay based on a normal workday for time absent for jury duty. An employee should report immediately to his/her employment if excused from jury duty before the end of a regularly scheduled work shift or if not impaneled to serve on a jury during a particular day.

Employees may keep their service check received to compensate for mileage, meals and incidental expenses associated with this public duty.

Temporary and Seasonal employees are not eligible for this benefit. However, the absence will be excused.

Note: This guideline does not cover situations in which employees are subpoenaed to serve as witness in court. These situations will be individually addressed by the employee, his/her supervisor and the People Services Department.

## Leave of Absence

Prime Communications provides employees with three types of leave:

> FMLA Leave: This leave is governed by the Family Medical Leave act (FMLA). All requests for leave must be reviewed to determine if the leave meets requirements of the FMLA.

> Personal Leave: This leave may be used for personal absences for employees with at least 6 months of service.

> Military Leave: This leave may be used to accommodate employees who volunteer or who are called to serve in military obligations. Please see Military Leave of Absence policy for more details.

In order to take a leave of absence, an employee should submit a written request for leave of absence to the People Service Department before leave is to begin or as soon as practical. The written request for leave must include the reason for leave, the expected dates the leave is to begin and end, and information about the employee's intent to return to work at the end of the leave.

Appropriate documentation, such as medical certification, court order, etc... must also be submitted for leaves of absence. The Company is entitled to second medical opinion, at the Company expense, regarding the need for medical leave.

All requests for leave should be sent to the People Service Department. The People Service Department will work with the employee's supervisor to determine if an employee is permitted to take a leave of absence after reviewing the employee's request and supporting documentation.

If FMLA leave exceeds 16 weeks in a "rolling" 16 month period, the People Services Department will determine if the leave should be converted to Personal leave and extended. Combined leave time for the birth, adoption or foster care of a child should not exceed 16 weeks.

FMLA is not automatically converted to Personal Leave upon expiration. If an employee is continuously on FMLA, Personal Leave or a combination of both for 16 weeks or more, the People Services Department will review the employee's leave status and (i) request the employee return to work with or without reasonable accommodation; (ii) extend the leave or (iii) terminate employment.

Employees may use their available remaining vacation days while on leave. Otherwise, the leave of absence, whether FMLA or not, will be on an unpaid basis.

Employee's benefits remain in place while on leave. Upon return from leave, employees will be required to pay the full unsubsidized premiums for benefits during their leave.

## Military Leave

Prime supports and accommodates employees who volunteer or who are called to serve military obligations. The Company will comply with all federal, state, and local laws including USERRA (Uniformed Services Employment and Reemployment Rights Act).

## Insurance Program



The Insurance Program includes the following coverage's:

- Health Insurance
- Dental Insurance
- Life Insurance and AD&D Coverage
- Short Term Disability
- Long Term Disability

Employees who participate in the Insurance Program have all the coverage's listed above and will be charged one flat rate for all.

Eligibility Criteria:

Full-time Hourly Associates           1 year of employment
Management                            90 days of employment.

If an employee does not enroll at the time they reach eligibility, they must wait until the next open enrollment that falls in July. However, in the event of a life qualifying event, you may change the status of coverage at that time. A "life qualifying event" is considered:

- Birth or adoption of a child
- Marriage
- Divorce
- Loss of other coverage provided by a family member
- Death of a dependant or spouse

## Optional Insurance Coverage

Employees have the option to additional Life and AD&D Insurance for themselves, Spouse and children

Optional Life and AD&D

You can choose at a minimal monthly premium payroll deducted to add additional Life Insurance on yourself up to 5x you annual salary or a maximum of $550,000. Likewise you may purchase additional AD&D coverage up to 5x of your salary with a maximum potential of $550,000.

Spouse Life Insurance

You can add at a minimum monthly premium payroll deducted each pay period Life Insurance on your Spouse. You can only purchase coverage equal to half of the employees insurance.

Child Life Insurance

You can add at a minimum monthly premium payroll deducted each pay period Life Insurance on your child. You can only purchase up to $5,000 per child.

# Company Policies

## Professional Business Conduct

Since every employee is a representative of the Company, it is critical that employees maintain a professional work ethic. Employees are expected to come to work on time, in professional attire with a positive attitude.

Professional Attitude: As a customer service focused organization that deals with the general public on a daily basis, it is imperative that employees come to work each day with a positive attitude. To the customers, the Sales Associates are the Company's image. Their attitude will determine whether the Company is successful in attracting and retaining loyal customers.

Customer Service: Since the initial contact with the customer will make a lasting impression, employees should greet each customer with a smile. All interaction should be cordial and friendly. Employees should educate the customer on the types of plans that are available and work with them to make an informal decision about their purchase. Customers should feel as if they are most important part of the business.

Improper Conduct: Employees should strive to maintain an appropriate professional behavior at work. Inappropriate behavior, such as scuffling, throwing objects or other horseplay, profanity or vulgar language, idleness, dishonesty, gossiping or any behavior listed as non-negotiable is prohibited and will result in disciplinary action up to and including termination.

## Payment of Bonuses

Prime Communications considers all Bonuses to be discretionary. Prime may make cash incentive awards based on any combination of objectives by the corporate office, market management and specific locations and/or individual performance measures. Pursuant to the Bonus Policy, Prime Communications may set annual performance objectives and goals that if achieved will trigger the payment of bonuses to eligible employees.

The employee must be employed with Prime Communications at time of bonus payment in order to receive their bonus. Whether the employee resigned in good standing or was terminated for cause does not make a difference in the payment of bonuses upon termination.

New Managers who are put in place but do not work a full month, will receive their first month bonus calculation based on dividing the full months' bonus by 4.33 and multiplying that amount by the number of full weeks the employee is employed for the first month. *A full week is considered seven consecutive days*.

An employee who is on extended leaves of absence or FMLA will not receive any bonuses earned before leave until they return from their leave. Upon the employees' return their bonus will be determined by how many weeks they were gone during the month the bonus was earned. Employees' who are gone more than two weeks, will have their bonus pro-rated for the month by dividing the bonus by 4.33 and multiplying that amount by the number of full weeks worked during that month. Employees who are gone for more than four consecutive weeks will forfeit that months' bonus as they were not present to earn the bonus. There is no proration for employees who are paid on Commissions or who are out due to vacation, proration is only afforded to those

individuals who are on a formal leave of Absence and have filed Leave of Absence paperwork with the People Services Department.

Bonuses will be taxed at the current federal/state bonus tax rate as applicable by law.

All bonuses are paid at the discretion of management and therefore there is no set date of payout. Payout is determined on a case by case basis by the direct supervisor or executive management.

## Non-Negotiable Behaviors

It is not possible to list all actions that are considered unacceptable in the workplace. However, the following are examples of violations and infractions of rules or policies that are deemed non-negotiable and are grounds for immediate termination without progressive disciplinary action:

- Insubordination or refusal to do your assigned work or to follow your supervisor's instructions.
- Falsification or misrepresentation of information in the employment application process.
- Horseplay
- Falsification or misrepresentation in connection with company records or procedures
- Sleeping during a shift
- Fraud or misrepresentation
- Disclosure of Confidential information
- Intentionally, recklessly or carelessly damaging Prime property or the property of another person
- Violations of Anti-Harassment Policy
- Violations of Drug and Alcohol Policy
- Violations of Electronic Communications Policy
- Use of profane, threatening, intimidating or abusive language or physical force against another person, including such acts towards a supervisor off Company property, if the act is due to a work related issue.
- Theft or failure to report theft or any other illegal act.
- Refusal to complete assigned schedule, walking off the job without approval, job abandonment or failure to report to work for three (3) consecutive days without notifying a supervisor.
- Possession of firearms, ammunition, knives or other weapons on company property.
- Unauthorized use or possession of Prime property, including, but not limited to, records, equipment, and merchandise.
- Carrying on activities during work time for personal benefit and not for the benefit of Prime Communications.
- Unlawful, immoral conduct or behavior otherwise deemed unbecoming of a Prime employee.

## Anti-Harassment Policy

Prime is committed to providing a work environment that is free of illegal discrimination and harassment of any kind. Harassment of any employee, customer, client, applicant, vendor or supplier will not be tolerated. Any form of harassment which violates federal, state or local law, including, but not limited to harassment related to an individual's race, religion, color, sex, sexual orientation, national origin, ancestry, citizenship status, marital status, pregnancy, age, medical condition (cancer related or HIV/AIDs related), handicap or disability is a violation of this policy, and will be treated as a disciplinary matter. For these purposes the term harassment includes slurs and any other offensive remarks, jokes or other verbal, graphic or physical conduct.

In addition to the above listed conduct, sexual harassment can also include the following examples of unacceptable behavior:

- Unwelcomed sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature where

    - Submission to such conduct is either an expressed or implied term or condition of an associate's employment;
    - Submission to or rejection of such conduct by an associate is used as the basis for employment decisions affecting such associate; or
    - Such conduct has the purpose or effect of unreasonably interfering with an associate's work performance or creating an intimidating, hostile or offensive working environment.

    The following are examples (but not an exhaustive list) of actions and materials that are prohibited in the workplace: sexual propositions, unwelcome physical touching or attempts to touch, remarks of a sexual nature, sexually oriented jokes or comments, pornographic materials, unwelcome facial gestures (elevator eyes), written material of a sexual nature, inquires regarding a persons' sex life, relationship, etc.., blocking an associate's movement and pressuring an associate for social activity.

### How do I report harassment or discrimination?
Associates who believe that they or another associate is being or has been harassed or discriminated against should immediately report their concerns (in writing, in person, or by telephone) to their Manager, District Manager, General Manager or People Services Department at 281-240-7800, or the Ethics Hotline on Employee Portal.

### How will a report of harassment or discrimination be handled?
All concerns will be forwarded to the People Services Dept., who will investigate all claims of harassment or discrimination promptly and professionally. All claims will be treated as confidentially as possible. Prime Communications prohibits retaliation or intimidation against associates who report harassment or discrimination or who assist in a harassment or discrimination investigation.

Any associate found to have violated the Anti-harassment Policy will be subject to appropriate disciplinary action up to and including termination.

## Workplace Violence, Firearms and Weapons Policy

Prime Communications promotes a safe environment for its employees, customers and visitors. Violence, threats, harassment, intimidation and other disruptive behavior in the workplace will not be tolerated. Such behavior can include but is not limited to:

- Physical acts against persons or Company property
- Verbal threats or vicious statements that are meant to harm or to cause a hostile environment.
- Written threats, vicious cartoons, notes or other written conduct that are meant to threaten or have the effect of creating a hostile environment; or
- Visual acts that are threatening or are intended to convey injury or hostility.

Individuals who commit such acts may be removed from the premises and may be subject to disciplinary action up to an including termination, criminal penalties or both. Any employee who believes he/she has been the subject of, or witness to violence, threats, harassment, intimidation and other disruptive behavior in the workplace must report the incident to anyone of the following: his/her Manager, District Manager, General Manager or People Services Dept. **Threats or assault that require immediate attention should be reported to the police at 911.**

## Smoking/Tobacco Usage

Considering the health risks, safety, lost productivity and potential smoke or fire damage that can be done to work, stores or office areas, tobacco usage, including smoking, is prohibited on premises owned or occupied by Prime Communications. Premises include buildings, grounds and parking lots.

## Drug/Alcohol Usage

Prime Communications has a policy of maintaining a safe, healthy and drug/alcohol free work environment for all its employees. Employees may not use, possess, transport, sell or be under the influence of alcohol or any prohibited substance while on any Prime Communications owned or occupied premise or in the performance or work.

### _What is a prohibited substance?_
A prohibited substance is any illegal drug, illegal narcotic, unauthorized or misused prescription drug or drug paraphernalia.

### _Searches_
The Company reserves the right to carry out searches and examine the person and property of any individual when such individual and/or his property is on the premises owned or occupied by the Company. This right includes but is not limited to searches of office furniture, vehicles, containers, briefcase, purses, lunch pails, pockets and lockers. The Company at its sole discretion may seize any illegal, unauthorized, misappropriated or prohibited items. In states where permitted, the Company may require that applicants and employees submit to drug and/or alcohol testing when, in the opinion of the Company, such test(s) should be administered.

## Occupational Injuries and Illnesses

All on the job injuries or illnesses must be immediately reported to the employee's Manager or District Manager and the People Services Department.

## Conflict of Interest

Employees should not engage in activities that involve a conflict between their personal interests and the interests of Prime Communications. Such circumstances could compromise or appear to compromise the employee's ability to make impartial business decisions. If in doubt you should disclose an issue to your supervisor to ensure it can be adequately considered.

Neither an employee nor their immediate family members should have interests or investments in a competitor, customer, partner, or supplier of Prime Communications that would create a conflict of interest.

Employees should not hold positions in or have relationships with outside organizations that have business dealings with Prime Communications if the employee's position in the Company allows them to influence these transactions.

Employees must obtain approval from their manager to participate in recreational activities provided by customers or suppliers.

## Conflict/Dispute Resolution

Prime Communications believes that all employment issues can and should be resolved through your immediate manager, unless the particular problem is with your manager or you are not comfortable in discussing the issue with your immediate manager. In the event that you are not satisfied with your manager's decision, your manager is not getting back to you in timely manner or you are uncomfortable in discussing the matter with your manager, then you should take the issue to People Services Department (unless the particular problem is with the People Services Department). If you are not satisfied with the decision of the People Services Department or you are uncomfortable in discussing the matter with the People Services Department, you may appeal the issue to the President of Sales and Operations.

In the event that you are not satisfied with the decision of the President of Sales and Operations, you may follow the Dispute/Conflict Resolution Program and ask for Mediation of the issue, where a neutral person selected jointly by the Employee and Company hears the issues and tries to bring about resolution.

In the event that you are not satisfied with the results of the Mediation, then you may appeal the matter to the Arbitration in accord with the Dispute/Conflict Resolution Program. The results of the Arbitration will be final and binding upon all parties.

Employee understands that if he/she chooses to accept employment or to continue employment with Prime Communications after the set date forth below, Employee agrees to all provisions of the Dispute/Conflicts Resolutions Program.

**This includes the requirements under this Program that any legal dispute <u>the Employee has against Prime Communications have waived all rights to bring a lawsuit</u> and to a jury trial regarding any dispute, including, but not limited to, claims for pay or benefits arising under the Fair Labor Standards Act, Texas Pay Day Law Act or other similar state statue, the Employee Retirement Income Security Act "(ERISA," except of any vested benefits), COBRA, personal injuries unrelated to job-related illnesses or injuries, and claims of discrimination based upon race, color, religion, sex, national origin, age, retaliation of any nature or disability under any federal, state or local civil rights statue; or any other claims, whether specifically employment-related or otherwise, arising from contract, tort or statue which Employee might have arising from my employment with and separation from the Company.** Employee understands that this Program does not prevent an Employee from filing a complaint with any government agency with respect to any claim covered by this Program; however, in the event that the Employee files a lawsuit against the Company or any of its affiliated business or their supervisors and/or managers with respect to such a claim covered by the Program, that the Company will ask the court to dismiss such suit and refer it to this Program, even if the dispute arises after Employee is no longer employed by the Company. Employee also understands and agrees that by having this binding Dispute/Conflict Resolution Program, the Company is waiving its right to bring any lawsuit against Employees with the sole exceptions of being able to seek injunctive relief against me for unfair competition or the use or disclosure of confidential information. Employee further acknowledges that with respect to the Dispute/Conflict Resolution Program, that the Employee has been given the opportunity to discuss this Program with Employee's private legal counsel to the extent they wished to do so.

## External Employment

Employees should not take additional employment with outside organizations or operate their own business if such employment or activity will create an actual or perceived conflict of interest. Employees should notify their manager of additional employment to ensure compliance. No other employment should conflict with an Employee being able to complete their assignments and work their schedule. Prime will not work around another Company's schedule.

Upon employment, employees in certain positions may be required to sign a non-compete agreement.

## Dress Code Policy

All clothing should be neat, clean, and pressed and in good repair (no holes or missing buttons, not faded, etc.) Clothing should be tasteful and fit well. No clothing should be too tight, too loose or revealing. Employees should follow the specific dress code for the job that they are performing. There is a difference in what is considered appropriate at the stores and the Service Center.

### Personal Hygiene and Appearance

- Hair should be clean and neatly brushed or combed. Hair should be natural looking, well maintained, and neatly combed and styled. Extreme styling or unnatural hair color for men or women is not permitted.
- Facial hair for men is permitted as long as it is neatly trimmed.
- Fingernails should be clean and trimmed. Excessively long nails are not permitted for safety reasons. We recommend that women who polish their nails use conservative or neutral colors.
- Associates are required to wear antiperspirant or deodorant due to close contact with customers and fellow associates. For the same reason, the use of heavy scents and fragrances should be avoided.
- Customers and co-workers are drawn to and respond to a nice smile, but not bad breath. We ask that you have clean teeth and fresh breath.

### Jewelry

- Jewelry should be limited and in good taste.
- Earrings, if worn, must be worn on the lower ear lobe and limited to a maximum of two earrings per lobe.
- Ear cuffs are not permitted.
- Other pierced jewelry, such as eyebrow, tongue or nose, are not acceptable to be worn while at work.

### Unacceptable Shoes:

- Sports styles such as basketball, tennis, running or sneakers
- Sandals, whether dress or casual
- Topsiders or any style boat or deck shoes
- Military style or work boots, clog-style footwear

### Miscellaneous

- Women may wear makeup that is natural in appearance. Avoid excessive or extreme makeup.
- Sunglasses should not be worn indoors nor worn resting on the top of the head. However, prescription lenses that adjust to the lighting are acceptable.
- Tattoos may not be exposed.
- Name badges are to be worn by all Associates, including non-selling associates, while working in a Prime location.

Additional Considerations:

District Managers have the right to assign dress codes to their store locations (for example, requiring ties to be worn at all times). The store dress codes must follow the above dress code guidelines, but can be more specific. Once a store has been assigned a specific dress code, the new code must be posted in store and uniformly applied.

# Field Dress Code

## Acceptable Men's Attire



- Short or long sleeved oxford style shirts with straight collar or button down collar.
- AT&T Polo Shirts
- Solid color sweater
- Dress pants solid colors only; black, gray, brown, navy
- Tie at least 2 inches wide
- Dress shoes or dress boots
- Belt needs to be black or brown
- Dress socks

## Appropriate Attire for Women



- Dress shirt or blouse
- AT&T Polo Shirts
- Dresses
- Solid color sweaters
- Dress pants/skirts
  - solid colors
  - skirts may not be shorter than 3 inches above the knee.
- Appropriate undergarments
- Leather dress shoes



| Unacceptable Attire for Men | Unacceptable Attire for Women |
|---|---|
| • Flannel, polo, golf or rugby shirts<br>• Denim shirts<br>• Dark dress shirts in colors such as:<br>  - Black, brown, green, navy, purple<br>• Patterned dress shirts<br>• Stripes, plaid, checks<br>• Turtleneck worn alone<br>• T-shirts, short or long sleeve<br>• Sweat shirts<br>• Tank tops<br>• Jeans in any color<br>• Denim pants, fatigues<br>• Sweat pants, shorts<br>• warm-up or jogging suits<br>• Athletic socks | • Flannel, polo, golf or rugby shirts<br>• Denim shirts<br>• Halter tops<br>• Tube tops<br>• Tops that expose midriff<br>• Sheer see-through blouses<br>• Sleeveless or spaghetti-straps<br>• T-shirts, short or long sleeve<br>• Sweat shirts<br>• Tank tops<br>• Low-cut dresses or blouses<br>• Sundresses<br>• Short skirts/mini skirts<br>• Jeans in any color<br>• Denim pants, fatigues<br>• Sweat pants<br>• Corduroy pants<br>• Capri/crop pants<br>• Leggings/stirrup pants<br>• Shorts/culottes<br>• warm-up or jogging suits<br>• Apparel made of spandex |

## Driving Policy

Any employee who operates a vehicle on "Company Business" to execute their normal work-related duties and responsibilities will be subject to this policy. "Company Business" is considered driving to visit stores by Field Management, picking up and delivering merchandise amongst locations, making bank deposits, and travel to training classes out of town.

To be considered an acceptable driver, a driver must maintain a valid driver's license, valid insurance, and not have been convicted for any one of the following violations within the previous thirty-six months:

- Driving under the influence of alcohol and drugs
- Driving while ability impaired by alcohol or drugs
- Leaving the scene of an accident
- Reckless driving
- Speed contests ("drag" racing)
- Using any vehicle in or during the commission of a felony
- Driving personal vehicle without adequate insurance
- Attempting to elude a police officer.
- Multiple (3 or more) moving violations within a year.

Employees are not allowed to operate personal vehicles on Company business while under the influence of alcohol and/or drugs or while impaired by alcohol and/or drugs as defined by appropriate state law.

Any violations of traffic laws and resulting fines are the responsibility of the individual.

The use of cell phones while operating a vehicle is dangerous and employees are cautioned against such use while driving on company business.

Employees involved in vehicle-related accidents shall:

1. Comply with local laws governing such accidents
2. Document the accident via a police report.
3. Report the accident as soon as possible to their insurance carrier.
4. Report the accident to his/her supervisor as soon as possible.
5. Obtain the name, address, and telephone numbers of any passengers or witnesses and any and all information about injured persons involved in an automobile accident.
6. Refrain from making comments regarding fault except to their supervisor or insurance company.

When driving a personal vehicle on company business, the employee's personal auto insurance provides primary coverage. Minimal limits of liability insurance should be carried and proof of coverage should be given upon request.

Employees who are on a "Car Allowance" will be required to follow all traffic laws applicable to the state in which they conduct business. A valid driver's license and relatively new vehicle must be maintained at all times. Proof of insurance must be provided to the Company upon hire, promotion, or annually which ever is applicable.

Without proof of insurance liability, the Company reserves the right to revoke the "Car Allowance". Proof of liability must be provided to the People Services Department annually or upon request.

The company may revoke driving privileges, seek full reimbursement, and/or terminate an employee as a result of gross or willful negligence by the employee entrusted with the care, custody, and control of a hired, non-owned, or personal vehicle while on company business.

## Electronics Communication Acceptable Usage

These guidelines are meant to assist in effectively and appropriately using Electronic Communication Tools (ECT) and apply to every employee. Failure to follow these guidelines will lead to disciplinary action up to and including termination.

Electronic communication tools covered by this policy include, but are not limited to; company email, voice mail, telephone services, cellular phones, pages, servers, and computer networks. This policy also covers the use of services not provided directly by Prime Communications (e.g. hotmail, yahoo) but accessed by employees using any Prime resource or services.

In using Electronic Communication Tools, employees have to use integrity and professionalism in all communications and comply with all laws and company policies. Acceptable uses of ECT include:

- Internal communication with Prime employees on business matters
- External communications with customers, suppliers and business Partners
- Accessing information resources for appropriate business purposes

Employees should be aware that anything they say in an email can be discovered in a court proceeding if an employee says something defamatory about another employee, customer or supplier that could be used by them to sue the individual who wrote the email.

Limited personal use by employees before or after normal business hours is acceptable. However, use during business hours must be limited to activities that cannot reasonably occur at any other time. Excessive personal use can lead to disciplinary action up to and including termination. Company provided email should be used for business purposes only and should not be distributed for personal usage.

Electronic Communication Tools are Company owned and, to the extent allowed by law, are subject to monitoring by Prime Communications. This applies to both telephone calls, cell-phone calls, text messages, and email messages. The Company reserves the right to access messages, data or other Company owned computer based technology and use the content for any lawful purpose. Employees should not have the expectation of privacy with respect to ECT messages or data.

## Social Network Sites

Employees who utilize social networking sites such as Twitter, Facebook and Linked-in should note that if you add a friend that is a co-worker, manager or the Company's social sites, you are subject to having anything that you mentioned that is a violation of Company policy used for disciplinary purposes. Likewise, if your account is made public regardless of whether or not the Company or its employees are on your friends list may also be used in determining whether a Company policy has been violated.

## Acceptance of Gifts

No employee may solicit any gifts or accept gifts of significant value (i.e. in excess of $25.00, lavish entertainment) or other benefit from potential and actual clients, customers, suppliers or competitors. Special care must be taken to avoid even the impression of a conflict of interest.

Under no circumstances should an employee request a gift of any kind from a supplier, customer or party with whom Prime does business. In addition, employee must not exchange gifts with representatives of competitor companies, since the provision or receipt could create an actual or perceived conflict of interest.

## Company Communications

An effective internal communication system, both formal and informal, is vital to the operation of any organization as it informs, enlightens and educates employees about information that may affect their roles. Prime offers several avenues for mass internal communications.

*Bulletin Boards* – At every location, a bulletin board is in place to post Company announcements, federal and state notices and Company policies. Unauthorized and/or unapproved materials should not be posted.

*E-Mail* – Email distributions lists are in place for timely communication of critical information.

*Internet* – Use of the secure areas of our internet provides low cost and easy to sue tools for communicating information and ideas throughout the Company.

## Business Related Travel

Prime will reimburse individuals for reasonable, necessary, appropriate and approved travel and business expenses incurred in the performance of work related business. Individuals are expected to be prudent when incurring expenses.

Employees and supervisors are responsible for ensuring the travel is appropriate, reasonable and necessary to the mission, responsibilities, or duties of the department of division. Under no circumstances may an individual approve his or her own expenses.

Please refer to the Travel Policy for an outline of acceptable charges and expense limits.

## Cell Phone Usage

Due to our strong affiliation with our national carriers, employees can only utilize designated carrier phones on Company premises or while performing Company business. The use of non-designated phones is prohibited and all non-designated phones must be left in the employee's car or home.

## Inclement Weather and Temporary Shut-Down of Company Operations

An emergency situation is defined as an unforeseeable natural disaster or man-made event that prohibits normal business operations. Such situations include, but are not limited to: fires, floods, snow or ice storms, hurricanes, earthquakes, tornadoes, bomb threats, etc...

If an emergency situation occurs and the Company closes offices, the Company may, at its discretion, provide paid time off for eligible employees. If an emergency situation occurs and the Company does NOT close offices, but the employee is unable to attend work, the employee may use his/her eligible vacation or personal days to document and be paid for the time missed.

## Protection of Assets Policy

All employees are considered responsible for ensuring the safety of Prime Communications property. Property is inclusive of inventory, cash, checks, deposits, computers, displays, fixtures and storage areas. While on the premises, each employee is expected to follow policies in securing these assets.

The following acts relating to Company Property will be subject to immediate termination:

1. Failure to record any sale or other income, whether for personal benefit or not. This includes, but is not limited to, deliberate omission and/or deletion of items or amounts from bank deposits, petty cash, refund documents, vendor agreements or contracts, and the like.

2. Failure to adequately safeguard the day's deposit; as well as failing to make a deposit daily.

3. Failure to adequately safeguard Company property or merchandise including, but not limited to, leaving secured items unsecured, leaving lockable areas or fixtures unlocked, leaving security devices in an inoperable condition or failing to follow security procedures.

4. Theft of money or merchandise from the Company. This includes, but is not limited to:

   a. "borrowing" or "loans" of company merchandise, vendor demo merchandise, company property, or company funds by any team member.
   b. Writing a personal check or using a personal credit card while removing a similar sum from the cash drawer (i.e. "check cashing") or using a debit card to obtain cash withdrawals on the store point of sale system.

5. The writing of fictitious sales documents (including refunds) or the fictitious voiding of any sales document, including the alteration of any cash, check, credit, credit/debit card or gift card transaction, to create and/or conceal an overage, shortage, or unauthorized removal of funds.

6. Giving away or discounting merchandise or services to induce a potential customer to purchase or for other purposes (except where authorized by the Company)

7. Displaying, demonstrating or offering for sale products or services other than those authorized by the Company on Company property or during work time. Further, team members may neither solicit nor accept any referral fee, commission, or other form of compensation or benefit as a result of directing customers to any individual or firm other than the Company.

   Unless specifically approved in advance by the Company, team members are not permitted to display, or distribute materials including, but not limited to, newsletters, user group information, pamphlets, business cards, brochures, or other printed materials which promote products or services other than those authorized by the Company.

8. Prime Communications reserves the right at any time to inspect all property and the contents thereof, which is owned by or leased by Prime Communications. This right of inspection of Company property includes but is not limited to desks, safes, boxes, trash cans, files, cabinets, receptacles, fixtures and storage areas of facilities.

9. Inventory is to be conducted in accordance with Loss Prevention procedures as outlined by the Audit Department. Missing inventory is to be reported immediately to the District Manager and Audit Department.

## Restitution for Company Property Losses

All Prime Communications employees are expected to protect and preserve company assets (including cash, merchandise, and other property). Instances of loss of assets may be investigated by company officials and/or by the appropriate law enforcement agency. Where it is determined that dishonest activity has occurred, termination is certain and prosecution is probable in cases involving criminal activity.

When it is discovered that any associate has acted in a dishonest and/or grossly negligent manner, resulting in a loss to the Company, the Company reserves the right to deduct the amount of such loss from his/her earnings or from any other sum due to the associate from the Company to the extent permitted by applicable law.

June 2010

## PRIME
### Sales Compensation/Bonus Plan
June 2010

**POSITION: Store Manager**

**TARGET EARNINGS $40,000 - $65,000**
(Salary at target plus 100% achievement of quotas)

Annual Base Salary – Determined by store size, incumbent experience, and job responsibilities

**Minimum $33,700 – Maximum $30,000**

| Gross Profit (GP) Achievement to Budget* | | % GP Earned* | Bonus | Total Potential |
|---|---|---|---|---|
| 60% | 79.99% | 3.0% | – | 3.0% |
| 80% | 99.99% | 5.0% | 1.0% | 6.0% |
| 100% | 119.99% | 6.0% | 2.0% | 8.0% |
| 120.0% | and above | 7.0% | 3.5% | 10.5% |

**(I) Bonus Accelerators:**
1. Attain 100% of total phone target
2. Personal GP achieved in Solutions Floor Training > $2,500
3. Attain a 75% Net Rep Satisfaction CFT score as per AT&T's DSR

**Bonus GP:**
1. Surpass total handset target by 10% and earn 1.1 GP credit on total market GP.

❖ Gross Profit calculated is net of costs and chargebacks with factored discounts and features.
❖ Must be employed at time of payout to earn bonus
❖ More than three months under quota (70%) may lead to termination and/or demotion from position
❖ Bonus deductions include, but are not limited to: unsupported inventory shrinkages and missing deposits

"Pursuant to Company policy as detailed in the current Employee Handbook, to receive a bonus you must be actively employed by the Company on the day that such bonus is actually paid. Bonus payment dates may vary and are solely within the discretion of the Company."
Note: Special spifs can be granted when deemed appropriate by Executive Management

July 2010

## PRIME
### Sales Compensation/Bonus Plan
July 2010

**POSITION: Store Manager**

**TARGET EARNINGS $40,000 - $65,000**
(Salary at target plus 100% achievement of quotas)

Annual Base Salary – Determined by store size, incumbent experience, and job responsibilities

**Minimum $33,700 – Maximum $30,000**

| Gross Profit (GP) Achievement to Budget* | | % GP Earned* | Bonus | Total Potential |
|---|---|---|---|---|
| 60% | 79.99% | 3.0% | – | 3.0% |
| 80% | 99.99% | 5.0% | 1.0% | 6.0% |
| 100% | 119.99% | 6.0% | 2.0% | 8.0% |
| 120.0% | and above | 7.0% | 3.5% | 10.5% |

**(I) Bonus Accelerators:**
1. Attain 100% of total phone target
   **Bonus:** Activate 10 COE iPhones for the store and earn 120% GP credit for all store accessories sold for the month.
2. Attain $37 in APO and $18 in FPO for the store

❖ Gross Profit calculated is net of costs and chargebacks with factored discounts and features.
❖ Must be employed at time of payout to earn bonus
❖ More than three months under quota (70%) may lead to termination and/or demotion from position
❖ Bonus deductions include, but are not limited to: unsupported inventory shrinkages and missing deposits

"Pursuant to Company policy as detailed in the current Employee Handbook, to receive a bonus you must be actively employed by the Company on the day that such bonus is actually paid. Bonus payment dates may vary and are solely within the discretion of the Company."
Note: Special spifs can be granted when deemed appropriate by Executive Management



DEFENDANT'S EXHIBIT
4

Version 1 Prime Communications confidential for internal company use only

## August 2010

**PRIME COMMUNICATIONS**

### Sales Compensation/Bonus Plan

August 2010

**POSITION: Store Manager**

**TARGET EARNINGS $40,000 - $65,000**
(Salary at target plus 100% achievement of quotas)

Annual Base Salary — Determined by store size, incumbent experience, and job responsibilities

**Minimum $23,700 — Maximum $38,000**

| Gross Profit (GP) Achievement to Budget* | | % GP Earned* | Bonus¹ | Total Potential |
|---|---|---|---|---|
| 60% | 79.99% | 3.0% | - | 3.0% |
| 80% | 99.99% | 5.0% | 1.0% | 6.0% |
| 100% | 119.99% | 6.0% | 2.0% | 8.0% |
| 120.0% | and above | 7.0% | 3.5% | 10.5% |

(i) **Bonus Accelerators:**

1. Attain 100% of total phone target
2. Attain $155 in GP/Handset

❖ Gross Profit calculated is net of costs and chargeback's with factored discounts and features.
❖ Must be employed at time of payout to earn bonus
❖ More than three months under quota (70%) may lead to termination and/or demotion from position
❖ Bonus deductions include but are not limited to: unsupported inventory shrinkages and missing deposits

*Pursuant to Company policy as detailed in the current Employee Handbook, to receive a bonus you must be actively employed by the Company on the day that such bonus is actually paid. Bonus payment dates may vary and are solely within the discretion of the Company."

Note: Special spifs can be granted when deemed appropriate by Executive Management

Version 1.1                    Prime Communications confidential for internal company use only.

## Sept. 2010

**PRIME COMMUNICATIONS**

### Sales Compensation/Bonus Plan

September 2010

**POSITION: Store Manager**

**TARGET EARNINGS $40,000 - $65,000**
(Salary at target plus 100% achievement of quotas)

Annual Base Salary — Determined by store size, incumbent experience, and job responsibilities

**Minimum $23,700 — Maximum $30,000**

| Gross Profit (GP) Achievement to Budget* | | % GP Earned* | Bonus¹ | Total Potential |
|---|---|---|---|---|
| 60% | 79.99% | 3.0% | - | 3.0% |
| 80% | 99.99% | 5.0% | 1.0% | 6.0% |
| 100% | 119.99% | 6.0% | 2.0% | 8.0% |
| 120.0% | and above | 7.0% | 3.5% | 10.5% |

(i) **Bonus Accelerators:**

1. Attain 100% of total phone target for store
2. Attain $155 in GP/Handset
3. Completion of September 2010 training courses for store employees (as assigned by Sales Ops)

❖ Gross Profit calculated is net of costs and chargeback's with factored discounts and features.
❖ Must be employed at time of payout to earn bonus
❖ More than three months under quota (70%) may lead to termination and/or demotion from position
❖ Bonus deductions include, but are not limited to: unsupported inventory shrinkages and missing deposits

*Pursuant to Company policy as detailed in the current Employee Handbook, to receive a bonus you must be actively employed by the Company on the day that such bonus is actually paid. Bonus payment dates may vary and are solely within the discretion of the Company."

Note: Special spifs can be granted when deemed appropriate by Executive Management

Version 1.1                    Prime Communications confidential for internal company use only.

Oct. 2010

PRIME

**Sales Compensation/Bonus Plan**

October 2010

**POSITION: Store Manager**

**TARGET EARNINGS $40,000 - $66,000**
(Salary at target plus 100% achievement of quotas)

Annual Base Salary – Determined by store size, incumbent experience, and job responsibilities

**Minimum $33,750 – Maximum $30,000**

| Gross Profit (GP) Achievement to Budget* | | % GP Earned* | Bonus | Total Potential |
|---|---|---|---|---|
| 60% | 79.99% | 3.0% | - | 3.0% |
| 80% | 99.99% | 5.0% | 1.0% | 6.0% |
| 100% | 119.99% | 6.0% | 2.0% | 8.0% |
| 120.0% | and above | 7.0% | 3.5% | 10.5% |

(I) **Bonus Accelerators:**

1. Attain 100% of total phone target for store
2. Attain $3,000 in Personal Training GP

❖ Gross Profit calculated is net of costs and chargeback's with factored discounts and features
❖ Must be employed at time of payout to earn bonus
❖ More than three months under quota (70%) may lead to termination and/or demotion from position
❖ Bonus deductions include, but are not limited to, unsupported inventory shrinkages and missing deposits

Pursuant to Company policy, as detailed in the current Employee Handbook, to receive a bonus you must be actively employed by the Company on the day that such bonus is actually paid. Bonus payment dates may vary and are solely within the discretion of the Company.

Note: Special sp's can be granted when deemed appropriate by Executive Management

Version 1.1

Prime Communications confidential for internal company use only.

Nov. 2010—May 2011

PRIME

**Sales Compensation/Bonus Plan**

Effective: November 2010

**POSITION: Store Manager**

**TARGET EARNINGS $40,000 - $66,000**
(Salary at target plus 100% achievement of quotas)

Annual Base Salary – Determined by store size, incumbent experience, and job responsibilities

**Minimum $33,750 – Maximum $30,000**

| Gross Profit (GP) Achievement to Budget* | | % GP Earned* |
|---|---|---|
| 60% | 79.99% | 3.0% |
| 80% | 99.99% | 6.0% |
| 100% | 119.99% | 8.0% |
| 120.0% | and above | 10.0% |

**Please note:**

- Prime Management believes that it is essential for all employees to fully understand their pay plan. Please communicate with your respected supervisor should you have any questions comments or concerns.

  ○ For commission and bonus purposes, gross profit calculated is 'net' of costs and chargebacks taking into account all factored discounts and features.

    ▪ All commissions/bonuses are calculated using actual commissions received from at&t, which may vary from transactions sold in RQ4.

  ○ If you have any questions please contact your District Manager for clarity or refer to the employee handbook for further clarification.



**Sales Compensation/Bonus Plan**

Effective: June 2011

**POSITION: Store Manager**

**TARGET EARNINGS $60,000 - $65,000**
(Salary at target plus 100% achievement of quotas)

Annual Base Salary – Determined by store size, incumbent experience, and job responsibilities

Minimum $23,700 – Maximum $30,000

| Gross Profit (GP) Achievement to Budget* | | % GP Earned | Accelerator* | Total Potential Bonus |
|---|---|---|---|---|
| 60% | 79.99% | 2.0% | 1.0% | 3.0% |
| 80% | 99.99% | 4.0% | 2.0% | 6.0% |
| 100% | 119.99% | 6.0% | 2.0% | 8.0% |
| 120.0% | and above | 8.0% | 2.0% | 10.0% |

* Managers are eligible to earn an additional 'Accelerator' for attaining at least $3,500 in net personal sales Gross Profit.

  - Managers of locations that achieve $30,000+ in net Gross Profit are relieved from this requirement and will receive the additional accelerator as noted above, regardless of personal sales achievement.

**Please note:**

  - Prime Management believes that it is essential for all employees to fully understand their pay plan. Please communicate with your respected supervisor should you have any questions comments or concerns.

    For commission and bonus purposes, gross profit calculated is 'net' of costs and chargebacks taking into account all factored discounts and features

    - All commission/chargebacks are calculated using actual commissions received from at&t, which may vary from transactions sold in RQ4.

    If you have any questions please contact your District Manager for clarity or refer to the employee handbook for further clarification.

ROSE LORENZO,                          )
                                       )
              Plaintiff,               )
                                       )
v.                                     )        Civil Action No. 5:12-cv-69-H
                                       )
PRIME COMMUNICATIONS, L.P.,            )
                                       )
              Defendant.               )
_____      )

## AFFIDAVIT OF LAREN WHIDDON

I, Laren Whiddon, being duly sworn, depose and say:

1.     I am over the age of eighteen and am competent to testify to the statements in this affidavit based on my personal knowledge.

2.     I am currently employed as the CFO at Prime Communications, L.P.

3.     I have been involved in the business of selling mobile phones and cellular services for the last 25 years.

4.     Based upon my experience in the industry, I can state that Defendant Prime Communications, L.P.'s chargeback policy is similar to other chargeback policies in the industry.

5.     Upon information and belief, the policy of refunding advanced sales commissions that have not yet been earned and are subject to a charge back period, is not a policy that is particular to Prime Communications, L.P. and is generally utilized in the industry by other mobile phone retailers.

Further Affiant sayeth not.

DEFENDANT'S
EXHIBIT
5

312557

1

Signed this the 19th day of July, 2013.

_____
Laren Whiddon

STATE OF TEXAS

COUNTY OF FORT BEND

   I, a Notary Public of the County and State aforesaid, certify that _Laren_____
personally appeared before me this the _19th_ day of July 2013, and signed the foregoing
instrument voluntarily for the purposes expressed therein and certified under oath as to the truth
of the matters contained therein.

   [SEAL]

SHAHEEN RUSTOM
My Commission Expires
March 7, 2017

_____
Notary Public
My Commission Expires: _3/7/17_

2

312557

1

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2                      WESTERN DIVISION
                   Case No. 5:12-cv-00069-11
 3
    ROSE LORENZO, individually      )
 4  and on behalf of others similarly)
    situated,                       )
 5                       Plaintiffs )
                                    )
 6       v.                         )
                                    )
 7  PRIME COMMUNICATIONS, L.P., a   )
    Texas General Partnership,      )
 8                       Defendant. )

 9       *********************************************
               ORAL DEPOSITION OF LAREN WHIDDON
10            AS THE CORPORATE REPRESENTATIVE OF
                  PRIME COMMUNICATIONS, L.P.
11                      VOLUME 1 OF 1
                        JUNE 10, 2013
12       *********************************************

13       ORAL DEPOSITION OF LAREN WHIDDON AS THE CORPORATE

14  REPRESENTATIVE OF PRIME COMMUNICATIONS, L.P., produced

15  as a witness, duly sworn by me, at the instance of the

16  Plaintiffs, taken in the above-styled and numbered cause

17  on the 10th day of June, 2013, from 1:34 p.m. to

18  4:00 p.m., before Audrey L. Waldrop, Certified Shorthand

19  Reporter No. 6218 in and for the State of Texas, at

20  Weinstein Spira & Company, 3 Greenway Plaza, Suite 1700,

21  Houston, Texas, pursuant to the Federal Rules of Civil

22  Procedure (and the provisions stated on the record or

23  attached therein).
                             TAXABLE COST:
24                           PAID BY:
                             TBA NO.:
25                           JOB NUMBER:
```

DEFENDANT'S EXHIBIT
6

Electronically signed by Audrey Waldrop (101-422-146-7615)    3b03de35-9b00-4584-8895-5b07be83f443

Case 5:12-cv-00069-H   Document 53-6   Filed 07/19/13   Page 1 of 7

1    Q.    Okay.  Are they included as -- are they

2  included as -- let me strike that.

3    So when AT&T offers a spiff and someone -- it

4  depends on the spiff as to whether or not the

5  salesperson sees any benefit from --

6    A.    Correct.

7    Q.    -- from selling that spiff; is that correct?

8    A.    Correct.  That's correct.

9    Q.    In those instances where the salesperson does

10  not receive a benefit from the spiff --

11    A.    Uh-huh, uh-huh.

12    Q.    -- where is the benefit going?  Is it going to

13  Prime and just not down to the employees, or is it going

14  to Prime's owners?

15    A.    It would go to Prime to cover, you know,

16  operating expenses.

17    Q.    Okay.  So as I understand it correctly, some

18  spiffs are included in gross profit, some spiffs are

19  not?

20    A.    Correct.

21    Q.    Now, are there any other types of -- of

22  rebates -- I'm just thinking about, you know, going to

23  the grocery store and, you know, getting a rebate or a

24  rebate on a car or anything like that -- where AT&T --

25  well, perhaps this is -- maybe I'm asking something

ROSS REPORTING SERVICES, INC.              281-484-0770

Electronically signed by Audrey Waldrop (101-425-745-7816)

Case 5:12-cv-00069-JRG   Document 53-6   Filed 07/19/13   Page 2 of 7

36963838-5b0d-4584-8895-5b07be83f443

\* \* \*

453

* * *

34

1    A.    Yes.

2    Q.    Okay.  And, now, for a sales manager --

3          MR. WALKER:  Objection to form.  They're

4    store managers, not sales managers.

5    Q.    (By Mr. Antell)  Store manager.  For a store

6    manager, is that the same -- same process, or is it

7    different?

8    A.    It is.

9    Q.    Okay.

10   A.    Same process.

11   Q.    Same process.  Okay.  Now, how does Prime go

12   about calculating charge-backs for salespersons and

13   managers?

14   A.    Uh-huh.  When we receive the monthly commission

15   file from AT&T, there will be charge-backs reflected at

16   the CTN level, so we will go back to the period in which

17   that was first activated to determine which sales rep is

18   associated with that activity; and their current

19   commission or gross profit will be impacted by whatever

20   we granted them in gross profit on the initial

21   transaction.

22   Q.    Okay.  And how does -- does Prime -- well,

23   actually, how does -- what's the effect of a charge-back

24   on a salesperson?

25   A.    We -- the salesperson loses their gross profit

ROSS REPORTING SERVICES, INC.                281-484-0770
Electronically signed by Audrey Waldrop (101-425-743-7819)   Case 5:12-cv-00069-H   Document 53-6   Filed 07/19/13   Page 3 of 7   36098838-0b0d-4584-8895-5b07be83f443

454

1    associated with that and is going to see a reduction in

2    their -- in their earnings, as does Prime.

3        Q.   Is there a scenario where a salesperson has

4    already been paid something, has already been paid a

5    commission for a transaction that eventually cancels and

6    is then charged back against that?  Is that how it

7    works, or is it --

8        A.   Correct.

9        Q.   Okay.  So they see a reduction in pay in a

10   subsequent paycheck?

11       A.   Correct.

12       Q.   Sort of after -- after the money's been sort of

13   paid, so to speak, it's now being deemed as unearned?

14       A.   Correct.

15       Q.   And being charged back against; is that

16   correct?

17       A.   That's correct.

18       Q.   Okay.  So would that mean that they would not

19   be seeing money -- basically, they wouldn't be getting

20   paid money that they did earn because something else

21   canceled in the past; is that correct?

22       A.   That's correct.

23       Q.   Okay.  Does Prime have any written agreements

24   with any hardware providers?

25       A.   Yes.

ROSS REPORTING SERVICES, INC.                281-484-0770
Electronically signed by Audrey Waldrop (101-425-145-7819)   Case 5:12-cv-00069-H   Document 53-6   Filed 07/19/13   Page 4 of 7   36098838-0b00-4584-8895-5b07be831443

* * *

455

Laren Whiddon  As the Corporate Representative of Prime Communications

45

1    RQ4.

2        Q.    Okay.  And that's because that's based on what

3    AT&T pays you on a given month for commissions; is that

4    right?

5        A.    Correct.

6        Q.    Okay.  And -- okay.  So as far as commissions

7    and charge-backs are concerned, those are only passed

8    through or deducted from a solution specialist or a

9    store manager based on whether or not AT&T either pays

10   you the commission or gives you a charge-back; is that

11   correct?

12       A.    Correct.

13       Q.    In regards to accessory charge-backs, when

14   those occur -- well, strike.

15       Let me ask you this.  Do store managers or solution

16   specialists earn commissions on accessories?

17       A.    Yes.

18       Q.    Is that all accessories or just certain

19   accessories?

20       A.    For the most part, all accessories that produce

21   gross profit, if they're sold above cost.

22       Q.    If there is an accessory, just hypothetically

23   speaking, that the store manager or the solution

24   specialist does not receive a commission for, okay --

25   Zev used the hypothetical of his case.  He buys that

ROSS REPORTING SERVICES, INC.                    281-484-0770
Electronically signed by Audrey Waldrop (101-425-145-7815)   Case 5:12-cv-00069-H   Document 53-6   Filed 07/19/13   Page 5 of 7   360ad638-9b0d-4584-8895-5b07be83f443

456

46

1   case.  Let's say that just does not go into the gross

2   profit for a solution specialist or a store manager.

3   Zev then returns the case to the store.  Would the store

4   manager or the solution specialist be charged back

5   because the case was returned even though they didn't

6   receive -- even though it wasn't calculated in their

7   gross profit?  Does that question makes sense?

8       A.   Yeah.  To my knowledge, no.

9       Q.   Okay.

10      A.   Yeah.  So --

11      Q.   So it's only -- I'm sorry.  Go ahead.

12      A.   Yeah, I was just going to say, you know, a

13  store manager is held accountable for the assets within

14  the store; and on a monthly basis we do a

15  book-to-physical inventory count and if there is

16  shrinkage, we give the store an allowance of 3 1/2

17  percent of gross -- or cost of goods sold; and as long

18  as it's within that threshold, they're not penalized at

19  all.  If it exceeds that, then they will receive an

20  adjustment to their gross profit.

21      Q.   But I guess the one thing I wanted to kind of

22  clear up or make sure I was clear on is that Prime does

23  not charge back the solution specialist or the store

24  manager for returns on items that they never even got --

25      A.   Correct.

Case 5:12-cv-00069-H   Document 53-6   Filed 07/19/13   Page 6 of 7
360e3658-0b00-4584-8895-5b07be83f443

1  Q.  -- a commission for in the first place?

2  A.  That's correct.  That's correct.  To my

3  knowledge, yeah.

4  Q.  I just wanted to make sure that was clear.

5  A.  Yeah.

6  Q.  Okay.  Since there was a discrepancy.

7  A.  Right.

8  Q.  Or not a discrepancy but a discussion.

9  A.  Right.

10  Q.  Commissionable -- commissionable --

11  A.  Yeah, the basis of our plan is if we charge

12  someone back, we make every effort to, you know, ensure

13  that we charge them back what they were initially paid.

14        MR. WALKER:  All right.  No further

15  questions on that section.

16        MR. ANTELL:  Off the record just for a

17  second.

18        (Recess from 2:24 p.m. to 4:00 p.m.)

19        MR. WALKER:  Back on the record.  Both

20  witnesses will read and sign.

21        THE REPORTER:  Thank you.  That's the end

22  of the deposition.

23        (Deposition concluded at 4:00 p.m.)

24

25

Electronically signed by Audrey Waldrop (101-425-145-7819)        360a3636-0b00-4584-8895-5b07be83f443

* * *

Case 5:12-cv-00069-H   Document 53-6   Filed 07/19/13   Page 7 of 7

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

| | |
|---|---|
| ROSE LORENZO, | ) |
| Plaintiff; | ) |
| | ) |
| v. | ) |
| | ) |
| PRIME COMMUNICATIONS, L.P., | ) |
| Defendant. | ) |

---

DEPOSITION OF ROSE EMILY LORENZO

---

In Raleigh, North Carolina

Friday, December 14, 2012

Reported by Robbie W. Worley

Worley Reporting

P.O. Box 91447

Raleigh, NC 27675

919-870-8070



DEFENDANT'S EXHIBIT
7

1   A    It was something that I did because I wanted to

2           make sure that the sales were accurate and that I

3           was getting paid.

4   Q    Got you.

5   A    You know, and that my solution specialists were

6           getting paid what they should have been getting

7           paid, unless if they made a mistake.

8   Q    Got you.  And in reviewing those invoices, did you

9           ever find mistakes in what was put in RQ4 compared

10         to what was actually in POS?

11  A    I did.  Billy Moan had one mistake and we corrected

12         it that same day.

13  Q    Okay.  So your recollection is, there's -- you've

14         never let an invoice go to corporate that had a

15         mistake between RQ4 and POS?

16           MR. DUNN:  Objection.

17  Q    Is that correct?

18           MR. DUNN:  You may answer.

19  A    Yes, that's correct.

20  Q    Okay.  Assuming for hypothetical sake, I know you

21         said it didn't happen to you, but let's just say in

22         another store the information from RQ4 and POS got

23         to corporate and they were incorrect.  POS, it was

24         a $39.99 plan and RQ4 was a $59.99 plan.  Would you

97

1      agree that it would be in -- it would be acceptable

2      in your understanding of the chargeback policy for

3      Prime Communications to pay the employee the

4      commission for a $39.99 plan as opposed to the

5      $59.99 plan because the $39.99 plan was what was in

6      POS and what the customer has been paid?

7    A    That's correct.

8    Q    And do you recall when you were told about the

9          chargeback policy of Prime Communications?

10   A    I don't think I understood the chargeback policy

11         until I actually became a manager at Middle Creek.

12   Q    Uh-huh.

13   A    And I started when I got my first check as a

14         manager of Middle Creek.  I didn't even know where

15         to go to verify the commissions.  And I contacted

16         the district manager and said, "How do I verify

17         what I'm getting paid is actually what I should be

18         getting paid?"

19                  "Oh, you got to go to this site."

20                  "Well, how do I get access to it?"

21                  "You need to call the corporate office

22         and they will give."

23                  I called Crystal, who was my old manager

24         and said, "How do I get access to this?"  She made

98

1           a phone call to somebody at corporate and said,

2           she's a new manager, can you give her access?  And

3           I got access, right?

4    Q      Uh-huh.

5    A      And when I got that access, I discovered that I was

6           being charged for the previous manager's sales.

7           Sales that occurred prior to me even being employed

8           with Prime.  And I brought that to the district

9           manager's attention.  I brought that to the

10          regional manager's attention.  I took that to

11          corporate.  And the response I got was, you took

12          over the store, and this is how we do business.

13   Q      Do you know the amount of chargebacks that you were

14          charged back for the previous manager's sales?

15   A      Offhand, no, I don't know the exact dollar amount,

16          but it was a lot.

17   Q      Were you compensated for the previous manager's

18          sales?

19   A      No.

20   Q      Okay.  Then, how did -- to your understanding, how

21          were you only given the chargebacks and not credit

22          for the sales?

23   A      Because she got paid the sales prior to me even

24          being employed.  Those sales were paid to Amy, was

* * *

130

1    A    So if Billy or Suleika had a chargeback, then that

2         reflected off of the store, which ultimately was

3         what I would get paid off of.

4    Q    Basically, the store's net sales of all the sales

5         in the store, minus all the chargebacks for that

6         store, would be where you would get your

7         commissions off of; is that correct?

8    A    That's correct.

9    Q    Okay.  I want to kind of show you some exhibits and

10        just ask you some questions.  Let me show you one

11        that's been already marked in a previous deposition

12        as Exhibit 8.  This is a three-page document that

13        was marked by Mr. Butler at the deposition of Prime

14        Communications.  It's - and I will represent to

15        you, that I believe the first page -- all three

16        pages are a wage deduction authorization agreement.

17        They are the same -- reportedly the same agreement.

18        The first one is signed and then the next two are

19        just cleaner or more clear copies of the wage

20        deduction authorization agreement.  If you look on

21        the first page, the signature at the bottom that

22        looks like to me Rose E. Lorenzo; is that your

23        signature?

24   A    Yes, it is.

131

| | | |
|---|---|---|
| 1 | Q | Okay, and that date, October 20, 2009, would that |
| 2 | | be the date that you started employment as a |
| 3 | | solution specialist in the Fuquay-Varina store? |
| 4 | A | That would be the date that I went in and signed |
| 5 | | the paperwork, the W-4, the I-9, that stuff. |
| 6 | Q | All the other kind on employee paperwork and things |
| 7 | | of that nature? |
| 8 | A | That's correct. |
| 9 | Q | At the start of a hire. Did anyone go over this |
| 10 | | agreement with you? |
| 11 | A | No. |
| 12 | Q | Who made you sign this? |
| 13 | A | Crystal. |
| 14 | Q | Did you have a chance to read the document before |
| 15 | | you signed it? |
| 16 | A | I don't believe I did. I just believe that she |
| 17 | | said -- well, Jessie was there and Crystal, and |
| 18 | | this is your hiring packet that you need to sign |
| 19 | | these because we need this off to the corporate |
| 20 | | office today. |
| 21 | Q | Okay. |
| 22 | A | You know, so I just went through, filled out the W- |
| 23 | | 4, the I-9, and just signed the paperwork, and off |
| 24 | | they went. |

132

| | | |
|---|---|---|
| 1 | Q | And do you remember where you were when you signed |
| 2 | | these documents? |
| 3 | A | At the Fuquay store. |
| 4 | Q | Were you on the clock at the time? |
| 5 | A | No. |
| 6 | Q | Okay. They just asked you to come in and sign the |
| 7 | | stuff? |
| 8 | A | Yes. |
| 9 | Q | Did they give you as much time as you wanted to, to |
| 10 | | read over the documents and sign all the things |
| 11 | | that you needed to? |
| 12 | A | I just felt like a sense of urgency, like they |
| 13 | | needed to get this to corporate by a certain time |
| 14 | | in order to get me hired. |
| 15 | Q | Do you remember when they had to get it into |
| 16 | | corporate? |
| 17 | A | That day, before 4:00 or something. |
| 18 | Q | Do you remember when you came into the store? |
| 19 | A | Around 1:00, maybe. |
| 20 | Q | So, I guess you would have three hours to go over |
| 21 | | the documents if you needed to? |
| 22 | A | Possibly. |
| 23 | Q | And I can't remember if I asked you this. Did you |
| 24 | | ever actually read this statement or agreement? |

1  A     I don't believe that I actually -- I think I may

2        have skimmed over it.

3  Q     Have you ever read this agreement?

4  A     After the fact, yes, I have.

5  Q     When did you last read this agreement?

6  A     Maybe two years ago or a year ago.

7  Q     Okay.  If you look in the agreement at the top of

8        the page.  Look on the second page, it reads a

9        little easier.  First paragraph says, "I

10       understand --

11              MR. DUNN:  I'll object to that, that it

12       reads easier.

13              MR. WALKER:  Oh, that it reads easier.

14       Okay.  I was a little confused for a second.  Yeah,

15       I can agree that it doesn't read much easier.  No,

16       that's fine.  It's a good stab back at my attorney

17       comment from earlier.

18  Q    I'm going to start again at the top of the page.

19       It says, "I understand and agree that my employer,

20       Prime Communications, L.P. (The Company,) may

21       deduct money from my pay from time to time for

22       reasons that fall into the following categories up

23       to the maximum amount permitted by law per pay

24       period."  First of all, did I read that correctly?

134

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | As far as you can see on the page. |
| 3 | A | Yeah. |
| 4 | Q | Looking down on paragraph 8, it reads, "The |
| 5 | | postpaid and prepaid sales are subject to a 180-day |
| 6 | | deactivation deduction as are vertical commissions, |
| 7 | | both of which may be deducted from my pay when the |
| 8 | | company is informed of same." Have you ever had |
| 9 | | anyone explain to you what that paragraph means? |
| 10 | A | No. |
| 11 | Q | Have you ever asked anyone what that paragraph |
| 12 | | means? |
| 13 | A | Yes. |
| 14 | Q | Okay. And what would they say? |
| 15 | A | That means you're going to get charged back if the |
| 16 | | sale isn't valid. |
| 17 | Q | Okay. And is it your understanding from reading |
| 18 | | that paragraph that it's a 180-day deactivation |
| 19 | | period, as opposed to a 30-day activation period? |
| 20 | A | Yes, I understand that. |
| 21 | Q | Okay. Because I believe earlier we were talking |
| 22 | | about if there were returns or things in the 30- |
| 23 | | day period, that's when chargebacks would occur. |
| 24 | | That was your understanding. |

135

| | | |
|---|---|---|
| 1 | A | My understanding is that the client has 30 days to |
| 2 | | return the item, whether it's an accessory -- well, |
| 3 | | accessories was 14 days, but a phone.  If they |
| 4 | | wanted to cancel the line, it's within 30 days. |
| 5 | | They can't come back six months later -- |
| 6 | Q | Right. |
| 7 | A | -- and say, I want to cancel my -- I want to return |
| 8 | | this phone, six months later. |
| 9 | Q | What about like deactivation of certain add-ons or |
| 10 | | accessories -- not accessories, but -- |
| 11 | A | Features? |
| 12 | Q | Features, thank you.  That's the word I was looking |
| 13 | | for.  What about features, when could they |
| 14 | | deactivate those or take those off their plan? |
| 15 | A | Yes, a client could deactivate any feature, except |
| 16 | | for data from their plan at any time. |
| 17 | Q | Okay.  And so for instance, under this paragraph, |
| 18 | | if a person changed a feature within the 180-day |
| 19 | | window, that would affect your chargebacks or that |
| 20 | | would necessitate a chargeback to your commissions; |
| 21 | | is that correct? |
| 22 | A | It would if AT&T charged it back. |
| 23 | Q | Okay.  If they charged back Prime; is that correct? |
| 24 | A | That's correct. |

136

```
1   Q      Okay.  Do you know the agreement between Prime and
2          AT&T that they had about how far from the date of
3          sale, AT&T could charge back Prime for commissions?
4   A      I'm not privy to Prime's agreement with AT&T.
5   Q      Okay.  And this, I'm not trying to be a smart aleck
6          on this one, I just have to ask you a couple
7          questions that I'm not going to offend you.  I'm
8          trying not to offend you, but I have to ask them
9          just as basic things.
10  A      Okay.
11  Q      I'm assuming that -- you said you skimmed over
12         this, but there's nothing prohibiting you, you
13         could have read this when you signed this, correct?
14  A      That's correct.
15  Q      I mean, you can read and understand the English
16         language, I would assume, based on your education
17         and background, is that correct?
18  A      And Spanish as well.
19  Q      And Spanish as well, that's correct.  And the fact
20         that we've been talking here for a while.  Okay.
21         Thank you very much.
22         _____
23                (DEPOSITION EXHIBIT 9
24              MARKED FOR IDENTIFICATION)
```

* * *

Examination of Rose Emily Lorenzo
Rose Lorenzo v. Prime Communications, LP

1        that's causing the chargeback and how much that

2        charge back is. Is that correct?

3  A    That's correct.

4  Q    And that would be by month that the chargeback

5        occurred?

6  A    That's correct.

7  Q    Okay. So you can see that but what you're saying

8        is, there's no way for you to verify that that

9        chargeback actually occurred.

10  A    That's correct.

11  Q    Without the Social Security number.

12  A    That's correct. Or an accounting from Prime that

13        says, here's a report from AT&T that says this is

14        what you're being charged back.

15  Q    Okay.

16  A    Right? So since they're on the store level,

17        there's no report that says, AT&T charged Prime

18        back this and in essence we have to charge you

19        back. You can't -- there's no verification. And

20        especially when you're going back six months to a

21        sale, or a sale that you didn't even do. You know,

22        it's somebody else's sale and you're getting -- you

23        can't verify it.

24  Q    What would you want to verify it to, the person's

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| ROSE LORENZO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:12-cv-69-H |
| | ) | |
| PRIME COMMUNICATIONS, L.P., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## AFFIDAVIT OF SHEHZAD MOMIN

I, Shehzad Momin, being duly sworn, depose and say:

1.     I am over the age of eighteen and am competent to testify to the statements in this affidavit based on my personal knowledge.

2.     I am currently employed as the Commissions Analyst at Prime Communications, L.P.

3.     As a Commissions Analyst I am familiar with the POS and RQ4 system of Defendant Prime Communications, L.P.

4.     I was asked to investigate the background information regarding commissions and bonuses paid, as well as the reason for any refund or charge back associated with the invoices identified as MIDDLIN1379, MIDDLIN1360, and MIDDLIN924.

5.     Upon my review of information regarding MIDDLIN1379, I found that this was a refund invoice and that the feature with bill code TDSMT1 was entered into RQ4 but was not in entered into POS system on the customer's account. Essentially, this was a "phantom sale" that

1

never took place in AT&T POS; since the customer did not get activated, AT&T did not pay Prime, which therefore did not get credited to Gross Profit.

6.     For Invoice MIDDLIN1360, the phone on this invoice was exchanged for another phone; this exchange generated an increase of $74.99 in Gross Profit, which was credited to the employee. The feature bill code MSG4 is a family shared texting feature, which is only paid once by AT&T, since it applies to the customer's entire account, consisting of numerous phone numbers. This was essentially a duplicate of the feature that was already on the account, in this case added to one of the secondary lines on the account (i.e., the account already had a MSG4 family texting feature); therefore, AT&T did not pay Prime any commission for it, and therefore the employee earned no Gross Profit. The gross profit of $15.28 was paid for the cell phone case that was sold on this invoice.

7.     For invoice MIDDLIN924, a Gross Profit of $25.99 was registered for the phone sale, as well as a Gross Profit of $19.96 was registered for a feature with bill code VAD1. However, the feature with bill code ANIP6 was entered into RQ4 and not the POS system on the customer's account; this was another "phantom" sale that did not take place on AT&T POS and was not activated on the customer's line. Therefore, AT&T did not pay Prime for this bill code. Additionally, the feature with bill code MSG4 was not paid by AT&T for the same reason explained in the previous paragraph (re: Invoice MIDDLIN1360); therefore, there was no commission on that feature. Lastly, the auto-attach iPhone data feature is a non-commissionable feature: it was well known by employees that AT&T paid a flat commission to Prime for all iPhone sales, inclusive of the voice plan and any or all features; separate iPhone features were not commissionable by AT&T and generated zero additional Gross Profit.

Further Affiant sayeth not.

2

Signed this the 19th day of July, 2013.

_____
SHEHZAD MOMIN

STATE OF TEXAS
COUNTY OF _FORT BEND_

    I, a Notary Public of the County and State aforesaid, certify that SHEHZAD MOMIN personally appeared before me this the _19th_ day of July 2013, and signed the foregoing instrument voluntarily for the purposes expressed therein and certified under oath as to the truth of the matters contained therein.

    [SEAL]

_____
Notary Public
My Commission Expires: _3/7/17_

SHAHEEN RUSTOM
My Commission Expires
March 7, 2017

3

312561

# *Dispute/Conflicts Resolution Program*

      This Program includes all applicants, employees and former employees of Prime Communications (together referred to by the term "Employees"). Employees and Prime Communications (the "Company") recognize that differences may arise between them during or following the application/assignment/employment process, including any or all periods of employment with the Company and/or separation from employment, and that those differences may or may not be related to the application/assignment/employment process. Employees and the Company have agreed to settle any and all claims between them by this Dispute/Conflicts Resolution Program (hereafter referred to as "Program"), and have **waived their rights to bring a lawsuit against each other (including any right to a jury trial)** regarding any dispute, including, but not limited to claims pertaining to pay, benefits, personal injuries unrelated to job related illness or accidents, and claims of discrimination based upon race, color, religion, sex, national origin, age, disability, or retaliation under any federal, state or local statute or under the common law of any state, except for those specifically set forth below. The Employees and the Company believe that by agreeing to this procedure, they anticipate gaining benefits of a speedy, impartial, final, and binding dispute-resolution procedure.

## CLAIMS COVERED BY THE PROGRAM

      The Company and Employees have mutually consented to the resolution by arbitration of all claims or controversies ("claims"), past, present or future, in the event Mediation is not successful, whether or not arising out of the application for employment, assignment/ employment or the termination of Employee's assignment/employment that the Company may have against Employee or that Employee may have against any of the following: (1) the Company, (2) its officers, directors, employees, or agents in their capacity as such or otherwise, (3) the Company's parent, subsidiary, and affiliated entities, (4) the benefit plans or the plans' sponsors, fiduciaries, administrators, affiliates, and agents, and/or (5) all successors and assigns of any of them.

      The only claims that are arbitrable are those that, in the absence of this Agreement, could have been brought in a court of law under applicable state or federal law. The claims covered by this Agreement include, but are not limited to: claims for wages or other compensation due; claims for breach of any contract or covenant (express or implied); claims for personal injury ("tort claims"); claims for discrimination (including, but not limited to, race, sex, color, religion, national origin, age, disability, harassment of any nature prohibited by law, retaliation, work-related illnesses or injuries; claims for benefits (except claims under an employee benefit or pension plan that either (1) specifies that its claims procedure shall culminate in an arbitration procedure different from this one, or (2) is underwritten by a commercial insurer which decides claims); and claims for violation of any federal, state or other governmental law, statute, regulation, or ordinance, except claims excluded in the section of this Agreement entitled "Claims Not Covered by the Agreement."

      Except as otherwise provided in this Agreement, both the Company and its Applicants and Employees have agreed that neither of them shall initiate or prosecute any lawsuit or administrative action (other than an administrative charge of discrimination to the Equal

Employment Opportunity Commission, Texas Commission on Human Rights [or other State fair employment practice agency), or a similar local fair employment practices agency, or an administrative charge within the jurisdiction of the National Labor Relations Board] in any way related to any claim covered by this Agreement.


## CLAIMS NOT COVERED BY THE PROGRAM

Claims which Employees may have for unemployment compensation and workers' compensation benefits are not covered by this Agreement. Also not covered are claims by the Company for injunctive and/or other equitable relief for unfair competition and/or the use and/or unauthorized disclosure of trade secrets or confidential information, as to which either party may seek and obtain relief from a court or administrative agency of competent jurisdiction.


## MEDIATION

In the event that the Employee takes his/her complaint through the Program and is not satisfied with the decision of the Chief Operations Officer (COO), then within 10 days from the date of the decision of the COO, the Employee may ask for Mediation of the issue, whereby a neutral person selected jointly by the Employee and Company will hear the issue and try to get an agreement between the parties to resolve same. Employees will be required to pay no more than two weeks of regular pay toward the cost of the Mediator, and the Company shall pay the remaining costs. In the event that the parties reach an agreement to resolve the issue, then they shall put their agreement into writing. In the event that the parties are not able to agree, then the Employee may appeal the issue to Arbitration. The Company will be required to use the Program for any and all disputes with employees, except as noted above.

Any reference in this Program to the Company will be a reference also to all parent, subsidiary, and affiliated entities, all benefit plans, the benefit plans' sponsors, fiduciaries, administrators, affiliates, and all successors and assigns of any of them.


## TIME UNITS FOR COMMENCING ARBITRATION AND REQUIRED NOTICE OF ALL CLAIMS

The Company and Employees have agreed that either party must give written notice of any claim to the other party no later than the expiration of the statute of limitations (deadline for filing) that the law prescribes for the particular claim. Otherwise, the claim shall be void and deemed waived. The legal doctrines of tolling, equitable or otherwise, shall not apply to extend the time for bringing a claim covered by this Agreement. The parties understand that they are encouraged to give written notice of any claim as soon as possible after the event or events in dispute so that arbitration of any differences may take place promptly.

Written notice of an intention to arbitrate any claim against the Company, or its officers, directors, employees or agents, shall be sent to the **Human Resources Department**. Employees

will be given written notice of any claim brought against them by the Company at the last address provided in writing to the Company. The written notice shall identify and describe the nature of all claims asserted and the facts upon which such claims are based and the relief or remedy wanted by either party. The notice shall be sent to the other party by certified or registered mail, return receipt requested or by means of a written receipt to prove delivery. It is recognized that more than one Employee may proffer substantially similar claims against the Company and seek substantially similar relief. It is agreed that such claims may be brought together in one arbitration, but that class actions and any other form of collective action are prohibited, and **Employee waives his or her rights to bring such actions against the Company.**

Except as provided in this Program, the Federal Arbitration Act shall govern interpretation, enforcement, and all proceedings pursuant to any arbitration of any dispute between the parties. To the extent that the Federal Arbitration Act is inapplicable, state law pertaining to agreements to arbitrate shall apply.

## REPRESENTATION

Any party may be represented by an attorney or other representative selected by the party.

## DISCOVERY

Each party shall have the right to take the deposition of two individuals and any expert witness designated by another party; provided, however, if more than one Employee is involved in the arbitration, Company may be permitted two depositions with respect to each Employee. Each party also shall have the right to serve written interrogatories and requests for production of documents and for admissions to any party in accordance with the Federal Rules of Civil Procedure. The subpoena right specified below shall be applicable to discovery pursuant to this paragraph. Additional discovery may be had only where the arbitrator selected so orders.

## DESIGNATION OF WITNESSES

At least two weeks before the arbitration, the parties must exchange lists of witnesses, including any experts, together with copies of any opinions expert reports to be offered into evidence at the hearing. Copies of all exhibits intended to be used at the arbitration hearing shall be exchanged 10 days prior to the hearing.

## SUBPOENAS

Each party shall have the right to subpoena witnesses and documents for the arbitration, as well as documents relevant to the case from third parties.

## ARBITRATION PROCEDURES

The arbitration will be held under the auspices of the Judicial Arbitration & Mediation **Services/Endispute** ("J-A-M-S"), or any other service to which the parties agree, with the designation of the sponsoring organization to be made by the party who did not initiate the claim.

The Program provides that any arbitration shall be in accordance with the then-current J-A-M-S Employment Arbitration Rules or equivalent (if J-A-M-S is designated), or the applicable rules of any other service to which the parties mutually agree, but only to the extent that such rules do not conflict with any provisions of this Program. The arbitrator shall be either a retired judge, or an attorney who is experienced in employment law and licensed to practice law in the state in which the arbitration is convened (the "Arbitrator"). The arbitration shall take place in or near the city in which the Employee is or was last employed by the Company.

The Arbitrator shall be selected as follows: The service selected shall give each party a list of seven (7) arbitrators drawn from its panel of employment dispute arbitrators, who meet the parties' qualifications. Each party shall have ten (10) calendar days from the postmark date on the list to strike all names on the list it deems unacceptable. If only one common name remains on the lists of all parties, that individual shall be designated as the Arbitrator. If more than one common name remains on the lists of all parties, the parties shall strike names alternately from the list of common names until only one remains. The party who did not initiate the claim shall strike first. If no common name remains on the lists of all parties, the selected service shall furnish an additional list of seven (7) arbitrators from which the parties shall strike alternately, with the party initialing the claim striking first, until only one name remains. That person shall be designated as the Arbitrator.

The Arbitrator shall apply the substantive law including, but not limited to applicable statutes of limitations (and the law of remedies, if applicable) of the state in which the claim arose, or federal law, or both, as applicable to the claim(s) asserted. The Arbitrator is without jurisdiction to apply any different substantive law or law of remedies. The Arbitration Rules of Evidence shall apply. The Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable. The arbitration shall be final and binding upon the parties, except as provided in this Agreement.

The Arbitrator shall have jurisdiction to hear and rule on pre-hearing disputes and is authorized to hold pre-hearing conferences by telephone or in person, as the Arbitrator deems necessary. The Arbitrator shall have the authority to entertain a motion to dismiss and/or a motion for summary judgment by any party and shall apply the standards governing such motions under the Federal Rules of Civil Procedure and applicable federal common law. The arbitrator shall be paid an agreed upon hourly rate for the time spent reviewing and ruling on such motions and responses, and such fee shall be paid by the moving party unless otherwise ordered by the Arbitrator or otherwise required by law governing employment discrimination or other claims.

Either party, at its expense, may arrange for and pay the cost of a court reporter to provide a stenographic record of proceedings. Should any party refuse or neglect to appear for or participate in, the arbitration hearing, the Arbitrator shall have the authority to decide the dispute based upon whatever evidence is presented. Either party, upon request at the close of hearing, shall be given leave to file a post-hearing brief. The time for filing such a brief shall be set by the Arbitrator.

The Arbitrator shall render an award by written opinion in the form typically rendered in labor arbitrations no later than thirty (30) days from the date the arbitration hearing concludes or the post-hearing briefs (if applicable) are received, whichever is later. The opinion shall be in writing and include the factual and legal basis for the award.

Either party shall have the right within twenty (20) days of issuance of the Arbitrator's opinion, to file with the Arbitrator a motion to reconsider (accompanied by a supporting brief), and the other party shall have twenty (20) days from the date of the motion to respond. The Arbitrator thereupon shall reconsider the issues by the Motion and promptly issue a decision, which (except as provided by this Agreement) shall then be final and conclusive upon the parties. The costs of such a motion for reconsideration and written opinion of the Arbitrator shall be borne by the party prevailing on the motion, unless the Arbitrator orders otherwise or applicable law provides to the contrary.

## ARBITRATION FEES AND COSTS

The Company and Employee shall share any filing fees and the cost of the arbitration service, if any, and the Arbitrator's fee by Employee paying up to no more than one month of pay and the Company paying the balance. Each party shall pay for its own costs and attorneys' fees, if any; provided, however, that the Company shall pay up to $ 1,000.00 to any attorney employed by the Employee upon presentation of a statement for services from the attorney indicating time worked and hourly rate for consultation in connection with and during the arbitration process, irrespective of the results of the hearing. If any party prevails on a statutory claim, which affords the prevailing party attorneys' fees, or if there is a written agreement providing for fees, the Arbitrator may award reasonable fees to the prevailing party; however, in the event the claim is not a statutory claim which specifically affords the prevailing party attorney fees, then no attorney fees may be awarded. In the event the law of the jurisdiction in which the arbitration is held requires a different allocation of fees and costs in order for this Agreement to be enforceable, then such law shall be followed.

## JUDICIAL REVIEW

Either party may bring an action in any court of competent jurisdiction to compel arbitration under this Agreement and to enforce an arbitration award. A party opposing enforcement of an award may bring a separate action in any court of competent jurisdiction to set aside the award, where the standard of review will be the same as that applied by an appellate court reviewing a decision of a trial court sitting without a jury.

## REQUIREMENTS FOR MODIFICATION OR REVOCATION

This Agreement to arbitrate shall survive the termination of my assignment or employment and the expiration of any benefit. It can only be revoked or modified by a writing, which specifically states an intent to revoke or modify this Agreement.

## SOLE AND ENTIRE AGREEMENT

This is the complete Program on the subject of arbitration of disputes. This Program supersedes any prior or contemporaneous oral or written understandings on the subject. No party is relying on any representations, oral or written, on the subject of the effect, enforceability, or meaning of this Program, except as specifically set forth in this Program. All remaining provisions shall remain in full force and effect.

## CONSIDERATION

The agreement by the Company and by its Employees to first mediate and then arbitrate differences, rather than litigate them before courts or other bodies, provide full and adequate consideration for this Program.

## NOT AN EMPLOYMENT AGREEMENT

This Program does not, in any way, alter the "at-will" status of the Employee's assignment/employment; however, this Program is intended to be contractual in nature and enforceable by either party. Although this Program may be changed, altered, modified or cancelled by the Company, any disputes occurring prior to the effective date of the change, will be processed in accord with its provisions, which existed at the time. Any changes to the Program will be communicated to Employees on the Company's internal website.

## CONFIDENTIALITY

All parties agree to keep confidential and not to make any public disclosures concerning any claim for arbitration or the arbitration itself, except as may be required or allowed by law.

## SEVERABILITY

If any provision of this Agreement is determined to be void, invalid, unenforceable, or against public policy, such provision shall be deemed severable from this Agreement, and the remaining provisions of the Agreement will remain unaffected and in full force and effect.

## MISCELLANEOUS

**The Company, Applicants and Employees understand that this Program does <u>not</u> prevent the filing of a complaint with any governmental agency with respect to any claim covered by this Program; however, in the event that Employee files a lawsuit against the Company or any of its affiliated businesses or their supervisors and/or managers with respect to such a covered claim, it is understood and agreed that the Company will ask the court to dismiss such suit and to refer it to this Program, even if the dispute arises after Employee is no longer employed by the Company.**

This Program is effective as of August 1, 2006. Continued employment following this date means that Employees have accepted this Program.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

ROSE LORENZO, individually and on
behalf of others similarly situated,

Plaintiffs,

v.

Case No: 5:12-cv-00069-H

PRIME COMMUNICATIONS, L.P., a
Texas General Partnership,

Defendant.

## Declaration of Rose Lorenzo

I, Rose Lorenzo declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      My name is Rose Lorenzo. I am 52 years of age, suffer no mental disabilities, and am otherwise competent to make this Declaration. I have personal knowledge of the information contained in this Declaration, and I give this Declaration of my own free will.

2.      I was employed by Prime Communications, L.P. ("Prime") from October 24, 2009 to June 17, 2011, and served in several capacities as a Prime employee.

3.      I was initially hired as a Sale Associate at Prime's Fuquay location, but after three (3) months in that position, I was asked to take a Store Manager position at another Raleigh area location.

4.      I became a manager of the Middle Creek Commons store on February 10, 2010, and remained in that position until I left Prime in June 2011.

5.     While at Prime I was presented and/or allowed access to an Employee Handbook which stated in pertinent part that:

> In the event that you are not satisfied with the results of the Mediation, then you may appeal the matter to *the Arbitration in accord with the Dispute/Conflict Resolution Program*. The results of the Arbitration will be final and binding upon all parties. Employee understands that if he/she chooses to accept employment or to continue employment with Prime Communications after the set date forth below, Employee agrees to all provisions of the *Dispute/Conflicts Resolutions Program*. (emphasis added).

6.     Though the Employee Handbook specifically references a "Dispute/Conflicts Resolution Program" which calls for employment claims to be subject to arbitration proceedings governed pursuant to a specific underlying "Dispute/Conflicts Resolutions Program," I was never provided a copy of any document outlining the same, nor was I informed of the Program's contents.

7.     When I asked for a more detailed explanation or further documentation of the arbitration program, I was directed to the Employee Handbook and told that was the only information Prime had regarding the Dispute/Conflicts Resolutions Program.

8.     The result is that I never knew what the terms of arbitration were before or after I signed the document.  The Employee Handbook also states that I was provided an opportunity to discuss the Program with counsel.  However, I was not provided the program until years after I was given (access to) the Employee Handbook and therefore never had a chance to discuss the matter with counsel at that time.

9.     The first time the terms of the purportedly applicable "Dispute/Conflicts Resolutions Program" were made available to me was during this litigation after my attorneys requested the same from Prime's counsel following Prime's Motion to Compel Arbitration.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 22 day of July, 2013 in the City of Raleigh, North Carolina.

Rose Lorenzo

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

ROSE LORENZO, individually and on
behalf of others similarly situated,

        Plaintiffs,

           Case No: 5:12-cv-00069-H

v.

PRIME COMMUNICATIONS, L.P., a
Texas General Partnership,

        Defendant.

## Declaration of Guy Rodriguez

I, Guy Rodriguez declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.    My name is Guy Rodriguez. I am 42 years of age, suffer no mental disabilities, and am otherwise competent to make this Declaration. I have personal knowledge of the information contained in this Declaration, and I give this Declaration of my own free will.

2.    I was employed by Prime Communications, L.P. ("Prime") from November 1, 2010 to April 2011, and served in several capacities as a Prime employee.

3.    I was initially hired as a Store Manager at Prime's Holly Springs location and worked there until I terminated my employment in April 2011.

4.    While at Prime I was presented and/or allowed access to an Employee Handbook which stated in pertinent part that:

> In the event that you are not satisfied with the results of the Mediation, then you may appeal the matter to ***the Arbitration in accord with the Dispute/Conflict Resolution***

*Program*. The results of the Arbitration will be final and binding upon all parties. Employee understands that if he/she chooses to accept employment or to continue employment with Prime Communications after the set date forth below, Employee agrees to all provisions of the ***Dispute/Conflicts Resolutions Program***. (emphasis added).

5.      Though the Employee Handbook specifically references a "Dispute/Conflicts Resolution Program" which calls for employment claims to be subject to arbitration proceedings governed pursuant to a specific underlying "Dispute/Conflicts Resolutions Program," I was never provided a copy of any document outlining the same, nor was I informed of the Program's contents.

6.      The result is that I never knew what the terms of arbitration were before or after I signed the document. The Employee Handbook also states that I was provided an opportunity to discuss the Program with counsel. However, I was not provided the program until years after I was given (access to) the Employee Handbook and therefore never had a chance to discuss the matter with counsel at that time.

7.      The first time the terms of the purportedly applicable "Dispute/Conflicts Resolutions Program" were made available to me was during this litigation after my attorneys requested the same from Prime's counsel following Prime's Motion to Compel Arbitration.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 22 day of July, 2013 in the City of Raleigh, North Carolina.

Guy Rodriguez

Payroll Cycle Summary

Pay Period 06/30 - 07/13

| Region | Location | NE [DISTRIBUTE] 44.5 RSC-IHE-Box | STEPS 4 & 5 (ACTUALS AND REVIEW) RSC Actuals Total Worked | Variance | RSM Actuals (Hourly) Worked | RSM Actuals (Salaried) Worked | Count RSC | Count RSM (Hourly) | Count RSM (Sal) | Bi-weekly HRS/RSC | HRS/RSM (Hourly) | HRS/RSM (Sal) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CAR | AIR Callanbridge Commons (S) | 70 | 155 | 85 | 0 | 0 | 2 | 0 | 0 | 78 | | |
| CAR | AIR Denver (S) | 135 | 154 | 19 | 0 | 86 | 2 | 0 | 1 | 77 | | 86 |
| CAR | AIR Elmsley Square (S) | 135 | 187 | 52 | 86 | 0 | 3 | 1 | 0 | 62 | 86 | |
| CAR | AIR Kernersville (S) | 265 | 246 | -19 | 0 | 113 | 3 | 0 | 1 | 82 | | 113 |
| CAR | AIR Quaker Village (S) | 135 | 156 | 21 | 94 | 0 | 2 | 1 | 0 | 78 | 94 | |
| CAR | AIR Sanford (S) | 135 | 204 | 69 | 0 | 71 | 3 | 0 | 1 | 68 | | 71 |
| CAR | Battleground (S) | 135 | 69 | -66 | 0 | 94 | 1 | 0 | 1 | 69 | | 94 |
| CAR | Center Point (S) | 135 | 151 | 16 | 0 | 90 | 2 | 0 | 1 | 75 | | 90 |
| CAR | Concord (S) | 135 | 206 | 71 | 0 | 100 | 3 | 0 | 1 | 69 | | 100 |
| CAR | Cotswold Village (S) | 135 | 75 | -60 | 0 | 0 | 2 | 0 | 0 | 38 | | |
| CAR | Crabtree Valley Mall (K) | 200 | 151 | -49 | 0 | 99 | 2 | 0 | 1 | 75 | | 99 |
| CAR | Dunn (S) | 70 | 87 | 17 | 1 | 0 | 3 | 1 | 0 | 29 | 1 | |
| CAR | Falls Point (S) | 70 | 152 | 82 | 0 | 0 | 2 | 0 | 0 | 76 | | |
| CAR | Fuquay Crossings (S) | 200 | 164 | -36 | 0 | 83 | 2 | 0 | 1 | 82 | | 83 |
| CAR | Greenville - CAR (S) | 70 | 149 | 79 | 85 | 0 | 2 | 0 | 0 | 74 | 85 | |
| CAR | Hartsville (S) | 200 | 230 | 30 | 0 | 87 | 3 | 0 | 1 | 77 | | 87 |
| CAR | Holly Springs Crossing (S) | 70 | 78 | 8 | 0 | 0 | 1 | 0 | 1 | 78 | | 0 |
| CAR | Jacksonville (S) | 70 | 154 | 84 | 17 | 0 | 2 | 1 | 0 | 77 | 17 | |
| CAR | Kingspoint (S) | 135 | 135 | 0 | 0 | 88 | 2 | 0 | 1 | 67 | | 88 |
| CAR | Lenoir (S) | 135 | 58 | -77 | 0 | 85 | 1 | 0 | 1 | 58 | | 85 |
| CAR | Marion (S) | 200 | 158 | -42 | 0 | 92 | 3 | 0 | 1 | 53 | | 92 |
| CAR | Maynard Crossing (S) | 135 | 245 | 110 | 82 | 0 | 3 | 0 | 0 | 82 | | |
| CAR | McCrimmon (S) | 135 | 51 | -84 | 0 | 113 | 1 | 0 | 1 | 51 | | 113 |
| CAR | New Bern (S) | 135 | 63 | -72 | 70 | 0 | 1 | 1 | 0 | 63 | 70 | |
| CAR | Oleander (S) | 135 | 167 | 32 | 0 | 103 | 2 | 0 | 1 | 83 | | 103 |
| CAR | Palmetto Pavilion (S) | 135 | 81 | -54 | 0 | 100 | 2 | 0 | 1 | 40 | | 100 |
| CAR | Pyramid Village (S) | 190 | 181 | -9 | 0 | 89 | 2 | 0 | 1 | 90 | | 89 |
| CAR | Reidsville (S) | 135 | 116 | -19 | 0 | 90 | 2 | 0 | 1 | 58 | | 90 |
| CAR | Rocky Mount (S) | 70 | 79 | 9 | 93 | 0 | 1 | 0 | 0 | 79 | 93 | |
| CAR | Smithfield (S) | 200 | 181 | -19 | 0 | 137 | 3 | 0 | 1 | 60 | | 137 |
| CAR | Southpoint Mall (I) | 265 | 199 | -66 | 36 | 0 | 3 | 1 | 0 | 66 | 36 | |
| CAR | Wake forest (S) | 70 | 79 | 9 | 98 | 0 | 1 | 1 | 0 | 79 | 98 | |
| CAR Total | 32 | 4440 | 4559 | 119 | 663 | 1719 | 67 | 6 | 19 | 68 | 74 | 90 |

**Payroll Cycle Summary**

**NE (DISTRIBUTE)** — **STEPS 4 & 5 (ACTUALS AND REVIEW)** — **Bi-weekly**

Pay Period 07-14 - 07/27

| Region | Location | RSC HR Box (44.5) | RSC Actuals Total Worked | Variance | RSM Actuals (Hourly) Worked | RSM Actuals (Salaried) Worked | RSC (Count) | RSM (Hourly) (Count) | RSM (Sal) (Count) | HRS/RSC | HRS/RSM (Hourly) | HRS/RSM (Sal) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CAR | AIR Cullabridge Commons (S) | 70 | 165 | 95 | 0 | 0 | 2 | 0 | 0 | 83 | | |
| CAR | AIR Denver (S) | 135 | 154 | 19 | 0 | 99 | 2 | 0 | 0 | 77 | | 99 |
| CAR | AIR Elmsley Square (S) | 135 | 123 | -12 | 99 | 0 | 2 | 1 | 0 | 62 | 99 | |
| CAR | AIR Kernersville (S) | 265 | 320 | 55 | 0 | 93 | 4 | 0 | 1 | 80 | | 93 |
| CAR | AIR Quaker Village (S) | 135 | 72 | -63 | 108 | 0 | 1 | 0 | 0 | 72 | 108 | |
| CAR | AIR Sanford (S) | 135 | 217 | 82 | 0 | 68 | 3 | 0 | 1 | 72 | | 68 |
| CAR | Battleground (S) | 135 | 66 | -69 | 0 | 95 | 1 | 0 | 1 | 66 | | 95 |
| CAR | Center Point (S) | 135 | 154 | 19 | 0 | 86 | 2 | 0 | 1 | 77 | | 86 |
| CAR | Concord (S) | 135 | 236 | 101 | 0 | 102 | 3 | 0 | 1 | 79 | | 102 |
| CAR | Colswold Village (S) | 135 | 82 | -53 | 0 | 0 | 2 | 1 | 0 | 41 | 101 | |
| CAR | Crabtree Valley Mall (K) | 200 | 152 | -48 | 101 | 92 | 2 | 0 | 1 | 76 | | 92 |
| CAR | Dunn (S) | 70 | 243 | 173 | 0 | 0 | 3 | 1 | 0 | 81 | 0 | |
| CAR | Falls Point (S) | 70 | 171 | 101 | 102 | 0 | 3 | 0 | 0 | 57 | 102 | |
| CAR | Fuquay Crossings (S) | 200 | 123 | -77 | 0 | 99 | 2 | 1 | 0 | 61 | | 99 |
| CAR | Greenville - CAR (S) | 70 | 157 | 87 | 0 | 0 | 2 | 0 | 0 | 79 | | |
| CAR | Hartsville (S) | 200 | 233 | 33 | 0 | 90 | 3 | 0 | 1 | 78 | | 90 |
| CAR | Holly Springs Crossing (S) | 70 | 76 | 6 | 0 | 89 | 1 | 0 | 0 | 76 | | 89 |
| CAR | Jacksonville (S) | 70 | 150 | 80 | 98 | 0 | 3 | 1 | 1 | 75 | 98 | |
| CAR | Kingspoint (S) | 135 | 147 | 12 | 0 | 59 | 2 | 0 | 1 | 74 | | 59 |
| CAR | Lenoir (S) | 135 | 75 | -60 | 0 | 90 | 1 | 0 | 1 | 75 | | 90 |
| CAR | Marion (S) | 200 | 210 | 10 | 0 | 95 | 3 | 0 | 1 | 70 | | 95 |
| CAR | Maynard Crossing (S) | 135 | 243 | 108 | 24 | 88 | 3 | 0 | 0 | 81 | | 88 |
| CAR | McCimmon (S) | 135 | 78 | -57 | 0 | 0 | 2 | 0 | 1 | 39 | | |
| CAR | New Bern (S) | 135 | 26 | -109 | 81 | 0 | 1 | 1 | 0 | 26 | 81 | |
| CAR | Oleander (S) | 135 | 164 | 29 | 0 | 101 | 2 | 0 | 1 | 82 | | 101 |
| CAR | Palmetto Pavilion (S) | 135 | 137 | 2 | 0 | 100 | 2 | 0 | 1 | 69 | | 100 |
| CAR | Pyramid Village (S) | 190 | 242 | 52 | 0 | 94 | 3 | 0 | 1 | 81 | | 94 |
| CAR | Reidsville (S) | 135 | 150 | 15 | 0 | 90 | 2 | 0 | 1 | 75 | | 90 |
| CAR | Rocky Mount (S) | 70 | 79 | 9 | 90 | 0 | 1 | 1 | 0 | 79 | 90 | |
| CAR | Smithfield (S) | 200 | 195 | -5 | 0 | 101 | 3 | 0 | 1 | 65 | | 101 |
| CAR | Southpoint Mall (I) | 265 | 165 | -100 | 90 | 0 | 2 | 1 | 0 | 82 | 90 | |
| CAR | Wake forest (S) | 70 | 79 | 9 | 0 | 0 | 1 | 0 | 0 | 79 | | |
| **CAR Total** | **32** | **4440** | **4886** | **446** | **793** | **1771** | **68** | **9** | **19** | **72** | **88** | **91** |

Stephen Martin

1    Q.    Sure.    Well, I'll represent to you if you look

2    back at the answer, it says:    "Please see as attached as

3    Exhibit H an Excel spreadsheet that is similar to the

4    one used by Prime management to analyze hours budgeted,"

5    ya-da, ya-da, ya-da.

6    A.    Yeah.

7    Q.    Do you know what document this is similar to?

8    A.    Yeah, this is similar to the one that they use

9    on -- that comes out from the sales ops and other

10   leadership that helps give them guidance on the hours

11   that they need to staff.

12   Q.    And do you know how long that document's been

13   kept?

14   A.    Again, I think it fluctuates on a quarterly

15   basis.    So it's probably in the e-mail system.    But,

16   again, I can't speak to how far back they've done this.

17   Q.    Okay.

18   A.    I can just speak over the past year that it's

19   what they've done.

20   Q.    Okay.    Okay.    RSM actual hours worked, where

21   does that come from?

22   A.    That's straight out of RQ4.

23   Q.    Okay.    So why would the hours worked of the

24   sales consultants come from payroll but the hours

25   worked --

1          MR. WALKER:  "Count."

2     Q.   (By Mr. Antell)  "Count."  Okay.

3     A.   Yeah.

4     Q.   Yeah, my copy's just not -- and where does that

5  come from?  What is that, first of all?

6     A.   That is a -- again a spreadsheet formula that

7  converts the number that says "RSC Hours."  So it's a

8  manual just formula calculation.

9     Q.   Okay.  And so is this column, "Count RSC," is

10  that a goal, or is that the actual?

11     A.   That is the goal.

12     Q.   Okay.  Okay.  The next column, does that say

13  "Count Email"?

14     A.   That says "RSM Hours Actual."

15     Q.   And then above it, what does it say?

16     A.   I can't tell you.

17     Q.   You can't tell.

18          MR. ANTELL:  Bo, can you tell?

19          MR. WALKER:  Yeah, can I clear -- can we

20  go off the record for two seconds just so it's not on

21  the record.

22          MR. ANTELL:  Yeah, sure.

23          (Discussion off the record.)

24          MR. WALKER:  Back on the record.  Just to

25  be clear up some discrepancies or some wording on this

32

1  Exhibit 33, but starting from left to right reading

2  after the location, Zev, I'll represent to you that my

3  understanding of this document is the first column is

4  "RSC HR Box" which has been previously identified as the

5  projected or the budgeted hours worked by all solution

6  specialists at the store location.

7     The next box is "Total Work," is the actual hours

8  worked by solution specialists.  Right above that it

9  should read "RSC Actuals," which is kind of hard to

10  read.

11     And then "Variance," as the witness described, is

12  the difference between the actual work and the budgeted.

13     The next column would be the RSM actuals for hourly

14  store managers at that time.  "RSM" stands for store

15  manager.  And "Worked" will be the number of hours

16  worked by an hourly store manager as classified at that

17  time.

18     The next column would be RSM actuals for a salaried

19  manager, which is how many hours are worked by a

20  salaried store manager that are clocked in at that time.

21     And then continuing on in the graph, it reads "Count

22  RSC" would be just the number count of the number of

23  store -- or, excuse me, the number of solution

24  specialists who worked in the store during given -- the

25  during -- during the given pay period.

Electronically signed by Audrey Waldrop (101-425-145-7819)          488          7a01d285-e04a-4410-8e74-6eb45ca589ee

1    My mouth's getting tied up.

2    The next box would be the count of regional -- or

3  not regional, RSM store managers who are hourly

4  employees at that time during that same time period.

5    The next column would be the number of the count of

6  the RSM of salaried store managers at that given time.

7    And then the next three boxes just basically break

8  down the biweekly averages, hours worked by a sales

9  associate, hours worked by a hourly store manager, and

10  the hours worked per week -- or, excuse me, per pay

11  period of the store manager who's salaried.

12    And so that hopefully will clarify the boxes on the

13  top for you since they're hard to read.

14           MR. ANTELL:  One thing I would just

15  interject.  I think you said that this would be the

16  hourly -- this third column from the right you said

17  would be the hourly average for sales associates.

18           MR. WALKER:  For a week.

19           MR. ANTELL:  That would be total; is that

20  correct, or were individual sales associates working 90

21  hours a week?

22           MR. WALKER:  That's per -- well, it was

23  per associate per two weeks.

24           MR. ANTELL:  So --

25           MR. WALKER:  So, for instance, the 78 in

1 the first column?

2          MR. ANTELL:  Yeah, yeah.

3          MR. WALKER:  Or mine says 78.  I don't

4 know if we're on the same page.

5          MR. ANTELL:  Well, on a biweekly basis?

6          MR. WALKER:  On a biweekly basis.

7          MR. ANTELL:  Okay.  That's fine.  That --

8          MR. WALKER:  It's two solution specialists

9 working 78 hours over a two-week period on average.

10          MR. ANTELL:  On average.  That makes --

11          MR. WALKER:  For a store, for that store.

12          MR. ANTELL:  That makes perfect sense.

13 Okay.

14     Q.   (By Mr. Antell)  And it looks like -- I'm not

15 super familiar with the North Carolina geography, but I

16 believe that all of these stores are -- these stores

17 listed here, are these all North Carolina?  Is that

18 correct or no?

19     A.   These look like North Carolina primarily, yes.

20     Q.   Well, if you look at the rest of the exhibit, I

21 mean, it looks like we see the same stores over and over

22 again.  There's more store -- Prime has more stores than

23 what's listed here; is that correct?

24     A.   Yes.

25          MR. WALKER:  Could you clear up?  More

Electronically signed by Audrey Waldrop (101-425-145-7819)          490          7a01d285-e04a-4410-8e74-6eb45ca589ee

1  stores where, in North Carolina?

2           MR. ANTELL:  More stores total.

3           MR. WALKER:  Okay.

4      Q.   (By Mr. Antell)  I believe that this is

5  exclusively listed for North Carolina.

6      A.   Correct.

7      Q.   Do you know if there's some sort of data

8  limitation where Prime only keeps data from North

9  Carolina?

10     A.   No, we keep data at all our locations.

11     Q.   Okay.  Do you believe a report like this could

12 be run for every location?

13     A.   I -- I can't speak to that because I don't know

14 how they put this together.  So we'd have to talk to the

15 individual that put it together.

16     Q.   Do you know of any reason why a report like

17 this could not be run for every location?

18     A.   I -- I -- I don't know what it took to -- to

19 run this report.

20     Q.   Sure.

21     A.   It's not a standard report.

22     Q.   Uh-huh.

23     A.   So, therefore, I'm not sure all that it took to

24 get to this point.

25     Q.   And I'm not committing you --

Electronically signed by Audrey Waldrop (101-425-145-7819)      **491**      ★ ★ ★
7a01d285-e04a-4410-8e74-6eb45ca589ee

Stephen Martin

1    Q.   -- on a periodic basis?

2    A.   Yes, they do.

3          MR. ANTELL:  Okay.  All right.  Let me see

4  here.  That may be it.  Let me just check.

5    Q.  (By Mr. Antell)  If you'd turn to -- and I

6  apologize for having you go around.  Maybe I'll just

7  find and I can show it to you.  It's in Exhibit C of 32.

8    A.   Uh-huh.

9    Q.   It's towards the back.  Hang on.  Let me find

10  it first, and then I'll --

11         MR. WALKER:  Exhibit C was the job

12  descriptions that we looked at earlier?

13         MR. ANTELL:  Yeah.  Yeah, I thought there

14  was one for RSC; but there may not be.  I thought there

15  was.  We can go off the record.

16         (Discussion off the record.)

17         MR. ANTELL:  Back on the record.  You

18  know, I can't find it.

19    Q.  (By Mr. Antell)  If I had seen somewhere

20  documentation that indicated that an RSC position had a

21  35-hour-a-week requirement, does that sound reasonable

22  to you?

23    A.   I have personally seen the 32- and 30-hour.  I

24  have not seen a 35.

25    Q.   Okay.

Electronically signed by Audrey Waldrop (101-425-145-7819)    492    7a01d285-e04a-4410-8e74-6eb45ca589ee

Stephen Martin

1   A.   I don't know specifically for that one-to-two.

2   Q.   Uh-huh.

3   A.   But I know one-to-two plus.  It's in excess of

4   about 80 percent of our stores right now.

5   Q.   Well, I believe you testified earlier that

6   one-to-two is sort of the goal.

7   A.   Yeah, uh-huh.

8   Q.   I guess my question is then sort of:  How many

9   stores are fitting sort of that goal, or do you know

10  offhand sort of a percentage of stores that -- and

11  understanding --

12  A.   Yeah.

13  Q.   Understanding that, you know, you may have some

14  stores that are running at temporary one-to-one but

15  they're stores that generally speaking are the

16  one-to-two.

17  A.   That one-to-two is usually about 60 percent of

18  our business, if not more.  And then the others are

19  one-to-three, one-to-four, one-to-five; and then they

20  would make up the remaining difference.

21          MR. ANTELL:  Okay.  Great.  That's all the

22  questions I have.

23          MR. WALKER:  Okay.  No further questions.

24  You want to take a break before we go to --

25          MR. ANTELL:  Yeah, let me take a quick

Electronically signed by Audrey Waldrop (101-425-145-7819)          7a01d285-e04a-4410-8e74-6eb45ca589ee

| Agent Code | IMEI | Action Date | Contract Name | Action Type | SIM | BAN |
|---|---|---|---|---|---|---|
| W8467 | 01235000124727 | 11/3/2010 | CAR_RATE_PLAN | Disconnect | 8901410324336007408 | 000053401206424 |
| W8467 | 35608802707569 | 11/14/2010 | CAR_RATE_PLAN | Disconnect | 8901410324336007411 | 000053409046817 |
| W8467 | 01214800924786 | 11/7/2010 | CAR - PAY AS YOU GO | Disconnect | 8901410423250989992 | 000053409115933 |
| W8467 | 35982301390953 | 11/8/2010 | CAR_RATE_PLAN_2_YR | Connect | 8901410524335372615 | 000053409851159 |
| W8467 | 35557503137179 | 11/5/2010 | CAR_RATE_PLAN_2_YR | Connect | 8901410524335372616 | 000053409046817 |
| W8467 | 35982301544463 | 11/9/2010 | CAR_RATE_PLAN_2_YR | Connect | 8901410524335372614 | 000053401949089 |
| W8467 | 01214100650670 | 11/22/2010 | CAR_RATE_PLAN_2_YR | Connect | 8901410524322465003 | 000053409905490 |
| W8467 | 35982301161615 | 11/22/2010 | CAR_RATE_PLAN_2_YR | Connect | 8901410524322465004 | 000053409905490 |
| W8467 | 35859503356952 | 11/22/2010 | CAR_RATE_PLAN_2_YR | Connect | 8901410524322465005 | 000053409905490 |
| W8467 | 35349004701158 | 11/28/2010 | CAR_RATE_PLAN_2_YR | Connect | 8901410524322465008 | 000053409925975 |
| W8467 | 35349104340415 | 11/19/2010 | CAR_RATE_PLAN_2_YR | Connect | 8901410424381941577 | 000053402828908 |
| W8467 | 35349104344758 | 11/11/2010 | CAR_RATE_PLAN_2_YR | Connect | 8901410424381941571 | 000053408284896 |
| W8467 | 35627101934105 | 11/11/2010 | CAR_RATE_PLAN_2_YR | Connect | 8901410524335372611 | 000053409863365 |
| W8467 | 35349004670592 | 11/29/2010 | CAR_RATE_PLAN_2_YR | Connect | 8901410524322465010 | 000053409553463 |
| W8467 | 35190402202621 | 11/20/2010 | CAR_RATE_PLAN_2_YR | Connect | 8901410424381941578 | 000053402003845 |
| W8467 | 35242604133616 | 11/19/2010 | CAR_RATE_PLAN_2_YR | Connect | 8901410524335372609 | 000053409892385 |
| W8467 | 35190402369415 | 11/22/2010 | CAR_RATE_PLAN_2_YR | Connect | 8901410524322465006 | 000053409905490 |
| W8467 | 35349104337078 | 11/28/2010 | CAR_RATE_PLAN_2_YR | Connect | 8901410524322465007 | 000053409925975 |
| W8467 | 01226700328579 | 11/6/2010 | IPHONE_NEW | Feature Add | | 14396566 |
| W8467 | 01161400098316 | 11/18/2010 | IPHONE_NEW | Feature Add | | 53401744134 |
| W8467 | 11111111111111 | 11/20/2010 | CAR_PAY_AS_YOU_GO | Connect | 8901410424381941574 | 000053409897057 |
| W8467 | 11111111111111 | 11/10/2010 | CAR_PAY_AS_YOU_GO | Connect | 8901410524335372613 | 000053409860084 |
| W8467 | 35338804153867 | 11/15/2010 | CAR_PAY_AS_YOU_GO | Connect | 8901410423366772856 | 000053409878734 |
| W8467 | 35349004643900 | 11/2/2010 | CAR_STD_UPGRADE | Feature Add | 8901410424363160573 | 000053401545125 |
| W8467 | 35190402020919 | 11/16/2010 | CAR_STD_UPGRADE | Feature Add | 8901410312284631539 | 000053408354942 |
| W8467 | 01235000052470 | 11/4/2010 | CAR_STD_UPGRADE | Feature Add | 8901410321208009253 | 000053401701735 |
| W8467 | 01225200367257 | 11/22/2010 | CAR_EXC_UPGRADE | Feature Add | 8901410324317672912 | 000053402003845 |
| W8467 | 35190402239048 | 11/20/2010 | CAR_EXC_UPGRADE | Feature Add | 8901410423304557572 | 000053408354942 |
| W8467 | 35982301489009 | 11/29/2010 | CAR_STD_UPGRADE | Feature Add | 8901410223242200441 | 000053402489433 |
| W8467 | 35242604133523 | 11/26/2010 | CAR_STD_UPGRADE | Feature Add | 8901410212216555029 | 000053401633744 |
| W8467 | 35349104846381 | 11/19/2010 | CAR_STD_UPGRADE | Feature Add | 8901410321239071336 | 000053402145303 |
| W8467 | 35393204130871 | 11/16/2010 | CAR_STD_UPGRADE | Feature Add | 8901410421230251730 | 000053402693402 |

| Agent Code | IMEI | Action Date | Contract Name | Action Type | SIM | BAN |
|---|---|---|---|---|---|---|
| W8467 | 358595034945193 | 11/29/2010 | CAR_STD_UPGRADE | Feature Add | 89014104200990624500 | 00005340018783403 |
| W8467 | 012141006506511 | 11/26/2010 | CAR_STD_UPGRADE | Feature Add | 89014104243819415809 | 00005340026090947 |
| W8467 | 012252003628818 | 11/18/2010 | NA_STD_UPGRADE | Feature Add | 89014104211434252733 | 00000000602799511 |
| W8467 | 012423005831706 | 11/17/2010 | IPHONE_QUAL_UPG | Feature Add | | 534029691514 |
| W8467 | 015400064779605 | 11/22/2010 | IPHONE_QUAL_UPG | Feature Add | | 534021056673 |
| W8467 | 012543005419861 | 11/18/2010 | IPHONE_QUAL_UPG | Feature Add | | 534023521773 |
| W8467 | 012263003647955 | 11/4/2010 | IPHONE_QUAL_UPG | Feature Add | | 534017233659 |
| W8467 | | 11/3/2010 | CAR_FEATURE | Feature Backout | | 534026517385 |
| W8467 | | 11/3/2010 | CAR_FEATURE | Feature Renewal Backout | | 534017020824 |
| W8467 | | 11/14/2010 | CAR_FEATURE | Feature Backout | | 534090468174 |
| W8467 | | 11/3/2010 | CAR_FEATURE | Feature Backout | | 534026517385 |
| W8467 | | 11/3/2010 | CAR_FEATURE | Feature Backout | | 534026517385 |
| W8467 | | 11/1/2010 | CAR_FEATURE | Feature Backout | | 534026934024 |
| W8467 | | 11/17/2010 | CAR_FEATURE | Feature Backout | | 534029645997 |
| W8467 | | 11/22/2010 | CAR - FEA COMP | Feature Backout | | 534092761635 |
| W8467 | | 11/26/2010 | CAR_FEATURE_DWN | Feature Backout | | 534084147102 |
| W8467 | | 11/8/2010 | CAR - FEA COMP | Feature Backout | | 534016283817 |
| W8467 | | 11/22/2010 | CAR - FEA COMP DWN | Feature Backout | | 534027221846 |
| W8467 | | 11/6/2010 | CAR_FEATURE_DWN | Feature Backout | | 534028884637 |
| W8467 | | 11/8/2010 | CAR_FEATURE | Feature Backout | | 534016283817 |
| W8467 | | 11/22/2010 | CAR - FEA COMP | Feature Backout | | 534027221846 |
| W8467 | | 11/18/2010 | CAR_FEATURE | Feature Add | | 534028100714 |
| W8467 | | 11/6/2010 | NA_FEATURE | Feature Add | | 143965666 |
| W8467 | | 11/11/2010 | CAR_FEATURE | Feature Add | | 534098633654 |
| W8467 | | 11/22/2010 | CAR_FEATURE | Feature Add | | 534099054900 |
| W8467 | | 11/22/2010 | CAR_FEATURE | Feature Add | | 534099054900 |
| W8467 | | 11/22/2010 | CAR_FEATURE | Feature Add | | 534099054900 |
| W8467 | | 11/22/2010 | CAR_FEATURE | Feature Add | | 534099054900 |
| W8467 | | 11/20/2010 | CAR_FEATURE | Feature Add | | 534022038458 |
| W8467 | | 11/19/2010 | CAR_FEATURE | Feature Add | | 534021453031 |
| W8467 | | 11/29/2010 | CAR_FEATURE | Feature Add | | 534018783403 |
| W8467 | | 11/11/2010 | CAR_FEATURE | Feature Add | | 534082834967 |
| W8467 | | 11/19/2010 | CAR_FEATURE | Feature Renewal Add | | 534021453031 |

| Agent Code | IMEI | Action Date | Contract Name | Action Type | SIM | BAN |
|---|---|---|---|---|---|---|
| W8467 | | 11/26/2010 | CAR_FEATURE | Feature Renewal Add | | 534026090947 |
| W8467 | | 11/4/2010 | CAR_FEATURE | Feature Add | | 534017233659 |
| W8467 | | 11/19/2010 | CAR_FEATURE | Feature Add | | 534028289089 |
| W8467 | | 11/20/2010 | CAR_FEATURE | Feature Add | | 534023211005 |
| W8467 | | 11/16/2010 | CAR_FEATURE | Feature Add | | 534026934024 |
| W8467 | | 11/28/2010 | CAR_FEATURE | Feature Add | | 534099259752 |
| W8467 | | 11/28/2010 | CAR_FEATURE | Feature Add | | 534099259752 |
| W8467 | | 11/2/2010 | CAR_FEATURE | Feature Add | | 534015451255 |
| W8467 | | 11/29/2010 | CAR_FEATURE | Feature Add | | 534095534637 |
| W8467 | | 11/18/2010 | CAR_FEATURE | Feature Add | | 534017441345 |
| W8467 | | 11/17/2010 | CAR_FEATURE | Feature Renewal Add | | 534029691514 |
| W8467 | | 11/20/2010 | CAR_FEATURE | Feature Add | | 534020038458 |
| W8467 | | 11/29/2010 | CAR_FEATURE | Feature Add | | 534024894331 |
| W8467 | | 11/19/2010 | CAR_FEATURE | Feature Add | | 534098923851 |
| W8467 | | 11/26/2010 | CAR_FEATURE | Feature Add | | 534016337444 |
| W8467 | | 11/22/2010 | CAR_FEATURE | Feature Add | | 534099054900 |
| W8467 | | 11/28/2010 | CAR_FEATURE | Feature Add | | 534099259752 |
| W8467 | | 11/2/2010 | CAR_FEATURE | Feature Renewal Add | | 534015451255 |
| W8467 | | 11/16/2010 | CAR_FEATURE | Feature Renewal Add | | 534083549420 |
| W8467 | | 11/23/2010 | UV_INTERNET | Affiliate Add | | 26245702 |
| W8467 | | 11/23/2010 | UV_INTERNET | Affiliate Add | | 9196616763 |

| Bill Code | | Bill Code Descr | Ref Bill Code | | Reconnect Date | Disconnect Date | Init Svc Date | Bc Isd | Commissionable Value |
|---|---|---|---|---|---|---|---|---|---|
| CN1NM0A60 | S | NTN450RUMM5KNW | 39.99 CN1NM0A60 | S | | 11/3/2010 | 10/23/2010 | 10/26/2010 | -165.00 |
| FN3NM0A60 | S | FT9NTN1400RUMMUNW | 9.99 FN3NM0A60 | S | | 11/14/2010 | 10/26/2010 | 10/26/2010 | -165.00 |
| GPA1 | S | RETIRE Flat Rate | | | | 11/7/2010 | 5/12/2010 | 5/12/2010 | -35.00 |
| CN1NM0A60 | S | NTN450RUMM5KNW | 39.99 CN1NM0A60 | S | | | 11/8/2010 | 11/8/2010 | 165.00 |
| FN3NM0A60 | S | FT9NTN1400RUMMUNW | 9.99 FN3NM0A60 | S | | | 11/5/2010 | 11/5/2010 | 165.00 |
| FN2NM0A60 | S | FT9NTN700RUMMUNW | 9.99 FN2NM0A60 | S | | | 11/9/2010 | 11/9/2010 | 165.00 |
| FN3NM0A60 | S | FT9NTN1400RUMMUNW | 9.99 FN3NM0A60 | S | | | 11/22/2010 | 11/22/2010 | 165.00 |
| FN3NM0A60 | S | FT9NTN1400RUMMUNW | 9.99 FN3NM0A60 | S | | | 11/22/2010 | 11/22/2010 | 165.00 |
| FN3NM0A60 | S | FT9NTN1400RUMMUNW | 9.99 FN3NM0A60 | S | | | 11/22/2010 | 11/22/2010 | 165.00 |
| FN3NM0A60 | S | FT9NTN1400RUMMUNW | 9.99 FN3NM0A60 | S | | | 11/28/2010 | 11/28/2010 | 165.00 |
| FN3NM0A60 | S | FT9NTN1400RUMMUNW | 9.99 FN3NM0A60 | S | | | 11/19/2010 | 11/19/2010 | 165.00 |
| CN1NM0A60 | S | NTN450RUMM5KNW | 39.99 CN1NM0A60 | S | | | 11/11/2010 | 11/11/2010 | 165.00 |
| CN3NM0A60 | S | NTN900RUMMUNW | 59.99 CN3NM0A60 | S | | | 11/11/2010 | 11/11/2010 | 200.00 |
| FN9NM0A61 | S | FTNTNUNLIMITED | 49.99 FN9NM0A61 | S | | | 11/29/2010 | 11/29/2010 | 200.00 |
| FN3NM0A60 | P | FT9NTN1400RUMMUNW | 80.00 FN3NM0A60 | P | | | 11/20/2010 | 11/20/2010 | 275.00 |
| CN9NM0A61 | | NTNUNLIMITED | 69.99 CN9NM0A61 | | | | 11/19/2010 | 11/19/2010 | 275.00 |
| FN3NM0A60 | P | FT9NTN1400RUMMUNW | 80.00 FN3NM0A60 | P | | | 11/22/2010 | 11/22/2010 | 275.00 |
| FN3NM0A60 | P | FT9NTN1400RUMMUNW | 80.00 FN3NM0A60 | P | | | 11/28/2010 | 11/28/2010 | 275.00 |
| 4APLNEW2 | E | iPhone 3G New Activation | | | | | 11/6/2010 | 11/6/2010 | 400.00 |
| 4APLNEW2 | E | iPhone 3G New Activation | | | | | 11/18/2010 | 11/18/2010 | 400.00 |
| GP01 | S | $.10 SIMPLE PLAN | | | | | 11/20/2010 | 11/20/2010 | 35.00 |
| GP01 | S | $.10 SIMPLE PLAN | | | | | 11/10/2010 | 11/10/2010 | 35.00 |
| GP03 | S | $2 DAILY TLK/TXT | | | | | 11/15/2010 | 11/15/2010 | 35.00 |
| UPGT | F | Upgrade Fee | 80.00 GACFN3NM0A60P | D | | | 7/18/2009 | 11/2/2010 | 275.00 |
| UPGT | F | Upgrade Fee | 80.00 GACFN3NM0A60P | D | | | 10/28/2009 | 11/16/2010 | 275.00 |
| UPGT | F | Upgrade Fee | 60.00 GACGF12XXX3WP | D | | | 8/8/2008 | 11/4/2010 | 200.00 |
| XCPT | F | Upgrade Exception | 9.99 GACFN3NM0A60S | D | | | 7/10/2008 | 11/22/2010 | 130.00 |
| XCPT | F | Upgrade Exception | 9.99 GACFN3NM0A60S | D | | | 11/6/2009 | 11/20/2010 | 130.00 |
| UPGT | F | Upgrade Fee | 9.99 GACNFT5XX6WS | D | | | 6/17/2006 | 11/29/2010 | 165.00 |
| UPGT | F | Upgrade Fee | 39.99 GACC5M1XXX1W | D | | | 10/10/2001 | 11/26/2010 | 165.00 |
| UPGT | F | Upgrade Fee | 9.99 GACD01FXXX2WS | D | | | 10/8/2007 | 11/19/2010 | 165.00 |
| UPGT | F | Upgrade Fee | 9.99 GACFN2NM0A60S | D | | | 2/17/2009 | 11/16/2010 | 165.00 |

| Bill Code | | Bill Code Descr | Ref Bill Code | | Disconnect Date | Reconnect Date | Init Svc Date | Bc Isd | Value |
|---|---|---|---|---|---|---|---|---|---|
| UPGT | F | Upgrade Fee | 9.99 GACNP45XXX6WS D | | | | 9/13/2006 | 11/29/2010 | 165.00 |
| UPGT | F | Upgrade Fee | 14.99 GACNF21XX6WS D | | | | 7/30/2005 | 11/26/2010 | 165.00 |
| UPGT | F | Upgrade Fee | 69.99 NWSCN9NM00A61 D | | | | 12/6/2006 | 11/18/2010 | 275.00 |
| 4APLQUPGT | E | iPhone 3G Qualified Upgrade | | | | | 4/9/2005 | 11/17/2010 | 400.00 |
| 4APLQUPGT | E | iPhone 3G Qualified Upgrade | | | | | 10/12/2004 | 11/22/2010 | 400.00 |
| 4APLQUPGT | E | iPhone 3G Qualified Upgrade | | | | | 5/11/2004 | 11/18/2010 | 400.00 |
| 4APLQUPGT | E | iPhone 3G Qualified Upgrade | | | | | 8/17/2007 | 11/4/2010 | 400.00 |
| MSG4 | P F | FAMILY MSG UNLIMITED | 30.00 MSG4 P F | | | | 6/3/2005 | 10/7/2010 | -60.00 |
| MSG4 | P F | FAMILY MSG UNLIMITED | 30.00 MSG4 P F | | | | 9/21/2007 | 9/4/2010 | -60.00 |
| TDBB2 | F | DATAPRO 2GB BB | 25.00 TDBB2 F | | | | 10/26/2010 | 10/26/2010 | -50.00 |
| DTAU | F | FAMILY DATA UNLIMITD | 10.00 DTAU F | | | | 10/2/2010 | 10/2/2010 | -20.00 |
| DTAU | F | FAMILY DATA UNLIMITD | 10.00 DTAU F | | | | 6/3/2005 | 10/2/2010 | -20.00 |
| DTAU | F | FAMILY DATA UNLIMITD | 10.00 DTAU F | | | | 4/16/2008 | 8/21/2010 | -20.00 |
| MSGINTL | F | INTL_LD_MSG_100 | 10.00 MSGINTL F | | | | 1/27/2005 | 8/19/2010 | -20.00 |
| MSG1 | F | MESSAGING 200 | 5.00 MSG1 F | | | | 6/20/2010 | 6/20/2010 | -15.00 |
| FA02 | F | AT&T FamilyMap | 14.99 FA02 F | | | | 9/8/2010 | 9/8/2010 | -14.99 |
| VAD1 | F | VOICEDIAL *8 | 4.99 VAD1 F | | | | 6/27/2005 | 6/16/2010 | -14.97 |
| FA01 | F | AT&T FamilyMap | 9.99 FA01 F | | | | 7/5/2005 | 6/15/2010 | -9.99 |
| AN02 | F | NAVIGATOR UNL DATA | 9.99 AN02 F | | | | 7/15/2009 | 7/21/2010 | -9.99 |
| CRS | F | Roadside Assistance | 2.99 CRS F | | | | 6/27/2010 | 6/16/2010 | -8.97 |
| CRS | F | Roadside Assistance | 2.99 CRS F | | | | 7/5/2005 | 6/15/2010 | -8.97 |
| SLW1 | F | Smart Limit/Wireless | 4.99 SLW1 F | | | | 4/6/2009 | 11/18/2010 | 9.98 |
| MSG1 | F | MESSAGING 200 | 5.00 MSG1 F | | | | 11/6/2010 | 11/6/2010 | 10.00 |
| MSG1 | F | MESSAGING 200 | 5.00 MSG1 F | | | | 11/11/2010 | 11/11/2010 | 10.00 |
| DTAU | F | FAMILY DATA UNLIMITD | 10.00 DTAU F | | | | 11/22/2010 | 11/22/2010 | 20.00 |
| DTAU | F | FAMILY DATA UNLIMITD | 10.00 DTAU F | | | | 11/22/2010 | 11/22/2010 | 20.00 |
| DTAU | F | FAMILY DATA UNLIMITD | 10.00 DTAU F | | | | 11/22/2010 | 11/22/2010 | 20.00 |
| DTAU | F | FAMILY DATA UNLIMITD | 10.00 DTAU F | | | | 11/22/2010 | 11/22/2010 | 20.00 |
| DTAU | F | FAMILY DATA UNLIMITD | 10.00 DTAU F | | | | 11/15/2009 | 11/20/2010 | 20.00 |
| TDSBB1 | F | DATAPLUS 200MB BB | 15.00 TDSBB1 F | | | | 10/8/2007 | 11/22/2010 | 20.00 |
| MN21 | F | DATA UNLIMITED | 15.00 MN21 F | | | | 9/13/2006 | 11/29/2010 | 30.00 |
| TDSBB1 | F | DATAPLUS 200MB BB | 15.00 TDSBB1 F | | | | 11/11/2010 | 11/11/2010 | 30.00 |
| MSG3 | F | MESSAGING UNLIMITED | 20.00 MSG3 F | | | | 10/8/2007 | 11/19/2010 | 60.00 |

| Bill Code | | Bill Code Descr | Ref Bill Code | | Reconnect Date | Disconnect Date | Init Svc Date | Bc Isd | Value |
|---|---|---|---|---|---|---|---|---|---|
| MSG3 | F | MESSAGING UNLIMITED | 20.00 MSG3 | F | | | 7/30/2005 | 11/26/2010 | 40.00 |
| MSG3 | F | MESSAGING UNLIMITED | 20.00 MSG3 | F | | | 8/17/2007 | 11/4/2010 | 40.00 |
| TDBB2 | F | DATAPRO 2GB BB | 25.00 TDBB2 | F | | | 10/8/2008 | 11/19/2010 | 50.00 |
| IPB3 | F | DATAPRO 2GB IP | 25.00 IPB3 | F | | | 10/27/2006 | 11/20/2010 | 50.00 |
| TDBB2 | F | DATAPRO 2GB BB | 25.00 TDBB2 | F | | | 2/17/2009 | 11/16/2010 | 50.00 |
| TDBB2 | F | DATAPRO 2GB BB | 25.00 TDBB2 | F | | | 11/28/2010 | 11/28/2010 | 50.00 |
| TDBB2 | F | DATAPRO 2GB BB | 25.00 TDBB2 | F | | | 11/28/2010 | 11/28/2010 | 50.00 |
| TDBB2 | F | DATAPRO 2GB BB | 25.00 TDBB2 | F | | | 7/18/2009 | 11/2/2010 | 50.00 |
| TDBB2 | F | DATAPRO 2GB BB | 25.00 TDBB2 | F | | | 11/29/2010 | 11/29/2010 | 50.00 |
| MSG4 P | F | FAMILY MSG UNLIMITED | 30.00 MSG4 P | F | | | 10/31/2005 | 11/18/2010 | 60.00 |
| MSG4 P | F | FAMILY MSG UNLIMITED | 30.00 MSG4 P | F | | | 4/9/2005 | 11/17/2010 | 60.00 |
| MSG4 P | F | FAMILY MSG UNLIMITED | 30.00 MSG4 P | F | | | 11/20/2010 | 11/20/2010 | 60.00 |
| MSG4 P | F | FAMILY MSG UNLIMITED | 30.00 MSG4 P | F | | | 6/17/2006 | 11/29/2010 | 60.00 |
| MSGD | F | MESSAGING + DATA UNL | 30.00 MSGD | F | | | 11/19/2010 | 11/19/2010 | 60.00 |
| MSGD | F | MESSAGING + DATA UNL | 30.00 MSGD | F | | | 10/10/2001 | 11/26/2010 | 60.00 |
| MSG4 P | F | FAMILY MSG UNLIMITED | 30.00 MSG4 P | F | | | 11/22/2010 | 11/22/2010 | 60.00 |
| MSG4 P | F | FAMILY MSG UNLIMITED | 30.00 MSG4 P | F | | | 11/28/2010 | 11/28/2010 | 60.00 |
| MSG4 P | F | FAMILY MSG UNLIMITED | 30.00 MSG4 P | F | | | 7/18/2009 | 11/2/2010 | 60.00 |
| MSG4 P | F | FAMILY MSG UNLIMITED | 30.00 MSG4 P | F | | | 10/28/2009 | 11/16/2010 | 60.00 |
| HDXTR6C | | HSI-Direct Xtreme 6.0 | 47.95 HDXTR6C | | | | | | 125.00 |
| HDXTR6C | | HSI-Direct Xtreme 6.0 | 47.95 HDXTR6C | | | | | | 125.00 |

| Non-Commissionable SPIFs | Non-Commissionable Bonus | Non-Commissionable $40 VAB | Non-Commissionable $15 Spif | Non-Commissionable $20/$25 Spif | Non-Commissionable $30 FT Spif | Non-Commissionable $20 Signage Spif | Non-Commissionable $75 SPIF |
|---|---|---|---|---|---|---|---|
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | -20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 35.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 35.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 35.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 35.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 35.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 35.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

| SPIFs | Bonus | $40 VAB | $15 Spif | $20/$25 Spif | $30 FT Spif | $20 Signage Spif | $75 SPIF |
|---|---|---|---|---|---|---|---|
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | -4.99 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | -2.99 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

| SPIFs | Bonus | $40 VAB | $15 Spif | $20/$25 Spif | $30 FT Spif | $20 Signage Spif | $75 SPIF |
|---|---|---|---|---|---|---|---|
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

| Non-Commissionable | Location |
|---|---|
| 0.00 | Georgia Carolinas |
| 0.00 | Georgia Carolinas |
| 0.00 | Georgia Carolinas |
| 15.00 | Georgia Carolinas |
| 15.00 | Georgia Carolinas |
| 15.00 | Georgia Carolinas |
| 15.00 | Georgia Carolinas |
| 15.00 | Georgia Carolinas |
| 15.00 | Georgia Carolinas |
| 15.00 | Georgia Carolinas |
| 15.00 | Georgia Carolinas |
| 15.00 | Georgia Carolinas |
| 15.00 | Georgia Carolinas |
| 15.00 | Georgia Carolinas |
| 15.00 | Georgia Carolinas |
| 15.00 | Georgia Carolinas |
| 15.00 | Georgia Carolinas |
| 15.00 | Georgia Carolinas |
| 0.00 | Georgia Carolinas |
| 0.00 | Georgia Carolinas |
| 0.00 | Georgia Carolinas |
| 0.00 | Georgia Carolinas |
| 0.00 | Georgia Carolinas |
| 15.00 | Georgia Carolinas |
| 15.00 | Georgia Carolinas |
| 15.00 | Georgia Carolinas |
| 0.00 | Georgia Carolinas |
| 0.00 | Georgia Carolinas |
| 15.00 | Georgia Carolinas |
| 15.00 | Georgia Carolinas |
| 15.00 | Georgia Carolinas |
| 15.00 | Georgia Carolinas |

| | Location | |
|---|---|---|
| 15.00 | Georgia Carolinas | |
| 15.00 | Georgia Carolinas | |
| 0.00 | Georgia Carolinas | |
| 0.00 | Georgia Carolinas | |
| 0.00 | Georgia Carolinas | |
| 0.00 | Georgia Carolinas | |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |

| | Location | |
|---|---|---|
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |
| 0.00 | Georgia Carolinas | #REF! |